# Exhibit A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**OCTOBER 2022**

E-Filing Number: 2210047535

**002134**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| JOHN K.A. DOE | THE UNIVERSITY OF THE ARTS |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| TWO LIBERTY SOUTH 50 SOUTH 16TH STREET SUITE 1700 PHILADELPHIA PA 19102 | 320 SOUTH BROAD STREET PHILADELPHIA PA 19102 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | KATHRYN DONOVAN |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 803 MCCABE AVENUE WILMINGTON DE 19802 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | DANIEL DUNN |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 3 WINTERBERRY PLACE DELRAN NJ 08075 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 3 | ☒ Complaint  ☐ Petition Action  ☐ Notice of Appeal ☐ Writ of Summons  ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less ☒ More than $50,000.00 | ☐ Arbitration ☒ Jury ☐ Non-Jury ☐ Other: | ☐ Mass Tort ☐ Savings Action ☐ Petition | ☐ Commerce ☐ Minor Court Appeal ☐ Statutory Appeals | ☐ Settlement ☐ Minors ☐ W/D/Survival |

| CASE TYPE AND CODE |
|---|
| 2O - PERSONAL INJURY - OTHER |

| STATUTORY BASIS FOR CAUSE OF ACTION |
|---|
| |

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? YES        NO |
|---|---|---|

**FILED PRO PROTHY**

OCT **25** 2022

**I. LOWELL**

### TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: JOHN K.A. DOE

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| MELISSA FRY HAGUE | THE JOEL BIEBER FIRM TWO LIBERTY PLACE 50 S. 16TH STREET, SUITE 1700 PHILADELPHIA PA 19102 |

| PHONE NUMBER | FAX NUMBER |
|---|---|
| (804)409-3440 | none entered |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 202850 | MHAGUE@JOELBIEBER.COM |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| MELISSA FRY HAGUE | Tuesday, October 25, 2022, 11:15 am |

**THE JOEL BIEBER FIRM**
BY:   MELISSA FRY HAGUE
       MICHAEL R. MANARA
IDENTIFICATON NOs. 202850, 318343
TWO LIBERTY PLACE
50 SOUTH 16th STREET
SUITE 1700
PHILADELPHIA, PA 19102
(215) 999-9183



*Filed and Attested by the
Office of Judicial Records
25 OCT 2022 11:15 am
I. LOWELL*

ATTORNEY FOR PLAINTIFF

| | |
|---|---|
| **JOHN K.A. DOE,**<br><br>              *Plaintiff,*<br>       vs.<br><br>**THE UNIVERSITY OF THE ARTS**<br>320 South Broad Street<br>Philadelphia, PA 19102;<br><br>**KATHRYN DONOVAN**<br>803 McCabe Avenue<br>Wilmington, DE, 19802;<br><br>**DANIEL DUNN**<br>3 Winterberry Place<br>Delran, NJ, 08075;<br><br>**JOHN DOES 1-5, INDIVIDUALS**<br><br>              *Defendants.* | **PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS**<br><br><br>**OCTOBER TERM, 2022**<br><br>**DOCKET No.:**<br><br><br>**JURY OF 12 DEMANDED**<br><br>**THIS IS NOT AN ARBITRATION<br>MATTER** |

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff.  You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR | Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las páginas siguientes, tiene veinte (20) dias, a partir de recibir esta demanda y la notificatión para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted. Sea avisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir culquier otra demanda o alivio solicitados por el demandante. Usted puede perder dinero o propiedad u otros derechos importantes para usted.<br><br>USTED DEBE LLEVAR ESTE DOCUMENTO A SU |

1

| | |
|---|---|
| LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.<br><br>IF YOU CANNEOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.<br><br>PHILADELPHIA BAR ASSOCIATION LAWYER REFERRAL AND INFORMATION SERVICE<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-1701 | ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PARGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL.<br><br>ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.<br><br>SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS  REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.<br><br>ASSOCIACION DE LICENDIADOS DE FILADELFIA SERVICO DE REFERENCA E INFORMACION LEGAL<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telefono: (215) 238-1701 |

Case ID: 221002134

**THE JOEL BIEBER FIRM**
BY:    MELISSA FRY HAGUE
         MICHAEL R. MANARA
IDENTIFICATON NOs. 202850, 318343
TWO LIBERTY PLACE
50 SOUTH 16th STREET
SUITE 1700
PHILADELPHIA, PA 19102
(215) 999-9183


*Filed and Attested by the*
*Office of Judicial Records*
*25 OCT 2022 11:15 am*
*I. LOWELL*

ATTORNEY FOR PLAINTIFF

| | |
|---|---|
| **JOHN K.A. DOE,**<br><br>                    *Plaintiff,*<br>     vs.<br><br>**THE UNIVERSITY OF THE ARTS**<br>320 South Broad Street<br>Philadelphia, PA 19102;<br><br>**KATHRYN DONOVAN**<br>803 McCabe Avenue<br>Wilmington, DE, 19802;<br><br>**DANIEL DUNN**<br>3 Winterberry Place<br>Delran, NJ, 08075;<br><br>**JOHN DOES 1-5, INDIVIDUALS**<br><br>                    *Defendants.* | **PHILADELPHIA COUNTY**<br>**COURT OF COMMON PLEAS**<br><br><br><br>**DOCKET No.:**<br><br><br>**JURY OF 12 DEMANDED**<br><br>**THIS IS NOT AN ARBITRATION**<br>**MATTER** |

## COMPLAINT

John K.A. Doe ("Plaintiff") through his undersigned counsel files this civil complaint against Defendants, The University of the Arts ("UArts" and/or "The University"), its employees/faculty members, Kathryn Donovan ("Donovan") and Daniel Dunn ("Dunn"), jointly and/or severally, separate sums in excess of Fifty Thousand Dollars ($50,000) in damages, upon causes of action whereof the following are true and accurate statements:

Case ID: 221002134

## NATURE OF THE ACTION

1.      This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts and omissions of Dunn, Donovan, UArts, and their respective employees, representatives, and agents relating to sexual assault, abuse and nonconsensual touching and harassment by Defendant Dunn.

2.      Plaintiff, a former student at UArts, seeks damages against defendants UArts and Donovan for their failure to properly handle Plaintiff's Title IX complaint after his professor, Defendant Daniel Dunn, sexually assaulted him in violation of UArts' Title IX policy on sexual misconduct, sexual violence, and sexual harassment.  Defendants UArts and Donovan failed to follow the University's Sexual and Gender-Based Violence, Discrimination, Exploitation, Stalking and Harassment Policy ("The Policy").  Having the power, authority and responsibility to act, Defendants failed Plaintiff, by showing deliberate indifference towards sexual assault perpetuated by a University professor when Defendant Donovan failed to immediately report Plaintiff's complaint to the Title IX Coordinator, lied to Plaintiff about drafting a statement for his review, mislead Plaintiff to believe the Title IX process was underway when, in truth, Donovan had not taken any action, and lied to Plaintiff about terminating the employment of Defendant Dunn.

3.      Plaintiff seeks relief for abuse and assault that occurred as a result of the negligence and failures of all Defendants and each and every Defendant is liable. Having the power, authority and responsibility to act, Defendants failed Plaintiff by showing deliberate indifference to sexual assault perpetuated by a professor on students, fostering an environment of abusive activity towards students, failing to institute corrective measures to protect students from assault and abuse, failing to investigate, train, oversee, monitor and supervise professors, employees, and agents, including but not limited to Defendant Dunn, failing to have a competent and trained Title IX

2

Case ID: 221002134

Coordinator, as required by law, failing to respond to complaints of sexual abuse, and/or actively defending and covering up abuse, all at the expense of Plaintiff.

4.     Plaintiff seeks damages against Defendant Dunn for engaging in non-consensual sexual contact when Defendant Dunn performed oral sex on Plaintiff, John K.A. Doe, while Plaintiff was incapacitated an unable to provide consent and, as a result, subsequently infecting Plaintiff with Syphilis.

## THE PARTIES

5.     Plaintiff is an adult male resident of the state of California.

6.     Defendant, University of the Arts is a private institution of higher learning and incorporated as an educational institution in the Commonwealth of Pennsylvania.  The University is a corporation with a principal address of 320 South Broad Street, Philadelphia, PA 19102.  It holds itself out as the only institution of its kind in the nation offering programs in design, fine arts, media arts, crafts, music, dance, theater, and writing.

7.     At all times material hereto, UArts, purposefully established significant contacts in the County of Philadelphia, Commonwealth of Pennsylvania, and has carried out, and continues to carry out substantial, continuous, and systematic business and educational activities in the County of Philadelphia, Commonwealth of Pennsylvania.

8.     UArts receives federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

9.     At all times material hereto, Defendant, UArts, operated by and through its authorized agents, servants, employees, officers, and/or faculty members who were acting within the course and scope of their employment, authority, agency, and/or faculty membership at UArts.

3

10.     Defendant Kathryn Donovan is a resident of the State of Delaware residing at 803 McCabe Avenue, Wilmington, DE, 19802.

11.     At all times material hereto, Defendant Donovan was a professor, faculty member, adjunct, instructor, and/or head of the Musical Theater Department of The Brind School of Theater at The University.

12.     At all times material hereto, Defendant Donovan was an employee, agent, and/or representative of Defendant UArts and was acting within the scope of her employment and/or agency with UArts.

13.     Defendant Daniel Dunn is a resident of the State of New Jersey residing at 3 Winterberry Place, Delran, NJ, 08075.

14.     At all times material hereto, Defendant Dunn was a professor, faculty member, adjunct, and/or instructor in the Musical Theater Department of The Brind School of Theater at The University.  Defendant Dunn had been a professor, faculty member, adjunct and/or instruction with The University since 2016.

15.     At all times material hereto, Defendant Dunn was an employee, agent, and/or representative of Defendant UArts and was acting within the scope of his employment and/or agency with UArts.

16.     At all times material hereto, Defendants John Does 1-5 were individuals who were acting in their capacity as officers, principal officers, agents, servants, employees, and/or faculty members of Defendant, UArts.

## STATEMENT OF FACTS

## THE SEXUAL ASSAULT

4

Case ID: 221002134

17.     Plaintiff John K.A. Doe enrolled in the four-year Musical Theater Bachelor of Fine Arts degree program, The Brind School of Theater at the University of the Arts in the fall of 2018 as a freshman.

18.     At all times material hereto, Defendant Donovan was the Head of the Musical Theater Program in The Brind School of Theater at The University.

19.     After successfully completing his first year in the musical theater program, Plaintiff started the fall 2019 semester as a sophomore.

20.     In the fall of 2019, as part of the required curriculum, Plaintiff enrolled in a yearlong class called Jazz Dance Practice which was taught by Defendant Dunn.

21.     Upon information and belief, in or around December 2019, Defendant Dunn and Plaintiff began communicating on an online platform, Instagram, through "liking" and "commenting" on each other's Instagram posts.

22.     Upon information and belief, in or around January or February 2020, Defendant Dunn invited Plaintiff to meet him at his theater company located in Philadelphia, Pennsylvania.

23.     Upon information and belief, in or around January or February 2020, Plaintiff met Defendant Dunn in the evening hours at his theater company.  Upon arrival at Defendant Dunn's theater company, Plaintiff was greeted by Defendant Dunn who provided, supplied, and/or served Plaintiff, who was not legal drinking age, with alcohol.  Plaintiff and Defendant Dunn did not engage in any sexual contact.

24.     Upon information and belief, after the social visit at Defendant Dunn's theater company, Defendant Dunn invited Plaintiff to his home located in Philadelphia, Pennsylvania.

5

25.     Upon information and belief, in or around February or March of 2020 Plaintiff met Defendant Dunn at his residence in Philadelphia, Pennsylvania.  During that social visit Defendant Dunn provided, supplied, and/or served Plaintiff alcohol.

26.     Upon information and belief, while at Defendant Dunn's residence, during a discussion about the film The Wizard of Oz, Defendant Dunn invited Plaintiff into his bedroom to watch a movie.  Defendant Dunn turned on the movie The Wizard of Oz.  Defendant Dunn continued to provide, supply, and serve Plaintiff alcohol the entire evening.  Plaintiff blacked out while watching the movie and lost consciousness.  Plaintiff was in and out of consciousness and unable to control his faculties.  Plaintiff recalls Defendant Dunn taking his shirt off, which made Plaintiff feel uncomfortable and nervous but he wasn't able to remain conscious.  Plaintiff recalls briefly regaining consciousness and seeing the movie The Wizard of Oz on the television and seeing Defendant Dunn performing oral sex on Plaintiff.

27.     At no time did Plaintiff consent to any kind of sexual activity including oral sex.  When Defendant Dunn was performing oral sex on Plaintiff, Plaintiff was unconscious and unable to control his faculties.  Plaintiff was not able to maintain a conscious state.

28.     Plaintiff woke the next day and found himself in Defendant Dunn's bed in his residence.  Plaintiff did not feel well and was barely able to walk when he attempted to leave Defendant Dunn's residence.

29.     Upon information and belief, the day after Defendant Dunn assaulted Plaintiff, at approximately 4:36 p.m., Defendant Dunn sent Plaintiff a private message on Instagram asking, "How was your slumbbbber?"  Plaintiff responded by private message stating, "I think I just got sober.  I did not mean to drink that much so I apologize greatly for that."

Case ID: 221002134

30.     Upon information and belief, at all times material hereto, Defendant Dunn knew or should have known that Plaintiff was not of legal drinking age when Defendant Dunn provided, supplied and/or served Plaintiff alcohol.

31.     Upon information and belief, Defendant Dunn and Plaintiff did not see each other outside of class after the assault.

## PUNITIVE DAMAGES ALLEGATIONS

32.     Upon information and belief, in April 2020 Plaintiff began to suffer from loss of appetite, nausea, jaundice, loss of energy, a rash, and abdominal pain.

33.     On or about April 30, 2020 Plaintiff was hospitalized at the Lurie Children's Hospital of Chicago and diagnosed with Syphilis.  Plaintiff was treated with three injections of penicillin as well as oral antibiotics.

34.     After Plaintiff was told he was diagnosed with Syphilis, he sent Defendant Dunn a private message in Instagram advising Defendant Dunn of his recent diagnosis and stating that Defendant Dunn was the last person he was with sexually.  Plaintiff also told Defendant Dunn that he could not remember everything that happened that night.

35.     Defendant Dunn responded to Plaintiff's message stating, "To be completely transparent, to my knowledge nothing happened between us that would have caused any type of contraction in that way.  Also, I am fully tested regularly and was tested prior to us hanging out and after and have received negative results both times.  I will certainly get tested again, and I am sorry you had to go through that.  Thank you for the heads up."

36.     Upon information and belief, Plaintiff contracted syphilis from Defendant Dunn the night that Defendant Dunn engaged in nonconsensual sexual contact with Plaintiff at Defendant Dunn's residence.

Case ID: 221002134

37.     On or about May 11, 2020 Plaintiff emailed Defendant Dunn requesting an extension of time for him to submit the "final dance assignment" due to his illness.

38.     Defendant Dunn responded stating, "If you are unable to get the assignment in due to exhaustion, I completely understand and can count this as excused."  Subsequently, Defendant Dunn excused the assignment for Plaintiff.

39.     Upon information and belief, other students sent requests to Defendant Dunn to extend the deadline for the "final dance assignment."  However, Plaintiff was the only student where Defendant Dunn responded to the request stating that he would excuse the assignment.

40.     Upon information and belief, the reason for which Defendant agreed to excuse the assignment for Plaintiff was based on sex and/or the nonconsensual sexual contact that occurred between the two Defendant Dunn and Plaintiff and/or Defendant transmitting syphilis to Plaintiff.

41.     At all relevant times, Defendant Dunn was in a position of power over Plaintiff because he was Plaintiff's professor, teacher and instructor at The University.

42.     At all relevant times, Defendant Dunn had direct control over the evaluation and grading of Plaintiff in the Jazz Dance Practice class.

43.     Defendant Dunn engaged in unwelcome verbal and/or non-verbal contact, sexual advance, request for sexual contact or sexual favors, or other unwanted conduct of a sexual nature that was sufficiently severe, persistent, or pervasive or having the effect of unreasonably interfering with an individual's academic or educational experience.

Case ID: 221002134

## STAFF MANUAL[1]

44.     Upon information and belief, Defendant Dunn's conduct violated the University's

Staff Manual which contains policies and procedures relating to benefits and employee rights and

responsibilities for all staff members of the University.

45.     Upon information and belief, Section 3, Sexual Harassment and Other Prohibited

Harassment, states, in part:

> Faculty, staff and students of the University are entitled to
> participate in and obtain the benefits of University programs,
> activities and employment without being discriminated against on
> the basis of: race, color, religion, sex, gender identity, national
> origin, ag[e]
>
> ***
>
> The rights defined by this policy apply to all faculty, staff and
> students of the University, and the obligations are **binding on all
> faculty and staff as part of their employment**, regardless of tenure
> or years of servic[e] (emphasis added)

46.     Upon information and belief, Section 3, Sexual Harassment and Other Prohibited

Harassment, defines consent as:

Consent

For the purpose of this policy, consent is clear, voluntary and unambiguous communication indicating a willingness to engage in a particular activity. Consent may not be inferred from silence, passivity, lack of resistance or lack of active response. In the absence of an outward demonstration, consent does not exist. Consent can be withdrawn by either party at any point. Consent is not effective if it results from the use of physical force, threat of physical force, intimidation, coercion, incapacitation or any other factor that would eliminate an individual's ability to exercise his or her own free will to choose whether or not to engage in a particular activity. Individuals are considered impaired and unable to give consent when intoxicated, of limited mental capability or other similar condition that interferes with reasonable judgment.

47.     Upon information and belief, Section 3, Sexual Harassment and Other Prohibited

Harassment, forbids any romantic or sexual interaction between students and faculty, stating:

---

[1] *See* the University's Staff Manual Attached hereto as Exhibit A.

9

Case ID: 221002134

Employee/Student Interaction

In addition to the general prohibitions against sexual misconduct, sexual harassment and other forms of harassment of any type, the University imposes an obligation on its staff and faculty members with regard to their interactions with students.  No employee may ask for a date, make a sexual advance to a student, or in any other way become romantically or sexually involved with a student.  This rule is for the protection of students, employees and the University.

If a staff or faculty member has any doubt or question about whether his or her relationship with a student violates this policy, the employee should refrain from further interaction with the student and contact the appropriate Title IX Deputy Coordinator for advice.

A staff or faculty member may not in any way use his or her status as an employee to intimidate a student or advance a personal or sexual relationship.

48.     Defendant Dunn's conduct and interactions with Plaintiff directly violated Section 3, Sexual Harassment and Other Prohibited Harassment, of the University's Staff Manual.

49.     Defendant Dunn knew or should have known that his conduct and interactions with Plaintiff directly violated Section 3, Sexual Harassment and Other Prohibited Harassment, of the University's Staff Manual.

50.     Upon information and belief, and on that basis Plaintiff alleges that Defendants, UArts and Donovan, at all times relevant to Plaintiff's abuse, knew that Defendant Dunn engaged in interactions with students, including Plaintiff, in violation of Section 3, Sexual Harassment and Other Prohibited Harassment, of the University's Staff Manual, knew that there were complaints about Defendant Dunn's inappropriate interactions with students, but nonetheless allowed Defendant Dunn to continue to be employed for Defendant UArts, without any prior warnings, protections, investigations, or remedial steps taken to limit his in appropriate interactions with students.

51.     Upon information and belief, employees, representatives, and agents of Defendant UArts were made aware of Defendant Dunn's conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, battery, and harassment of Plaintiff.

Case ID: 221002134

52.     The employees, agents, and/or representatives of Defendant UArts had a duty to report to The University's Title IX Coordinator the allegations of Defendant Dunn's inappropriate sexual conduct with students.

53.     Upon information and belief, Defendant UArts failed to implement and enforce a policy prohibiting employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Dunn, from asking students to go on a date, making any sexual advances towards a student, or becoming romantically or sexually involved with a student in any way.

54.     Upon information and belief, Defendant UArts failed to properly communicate to its employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Dunn, The University's policy prohibiting employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Dunn, from asking students to go on a date, making any sexual advances towards a student, or becoming romantically or sexually involved with a student in any way.

55.     Upon information and belief, Defendant UArts failed to ensure that its employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Dunn, were aware of and knew The University had a policy prohibiting employees, professors, faculty members, adjuncts, and/or instructors from asking students to go on a date, making any sexual advances towards a student, or becoming romantically or sexually involved with a student in any way.

56.     Upon information and belief, Defendant UArts did not put into place sufficient repercussions and/or disciplinary action for employees who violated the policy prohibiting employees, professors, faculty members, adjuncts, and/or instructors from asking students to go on a date, making any sexual advances towards a student, or becoming romantically or sexually involved with a student in any way.

11

**PLAINTIFF'S TITLE IX REPORT**

57.     On or about May 13, 2020 Plaintiff emailed Defendant Donovan, who was the Head of the Musical Theater Department at The University, and requested to talk to her about an important situation.

58.     On or about the evening of May 13, 2020, Plaintiff spoke with Defendant Donovan and reported to her in detail that Defendant Dunn, who was his professor at the time, invited Plaintiff to his home and supplied, served, and provided Plaintiff with alcohol and then performed oral sex on Plaintiff without his consent.  Plaintiff also told Defendant Donovan that Defendant Dunn gave him syphilis causing him to become ill and requiring him to be hospitalized.

59.     Defendant Donovan was a "Responsible Employee" under The University's Sexual and Gender-Based Violence, Discrimination, Exploitation, Stalking and Harassment Policy ("Policy"), Updated August 2019[2] and was mandated to report any incidents of misconduct under The Policy to The University's Title IX Coordinator.

60.     Defendant Donovan failed to immediately inform The University's Title IX Coordinator as required under the University's Policy.  *See* Exhibit B.

61.     The University's Policy states that it applies to conduct that occurs "In the context of University employment, education, research, recreational, social or artistic activity, *irrespective of the location of the occurrence*, if the conduct has or can be reasonably predicted to have a continuing negative effect on the University and its students, faculty, visiting faculty, affiliates, staff, contractors, vendors, visitors or guests."  *See* Exhibit B. (emphasis added).

---

[2] *See* University of the Arts Sexual and Gender-Based Violence, Discrimination, Exploitation, Stalking and Harassment Policy, Updated August 2019 attached hereto as Exhibit B.

Case ID: 221002134

62.     Upon information and belief, at all times material hereto, Defendant Donovan failed to properly advise Plaintiff of his rights under Title IX as required by The University's Policy.  *See* Exhibit B.

63.     Upon information and belief, in or around May 2020, UArts failed to have a Title IX Coordinator and/or a trained interim Title IX coordinator in violation of state and federal laws and The University's own policies. *See* Exhibit B.

64.     Defendant Donovan failed to provide Plaintiff with Support Resources as mandated by The Policy, including, but not limited to, University and local counseling and support resources, assistance with making a report, resources about and how to file a complaint under The University's Policy, and resources about what to expect from the University's investigation process under The Policy.  *See* Exhibit B.

65.     Defendant Donovan failed to provide Plaintiff with information regarding the following in violation of The University's Policy:

    a.   The right to seek medical treatment, and explain the importance of obtaining and preserving forensic and other evidence;

    b.   The right to contact law enforcement or to decline to contact law enforcement;

    c.   The right to seek a protective order;

    d.   The available University and community resources;

    e.   The right to request reasonable academic, housing, employment, and other accommodations;

    f.   The right to seek informal resolution or formal resolution under this Policy;

    g.   The University's prohibition against retaliation; and

    h.   Any other relevant information that may address the particular individual's safety or procedural questions and concerns.

Case ID: 221002134

*See* Exhibit B.

66.     After Plaintiff informed Defendant Donovan that he was served alcohol by his professor who then performed oral sex on him while he was in and out of consciousness, Defendant Donovan told Plaintiff that she would take care of things by writing out a statement based on what Plaintiff told her and she would send it to him for his review.

67.     Further in violation of The University's Policy (*see* Exhibit B), Defendant Donovan discouraged, intimated, and dissuaded Plaintiff from making a formal Title IX complaint by leading him to believe that a formal Title IX Complaint would result in a public trial.

68.     On June 15, 2020 Defendant Donovan wrote to Plaintiff implying that she was going to terminate Defendant Dunn's employment with the University by stating, "I have moved ahead with my plan to change the hiring for fall to reflect our conversation and will be putting an anonymous note on the file (which I will put past you before I do)- the delay is in my crafting precollege first and then moving to the fall hiring process, but I have already announced my intention (with no details or names shared) and so you can consider the plan in place. Sending you warmth and love and in a few weeks look for a statement for you to approve from me that will go on the official file."

69.     After the initial call with Defendant Donovan, Plaintiff followed up with her multiple times, including on June 12, September 22, October 4, and October 6 inquiring about the written statement Defendant Donovan told him she was going to draft and send to him for is approval.

70.     Despite repeated assurances that Defendant Donovan was drafting a written statement for Plaintiff's approval, Defendant Donovan never provided any such written statement to Plaintiff for his approval.

Case ID: 221002134

71.     Further in violation of The University's Policy (*see* Exhibit B), no interim support and/or protective measures were discussed with or provided to Plaintiff prior to the start of the fall 2020 semester to assure him that he could expect to continue his education in a safe environment free from sexual harassment, sexual violence, and sexual misconduct.

72.     As a result of The University's failure to provide the required interim support and/or protective measures as required by law and the University's Policy, Plaintiff took a leave of absence during the fall 2020 semester with the intention of returning in the Spring of 2021.

73.     Defendant Donovan responded to Plaintiff on September 22, 2020 stating, "many GENUINE apologies. there are so many things right now that put a big delay on that note, and it is very important to me. I will reach back this week with more information. thank you for reminding me. "

74.     On or about October 6, 2020, Defendant Donovan responded to Plaintiff's plea for action by stating, "Please write a statement that you would like for me to have on file to cover the information that we discussed this summer. I have a large number of responses to your email and I would rather respond than react, so I will keep this short. **As you know, I have long since terminated the employment of this individual**, not to be employed again. With the departure of the Theater Dean and the university's Title IX Coordinator, there is not in this interim semester a person to whom I would directly report the incident to carry out a trial or legally approach the matter. It was my understanding, though, from our conversation that you were interested in avoiding such an arrangement. **Which means that I am left as the superior of this individual and this position, and I have terminated their employment.**" (emphasis added).

75.     On or about October 7, 2020, Defendant Donovan wrote to Plaintiff advising him that she planned to speak to someone from the Title IX office that day for the first time.  Defendant

Case ID: 221002134

Donovan further admitted that she should have contacted the Title IX office when Plaintiff first reported to her.  Defendant Donovan further indicated that she was conducting her own research to determine the appropriate steps under Title IX.

76.    Upon information and belief, Defendant Donovan first informed The University's Title IX coordinator of Plaintiff's allegations on or about October 7, 2020.

77.    At all times material hereto, Defendant Donovan failed to inform anyone at The University's Title IX office about Plaintiff's complaint for five months.

78.    Upon information and belief, UArts failed to have an interim Title IX Coordinator employed, as required by law, between the time Plaintiff reported his Title IX Complaint to Defendant Donovan and October 7, 2020.

79.    On October 7, 2020, when finally reporting Plaintiff's allegations to the UArt's Title IX coordinator, Defendant Donovan admitted her mistake in handling Plaintiff's disclosure and apologized for "the delay and misstep in [her] approach to this matter." Defendant Donovan also indicated her "actions were not the correct ones to take."[3]

80.    After Plaintiff's disclosure, Defendant Donovan did not advise Plaintiff of his right to an advisor as required by The University's Policy.  *See* Exhibit B.

81.    After Plaintiff's disclosure, Defendant Donovan failed to adequately explain to Plaintiff the difference between the informal resolution process and the formal resolution process as required by The University's Policy.  *See* Exhibit B.

82.    After Plaintiff's disclosure, Defendant Donovan failed to explain and/or assist Plaintiff with the process of filing a formal complaint under Title IX as required by The University's Policy.  *See* Exhibit B.

---

[3] *See* 10/7/20 Correspondence attached hereto as Exhibit C.

16

Case ID: 221002134

83.     After Plaintiff's disclosure, Defendant Donovan failed to fully inform or ensure that Plaintiff was fully informed of all of his options under The University's Policy as required by The University's Policy.  *See* Exhibit B.

84.     On or about October 8, 2020, Plaintiff was contacted by Sara Pyle, Assistant Vice President for Student Services Student Affairs and provided a link to the page on The University's website about the Title IX process as well as a one-page document titled Title IX Resources and Reporting Options.

85.     On October 12, 2020, Plaintiff was contacted by the investigator that The University hired to conduct the Title IX investigation.

86.     On or about October 14, 2020, Plaintiff had an initial interview with the Title IX investigator where he provided to her a detailed account of the rape.

87.     On or about October 26, 2020, the Title IX investigator told Plaintiff that he would receive a summary of the interview for his review to make changes and edits to.  The Title IX investigator also requested additional evidence for her investigation, including all of Plaintiff's correspondence with Defendant Donovan.

88.     On or about November 5, 2020 Plaintiff had another conversation with the Title IX investigator and was again told that he would receive a written summary of the interview that took place on or about October 26, 2020 for his review to make changes and edits to.

89.     On or about November 5, 2020 Plaintiff was first advised of the Notice of Allegations that would be sent to Defendant Dunn as required under Title IX.

90.     On or about November 23, 2020, Plaintiff was advised by the Title IX coordinator that the University officially launched an investigation into Defendant Donovan's alleged mishandling of Plaintiff's Title IX report.

Case ID: 221002134

91.     Plaintiff was provided with the November 16, 2020  Notice of Alleged Allegations of Employee Misconduct[4] that were sent to Defendant Donovan which stated that the University was informed that Defendant Donovan failed to report Plaintiff's sexual assault to the University's Title IX coordinator for five months and was in violation of the following University policies:

    a.   The May 2020 Sexual Misconduct Policy, Section V

    b.   The August 2019 Sexual Misconduct Policy, Section V

    c.   The Faculty Handbook, Section 3.14

    d.   The Staff Manual, Chapter 4, Section 6

92.     As of December 10, 2020, Plaintiff still had not received the summary of his October 14, 2020 conversation with the Title IX investigator.  The Title IX investigator informed Plaintiff that she would send it to him by the morning of December 11.

93.     On December 14, 2020, Plaintiff was sent the summary of his interview with the Title IX investigator, exactly seven months after he reported the rape to the University.

94.     Plaintiff repeatedly asked the Title IX investigator and the Title IX coordinator to confirm the status of Defendant Dunn's employment with the University, but they refused to provide any assurances to Plaintiff regarding potential interactions with Defendant Dunn if he returned to the University.

95.     While Plaintiff initially intended to return to UArts in the spring of 2021, as a result of the trauma Plaintiff was suffering from caused by The University's mishandling of Plaintiff's Title IX complaint and the University's failure to provide assurances of no contact between him and Defendant Dunn, Plaintiff withdrew from The University in or around January 2021.

---

[4] *See* November 16, 2020 Employee Misconduct – Notice of Allegations directed to Katherine Donovan attached hereto as Exhibit D.

Case ID: 221002134

96.    After Plaintiff's disclosure of the assault, there were numerous unexplained and inexcusable delays throughout the Title IX investigation, including, but not limited to, the finalization of the investigators report and evidence file.

97.    On or about January 22, 2021, the investigator informed Plaintiff that the report would be finalized and sent to him for his review the week of January 25, 2021.

98.    On or about April 9, 2021, Plaintiff was first sent a copy of the Investigation report and evidence file for his review and response.  However, the report did not include the University's investigation into the allegations of employee misconduct against Defendant Donovan that were being investigated.  Despite repeated inquiries asking about the reason for the delay of the final investigation report and evidence file, at no time was Plaintiff provided an explanation for the delay in the finalization of the investigators report and evidence file.

99.    Despite being notified that the University launched an investigation into Defendant Donovan's mishandling of Plaintiff's Title IX complaint, Plaintiff was never provided an investigation report or advised of a hearing relating to the Alleged Allegations of Employee Misconduct.

100.    On or about July 29, 2021, fourteen (14) months after Plaintiff first reported he was raped by his professor, the Title IX hearing was held where it was determined, using the preponderance of evidence standard, that Defendant Dunn violated the following University policies:

    a.   Engaging in sexual misconduct against Plaintiff;

    b.   Engaging in sexual violence against Plaintiff; and

    c.   Engaging in sexual harassment against Plaintiff.

Case ID: 221002134

101.    Having the power, authority, and responsibility to act, Defendants failed Plaintiff by showing deliberate indifference after Plaintiff reported a Title IX complaint wherein a UArts' professor severed alcohol to an underage student and then sexually assaulted him.

**UNIVERSITY OF THE ART'S TITLE IX POLICY**

102.    Section IV of the University's Policy requires that UArts have a Title IX Coordinator that is "responsible for monitoring compliance with Title IX; tracking and reporting annually on all incidents in violation of this policy; and coordinating the University's investigation, response and resolution of reports made under this policy." *See* Exhibit B, Section IV.

103.    Section V of the University's Policy indicates the Reporting Responsibilities of University Employees and states:

> With the exception of the confidential resources listed in this policy, **all University employees, full and part-time, regardless of tenure or contractual status, are considered "Responsible Employees" and are mandated to report any incidents of misconduct under this Policy to the University's Title IX Coordinator.** Responsible Employees are required to share with the Title IX Coordinator all known information, including the identities of any alleged Respondent (if known), the identities of any Complainants, the names of other witnesses involved in the alleged misconduct, as well as all other relevant facts of which the Responsible Employee is aware, including the date, time, and location of the incident and any statements made by parties or witnesses.  (emphasis added)

> *See* Exhibit B, Section V.

104.    Section VII of the University's Policy prohibits certain conduct including but not limited to: Sexual Misconduct, Sexual Harassment, Gender-based Harassment, Sexual Violence, and Retaliation. *See* Exhibit B, Section VII.

105.    The University's Policy defines Sexual Misconduct as "a range of behaviors that includes, but is not limited to, sexual or gender-based harassment, sexual violence, sexual exploitation, relationship and interpersonal violence, stalking, and retaliation…. Additional factors

20

Case ID: 221002134

to consider include whether the conduct was unwelcome and whether a reasonable person in that individual's position would have perceived the conduct as intimidating, hostile, offensive, or otherwise prohibited by this policy." *See* Exhibit B, Section VII Sexual Misconduct.

106.    The University's Policy defines Sexual Harassment as:

> [A]ny unwelcome verbal or non-verbal contact, sexual advance, request for sexual contact or sexual favors, or other unwanted conduct of a sexual nature where:
>
> 1. Submission to or rejection of such behavior is made implicitly or explicitly a term or condition of instruction, employment, advancement, evaluation or participation in any University activity, program or benefit (commonly referred to as quid pro quo harassment); or
>
> 3. Such behaviors are sufficiently severe, persistent, or pervasive to have the purpose or effect of unreasonably interfering with an individual's academic or educational experience, working environment, or living conditions by creating an intimidating, hostile, or offensive environment (commonly referred to as hostile environment harassment).
>
> *See* Exhibit B, Section VII Sexual Harassment.

107.    The University's Policy defines Gender-based Harassment as "any unwelcome verbal or non-verbal contact or conduct based upon sex or gender, sexual orientation, gender identity or gender expression, [which] need not be specifically sexual in nature to be prohibited by this policy. *See* Exhibit B, Section VII Gender-Based Harassment.

108.    The University's Policy defines Sexual Exploitation as "an act or acts committed through non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage or other non-legitimate purpose. *See* Exhibit B, Section VII Sexual Exploitation.

109.    The University's Policy defines Sexual Violence as "having or attempting to have sexual contact with another person without that person's consent. This may include sexual

21

Case ID: 221002134

intercourse or sexual contact achieved by the use or threat of force or coercion, where an individual does not consent to the sexual act, or where an individual is incapacitated." *See* Exhibit B, Section VII Sexual Violence.

110.    The University's Policy defines Retaliation as "any adverse action taken or threat made against an individual or group of individuals for filing a complaint or report under this policy; filing an external complaint or report,[…] or participating in the University's investigative or disciplinary process related to a complaint or report under this policy." *See* Exhibit B.  UArts specifically notes that any "conduct that has or is intended to have a materially adverse effect on the working, academic, social or living environment of an individual" is an example of retaliation. *See* Exhibit B, Section VII Retaliation.

111.    Section XII of the University's Policy requires an Initial Review of a Report and states, "the Title IX Coordinator and/or other appropriate University administrators will make an initial review of the known information and respond to any immediate health or safety concerns raised by the report, including but not limited to the possible use of interim measures." *See* Exhibit B, Section XII.  Section XII further states that an individual making a report of sexual misconduct will receive information, including but not limited to: the right to seek medical treatment, right to contact law enforcement, right to seek a protective order, available University resources, right to reasonable accommodations, and any other relevant information relative to the individual.  *See id*.

112.    Section XIII of the University's Policy provides for Interim Measures and states "[t]he University may provide reasonable interim support and protective measures to prevent further acts of misconduct under this Policy and to provide a safe educational and work environment." *See* Exhibit B, Section XIII.  Examples of interim measures include: academic accommodations; medical and mental health services, including counseling; a No Contact

Case ID: 221002134

Directive that serves as a notice to both parties that they must not have verbal, electronic, written, or third-party communication with one another; and assistance identifying any other resources. *See id*.

113.    Section XVIII of the University's Policy provides the Formal Resolution Process for University Faculty and Staff accused of violations of the UArts' Policy with include: Complaint, Investigation, Adjudication, Sanction, and Appeal. *See* Exhibit B, Section XVIII.

114.    Based on the conduct as more fully described herein, Defendants UArts, Donovan, and Dunn violated the University's Title IX Policy.

115.    On or about July 29, 2021, at the Title IX hearing, Defendant Donovan admitted she lied to Plaintiff when she advised him that she terminated the employment of Defendant Dunn in the fall of 2020.  Defendant Donovan further admitted that she did not even have the authority to terminate Defendant Dunn's employment with the University.   Defendant Donovan also admitted that she lied to Plaintiff when she told him she was taking detailed notes of their conversation on May 13, 2021 when Plaintiff first reported to her that Defendant Dunn raped him. Defendant Donovan also admitted to lying about "putting an anonymous note on the file" of Defendant Dunn regarding the allegations asserted by Plaintiff.  Defendant Donovan admitted that she continually lied to Plaintiff over the course of five (5) months about crafting a statement for Plaintiff's review.

116.     Upon information and belief, in the spring of 2020, Defendant Dunn was offered a reasonable assurance of a teaching position for the fall semester of 2020.

117.    Defendant Donovan violated The University's Policy and Title IX of the Education Amendments of 1972 when she failed to immediately report Plaintiff's complaint to the UArts Title IX Coordinator/Office.

Case ID: 221002134

118.    Defendant Donovan violated The University's Policy and Title IX of the Education Amendments of 1972 when she failed to fully and accurately advise Plaintiff of his rights and options under The Policy and Title IX.

119.    Defendant Donovan attempted to intimate, coerce, and prevent Plaintiff from filing a formal Title IX complaint when she misrepresented to Plaintiff that a formal Title IX report would result in a public trial.

120.    Defendant UArts failed to ensure its employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Donovan, were properly trained on how to handle reports of sexual misconduct, sexual harassment, and/or sexual violence.

121.    Defendant UArts failed to ensure its employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Dunn, were properly trained and advised on The University's policies against sexual misconduct, sexual violence, sexual harassment, and/or serving underage students alcohol.

122.    Defendant UArts failed to mandate that all of its employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Donovan, received proper training on how to handle reports of sexual misconduct, sexual harassment, and/or sexual violence under The University's Policy and Title IX.

123.    Defendant UArts failed to provide its employees, professors, faculty members, adjuncts, and/or instructors, including Defendant Donovan, with accurate information regarding their reporting responsibilities according to The University's Policy and Title IX.

124.    Upon information and belief, at all times material hereto, Defendant UArts did not provide proper training or instruction to its employees, professors, faculty members, adjuncts, and/or instructors, including, but not limited to, Defendants, Donovan and Dunn, on sexual

24

Case ID: 221002134

misconduct, sexual violence, and sexual harassment as defined in The University's Policy and under Title IX.

125.    Upon information and belief, at all times material hereto, Defendant UArts failed to require and mandate training for all of its employees, professors, faculty members, adjuncts, and/or instructors, including Defendants Donovan and Dunn on sexual assault awareness and prevention, sexual misconduct, sexual violence and sexual harassment.

126.    Upon information and belief, Defendant UArts failed to ensure that its employees, professors, faculty members, adjuncts, and/or instructors, including Defendants Donovan and Dunn, received proper and sufficient training on sexual assault awareness and prevention, sexual misconduct, sexual violence and sexual harassment.

127.    Upon information and belief, Defendant UArts failed to suspend and/or terminate the employment of Defendant Dunn for misconduct, specifically, the sexual misconduct, sexual violence, and sexual harassment committed against Plaintiff.

128.    Upon information and belief, Defendant UArts failed to provide interim measures, such as a no contact order, that would have allowed Plaintiff to return to the University to continue his education after Plaintiff reported he was sexually assaulted by his professor, as required by The University's policy and Title IX. *See* Exhibit B, Section XIII Interim Measures.

129.    As a direct and proximate result of the University's failure to provide interim measures, Plaintiff was unable to return to school without fear of interaction with Defendant Dunn.

130.    After Plaintiff's disclosure, in violation of state and federal laws, Defendant UArts failed to provide Plaintiff a safe educational environment free from sexual harassment, sexual violence, and sexual misconduct.

Case ID: 221002134

131.     After Plaintiff's disclosure, Defendant UArts failed to make and/or put into place any accommodations that would have allowed Plaintiff to return to The University and continue his education in a safe environment free from sexual harassment, sexual violence, and sexual misconduct after Plaintiff reported that his professor, Defendant Dunn, raped him.

132.     After Plaintiff's disclosure, Defendants, UArts and Donovan, lied to Plaintiff about the employment status of Defendant Dunn.

133.     At all times material hereto, Defendant UArts' failure to properly supervise Defendants Donovan and Dunn and its negligence in retaining Defendants Donovan and Dunn was in violation of Pennsylvania common law.

134.     At all times material hereto, the acts, conduct, and omissions of Defendants, and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of Plaintiff.

135.     This action arises from Defendants' blatant disregard for Plaintiff's federal and state rights, and Defendants' deliberately indifferent and unreasonable response to teacher-on-student sexual assault and rape.

136.     The negligent, grossly negligent, careless, reckless, and/or other liability producing conduct of all Defendants was the direct and proximate cause of the permanent and severe physical, emotional and psychological trauma and injuries suffered by Plaintiff.

137.     This incident, and actions and inactions of the Defendants individually, jointly and/or severally caused Plaintiff permanent and severe physical, emotional and psychological trauma and injuries, hospitalization and medical treatment for syphilis. Plaintiffs trauma and injuries resulted in, among others, depression, major depressive disorder, anxiety, posttraumatic

Case ID: 221002134

stress disorder, as well as other psychological and emotional injuries that triggered a pre-existing eating disorder.

138.     As a direct and proximate result of the negligence, gross negligence, recklessness, and other liability producing conduct of the Defendants, Plaintiff has in the past and continues to suffer mental anguish, psychological trauma, psychological injury, emotional harm, humiliation, embarrassment, fear, loss of well-being, and restrictions on his ability to engage in normal interpersonal relationships and pleasures of life, and other intangible losses.

139.     As a direct and proximate result of the negligence, gross negligence, carelessness, recklessness, and other liability producing conduct of the Defendants, Plaintiff has been prevented and will be prevented in the future from performing his usual duties, activities, occupations and avocations and has suffered a loss of earnings, a loss of earning capacity as well as financial loss equivalent to tuition and fees for four semesters at UArts, housing costs, and other related expenses and a significant delay in obtaining a Bachelor's degree and delay in post-undergraduate employment.

140.     Defendants are jointly and severally liable for the damages suffered by Plaintiff.

## DISCOVERY RULE, ESTOPPEL AND FRAUDULENT CONCEALMENT

141.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

142.     Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortuous nature of the wrongdoing that caused the injury.

143.     Defendants' failure to report, document, or investigate complaints against Defendant Dunn, and concealment of Defendant UArts' actions taken in response to Plaintiff's

Case ID: 221002134

report of sexual misconduct, constitute fraudulent concealment that equitably tolls any proffered statute of limitation that may otherwise bar the recovery sought by Plaintiff herein.

144.   Defendants are estopped from relying on any statute of limitations defense because they fraudulently concealed and failed to disclose known dangerous behaviors and serious increased risks to Plaintiff's safety, health and wellbeing as a student at The University.

145.   Defendants represented that Defendants Dunn and Donovan were competent professors, faculty members, adjuncts, instructors and/or Heads of the musical theater department and entrusted them with the safety and wellbeing of students, including Plaintiff, instead of upholding their duty to protect students enrolled in UArts from sexual assault and abuse and to ensure students are provided a safe educational environment free from sexual harassment, sexual violence and sexual misconduct.

146.   At all relevant times, Defendants were under a continuing duty under federal law and parallel state laws to protect students, including Plaintiff, from sexual assault and abuse, and to provide a safe educational environment free from sexual harassment, sexual violence and sexual misconduct, and to disclose the true character, quality, and nature of their employees and/or agents.

147.   As a result of Defendants' concealment of the true character, quality and nature of Defendants Dunn and Donovan and their conduct, they are estopped from relying on any statute of limitations defense.

148.   Defendants furthered their fraudulent concealment through acts and omissions, including misrepresenting known dangers of sexual assault and abuse and a continued and systemic failure to disclose and/or cover up such information from/to students, faculty, employees and the public.

Case ID: 221002134

149.    Defendants' acts and omissions, before, during, and/or after the act causing Plaintiff's injuries prevented him from discovering the injury or cause thereof until recently.

150.    Defendants' conduct, because it was purposely committed, was known or should have been known by them to be dangerous, heedless, reckless, and without regard to the consequences or the rights and safety of Plaintiff.

## COUNT I

## TITLE IX (20 U.S.C. § 1681) CLAIM FOR HOSTILE COLLEGIATE ENVIRONMENT
### (Plaintiff v The University Of The Arts)

151.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

152.    As a court of unlimited original jurisdiction, this Court has concurrent jurisdiction with federal courts over actions arising under a federal statute, such as Title IX (20 U.S.C. § 1681), unless federal law provides otherwise.

153.    Title IX (20 U.S.C. § 1681), subsection (a) provides that subject to certain exceptions, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

154.    Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature. "It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."

155.    Plaintiff is a "person" within the meaning of 20 U.S.C. § 1681(a).

156.    UArts receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681 *et seq.*

Case ID: 221002134

157.    UArts is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment, including, specifically, allegations that sexual abuse, sexual assault, or sexual harassment that has been committed by an employee. U.S. Dept. of Ed., Office of Civil Rights, Questions and Answers on Title IX and Sexual Violence, Apr. 29, 2014, at 1, 3, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

158.    Defendant Dunn was an employee of UArts and professor within their education program to which Plaintiff was a student of.

159.    Defendant Dunn's actions and conduct toward Plaintiffs of nonconsensual sexual assault, battery, and molestation, which includes nonconsensual sexual touching and nonconsensual oral sex, in addition to further conduct described above, constitute sex discrimination under Title IX.

160.    Defendant UArts owed Plaintiff a duty under Title IX, which included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, and other sexual misconduct.

161.    Upon information and belief, an "appropriate person" at UArts, within the meaning of Title IX, including but not limited to, Defendant Donovan, had actual and constructive notice of sexual assault, battery, molestation, and harassment committed by Defendant Dunn as described herein this Complaint.

162.    UArts failed to carry out their duties to promptly investigate and take corrective action under Title IX such to ensure a safe environment free from sexual abuse and harassment, for Plaintiff to complete his education.

163.    As set forth in the Complaint, following Plaintiff's disclosure to Defendant Donovan that he had been sexually assaulted by Defendant Dunn, the University and its agents

Case ID: 221002134

and/or employees failed to take immediate responsive action, failed to inform Plaintiff of his rights under Title IX, failed to enter a "no contact order" between Plaintiff and Defendant Dunn, misrepresented the status of the investigation, lied about material facts, and failed to set forth accommodations for Plaintiff to continue his education is a safe environment free from sexual harassment and abuse, all of which deprived Plaintiff of participation and benefits of the UArts' education program, benefits, and opportunities.

164.    The complete inaction of Defendant UArts, including its agents and employees, and the violation of the University's Guidelines, Policies, Manuals, and/or Handbook constitute deliberate indifference in the wake of being notified that Plaintiff was sexually assaulted by a University professor.

165.    UArts acted with deliberate indifference to known acts of sexual assault, abuse, and molestation by:

a)  Failing to investigate and address Plaintiff's complaint that he was sexually assaulted by his professor, as required by Title IX;

b)  Failing to appropriately supervise Defendant Dunn;

c)  Failing to have a Title IX coordinator or interim Title IX Coordinator;

d)  Failing to adequately advise Plaintiff of his rights under Title IX as required by law;

e)  Failing to advise Plaintiff of the true status of Defendant Dunn's employment status;

f)  Insisting and encouraging Plaintiff not to formally report the sexual assault;

g)  Failing to enter a no contact order between Plaintiff and Defendant Dunn; and

h)  Failing to institute corrective measures to permit Plaintiff to complete his education in an environment free from discrimination, sexual harassment and sexual abuse, as required by law.

166.    Defendant UArts, including its agents and employees' failure to appropriately respond to, discipline, or in any way effectively and promptly address Plaintiff's sexual assault by

Case ID: 221002134

a University employee resulted in Defendant UArts breach its duty under Title IX to provide students, such as Plaintiff, an educational environment free from discrimination, sexual harassment and sexual abuse.

167.    Defendant UArts, including its agents and employees' had actual and/or constructive notice of the sexual assault committed on Plaintiff by Defendant Dunn.

168.    Defendant UArts, including its agents and employees' inaction and/or lack of corrective action concerning established violations of University Policy and Title IX constituted a deliberate indifference to a known sexual assault which was severe and objectively offensive as to bar Plaintiff's access to educational opportunity.

169.    As a direct and proximate result of the deliberate indifference of Defendant UArts, including its agents and employees, following the sexual assault, fostered a hostile collegiate environment.

170.    As a direct and proximate result of the deliberate indifference of Defendant UArts, including its agents and employees, following the sexual assault, Plaintiff was barred access to an educational opportunity or benefit, and Defendants' continued inaction caused Plaintiff continued physical and emotional damage which deprived Plaintiff of his educational opportunity and benefits.

171.    As a result of Defendants, UArts' deliberate indifference and failure to act, by and through its authorized agents, servants, employees, and/or faculty members who were acting within the course and scope of their employment and/or authority, as aforesaid, Plaintiff sustained serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

Case ID: 221002134

172.    Any and all commission and/or omissions, practices, and policies of Defendant UArts as aforementioned, collectively constitute violations of Title IX (20 U.S.C. § 1681), which prohibits sexual hostile climates in schools.

WHEREFORE, Plaintiff claims of Defendant, The University of the Arts, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

## COUNT II

## TITLE IX (20 U.S.C. § 1681) PRE-ASSAULT CLAIM FOR HOSTILE COLLEGIATE ENVIRONMENT
### (Plaintiff v The University Of The Arts)

173.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

174.    As a court of unlimited original jurisdiction, this Court has concurrent jurisdiction with federal courts over actions arising under a federal statute, such as Title IX (20 U.S.C. § 1681), unless federal law provides otherwise.

175.    Title IX (20 U.S.C. § 1681), subsection (a) provides that subject to certain exceptions, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

176.    Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature. "It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."

177.    Plaintiff is a "person" within the meaning of 20 U.S.C. § 1681(a).

Case ID: 221002134

178.     UArts receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681 *et seq.*

179.     UArts is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment, including, specifically, allegations that sexual abuse, sexual assault, or sexual harassment that has been committed by an employee. U.S. Dept. of Ed., Office of Civil Rights, Questions and Answers on Title IX and Sexual Violence, Apr. 29, 2014, at 1, 3, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

180.     Defendant Dunn was an employee of UArts and professor within their education program to which Plaintiff was a student of.

181.     Defendant Dunn's actions and conduct toward Plaintiffs of nonconsensual sexual assault, battery, and molestation, which includes nonconsensual sexual touching and nonconsensual oral sex, in addition to further conduct described above, constitute sex discrimination under Title IX.

182.     Defendant UArts owed Plaintiff a duty under Title IX, which included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, and other sexual misconduct.

183.     Upon information and belief, an "appropriate person" at UArts, within the meaning of Title IX, had actual and constructive notice of sexual assault, battery, molestation, and harassment committed by Defendant Dunn prior to Plaintiff's sexual assault.

184.     UArts failed to carry out their duties to investigate and take corrective action under Title IX.

Case ID: 221002134

185.    UArts failed to adequately supervise Defendant Dunn even though UArts had actual or constructive knowledge that Nassar posed a substantial risk of sexual abuse to students to whom he had unfettered access.

186.    UArts acted with deliberate indifference to known acts of sexual assault, abuse, and molestation by:

   a)  Failing to investigate and address prior complaints against Defendant Dunn of sexual assault, as required by Title IX;

   b)  Failing to appropriately supervise Defendant Dunn; and

   c)  Failing to institute corrective measures to prevent Defendant Dunn from violating and sexually abusing other students.

187.    Upon information and belief, Defendant UArts, including its agents and employees, knew or should have known of the risk of sexual assault on UArts' students and responded inadequately and with deliberate indifference to effectively investigation of such incidents.

188.    Upon information and belief, UArts' failure to promptly and appropriately investigate and remedy prior complaints of sexual assault resulted in Plaintiff being subject to further harassment and a sexually hostile environment, effectively denying him access to educational opportunities at UArts.

189.    Upon information and belief, Defendant UArts, including its agents and employees, exhibited deliberate indifference in their failure to implement appropriate disciplinary measures, policies, procedures, and/or training of its employees and staff to address the risk of sexual assault on UArts' students, and as a result, UArts' students, including Plaintiff, were denied the educational benefits and opportunities in violation of Title IX (20 U.S.C. § 1681).

190.    As a result of Defendants, UArts' deliberate indifference and failure to act, by and through its authorized agents, servants, employees, and/or faculty members who were acting

Case ID: 221002134

within the course and scope of their employment and/or authority, as aforesaid, Plaintiff sustained serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendant, The University of the Arts, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

## COUNT III

### BREACH OF CONTRACT
### (Plaintiff v The University Of The Arts and Kathryn Donovan)

191.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

192.    Upon enrollment, Plaintiff entered into a contract with The University and its employees, agents, servants and/or faculty members, including Donovan, with the terms expressly provided in the University of the Arts' Student Handbook ("Handbook") and the Sex- and Gender-Based Misconduct Policy ("Policy").[5]

193.    The University and its employees, agents, servants and/or faculty members manifested its intent to be contractually bound with its students, including Plaintiff, with the terms expressly provided in the Handbook and Policy.  According to the UArts' website,

> The Student Handbook and the Code of Conduct have been designed to both empower students while holding them accountable. **Everyone in the UArts community, from first-year students to seniors and faculty and staff, is held to the same values and expectations and is informed about policies, procedures, rights and privileges.**

---

[5] *See* University of the Arts Student Handbook and the Sex- and Gender-Based Misconduct Policy (Appendix A of the Student Handbook) attached hereto as Exhibit E.

Case ID: 221002134

We encourage all students to review the information in the Student Handbook to learn their rights and responsibilities.[6] (emphasis added)

194.    The University and its employees, agents, servants, and/or faculty members, including Donovan, explicitly manifested their intent to be bound to the terms of their written policies and procedures, including the Notice Of Non-Discrimination And Equal Opportunity and Title IX Resources/Sexual Harassment Policy.  According to the UArts' website, "[t]he University of the Arts has developed written policies and procedures to promote and communicate consistency, continuity and understanding within our institution. **These policies are to be followed by all faculty, staff, students and visitors of the University**."[7] (emphasis added)

195.    The University and its employees, agents, servants, and/or faculty members promised its students, including Plaintiff, to abide by the terms, conditions, "policies, procedures, rights and privileges"[8] set forth in the Handbook and Policy.

196.    Plaintiff, to his detriment, relied upon the representations of The University, its faculty members, employees, and agents, including Donovan, regarding provisions that are expressly stated in the Handbooks and The Policy.

197.    In particular, The University, its faculty members, employees, and agents, including Donovan, expressly agreed, inter alia, in the Student Handbook under the following sections:[9]

**NOTICE OF NON-DISCRIMINATION AND EQUAL OPPORTUNITY**:

1)    The University prohibits acts of retaliation against those who report acts of harassment discrimination or who cooperate with the investigative process;

---

[6] *See* https://www.uarts.edu/life-at-uarts/community-standards/student-handbook (last visited August of 2022).
[7] *See* https://www.uarts.edu/about/policies-and-regulations (last visited August of 2022)
[8] *Id.*
[9] *See* Exhibit E.

Case ID: 221002134

2)    **All faculty…at The University are required to report incidents of sexual misconduct to The University's Title IX Coordinator**; and

3)    The University will promptly and equitably respond to all reports of discrimination and harassment and retaliation…

**DISCRIMINATION AND DISCRIMINATORY HARASSMENT**:

a)  [T]he University will act to remedy all forms of harassment when reported, whether or not the harassment rises to the level of creating a "hostile environment" under this section.

**VIOLENCE**:

a)  The University is committed to maintaining a safe working, learning and living environment for all members…Threats, acts of aggression, physical attack and violence are unacceptable…

**STUDENT CODE OF CONDUCT**:

a)  Prohibited behavior at The University of the Arts includes the following:

  1.  Violation of policies as described in the University Catalog, the Student Handbook, and all other rules governing University facilities, programs and services

      a.  Conduct prohibited by the Sex- and Gender-Based Misconduct Policy, as outlined in Appendix A.

b)  Non-compliance with the directions of the University; and

c)  Violation of statutes, laws, ordinances and/or regulations of the City of Philadelphia, Commonwealth of Pennsylvania (or other states, when applicable) and the United States of America.

**CONDUCT REVIEW PROCESS**:

a)  Allegations involving sex-and gender-based misconduct will be forwarded to the Title IX coordinator;

b)  If the alleged incident represents a violation of federal, state, or local law, the reporting complainant is encouraged to initiate proceedings in the criminal or civil court system regardless of whether a complaint is filed within the University; and

Case ID: 221002134

    c)  A…witness who intentionally provides misleading information may be subject to discipline…

198.    In addition to prohibited conduct under The Student Handbook as stated herein, The University and its employees, agents, servants and/or faculty members, including Donovan, further expressly agreed in its Sexual and Gender-Based Violence, Discrimination, Exploitation, Stalking and Harassment Policy[10] that:

**REPORTING RESPONSIBILITIES OF UNIVERSITY EMPLOYEES**

    a.  All University employees, full and part-time, regardless of tenure or contractual status, are considered "Responsible employees" and are mandated to report any incidents of misconduct under this Policy to the University's Title IX Coordinator;

**CONDUCT PROHIBITED BY POLICY**

    a.  ***Retaliation***: Retaliation is defined as any adverse action taken or threat made against an individual or group of individuals for filing a complaint or report under this policy…[including] any other conduct that has or is intended to have a materially adverse effect on the working, academic, social or living environment of an individual.

**INITIAL REVIEW OF A REPORT**

    a.  An individual making a report of sexual misconduct under The Policy can expect information regarding: The right to seek a protective order, The right to information resolution or formal resolution under The Policy, and the University's prohibition against retaliation;

**INTERIM MEASURES**

    a.  The University may provide reasonable interim support and protective measures to prevent further acts of misconduct under this Policy and to provide a safe educational environment;

**FORMAL RESOLUTION PROCESS FOR FACULTY AND STAFF RESPONDENTS**

    a.  **Sanction**: In determining an appropriate sanction for a violation of this Policy, the University may consider a range of factors, including but not limited to: the

---

[10] *See* Exhibit B.

Case ID: 221002134

nature of the conduct; the degree of violence, if any, involved; the impact of the conduct on the Complainant or other parties; the impact or implications of the conduct on the community or the University; prior misconduct by the Respondent; maintenance of a safe and respectful educational and employment environment; and any other mitigating, aggravating, or compelling circumstances in order to reach a just and appropriate resolution in each case.

    i. Sanctions that may be imposed under this Policy include, but are not limited to: Verbal Warning; Written Warning; Educational Requirement; Suspension; Termination; and Other Discipline.

### OBLIGATION TO PROVIDE TRUTHFUL INFORMATION

    a. All University community members are expected to provide truthful information in any report or proceeding under The Policy. Knowingly submitting or providing false or misleading information in bad faith…to cause intentional harm to another, or to obstruct or delay the University's process in connection with an alleged Policy violation is prohibited and subject to disciplinary sanctions.

199. The University and its employees, agents, servants, and/or faculty members, including Donovan, breached their obligations under the contract with Plaintiff, namely by failing to abide by the terms and conditions of the Student Handbook and Policy as stated in detail herein.

200. Based on Plaintiff's allegations against Dunn and Donovan, The University recognized that Donovan's alleged misconduct may violate UArts' policies in the Sexual Misconduct Policies, Faculty Handbook, and Staff Manual. On November 16, 2020, Christine Schaefer, the UArts' Associate Vice President for Human Resources, sent a "Notice of Allegations" letter to Donovan.[11] The letter outlined Donovan's potential violations of University policies in handing Plaintiff's disclosure:

---

[11] *See* Notice of Allegations letter to Defendant Donovan attached hereto as Exhibit D. For purposes of Plaintiff's breach of contract claim, of the potential violations noted in the letter, only Donovan's violations of the Sexual Misconduct Policies are triggered. Plaintiff is not contractually bound by the UArts' Faculty Handbook and Staff Manual; thus Donovan's violation of the UArts' Faculty Handbook and Staff Manual is discussed in support of Plaintiff's negligence claims, *infra*.

Case ID: 221002134

The allegations set forth above may implicate the following University policies and sections:

    a)     The May 2020 Sexual Misconduct Policy, Section V
    b)     The August 2019 Sexual Misconduct Policy, Section V
    c)     The Faculty Handbook, Section 3.14
    d)     The Staff Manual, Chapter 4, Section 6

The above-referenced policies and sections are identified for your assistance and not intended to be an exhaustive list of implicated terms.

201.    The University and its employees, agents, servants, and/or faculty members, including Donovan, breached and/or repudiated their contract with Plaintiff by:

a.  Failing to properly handle Plaintiff's Title IX Complaint;

b.  Failing to ensure Plaintiff was provided a safe educational environment free from sexual abuse, sexual violence and sexual harassment prior to and after he reported he was sexually assaulted by Defendant Dunn;

c.  Failing to take immediate action when Plaintiff reported he was sexually assaulted by Defendant Dunn;

d.  Failing to properly inform Plaintiff of his options and rights under Title IX and The University's Policy;

e.  Providing false information to Plaintiff in an attempt to prevent him from filing a formal Title IX Complaint;

f.  Providing false information to Plaintiff regarding the corrective actions taken by The University;

g.  Failing to provide interim support and protective measures to Plaintiff for him to continue his education in a safe environment free from harassment and retaliation;

h.  Providing false information regarding Defendant Dunn's employment status with The University;

i.  Failing to have a trained and competent Title IX Coordinator or interim Title IX Coordinator in place when Plaintiff reported his sexual assault; and

j.  Failing to adequately train employees, including, but not limited to, Defendant Donovan, of their reporting obligations under Title IX.

Case ID: 221002134

202.    The University and its employees, agents, servants and/or faculty members, including Donovan, breached their contract with Plaintiff by falsely, and with the intent to deceive Plaintiff, in violation of the clearly stated rights, provided Plaintiff with false information regarding his rights and options under Title IX and The University's Policy, the complaint process under The University's Policy, and corrective actions taken by The University in response to Plaintiff's report as detailed herein. The clearly stated procedures under The Policy guaranteed Plaintiff the right to full, fair, and truthful information regarding his rights and options under Title IX and The University's Policy without retaliation for reporting sexual misconduct against an employee or faculty member.

203.    As a result of the conduct of Defendants UArts and Donovan, Plaintiff suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, depression, anxiety, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, financial loss, delay in obtaining a Bachelor's degree, delay in post-undergraduate employment and has sustained and continues to sustain loss of earnings and earning capacity.

204.    In addition to the aforementioned injuries and/or damages, as a result of the breach of contract by Defendants UArts and Donovan, Plaintiff suffered emotional distress with associated bodily injury, namely the exacerbation and/or aggravation of a pre-existing eating disorder resulting in malnutrition and malnourishment.

205.    Based on the sensitive, personal nature and character of Plaintiff's allegations, Defendants UArts and Donovan's breach of contract is the type of breach such that serious emotion disturbance is a particularly likely result.

Case ID: 221002134

206.     As a result of the breach of contract by Defendants UArts and Donovan, Plaintiff suffered severe emotional disturbance requiring significant medical treatment and counseling.

207.     By reason of Defendants UArts and Donovan's breach of contract by and through its authorized agents, servants, employees, and/or faculty members who were acting within the course and scope of their employment and/or authority as aforesaid, caused Plaintiff to sustain serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendants, The University of the Arts and Kathryn Donovan, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

## COUNT IV

## NEGLIGENCE
### (Plaintiff v The University Of The Arts and Kathryn Donovan)

208.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

209.     While Plaintiff was enrolled as an undergraduate student at UArts, Defendant Donovan was the Head of the Musical Theater Department.

210.     At all times relevant hereto, Defendant Donovan was acting within the course and scope of her employment and/or authority with the University.

211.     At all times relevant hereto, Defendants, UArts and Donovan, were responsible for the safety and wellbeing of students of The University and owed a duty to exercise ordinary care to provide a reasonably safe environment to students, visitors, their guests, including Plaintiff.

Case ID: 221002134

212.     At all times relevant hereto, Defendants, UArts and Donovan, owed Plaintiff a duty to exercise ordinary care to ensure an educational environment free of sexual assault, sexual violence, sexual harassment and retaliation while interacting with faculty, employees, representatives and/or agents.

213.     In addition to the duty to exercise ordinary care as discussed in the foregoing paragraphs, after Plaintiff's disclosure of the sexual assault to The University and Donovan, Defendants undertook a duty to exercise ordinary care in handling Plaintiff's disclosure in accordance with the University's policies and the law.

214.     At all times relevant hereto, Defendant Donovan was an employee acting within the course and scope of her employment and/or authority with the University, and Defendant was bound to the terms and conditions of the UArts' Staff Manual.

215.     The UArts' Staff Manual established a duty on its Administrators, Faculty Members and Supervisors, including Defendant Donovan, who have knowledge of sexual misconduct, such that:

> In the event that a complaint of sexual harassment, sexual misconduct or other form of harassment -- formal or informal, written or oral, from an alleged victim or otherwise -- is made to an administrator, faculty member or staff member other than those specifically identified above, that administrator, faculty member or staff member **must**: (a) inform the person making the complaint that the matter will be referred to the appropriate Title IX Deputy Coordinator; and (b) promptly report, either orally or in writing, such complaint to the designated Title IX Deputy Coordinator. Every University administrator, faculty member and staff supervisor has a duty to maintain a workplace/educational environment free of any form of sexual harassment, sexual misconduct or other form of harassment. (emphasis added). [12]

---

[12] *See* Exhibit A at pg. 67 Duty of Administrators, Faculty Members and Supervisors with Knowledge of Harassment.

Case ID: 221002134

216.     Defendants, UArts and Donovan, breached their duty of care owed to Plaintiff in the following respects:

    a.   Failing to properly handle Plaintiff's disclosure;

    b.   Failing to follow guidelines established in the University's Staff Manual;

    c.   Failing to inform Plaintiff of his rights under Title IX and the University policies;

    d.   Failing to inform Plaintiff that the matter will be referred to the Title IX Coordinator;

    e.   Failing to promptly report Plaintiff's disclosure to the designated Title IX Coordinator;

    f.   Failing to have a trained and competent Title IX Coordinator or interim Title IX Coordinator in place at the time Plaintiff reported his sexual assault;

    g.   Failing to properly handle Plaintiff's disclosure of sexual assault by a University Employee;

    h.   Failing to properly handle the Title IX process and/or investigation;

    i.   Failing to maintain an educational environment free of any form of sexual harassment, sexual misconduct or other form of harassment;

    j.   Failing to provide and ensure a safe educational environment for students, including Plaintiff;

    k.   Failing to provide and ensure an environment free from retaliation in response to reports of sexual misconduct by faculty members;

    l.   Failing to use due care under the circumstances for the safety and wellbeing of Plaintiff;

    m.   Failing to adequately plan, plot and implement safety policies, procedures and responses;

    n.   Failing to require, use, and enforce proper and necessary safety measures;

    o.   Failing to implement and provide interim support and corrective measures after Plaintiff reported he was sexually assault by his teacher;

    p.   Failing to implement a no contact order between defendant Dunn and Plaintiff during the Title IX investigation;

Case ID: 221002134

q.   Failing to enact and enforce policies against retaliation;

r.   Failing to implement and/or enforce a policy against teachers/employees serving underage students alcohol; and

s.   Enacting policies and procedures which were not adequate to prevent or discourage faculty members from committing sexual abuse.

217.   Defendant Donovan admitted she breached her duty of care owed to Plaintiff as Donovan admitted "actions were not the correct ones to take," and apologized for "the delay and misstep in [her] approach to this matter." *See* Exhibit C.

218.   The aforementioned negligent, grossly negligent, careless, reckless, and/or other liability producing acts and/or omissions by Defendant Donovan occurred while acting within the course and scope of her employment with the University, and as such, Defendant UArts is liable for that conduct under the doctrine of *respondeat superior*.

219.   As a result of Defendants, UArts and Donovan's, negligence and gross negligence while acting within the course and scope of their employment and/or authority, as aforesaid, Plaintiff sustained serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendants, The University of the Arts and Kathryn Donovan, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

## COUNT V

### NEGLIGENT MISREPRESENTATION
### (Plaintiff v The University Of The Arts and Kathryn Donovan)

46

Case ID: 221002134

220.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

221.    At all times relevant to this cause, and as detailed herein, Defendants UArts and Donovan, negligently provided Plaintiff with false or incorrect information or omitted or failed to disclose material information concerning Plaintiff's rights and options under The University's Policy and Title IX, including, but not limited to, telling Plaintiff that a formal complaint under Title IX would involve a public trial, that Defendant Donovan was drafting a complaint/statement for Plaintiff's review and approval over a five month period and that The University would expeditiously address Plaintiff's Title IX Complaint.

222.    In addition to aforementioned misrepresentations, Defendants UArts and Donovan, negligently provided Plaintiff with false or incorrect information, omitted and/or failed to disclose material information concerning the status of Defendant Dunn's employment status with The University.

223.    The information provided by Defendants, UArts and Donovan, to Plaintiff was false and misleading, and contained omissions and concealment of truth about Plaintiff's rights and options under The University's Policy related to reporting incidents of sexual misconduct, sexual violence and sexual harassment, Defendant Dunn's employment status with the University and that The University would expeditiously investigate Plaintiff's Title IX report. Defendants, UArts and Donovan, made the foregoing misrepresentations knowing that they were false and/or without reasonable basis in fact.

224.    Upon information and belief, Defendants' intent and purpose in making these misrepresentations was to deceive and defraud Plaintiff; to intimidate and discourage Plaintiff from making a formal complaint under Title IX; to protect the University from public disclosure or scandal relating to the sexual assault perpetuated by Defendant Dunn; and to falsely assure

47

Case ID: 221002134

Plaintiff that the University resolved the situation by terminating the employment of Defendant Dunn.

225.    The foregoing representations and omissions by Defendants were in fact false.

226.    In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Plaintiff was induced to and did remain enrolled in The University through the fall of 2020.

227.    Defendants knew and had reason to know that Plaintiff did not have the ability to determine the true facts and intentionally and/or negligently concealed and misrepresented the true facts.

228.    Defendants had sole access to material facts concerning The University's handling of Plaintiff's Title IX complaint, status of the Title IX investigation, and the status of Defendant Dunn's employment with The University.

229.    Plaintiff reasonably relied upon misrepresentations and omissions made by Defendants where the concealed and misrepresented facts were critical to understanding the true status of Plaintiff's Title IX investigation and whether The University was a safe environment for Plaintiff to finish and obtain his bachelor's degree.

230.    Plaintiff's reliance on the foregoing misrepresentations and omissions by Defendants' were the direct and proximate cause of Plaintiff's injuries as described herein.

231.    As a direct and proximate result of the conduct of Defendants UArts and Donovan, Plaintiff suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, depression, anxiety, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, financial

Case ID: 221002134

loss, delay in obtaining a Bachelor's degree, delay in post-undergraduate employment and has sustained and continues to sustain loss of earnings and earning capacity.

232.    By reason of Defendants, UArts and Donovan's negligence and gross negligence by and through its authorized agents, servants, employees, and/or faculty members who were acting within the course and scope of their employment and/or authority, as aforesaid, caused Plaintiff to sustain serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendants, The University of the Arts and Kathryn Donovan, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

### COUNT VI

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff v The University Of The Arts and Kathryn Donovan)

233.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

234.    At all times relevant hereto, Defendants, UArts and Donovan, owed a duty to exercise reasonable care to provide a reasonably safe environment to UArts' students, including Plaintiff.

235.    At all times material hereto, as established by the University's Staff Manual (*see* Exhibit A), Defendants, UArts and Donovan, owed a duty to the University students, including Plaintiff, to properly handle a student's allegation of sexual assault and/or misconduct.

49

Case ID: 221002134

236.     Based on the sensitive nature of sexual assault and/or misconduct, Defendants, UArts and Donovan, knew or should have known that mishandling a student's disclosure of sexual assault or misconduct would result in severe emotional distress.

237.     Defendants, UArts and Donovan could reasonably foresee that Donovan's actions would cause emotional distress to Plaintiff.

238.     Defendants UArts and Donovan's conduct as described herein constituted negligence and caused significant emotional distress and physical injury to Plaintiff.

239.     As a result of the conduct of Defendants, UArts and Donovan, Plaintiff suffered discomfort and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, depression, anxiety, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, financial loss, delay in obtaining a Bachelor's degree, delay in post-undergraduate employment, and has sustained and continues to sustain loss of earnings and earning capacity.

240.     By reason of Defendants, UArts and Donovan's negligence and gross negligence by and through its authorized agents, servants, employees, and/or faculty members who were acting within the course and scope of their employment and/or authority, as aforesaid, caused Plaintiff to sustain serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendants, The University of the Arts and Kathryn Donovan, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive

Case ID: 221002134

damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

## COUNT VII

### NEGLIGENT TRAINING AND SUPERVISION
### (Plaintiff v. The University Of The Arts)

241.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

242.    Defendant UArts, including its agents and employees, owed a duty to maintain a reasonably safe condition for its students, such as the Plaintiff, who were enrolled at the University.

243.    According to the UArts' Staff Manual (*see* Exhibit A), "[t]he Federal Campus Sexual Violence Elimination Act (Campus (SaVe) included within the Violence Against Women Reauthorization Act specifically lists sexual assault… and requires Universities to provide training programs for new employees and annual training updates for employees. Accordingly, all employees are required to undergo training upon hire, and annually thereafter."

244.    Upon information and belief, the required trainings are designed to protect university students, including Plaintiff, from the risk of sexual assault.

245.    At all times material hereto, Defendants, Donovan and Dunn, were employed by Defendant UArts.

246.    Upon information and belief, Defendants Donovan and Dunn never received and/or completed the required training, including Title IX training, referenced the UArts' Staff Manual in violation of federal law and the University's policies.

247.    Upon information and belief, Defendant UArts' knew or should have known that failure to provide proper training to its staff and employees, including Defendants Donovan and Dunn, placed University students, including Plaintiff, at an increased risk of sexual assault.

51

Case ID: 221002134

248.     Defendant UArts including its agents and employees, breached their duty of care to Plaintiff in the following respects:

    a.   Failing to adequately train and supervise Defendant Dunn;

    b.   Failing to adequately train and supervise Defendant Donovan;

    c.   Failing to mandate that all faculty members receive sexual assault prevention and awareness and harassment training, including Defendants Dunn and Donovan;

    d.   Failing to adequately train faculty, including Defendant Donovan, on their reporting obligations under The Policy;

    e.   Failing to ensure faculty knew of The University's policies against sexual misconduct, sexual violence, sexual harassment and service of alcohol to underage students;

249.     As a direct and proximate result of Defendants, UArts' negligent training and supervision of Defendants Donovan and Dunn, by and through its authorized agents, servants, employees, and/or faculty members who were acting within the course and scope of their employment and/or authority, as aforesaid, Plaintiff sustained serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendant, The University of the Arts, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

**COUNT VIII**

**NEGLIGENT RETENTION**
**(Plaintiff v. The University Of The Arts)**

250.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

52

Case ID: 221002134

251.    Plaintiff John K.A. Doe was a former student at the University of the Arts enrolled in The Brind School of Theater from the fall of 2018 until the spring of 2021.

252.    At all times material hereto, Defendant UArts, including its agents and employees, owed a duty of care to provide a reasonably safe environment to its students, including, Plaintiff, free from harassment, discrimination, and assault.

253.    At all times material hereto, Defendant UArts, including its agents and employees, maintained a supervisory and/or student-teacher relationship over Plaintiff and had a duty to provide a reasonably safe environment to its students, including, Plaintiff, free from harassment, discrimination, and assault.

254.    Plaintiff met Defendant Dunn solely because of Dunn's status as a University employee.

255.    Upon information and belief, Defendant UArts, including its agents and employees, has actual and/or constructive knowledge that Defendant Dunn had a propensity to commit sexual assault, and knew or should have known that Defendant Dunn posed an unreasonable risk of harm to UArts' students, including Plaintiff, after Defendant Dunn was hired by the University.

256.    Defendant UArts, including its agents and employees, failed to appropriately investigate prior allegations and/or incidents of sexual assault involving Defendant Dunn and/or failed to relieve Defendant Dunn of his duty as an employee of the University, or failed to otherwise prevent harm by Defendant Dunn.

257.    As a result of Defendants, UArts' negligent retention of Defendant Dunn, by and through its authorized agents, servants, employees, and/or faculty members who were acting within the course and scope of their employment and/or authority, as aforesaid, Plaintiff sustained

Case ID: 221002134

serious and permanent and life-altering psychological injuries as well as physical injuries and financial loss as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendants, The University of the Arts and Kathryn Donovan, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

### COUNT VIIII

### NEGLIGENCE
### (Plaintiff v Daniel Dunn)

258.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

259.    At all relevant times, Defendant, Dunn, was an adjunct teacher, faculty member and employee of Defendant UArts where Plaintiff was enrolled as an undergraduate student and student in Defendant Dunn's Jazz Dance Practice class, which created a special, confidential, and fiduciary relationship between Plaintiff and Defendant, Dunn.

260.    Defendant Dunn owed a duty to Plaintiff and, by forcefully and aggressively sexually abusing and harassing Plaintiff, he breached that duty by acting with excessive and unreasonable force, threat and coercion, negligently and without due care for the reasons articulated in this Complaint.

261.    Defendant knew or should have known that Plaintiff was incapacitated and incapable of providing consent to engage in sexual acts and acted with willful disregard and/or recklessly for the reasons articulated in this Complaint.

262.    Defendant Dunn was unreasonable, negligent, grossly negligent, careless and reckless generally and in the following respects:

        a.    Failing to exercise reasonable care;

Case ID: 221002134

b.      Failing to retreat when Plaintiff passed out or incapacitated;

c.      Failing to obtain consent to engage in sexual acts from the Plaintiff;

d.      Using excessive and unreasonable force;

e.      Providing Plaintiff, who was under the legal drinking age, with alcohol;

f.      Engaging in sexual acts when Defendant Dunn knew or should have known that he was infected with syphilis;

g.      Disregarding Plaintiff's attempts to stop the sexual acts; and

h.      Failing to exercise reasonable care.

263.   By reason of the negligence, gross negligence, carelessness and recklessness of Defendant, Dunn, Plaintiff was caused to sustain serious and permanent and life-altering psychological injuries as well as physical injuries as more fully described herein.

WHEREFORE, Plaintiff claims of Defendant, Daniel Dunn, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

## COUNT X

### ASSAULT AND BATTERY
### (Plaintiff v Daniel Dunn)

264.   Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

265.   Defendant Dunn, in forcefully and aggressively sexually abusing Plaintiff engaged in intentional, wanton, willful and outrageous conduct, acted with deliberate malice, and/or was grossly and outrageously negligent, acted with reckless disregard of and with deliberate callous and reckless indifference to the rights, interest, welfare and safety of Plaintiff for the reasons articulated in this Complaint.

Case ID: 221002134

266.    As a result of Defendant Dunn's intentional, wanton, willful and outrageous conduct, Plaintiff was caused to suffer an immediate and reasonable apprehension of harmful or offensive contact with his body and was caused to sustain a harmful and offensive contact to his body.

267.    As a result of Defendant Dunn's intentional, wanton, willful and outrageous conduct, Plaintiff was caused to suffer serious and permanent psychological injuries and physical injuries as a result of transmitting syphilis to Plaintiff as stated herein.

268.    Defendant, Dunn, intentionally assaulted and caused bodily harm to Plaintiff by inflicting serious and permanent psychological injuries and physical injuries caused by forcibly and aggressively sexually abusing Plaintiff and transmitting syphilis to Plaintiff, thereby violating the common law of the Commonwealth of Pennsylvania whose courts have adopted the principles of the Restatement (Second) of Torts concerning the offenses of assault and battery, including, without limitation:

§ 13 Battery: Harmful Contact

(1)    An actor is subject to liability to another for battery if:

        a.    he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

        b.    a harmful contact with the person of the other directly or indirectly results.

§ 15 What Constitutes Bodily Harm
        Bodily harm is any physical impairment of the condition of another's body, or physical pain or illness

§ 18 Battery: Offensive Contact

(1)    An actor is subject to liability to another for battery if:

        a.    he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

56

Case ID: 221002134

      b.    an offensive co tact with the person of the other directly or indirectly results

§ 21 Assault

(1)    An actor is subject to liability to another for assault if:

    a.    he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

    b.    the other thereby put in such imminent apprehension.

269.    By reason of the carelessness, negligence, gross negligence, recklessness and/or intentional conduct of Defendant Dunn, Plaintiff, was caused to sustain serious and permanent and life-altering psychological injuries as well as physical injuries as more fully described in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiff claims of Defendant, Daniel Dunn, sums in excess of Fifty Thousand Dollars ($50,000.00) in damages, including punitive damages, exclusive of interest and costs, pursuant to Pa.R.C.P. § 238, and brings this action to recover the same.

**RESPECTFULLY SUBMITTED,**

THE JOEL BIEBER FIRM

BY:___*/s/ Melissa Fry Hague*_____
          MELISSA FRY HAGUE
          ***Attorney for Plaintiff***

Dated: _October 25, 2022_____

Case ID: 221002134



*Filed and Attested by the
Office of Judicial Records
25 OCT 2022 11:15 am
I. LOWELL*

# EXHIBIT A

Case ID: 221002134



# Staff Manual

**Human Resources Department**
**320 South Broad Street**
**Philadelphia, PA 19102**
**(215)717-6365**
**http://www.uarts.edu**

May 1, 2015

Case ID: 221002134

The University of the Arts

# Table of Contents

INTRODUCTION ................................................................................................. 4
ABOUT THE UNIVERSITY.................................................................................  4
MISSION STATEMENT........................................................................................  5
EQUAL EMPLOYMENT OPPORTUNITY POLICY STATEMENT..............................  5
AMERICANS WITH DISABILITIES ACT POLICY STATEMENT..............................  5


CHAPTER 1-      EMPLOYMENT.......................................................................7
    Section 1-        At-Will Employment Statement..................................... 7
    Section 2-        Definition of Employment Status...................................7
    Section 3-        Background Checks......................................................  8
    Section 4-        Hiring Procedures and Eligibility....................................9
    Section 5-        Authorization Forms Required...................................... 11


CHAPTER 2-      COMPENSATION .................................................................11
    Section 1-        Determination of Rates ...............................................11
    Section 2-        Staff with Teaching Assignments................................. 11
    Section 3-        Pay Days, Work Week and Break Periods......................12
    Section 4-        Payroll Deductions......................................................13
    Section 5-        Time Cards and Attendance Records............................14
    Section 6-        Overtime/Emergency...................................................15
    Section 7-        Salary Increases ........................................................ 16


CHAPTER 3-      EMPLOYEE BENEFITS...........................................................17
    Section 1-        Benefits Orientation.................................................... 18
    Section 2-        University Holidays......................................................18
    Section 3-        Paid Time Off
                    Personal Days  ...................................... 19
                    Sick Time.............................................. 20
                    Vacation  ...............................................21
                    Bereavement ........................................22
    Section 4-        Jury Duty..................................................................23
    Section 5-        Workers' Compensation  ........................................... 23
    Section 6-        Unemployment Compensation  ..................................23
    Section 7-        Social Security  ........................................................ 24
    Section 8-        Medical/Dental/Life Insurance/Disability
                    Medical.................................................24
                    Dental.................................................. 24
                    Life Insurance....................................... 25
                    Disability.............................................. 25
    Section 9-        Retirement Programs.................................................. 25
    Section 10-      Tuition Remission and Reimbursement.........................26
    Section 11-      Travel Insurance  ...................................................... 27
    Section 12-      Direct Deposit .......................................................... 28
    Section 13-      Library Privileges ...................................................... 28
    Section 14-      Sick Leave Donation Policy..........................................  28
    Section 15-      Miscellaneous Benefits ...............................................29
                    Pre-tax deductions for commuting costs............................ 29
                    Flexible Spending Accounts.............................. 29
                    GlobalFit Corporate Fitness Program................................. 29

Case ID: 221002134

The University of the Arts

CHAPTER 4-    EMPLOYEE RELATIONS.................................................................30
    Section 1-    Counseling and Progressive Discipline ..................................... 30
    Section 2-    Termination Due to Misconduct or Poor Performance............................ 30
    Section 3-    Resignation .................................................................. 31
    Section 4-    Exit Interview and Return of University Property…................................31
    Section 5-    Grievance Procedures         ...................................................... 32
    Section 6-    Sexual Harassment and Other Prohibited Harassment (summary)........ 33
    Section 7-    Retaliation Prohibited............................................................... 34
    Section 8-    Performance Evaluations   .......................................................... 34

CHAPTER 5-    POLICIES............................................................................ 36
    Section 1-    Personnel Records....................................................................... 36
    Section 2-    Confidentiality............................................................................ 36
    Section 3-    Conflict of Interest...................................................................... 37
    Section 4-    Policy on the Use of Social Media by Employees…............................. 37
    Section 5-    Non-discrimination Policy........................................................ 39
    Section 6-    Authorization - Donations, Grant Proposals, Contracts and
                            University Representation........................................................ 40
    Section 7-    Specialized Work Outside of Normal Job Responsibilities................... 40
    Section 8-    University Vehicle Use Policy....................................................... 40
    Section 9-    Use of University Property and Electronic Resources (summary).......... 41
    Section 10-   Smoking Policy........................................................................ 41
    Section 11-   Drug and Alcohol Abuse Policy (summary)....................................... 42
    Section 12-   Workplace Violence.................................................................. 42
    Section 13-   Solicitation.............................................................................. 43
    Section 14-   Dress, Appearance, Uniforms, Safety Gear...................................... 43
    Section 15-   Whistleblower Policy................................................................. 44
    Section 16-   Prolonged Incapacity or Illness.................................................... 44
    Section 17-   Worksite Lactation Policy........................................................... 45
    Section 18-   University Service..................................................................... 45
    Section 19-   Inclement Weather Closing Policy ............................................... 45
    Section 20-   Hiring of UArts Students for Outside Projects…................................46

CHAPTER 6-    LEAVES OF ABSENCE.............................................................47
    Section 1-    Family Medical Leave (summary)…................................................ 47
    Section 2-    Military Leave........................................................................... 47
    Section 3-    Domestic or Sexual Violence Leave…............................................ 48
    Section 4-    Crime Victim Leave…................................................................. 48
    Section 5-    Educational Leave..................................................................... 48
    Section 6-    Personal Leave......................................................................... 49

CHAPTER 7-    HR FORMS ......................................................................... 50

APPENDIX A-   DETAILED POLICY STATEMENTS.............................................51
    Section 1-    Drug and Alcohol Abuse Policy.................................................... 51
    Section 2-    Family Medical Leave................................................................ 57
    Section 3-    Sexual Harassment and Other Prohibited Harassment...................... 61
    Section 4-    Use of University Property and Electronic Resources ....................... 69

Case ID: 221002134

The University of the Arts

**INTRODUCTION**

This manual contains policies and procedures relating to benefits and employee rights and responsibilities for all staff members of the University of the Arts (the "University"). The Staff Manual has been designed to be used as a practical tool by all University staff members.  Please remember that this handbook is only a guide: it cannot, and does not, contain complete information about all of our policies.  The policies, programs and benefits discussed in the handbook are subject to change at any time at the sole discretion of the University.  Although the University will promulgate updated information concerning changes in the information set forth herein, it reserves the right to modify policies, programs or benefits without prior notification to employees.  The most current version is always posted online at Staff Manual. Therefore, any questions concerning University policies, programs, and benefits should be directed to Human Resources.

Employees covered by a collective bargaining agreement with the University are not subject to sections of this manual that are in conflict with the collective bargaining agreement.

Faculty employment, rights and responsibilities are articulated in the Faculty Handbook.  Only some parts of the Staff Manual apply to faculty as University employees. Chapters One and Four do not bear on faculty employment. In Chapter Three, sections 1-4 and 14 do not apply to faculty. All other parts of the Staff Manual do apply to faculty.

**ABOUT THE UNIVERSITY**

The University of the Arts is the largest comprehensive educational institution of its kind in the nation, preparing students for professional careers in design, visual, media, and performing arts, and emerging creative fields. The University of the Arts has evolved from two century-old institutions: the Philadelphia College of Art and the Philadelphia College of Performing Arts. The Philadelphia College of Art was formed in 1876 along with the Philadelphia Museum of Art. Initially known as the Pennsylvania Museum and School of Industrial Art, the institution was established in response to the interest in art and the Centennial Art Exposition. In 1949, the school became known as the Philadelphia Museum School of Art, reflecting the expanded programs that trained artists in many other areas, including the fine arts. The school received accreditation in 1959, and in 1964 separated from the Museum to become the Philadelphia College of Art. Today, the College of Art, Media and Design (CAMD) of The University of the Arts offers curricula in crafts, design, fine arts, media arts (photography, film and animation), museum studies (communication and education), and art education and art therapy.

The performing arts programs of the University of the Arts date from 1870, when three graduates of the Conservatory of Leipzig opened one of the first European-style conservatories of music in America: the Philadelphia Musical Academy. The Philadelphia Musical Academy became an independent college of music in 1950, granting a Bachelor of Music degree after a four-year course of study, one of only eight such music colleges in the nation at the time. While still offering only a music program, the school changed its name to the Philadelphia College of Performing Arts in 1976, the first such college in Pennsylvania. One year later, the former Philadelphia Dance Academy became part of the Philadelphia College of Performing Arts, and in 1983 the School of Theater Arts was created, thus creating a multi-disciplinary performing arts conservatory.

In 1983, the Philadelphia College of Art and the Philadelphia College of Performing Arts joined to become the Philadelphia Colleges of the Arts, and in 1987, the University of the Arts was inaugurated. In the fall of 1996, the University created a new academic unit, the College of Media and Communication, which emphasizes the integration of art, technology, and communication. The first two BFA degree programs offered by this new college were Writing for Film and Television, and Multimedia; the third, a BS degree program in Communication, began in September 1999. With the 2011 merger of the College of Art and Design and the College of Media and Communication, the University of the Arts currently comprises the College of Art, Media and Design (CAMD); the College of Performing Arts (CPA); and the Division of Liberal Arts (LA), which provides instruction in liberal arts for students of all the University.

Case ID: 221002134

The University of the Arts

**MISSION STATEMENT**

The Arts have the power to transform society.  They play an essential role in ensuring and enhancing the quality of life.  The University of the Arts is committed to inspiring, educating and preparing innovative artists and creative leaders for the Arts of the 21st century.

The University of the Arts is dedicated to educating the next generation of creative leaders, recognized both for their individual artistic achievement and for their contribution to advancing the character and status of their chosen discipline, by inspiring students to learn, create, lead and contribute to society through the arts and media.

The University of the Arts offers instruction across a broad spectrum of artistic disciplines.  We serve the community, in which we reside, the professions for which we prepare new members, and ultimately the society whose culture we both sustain and advance.

The University's goal is to direct each student's quest for creative self-expression towards a productive role in society.  Our programs develop the student's talent, aesthetic sensibility, conceptual and perceptual acumen, cultural awareness and professional expertise.  The curricula integrate specific knowledge and skills needed for technical mastery of the various arts disciplines with a significant examination of conceptual and humanistic studies.

To this end, the University endeavors to recruit and retain a distinguished teaching faculty and highly qualified, dedicated staff offering a breadth of professional expertise.

**EQUAL EMPLOYMENT OPPORTUNITY POLICY STATEMENT**

The University is committed to providing equal employment opportunity in all of our employment programs and decisions.  Discrimination in employment on the basis of any classification protected under federal, state or local law is a violation of our policy and is illegal.  Equal employment opportunity is provided to all employees and applicants for employment without regard to: race, color, religion, sex, gender identity, national origin, age, mental or physical disability, veteran status, genetic information, the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, possession of a GED instead of a high school diploma and military status as defined by Pennsylvania law, sexual orientation, gender identity, marital status, familial status and domestic/sexual violence victim status or any other prohibited factor.

This policy applies to all terms and conditions of employment, including, but not limited to, recruitment and hiring, placement, promotion, termination, reductions in force, recall, transfer, leaves of absence, compensation and training.

In keeping with the above, the Associate Vice President for Human Resources serves as the Equal Employment Opportunity ("EEO") Officer of the University, and as the coordinator for compliance with the Americans with Disabilities Act.  The AVP for HR, in coordination with the Provost and the President of the University, has overall responsibility for the implementation and monitoring of the respective policies, to ensure that the spirit and integrity of the equal opportunity policy is maintained.  Any questions you have concerning these policies should be directed to the Associate Vice President for Human Resources.

**AMERICANS WITH DISABILITIES ACT POLICY STATEMENT**

The University is committed to complying with the Americans with Disabilities Act, as amended, and applicable state and local laws providing for nondiscrimination in the employment of qualified individuals with covered disabilities.  The University also provides reasonable accommodation for such individuals in accordance with these laws.  It is the University's policy to:

- Ensure that qualified individuals with disabilities are treated in a nondiscriminatory manner in the pre-employment process and that employees with covered disabilities are treated in a nondiscriminatory manner in all terms, conditions, and privileges of employment.

Case ID: 221002134

The University of the Arts

- Keep all medical-related information confidential in accordance with the requirements of the ADA and retain such information in separate confidential files.  If any employee feels that his or her confidentiality has been breached, we ask that the employee report this to Human Resources immediately. We take such concerns very seriously.

- Reasonably accommodate applicants and employees with covered disabilities, except where such an accommodation is unreasonable or would otherwise create an undue hardship on the University. Reasonable accommodations may include, but are not limited to, making existing facilities readily accessible to and usable by individuals with disabilities, acquisition or modification of equipment or devices, provision of qualified readers or interpreters, appropriate adjustment or modification of examinations, training materials or policies, part-time or modified work schedules, job restructuring (reassignment of non-essential job functions) and reassignment to a vacant position.  If you have a disability and believe you need a reasonable accommodation to perform the essential functions of your job, you should contact Human Resources to request an accommodation.

- Notify individuals with covered disabilities that the University provides reasonable accommodation to qualified individuals with disabilities, by including this policy in the University's Staff Manual and by posting the Equal Employment Opportunity Commission's poster on not discriminating against individuals with disabilities and other protected groups conspicuously throughout the University's facilities.

This policy governs all aspects of employment, including job selection, job assignment, compensation, employee counseling steps, termination, and access to benefits and training.  For information regarding the procedure for requesting an accommodation, go to: Employee Request for ADA Accommodation. Please refer to the University's Anti-Harassment Policy for more information on reporting and other related procedures.

Also, and in accordance with the Genetic Information Nondiscrimination Act of 2008 (GINA), the University does not request or require from its employees genetic information of any individual or family member of the individual, except as may be specifically allowed by law.  To comply with this law, the University asks that employees refrain from providing any genetic information when responding to any request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

Case ID: 221002134

The University of the Arts

**CHAPTER 1-      EMPLOYMENT**

**Section 1-      At-Will Employment Statement**

All University employees are "at will."  Nothing in this manual is intended to create a contract of employment or a promise of employment of any kind, real or implied.  The University maintains the right to change or terminate these policies at any time, with or without notice.  Under Pennsylvania law, all employment is presumed to be at-will, which means that the employee may be discharged with or without cause, at pleasure, unless restrained by some contract, or where the employee's discharge would threaten clear mandates of public policy.  An at-will employment relationship exists when either the employer or the employee can terminate the employment relationship for any reason, at any time, and without any requirement of advance notice to the other party.  Just as an employee may be discharged at the will of the employer, so may the employee leave his/her job with the employer at will.  No oral or written communication or representation by anyone at the University other than the President, Provost or Associate Vice President for Human Resources will establish an employment contract, expressed or implied.

The University's benefit plans and programs, which are described in separate materials, may be referenced briefly in this manual.  Each benefit plan or program shall be subject to the terms of the specific documents by which it is governed and the University (or its designee) shall have complete discretion to determine benefit eligibility and interpret the terms of each plan or program.  In accordance with applicable law, the University reserves the right to amend, modify or terminate, in whole or in part, any of these benefit plans or programs at any time.

**CHAPTER 1-      EMPLOYMENT**

**Section 2-      Definition of Employment Status**

The University classifies positions in accordance with the provisions of the Fair Labor Standards Act ("FLSA").

FISCAL YEAR

Throughout this document, the term 'fiscal year is used to refer to the University's accounting period that begins on July 1 and ends the following year on June 30.

EXEMPT STAFF (Salaried/Monthly)

Certain employees are exempt from the provisions of the FLSA because of the nature of their jobs: executive, administrative and professional positions with managerial responsibility and which regularly require the use of a high degree of discretion.  Exempt employees do not receive overtime premium pay, but are paid on a salaried basis for all hours worked.  Exempt employees are not eligible for compensatory time off.

NON-EXEMPT STAFF (Hourly/Bi-weekly)

Non-exempt employees are those in all positions other than Exempt Staff positions and are paid overtime premium pay as required by applicable federal, state, and local laws, and as set forth in the overtime policy in this Staff Manual.

CALENDAR YEAR EMPLOYMENT ("CALENDAR YEAR")

A scheduled work year of 52 weeks/12 months.

ACADEMIC YEAR EMPLOYMENT ("ACADEMIC YEAR")

Generally, a scheduled work year of approximately 40 weeks/9 or 10 months, as determined by the academic

Case ID: 221002134

The University of the Arts

calendar and departmental needs.

EMPLOYMENT CATEGORIES:

REGULAR EMPLOYEE

An employee (whether Part-Time or Full-Time) who is hired to fill an established permanent position of a defined number of hours per week for at least 9 months each year on a continual basis and is not classified as a temporary employee.

TEMPORARY EMPLOYEES

An employee hired to fill a position intended to last for a specified duration up to twelve months.

FULL-TIME

An employee whose work schedule is consistently at least thirty-five (35) or forty (40) hours per week in either a calendar or academic year position depending on the department's hours of operation.

PART-TIME

An employee whose work schedule is consistently: (a) twenty-eight (28) hours per week in a department whose regular work schedule is thirty-five (35) hours per week; or (b) thirty-two (32) hours per week in a department whose regular work schedule is forty (40) hours per week.

PART-TIME ON-CALL

An employee whose work is scheduled on an on-call, hourly basis of twenty-seven (27) hours per week or less in departments whose regular work schedule is thirty-five (35) hours per week or employed for thirty-one (31) hours per week or less in departments whose regular work schedule is forty (40) hours per week.

**CHAPTER 1-      EMPLOYMENT**

**Section 3-       Background Checks**

To ensure the safety and security of its students, faculty, and staff, all employees at the University of the Arts are subject to background checks.

 An offer of employment may be extended to an applicant prior to receiving the results of a background investigation ('Advance Offer'); however, any Advance Offer is contingent upon successful completion of the background check. All offers of employment will be rescinded if the new hire applicant or incumbent employee refuses to complete the required background check authorization and release.  Background check results are kept as separate confidential files and not maintained in the personnel or applicant files.

If negative information is received, the applicant will be notified in writing before any adverse employment decision is made as required by the Fair Credit Reporting Act.  If an adverse employment decision is made based in whole or in part on information contained in a background check, the Human Resources Department will again notify the applicant in writing as required by federal, state and/or local law.  If an offer is rescinded because of information contained in a background check, this information is not shared with the hiring department, which only receives notification that the offer of employment has been rescinded.

Case ID: 221002134

The University of the Arts

Any misrepresentation, falsification or material omission of information on the application for employment or promotion or related materials is sufficient grounds for denial of employment or dismissal therefrom.  The University reserves the right to check sex and violent crime offender registries and public criminal records on incumbent employees in certain identified positions to evaluate an employee for continuing employment where the University has reason to believe a previously undisclosed record exists.  All checks comply with federal, state and local law.

**CHAPTER 1-      EMPLOYMENT**

**Section 4-       Hiring Procedures and Eligibility**

All requests to establish a new position, fill an existing vacancy or to reclassify an existing position due to a substantive change in position responsibilities must be submitted on the appropriate Personnel Requisition form. New position requests must also be accompanied by a Job Content Questionnaire ("JCQ") for salary review and position grade determination based on the University's position classification system, determination of status under the Fair Labor Standards Act (FLSA) and benefit eligibility.  Human Resources conducts a job audit for each reclassification request to determine if sufficient grounds have been established for reclassification.

All hiring forms are available in Human Resources or on the Portal at: Position Management.  The University's recruitment process is detailed in the Search Handbook

**Employment Eligibility and Verification:**

The University is committed to employing only United States citizens and aliens authorized to work in the United States.  We do not unlawfully discriminate on the basis of citizenship and national origin.

Federal law requires that every employee hired by the University complete Section 1 of the Employment Eligibility Verification Form (commonly called the I-9) on the first day of work and Section 2 within three work days of the start of work. The I-9 provides proof of eligibility to work in the United States. Employees must complete Section 1 and present documentation of identity and work eligibility, as described on the back of the I-9 form, to staff in Human Resource Services for verification and completion of Section 2. Completion of the I-9 process within three work days of the start of work is a condition of employment.  The University is not legally permitted to employ anyone that refuses or fails to complete the I-9 form. Former employees who are rehired must also complete the form if they have not completed an I-9 with the University within the preceding three years or if their previous I-9 is not valid or has not been retained.

**Employment of Relatives:**

The University considers applicants who are relatives of current employees on the same basis as all other applicants and uses the same screening, pre-employment interviewing, selecting and hiring practices as are used for non-relative applicants.

The University reserves the right to make unilateral decisions concerning the placement or supervision of a relative in order to avoid problems of reporting relationships, safety, security, morale and conflict of interest.  Where the relative is a spouse or a domestic partner, decisions concerning placement and supervision will be made on a case-by-case basis.

For the purpose of this policy, relatives are defined as your spouse, domestic partner, child, stepchild, sibling, parent, parent-in-law, and individuals who serve(d) as legal guardian of the employee.

Authorization by Human Resources and the appropriate dean or vice president is required for:

- An employee to supervise a relative.

- Relatives to work in the same department.

Case ID: 221002134

The University of the Arts

**Rehire of Former Employees:**

Former employees eligible for rehire will be considered for employment on the same basis as external applicants and are subject to the recruitment, selection and appointment policies.  Consideration of previous work record will be paramount in consideration for rehire.  Employees terminated for cause are not eligible for re-hire.

**The University's employment policies apply to all employees regardless of the sources of funding supporting the position.**

**Introductory Status:**

The Introductory Period ("IP") for new employees is 90 days from the date of hire. During this period, the new employee is extended the opportunity to establish his/her ability to perform the assigned work duties and responsibilities and be considered for a regular position.

Two weeks prior to the end of the IP, a formal review of employee performance must be completed by the supervisor and filed with Human Resources. At any time during the IP, the new staff member may resign without prejudice and the University may terminate the new staff member's services without the requirement of a formal warning, counseling and progressive discipline. The Grievance Process described later in this document is not available to staff members terminated during the IP.

At the discretion of the supervisor, in consultation with Human Resources, the IP may be extended.  Successful completion of the IP does not change the individual's status as an employee at-will.

**Identification Cards:**

All employees are required to carry valid University Identification Cards for admission to University buildings, and must present a valid University Identification Card upon request.  Employees not presenting Identification Cards may be denied entry to buildings.  An Authorization for Identification Card form, approved by Human Resources, must be presented to the Student Financial Services Department to secure a photo identification card.  Severely worn or damaged cards should be replaced promptly; there is no charge to employees for replacement of Identification Cards.

An employee who changes his/her legal name should bring his/her old identification card to Human Resources for replacement with a new card with the employee's new legal name.  Legal documentation of name change is required.

Validation stickers are issued on a semester basis and University Identification Cards are only valid with a current validation sticker.

Identification Cards must be returned to Human Resources upon an employee's termination of employment with the University.

**Contractors:**

Consultants, models and other independent contractors (collectively, "Contractors") are not employees of the University and as such are subject to the procurement procedures of the University and are not subject to the provisions and protections contained in this Staff Manual.  Contractors are subject to review by Financial Services in consultation with Human Resources to ensure proper classification as contractors in accordance with state and federal law.  As such, Financial Services may request additional information from the hiring department to ensure full compliance with applicable laws and University policies.

Case ID: 221002134

The University of the Arts

**Temporary Office Staffing Agencies:**

A Department Head may request short-term temporary office staff from an outside temporary staffing agency by contacting the Human Resources Department.  Arrangements for temporary office staff from outside agencies are made by the Human Resources Department; Departments are not permitted to make arrangements directly with outside agencies for temporary office staff.  Payment for temporary staff is the responsibility of the requesting department.

**CHAPTER 1-        EMPLOYMENT**

**Section 5-        Authorization Forms Required**

All personnel actions related to compensation and benefits of the University require an approved authorization form. These changes include adjustments in rate, change in funding source, number of weeks/months per year/hours per week, title, etc.   Payroll cannot process any change to the University's payroll records without an approved authorization form.

**CHAPTER 2-        COMPENSATION**

**Section 1-        Determination of Rates**

**New Hire:**

The grade and rate of pay is determined during the hiring process based on the candidate's credentials, experience and market conditions, if appropriate.

**Eligibility to apply for another position at the University:**

An employee with at least one full year of continuous service and satisfactory performance is eligible to apply for a position in another department of the University.  When an employee moves from one position to another he/she is subject to the Introductory Period as of the start date of the new position.

**Position Reclassification:**

Occasionally, reclassification of a position may be necessary due to a significant change in responsibilities.

**CHAPTER 2-        COMPENSATION**

**Section 2-        Staff with Teaching Assignments**

**Full-time Staff with Teaching Assignments:**

Full time, senior administrative staff (President, Vice President, Provost, Dean) are not eligible to receive additional compensation for teaching.

<u>Non-exempt staff are not permitted to teach at UArts.</u>

Teaching During the Regular Work day:
- Non-senior exempt staff may, in exceptional circumstances, be approved to teach (at UArts) no more than one course per semester during the work day.  Such staff will be compensated for teaching at established rates, provided that all primary work responsibilities are fulfilled.  Prior approval of the supervisor and the

Case ID: 221002134

The University of the Arts

appropriate vice president or dean is required.

Teaching Outside of the Regular Work day:
- Non-senior exempt staff may teach at UArts outside of the regular work day, and be compensated at established rates, subject to supervisor approval.  Supervisors will not unreasonably withhold such approval for teaching outside of the regular work day.

**CHAPTER 2-          COMPENSATION**

**Section 3-          Pay Days, Work Week and Break Periods**

**Pay Days:**

Exempt (salaried) employees are paid once a month on the 25th of each month, which payment represents the total salary earned for a given month of work.

Non-exempt (hourly) employees are paid bi-weekly on the Friday of the week following completion of the 2-week pay period.  Actual compensable hours must be submitted to the payroll department by 5:00 p.m. on the Friday preceding the payday on a time card signed by the employee and approved by his/her supervisor.

If a payday falls on a University holiday, paychecks will be distributed and payable on the work day immediately preceding the holiday.

Paychecks cannot be given to anyone other than the person named on the check unless prior written approval is given to Human Resources by the employee.

Each employee's payroll stub itemizes deductions made from gross earnings. The law requires the University to make deductions for social security and Medicare (FICA), child support, alimony, garnishments, Federal and where applicable, State income taxes.   In accordance with Pennsylvania law, pay statements will list hours worked, rates paid, gross wages, allowances, if any, claimed as part of the minimum wage, deductions and net wages.

Employees should review payroll stubs.  Any errors should be brought to the attention of Human Resources immediately and adjustments, if necessary, will be made in the next paycheck.

If you do not understand how your earnings were computed, or if you have any questions concerning your pay, please consult Human Resources.

In accordance with Pennsylvania law,  University employees will be notified in writing, at the time of hiring, of the rate of pay and of the time and place of payment and the rate of pay and the amount of any fringe benefits or wage supplements to be paid to the employee, a third party or a fund for the benefit of the employee and any change with respect to any of these items prior to the time of the change.

**Work Week:**

For payroll purposes, the University work week begins on Sunday at 12:01 a.m. and ends on Saturday at midnight. The University's normal business hours are Monday through Friday, 9:00 a.m. to 5:00 p.m.  Daily hours are scheduled in accordance with departmental policy and institutional needs.

**Break Periods:**

Work schedules for hourly paid, "non-exempt" staff normally include an unpaid lunch break.  Work schedules may provide for one paid 15-minute break period for each consecutive four hours worked. At the discretion of the

Case ID: 221002134

The University of the Arts

department, timing of break periods may be limited to specific times to facilitate departmental needs.  Employees are encouraged to consult their Department Head regarding specific break periods within their department.

If conditions warrant, employees may be asked to work through the normally scheduled break period. At such times, employee cooperation is expected. An employee who believes the department is abusing the break period policy should contact Human Resources.

Exempt staff are expected to exercise appropriate professional judgment when taking breaks.

Break periods are an employment privilege. Break periods may not be "saved" to shorten the employee's work day, to extend lunch breaks, or to alter the work schedule in any way. Break periods not taken will be forfeited. Abuse of break periods may result in loss of the privilege.

**Attendance and Absenteeism**

The University plans its business and educational activities with the expectation that employees will report to work as scheduled.  An employee's repeated pattern of absence, lateness or early departure places an unfair burden on others, and impedes the employee's performance as well as detracts from the quality of service provided by the University.  Regular, prompt attendance is an essential requirement of all positions with the University.  Supervisors will counsel employees whose attendance is a cause for concern.  Repeated absences, lateness or early departures may result in disciplinary action, up to and including termination.

**CHAPTER 2-      COMPENSATION**

**Section 4-       Payroll Deductions**

**Mandatory Deductions:**

Mandatory deductions include deductions for Federal Withholding Tax (income tax), Pennsylvania State Income Tax, Philadelphia City Wage Tax, F.I.C.A. (Social Security Tax) and Unemployment Compensation.  In keeping with Internal Revenue Service rules, all salary and wages, whether arising from normal departmental work or through University sponsored grants and contracts, require payroll withholding for mandatory deductions.

The Federal Withholding Tax deduction is determined by the number of exemptions claimed on the Employee's Withholding Allowance Certificate (Form W-4).  It is important that employees notify Payroll of any change in the number of exemptions.  Form W-4 may be obtained in Human Resources.

**Voluntary Deductions:**

Voluntary deductions are those made for contributory benefit programs in which the employee has elected to be enrolled or has elected to enroll his or her dependents.  These deductions include:  medical and dental insurance, retirement plan (contributions are mandatory for full-time faculty and senior administrators), supplemental retirement annuity, credit union and savings bonds, flexible spending plan, health club membership, annual fund contributions, etc.  Every paycheck stub lists the specific tax and benefit, as well as the amount deducted for the current pay period.

**Deductions from Exempt Employees**

The University is fully committed to complying with its obligations under the FLSA.  Therefore, it is our policy not to make deductions from the guaranteed salary of exempt employees except for reasons permitted by federal and state law.

Case ID: 221002134

The University of the Arts

The University may make deductions from an exempt employee's salary for the following reasons:  (1) if the employee absents himself/herself for one or more full days for personal reasons and does not have accrued paid leave; (2) if the employee absents himself/herself for one or more full days due to sickness or disability and does not have accrued or paid leave under the University's benefit plans; (3) as a penalty imposed in good faith for infractions of safety rules of major significance; (4) if the employee is suspended in good faith, for one or more full days, for infraction of the University's written policy on workplace conduct, which is applicable to all employees; or (5) if the employee takes a leave of absence.

If an exempt employee believes that an improper deduction has been made from his/her pay, he/she should immediately contact Human Resources which will promptly and fully investigate the situation.  If the University determines that the deduction was improper for any reason, the University will reimburse the employee and take steps to ensure that such improper deductions do not reoccur.

**CHAPTER 2-        COMPENSATION**

**Section 5-        Time Cards and Attendance Records**

**Non-Exempt Staff:**

Non-exempt staff must complete a bi-weekly time card in accordance with the University's bi-weekly payroll schedule. Time cards must indicate all hours worked during the pay period, lunch periods taken, as well as all other compensable days (sick, vacation, personal, holiday) used by an employee within the pay period.  In addition to indicating the starting, ending and lunch period times, all time cards must show the daily number of hours as well as the total number of hours to be paid.  All timecards must be signed by the employee and the employee's supervisor to authorize payment and must be delivered to the Human Resources Department by 5:00 p.m. on the Friday preceding the payday, in accordance with the schedule distributed by that office.

**Exempt Staff:**

Exempt staff must complete the Report of Benefit Days Used form.  This form is to be approved by the Department Head and sent to the Human Resources Department by the 5th of the month following the reporting month.  Exempt staff must have their reports approved by their direct supervisor.

**Time Clock Procedures:**

Any employee required to use a time clock must swipe his/her card in/out at his/her normally scheduled time. Payment will only be made for regularly scheduled time which is properly documented in the University's Time and Attendance Software with a virtual time card showing punch in/out times.  Employees are not permitted to work additional time beyond their scheduled hours without approval by their supervisor.

Employees are required to take a lunch break in each day when more than 7 hours are worked, unless authorized to work through the lunch break by their supervisor.   Absent this authorization, thirty minutes will automatically be deducted for the lunch break on any day where more than 7 hours are worked.  Lunch breaks are not required and no automatic deduction will be made on days when less than 7 hours are worked.

Only a Department Head or authorized staff in the Human Resources Department may edit employee punches or add compensable days.

Employees must notify their supervisor immediately if they fail to punch in/out or have any difficulties using the time clock.  Approved corrections/adjustments will occur in the following pay period if an employee fails to notify his/her supervisor immediately of a problem.  Employees will be paid for all time worked.  However, working time beyond the scheduled hours is grounds for disciplinary action.

Case ID: 221002134

The University of the Arts

The management of the Time Clock resides within the Human Resources and Campus Operations Departments. Any requests for modifications must be made to the Human Resources Department.

**CHAPTER 2-       COMPENSATION**

**Section 6-        Overtime/Emergency**

OVERTIME:

It is sometimes necessary for employees to work overtime. Overtime occurs when there is a business need, or when help is needed to cover for someone who is absent because of illness, vacation, or other reasons. From time to time the University may ask employees to work overtime because of extra work loads or special projects. In all cases, efforts will be made to advise employees of required overtime in advance. However, there may be emergency conditions which could prevent advance notice.

Managers and other exempt personnel are not eligible for overtime pay.  Non-exempt employees will be paid overtime at the rate of time and one-half (1½) for all approved hours actually worked over forty (40) in a work week. It is the responsibility of the Department Head to monitor all non-exempt staff for time worked, and to ensure time cards accurately reflect hours worked, regardless of budgetary funds.

Overtime work by non-exempt personnel must be approved in advance by an employee's manager or supervisor. Approval should be in written form, listing all individuals or departments permitted to work overtime.

Anyone working unauthorized overtime will be subjected to disciplinary action, up to and including termination. University recognized holidays are not counted as hours worked for purposes of computing overtime

EMERGENCY STAFFING POLICY

It may be necessary for a Department Head to require essential employees to work for emergency purposes. Essential employees are those individuals who are directly involved with the resolution of a particular emergency and these employees may vary with the type of emergency to be handled.

COMPENSATION DURING EMERGENCIES

When the University is declared officially closed due to weather or other emergency, employees who are scheduled to work on that day but excused due to the emergency will receive their regular rate of pay.  Any non-exempt (hourly) essential employees scheduled and requested to work on that day will be compensated for the emergency day at their normal daily rate if they are normally scheduled to work on that day, plus they will be paid at their regular straight time rate of pay for hours actually worked, in addition to any overtime.

Upon prior approval of the Division Head, individual employees may be asked to stay overnight for purposes of handling a real or anticipated emergency.  Those individuals required to stay overnight will be compensated for their time with the exception of 1/2 hour for breakfast, 1/2 hour for lunch, 1 hour for dinner, and 8 hours of sleeping time.  If the sleeping period is interrupted so that the employee is unable to get at least 5 hours sleep during the scheduled period the entire time will be counted as working time.  Only the costs incurred for sleeping accommodations will be covered by the University.  Employees are responsible for their own meals.

Travel time to and from the University for such emergencies will not be compensated. Employees required to remain on-call while not on the employer's premises will not be considered working during the on-call time and will not be compensated.

Case ID: 221002134

The University of the Arts

**CHAPTER 2-**          **COMPENSATION**

**Section 7-**          **Salary Increases**

Occasionally, an across-the-board increase in salary and/or wage rates may be awarded to eligible full and part-time staff.  Staff in their Introductory Period are not eligible for salary increases.  Staff employed in their current position for less than 6 months since the last across-the-board increase was awarded will receive an increase at one-half (50%) of the rate awarded to all other staff.

Case ID: 221002134

The University of the Arts

**CHAPTER 3-     EMPLOYEE BENEFITS**

Who qualifies for which benefits?  Please see the chart below; each benefit is described in detail later in this Chapter. All benefits are subject to the applicable waiting period as detailed in each section.

**BENEFITS ELIGIBILITY CHART**

**EMPLOYMENT CLASSIFICATION**

| Benefits | Regular Full Time | Regular Part Time | Temporary Staff | On-Call |
|---|---|---|---|---|
| Paid University Holidays | Yes | Yes | No | No |
| Personal Days | Yes | Yes | No | No |
| Sick Time | Yes | Yes | No | No |
| Vacation Time | Yes | Yes | No | No |
| Bereavement | Yes | Yes | No | No |
| Jury Duty | Yes | Yes | No | No |
| Worker's Compensation | Yes | Yes | Yes | Yes |
| Unemployment Compensation | Yes | Yes | Yes | Yes |
| Social Security | Yes | Yes | Yes | Yes |
| Medical | Yes | No | No | No |
| Dental | Yes | No | No | No |
| Group Term Life Insurance | Yes | No | No | No |
| Voluntary Life Insurance | Yes | No | No | No |
| Short-Term Disability | Yes | No | No | No |
| Long-Term Disability | Yes | No | No | No |
| Retirement Plan with University Match | Yes | Yes | No | No |
| Retirement Plan - Group Supplemental (No University Match) | Yes | Yes | No | Yes |
| Tuition Remission  (In-House) | Yes | No | No | No |
| Tuition Reimbursement | Yes | No | No | No |
| Travel Insurance | Yes | Yes | No | No |
| Direct Deposit | Yes | Yes | Yes | Yes |
| Library Privileges | Yes | Yes | No | No |
| Sick Leave Donation Program | Yes | Yes | No | No |
| Pre-Tax Commuter Benefits | Yes | No | No | No |
| Health Care & Dependent Care Flexible Spending | Yes | No | No | No |
| GlobalFit Corporate Fitness Program | Yes | Yes | Yes | Yes |

Case ID: 221002134

The University of the Arts

**Section 1-        Benefits Orientation**

Human Resources provides all new employees  with a University policies and benefits orientation. Human Resources schedules the orientation as close as possible to the new employee's first work day of work and notifies the employee of the date, time and location of the orientation session.  At this time, the new employee is given a copy of the Staff Manual, health insurance information and a summary of all services and benefits for which the employee is eligible. The University reserves the right to modify, change or eliminate any of its benefits at any time.  The terms of the specific plan documents control eligibility, benefits determinations and other conditions.

**CHAPTER 3-        EMPLOYEE BENEFITS**

**Section 2-        University Holidays**

The University provides paid holidays each fiscal year to eligible employees. Generally, the following holidays are observed:

> New Year's Day
> Martin Luther King's Birthday
> Memorial Day
> Independence Day
> Labor Day
> Thanksgiving Day/and the following day
> Christmas Day

Note: In addition to these holidays, the University, at the discretion of the President, may designate certain days as other compensated time off.

A.        Eligibility

1. Only regular full-time and part-time benefit eligible employees are eligible for paid holidays.

2. The employee must be on active payroll status or authorized compensable leave in the payroll period in which the holiday occurs in order to receive pay for holidays.

3. Employees must provide a physician's note for sick time taken on their regularly scheduled work day immediately preceding and/or immediately following a holiday in order to receive pay for holidays. A physician's note must be received by Human Resources within 36 hours of the employee's return to work.

   On a non-recurring basis, an employee's supervisor may submit a written request to Human Resources to waive the physician's note requirement for the employee's use of sick time immediately preceding and/or immediately following a holiday.  Waivers will be granted at the discretion of Human Resources, in consultation with the Vice President for Finance and Administration.

4. Temporary, Part Time non-benefit eligible and On-Call staff are not eligible to be paid for any University Holidays during which they do not work. However, part-time on call employees will receive time and a half for hours worked on New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.  All other University observed holidays worked by temporary and on-call staff are compensated at straight time.

Case ID: 221002134

The University of the Arts

B.      General Provisions

1.      The general policy regarding all University-designated holidays for non-exempt/hourly staff is that regular full-time and  part-time non-benefit eligible employees are paid for each holiday that falls on a regularly scheduled work day.

If a holiday falls on a non-regularly scheduled work day, the employee is allowed a floating holiday to be taken within 14 days of the University's scheduled holiday, not a Saturday or Sunday and the employee will not work on the day selected as the floating holiday.  All requests for a floating holiday must be made at least 7 days in advance of the schedule University holiday.   Supervisors will not unreasonably withhold approval.

If a holiday occurs during approved compensated leave time (i.e., vacation, sick time with physician's note (see A-3 above) or paid administrative leave), non-exempt hourly staff will be paid (straight time) for the holiday and that day will not be charged against the compensated leave time except in cases where the employee is receiving disability benefits or non-paid leave of absence.

Employees taking a floating holiday will be paid for their normal 5-day work week but will not be paid for an extra day in addition to working the five days that normally comprise their work week.   If an employee works all 5 days either by choice or supervisory directive, the employee will not be paid for a sixth day as the holiday.

2.      Regular full-time employees with 40 hour work weeks receive 8 hours of holiday pay for each holiday.

Regular full-time employees with 35 hour work weeks receive 7 hours of holiday pay for each holiday. Part-time benefit eligible employees receive pro-rated holiday pay for each holiday that falls on a regularly scheduled work day based on the normally scheduled hours worked in a work week.

3.      Non-exempt/hourly regular full and  part-time benefit eligible employees who are required to work during a holiday will be compensated on a straight time basis for the time worked, in addition to holiday pay on a straight time basis.

**CHAPTER 3-      EMPLOYEE BENEFITS**

**Section 3-      Paid Time Off**

Vacation, sick and personal time is accrued according to the schedule below.  It is the responsibility of the employee to verify that sufficient vacation, sick or personal time has been accrued and is available for use.  Time taken without sufficient benefit accrual will be unpaid. Only accrued time may be used, employees may not "borrow" against anticipated accruals.  Paid time off does not accrue during a leave of absence, disability or other no-pay status.

**Personal Days**

The University provides eligible employees with Personal Days that can be used at the staff member's discretion, subject to reasonable scheduling requirements of the department and with the approval of the staff member's supervisor.

Personal Days must be used within the fiscal year in which it accrues and may not be accumulated beyond the fiscal year.  Personal Days may not be scheduled or used by an employee after resignation notice has been given unless such notice exceeds ten (10) working days, and only if the Personal Day is approved by the staff member's supervisor prior to giving notice of resignation.

Case ID: 221002134

The University of the Arts

Employees are not paid for unused Personal Days upon termination of employment.

ELIGIBILITY:

1. Regular full-time employees are afforded the equivalent hours of two (2) Personal Days per fiscal year based on their position schedule
2. Regular part-time employees are afforded the equivalent hours of two (2) Personal Days per fiscal year, pro-rated on the basis of their work week as follows:
   a) Exempt Staff: based on the percentage of hours in the departmental work week and number of months scheduled to work.
   b) Non-exempt staff: based on number of scheduled hours in one work week.
      For example, an exempt employee who works 80% of the normal departmental work schedule (28 hours instead of 35 or 32 hours instead of 40) would be eligible for 80% of 2 Personal Days, or 1.6 days per fiscal year (11 1/4 hours for 35 hours/week schedules and 12 ¾ hours for 40 hours/week schedules).
3. Temporary and part-time on-call employees are not eligible for Personal Days.
4. New employees may not use Personal Days until completion of the introductory period.

**Sick Time**

Sick Time may be used for illness or injury of the staff member and for doctor/dentist appointments when it is not possible to schedule them during non-working hours. Sick time used for health care provider appointments which are not medically urgent must be scheduled in advance and approved by the supervisor. Sick time may be used for illness of a member of the staff member's household.

The following provisions apply to the use of sick time:

1. In order to be paid for sick time, an employee must notify his/her supervisor as far in advance as possible. Such a report should be made no later than one hour before the staff member's scheduled reporting time that the employee will be absent due to illness. Exceptions will be made only in the event of emergency situations, which cause the employee to be unable to contact the supervisor as provided herein. Employees who are absent and use sick time without reporting it promptly to the appropriate supervisor will not be paid for such absence, and may be subject to disciplinary action if the absence is deemed unexcused.
2. Employees who are absent under sick time for three consecutive work days or more must supply a physician's certification to Human Resources confirming the illness with an indication of the staff member's anticipated date of return. Continuing sick time taken for the same health condition, including intermittent sick time for the same health condition, may be covered by the policies set forth in the University's Family Medical Leave policy elsewhere in this manual. If a staff member's record of absences appears to indicate a pattern of abuse of sick time, further documentation of illness may be required, regardless of the number of consecutive days out.
3. Employees are not paid for unused sick time upon termination of employment.
4. Full-time exempt staff are paid an annual salary and are considered to be employed by the University the hourly equivalent of five full days per week. Therefore, sick time is debited at the equivalent hourly rate of five full days per week, continuing week to week for the entire period the staff member is out sick, excluding holidays and vacation periods.
5. After 30 calendar days of continuing absence due to the staff member's illness, eligible employees may apply for Short Term Disability.
6. Employees absent in order to care for an ill member of the staff member's household are not eligible to apply for continuing compensation under Short Term Disability or Long-Term Disability. These employees must apply for Family and Medical Leave to retain their employment status during a long-term absence covered by that policy.
7. Full-time exempt, regular part-time exempt and full-time non-exempt staff begin accruing sick time upon

Case ID: 221002134

The University of the Arts

completion of one calendar month of employment.  Sick time may be accumulated to a maximum of 210 hours for employees with 35 regularly scheduled hours per week, and 240 hours for employees with 40 regularly scheduled hours per week, according to the following schedule:

**Sick Time Accrual Schedule:**

A.     Non-Exempt Staff

1.  Regular full-time, non-exempt employees accrue sick time while actively working as follows:

| POSITION SCHEDULE: | 35 HOURS PER WEEK | 40 HOURS PER WEEK |
| --- | --- | --- |
| 0-60 months of employment: | 7 hours/month | 8 hours/month |
| 61 months or more: | 10.5 hours/month | 12 hours/month |

2.  Regular part-time, non-exempt employees accrue sick time according to the above schedule, pro-rated on the basis of average number of hours scheduled to work per week.

B.     Exempt Staff

1.  Regular full-time, exempt employees accrue sick time while actively working as follows:

| POSITION SCHEDULE: | 35 HOUR PER WEEK | 40 HOURS PER WEEK |
| --- | --- | --- |
| 0-36 months of employment: | 7 hours/month | 8 hours/month |
| 37 months or more: | 10.5 hours/month | 12 hours/month |

2.  Regular part-time, exempt employees accrue sick time according to the above schedule, pro-rated on the basis of percentage of full-time equivalence (%FTE) per month.

C.     Temporary/Part-Time On-Call Staff are not eligible for paid sick time.

For work-related sickness or injury also see the Worker's Compensation provisions of this manual.

**Vacation**

Vacation time accrual begins after an employee has completed one calendar month of employment and may be used after successful completion of the introductory period.

Staff members must schedule vacation time subject to the prior approval of his/her Supervisor with the understanding that the needs of the University and the department will be considered before approval is given.  Insofar as possible, however, consideration will be given to any specific request of an employee.

Staff members may carry over a maximum of one (1) year accrual of vacation time for use in the next fiscal year during their regular work schedules. Employees carrying more than one year maximum excess accrual as of June 30 must use the excess accrued days no later than August 30 of the next fiscal year.  Excess vacation accrual not used by the August 30 deadline will be forfeited.

As long as an employee gives two weeks' notice as outlined in the resignation policy, unused vacation time is paid to staff upon termination of employment.  As a condition of receiving such pay, employees must also return all University property prior to their departure from the University, and settle any outstanding course or other fees.

Employees terminated due to misconduct or poor performance are not entitled to receive advance notice, severance

Case ID: 221002134

The University of the Arts

pay, or reimbursement of accrued vacation upon termination.

**Vacation Accrual Schedule:**

**NON-EXEMPT/HOURLY STAFF**

NON-EXEMPT/HOURLY FULL-TIME CALENDAR YEAR (52 WEEKS) STAFF**:**

| POSITION SCHEDULE: | 35 HOURS PER WEEK | 40 HOURS PER WEEK |
|---|---|---|
| 0-36 months of employment: | 7 hours per month to a maximum of 70 hours per year. | 8 hours per month to a maximum of 80 hours per year. |
| 37-120 months of employment: | 8.75 hours per month to a maximum of 105 hours per year. | 10 hours per month to a maximum of 120 hours per year. |
| More than 120 months of employment: | 11.666 hours per month to a maximum of 140 hours per year. | 13.333 hours per month to a maximum of 160 hours per year. |

NON-EXEMPT/HOURLY REGULAR PART-TIME CALENDAR YEAR STAFF:

> After 1 month of employment vacation time accrues according to the above schedule, pro-rated based on the number of hours in your approved position.

NON-EXEMPT/HOURLY FULL-TIME ACADEMIC YEAR STAFF:

| POSITION SCHEDULE: | 35 HOURS PER WEEK | 40 HOURS PER WEEK |
|---|---|---|
| After 1 month of employment: | 7 hours per every 4 weeks worked up to a maximum of 70 hours per year. | 8 hours per every 4 weeks worked up to a maximum of 80 hours per year. |

NON-EXEMPT/HOURLY REGULAR PART-TIME STAFF:

> After 1 month of employment vacation time accrues according to the above schedule, pro-rated based on the number of hours in your approved position.

**EXEMPT STAFF**

EXEMPT FULL-TIME CALENDAR YEAR AND ACADEMIC YEAR STAFF:

> After 1 month of employment:  14 hours per month worked up to a maximum of 168 hours per year.

EXEMPT REGULAR PART-TIME STAFF:

> After 1 month of employment, vacation time accrues according to the applicable calendar year or academic year schedule, pro-rated on the basis of percentage of full-time equivalence.

**Bereavement**

Employees may be excused from work with pay, upon request, for four consecutive working days following the death

Case ID: 221002134

The University of the Arts

of a member of the immediate family.  Immediate family includes spouse, domestic partner, child, sibling, parent, parent-in-law and individual(s) who served as legal guardian of the employee.

Employees may be excused from work with pay, upon request, for one working day following the death of a relative directly related to the employee (grandparent, grandchild, aunt, uncle) not in the immediate family, for the purpose of attending the funeral or memorial service.

The University understands that some close friends may be emotionally significant to an employee.  While specific Bereavement Leave is not granted following the death of a friend, vacation and/or personal days may be used for bereavement upon approval by the staff member's supervisor.

**CHAPTER 3-        EMPLOYEE BENEFITS**

**Section 4        Jury Duty**

Employees called upon to serve as jurors will continue to receive full salary during periods of absence necessitated by appearance in court.  Since employees are being fully compensated by the University, all per diem jury checks received by the employee must be signed over to the University upon receipt. Employees are entitled to retain any fee paid by the court to reimburse the employee for meals or other expenses incurred by the employee while on jury duty.  Employees must notify their supervisor of the need for time off for jury or witness duty leave as soon as they receive a jury notice or jury summons from the court or a subpoena.  Employees serving as jurors are expected to communicate with their supervisors regularly to advise of the expected duration of jury service.  Employees may be requested to provide a written verification of service, including but not limited to, a jury notice, summons or a subpoena.  If work time remains after any day of jury or witness duty, employees must return to work for the remainder of their regular work schedule.

**CHAPTER 3-        EMPLOYEE BENEFITS**

**Section 5-        Workers' Compensation**

The University covers all employees with Workers' Compensation Insurance as a protection against financial loss due to injury or illness compensable under the Pennsylvania State Workers' Compensation Act and Occupational Disease Act. The precise terms of the benefit are as provided by law. Compensation is calculated on a sliding scale based upon the injured employee's average weekly wage.

I  If an employee is injured on the job, no matter how minor the injury, an Incident Report must be filed with the Human Resources Department immediately so that appropriate action can be taken by the University with respect to the employee's claim.  Reports must be submitted as soon as possible after an injury to make sure all eligible claims receive full benefits.  Reports received more than 21 days after the injury will be payable as of the date of the report. Reports received more than 120 days after the injury will not be compensated.

Employees do not accrue vacation or sick time while on leave due to an injury covered by Workers' Compensation.

In compliance with the Pennsylvania Workers' Compensation Act, and in specific compliance with Act 44 of the 1993 Amendments to the Workers' Compensation Act, all employees experiencing injury or illness in the course of their work are required to obtain initial treatment at one of the employer's designated health-care providers, and for at least ninety (90) days following the initial treatment.  A list of the names, addresses and phone numbers of the University's designated health-care providers are available in the Human Resources Department.

If an employee does not obtain initial treatment at one of the designated providers, any medical expenses incurred during this period will not be paid by the University or its insurance carrier.

Case ID: 221002134

The University of the Arts

If after receiving treatment from one of the designated providers for ninety (90) days, the employee wishes to change providers, he/she must provide the University with five days' notice of intent including the name of the provider.

A list of providers is available in the Human Resources Department, and at online at : Provider List.

**CHAPTER 3-     EMPLOYEE BENEFITS**

**Section 6-     Unemployment Compensation**

Terminated employees who meet certain requirements are eligible for unemployment compensation provided under federal and state laws.  Employers fund the majority of the costs of this program, but all employees who work in Pennsylvania are also required to pay Pennsylvania Unemployment Tax as a mandatory payroll deduction.

Further information is available at: Pennsylvania Unemployment Compensation Bureau.


**CHAPTER 3-     EMPLOYEE BENEFITS**

**Section 7-     Social Security**

All employees of the University are required to participate in the Federal Social Security Program via mandatory payroll deduction.  The cost to the employee is determined by Federal law as a percentage of the Social Security earnings base salary.  The University is required to match the amount the employee pays.  The precise terms of the Social Security program are defined by Federal law and regulations.

Further information is available at: Social Security.

**CHAPTER 3-     EMPLOYEE BENEFITS**

**Section 8-     Medical, Dental, Life and Disability Insurance**

All regular full-time employees are eligible to participate in the University's medical, dental, life and disability insurance benefits.  Eligible employees may elect to participate when hired, and during open enrollment each fall. The University's benefits plan year begins on November 1 and continues through October 31 of the following calendar year.  Benefit costs generally fluctuate year-to-year depending on many factors.  Detailed descriptions of eligibility requirements and benefits are provided in the benefit plan documents of each program that set forth specific definitions and provisions, which fully and solely govern entitlement to benefits.  In the event of any conflict between the provisions of this manual and the plan documents, the plan documents will prevail.  This summary is neither the plan nor a part of the plan, and does not constitute a contract.  It does not amend, extend or alter coverage that is provided under the plan documents.  Copies of the benefit plan documents may be obtained from the Human Resources Department or online at: Benefits

The benefits under these plans do not vest.  The University reserves the right, at its discretion, to amend, change, or terminate the University's benefit plans, programs, practices, or policies, as the University deems appropriate. Nothing contained in this document shall be construed as creating an express or implied obligation on the part of the University to maintain benefit plans, programs, practices or policies.

As required by the insurance contracts governing medical, dental and life insurance, new regular full-time employees are eligible for medical, dental, and life insurance on the first day of the month following four weeks of full-time employment at the University.

**Medical and Dental:**

Case ID: 221002134

The University of the Arts

The University offers a variety of medical and dental benefits to regular full-time employees.  Plan details, including coverage, eligibility, employee contributions, copays and co-insurance are found at: Benefits

Under the Federal government's COBRA regulations, medical and dental plans noted above are eligible to be continued for a specified period of time after an employee's separation from the University.  Notification of eligibility will be mailed upon such separation and/or information may be obtained through Human Resources.  Separated employees bear the full cost of participating under COBRA, and the University does not subsidize benefits for separated employees.

Questions regarding coverage should be directed to Human Resources.

**Group Term Life Insurance:**

The University provides term life insurance for all regular full-time employees.  Accidental death and dismemberment benefits are also provided under this insurance program.  Plan details may be found at:  Benefits

Employees may also participate in the Group Supplemental Life Insurance; however, the University does not make any contribution toward this coverage.  Plan details may be found at:  Benefits

**Short-Term Disability:**

Short-term disability benefits are available as wage replacement to all regular full-time employees after one year of employment with the University.  (The one-year prior service requirement is waived for eligible employees who, within three months prior to employment at the University, had group disability benefits.)  After 30 consecutive days of total disability, this plan provides a monthly income benefit equal to two-thirds (66.67%) of the staff member's regular salary, up to a weekly maximum dollar amount of $2,600.00, for up to 22 weeks.  The administrative services provider may require periodic medical certifications to confirm the continuing disability status.  The plan documents provide the specific terms and govern the award of such benefits.

An eligible employee must exhaust all accumulated sick, vacation and personal  time and experience a 30-day period of total disability (which may be concurrent with use of sick, vacation and personal time) before he or she is eligible for Short Term Disability.  A disabled employee is required to apply for Short Term Disability before the latter of (a) the expiration of his or her sick leave, or (b) the end of the initial 30-day period of total disability.

**Long-Term Disability:**

Long-term disability benefits are provided as wage replacement to regular full-time benefit eligible employees after one year of employment with the University.  (The one-year prior service requirement is waived for eligible employees who, within three months prior to employment at the University, had group disability benefits.)  After six months of total disability, exhaustion of all accumulated sick days  and confirmation of the disability, the plan provides a monthly income benefit equal to approximately 60 percent of the employee's regular salary, up to a monthly maximum of $10,000.00.  In addition, for participants in the University's retirement program at the time of disability, the program pays monthly premiums equal to the employee's and the University's retirement contributions as of the date the long-term disability benefit payments begin, towards the disabled employees' retirement annuity policy.  The disability insurance provider may require periodic medical certifications to confirm the continuing disability status.

An employee who is absent from work for one year or more and unable to perform the duties of his or her position will be evaluated for termination pursuant to the University's policy relating to Prolonged Incapacity or Absence.

Employees receiving Short-Term Disability or Long-Term Disability benefits for wage replacement do not accrue sick leave, vacation leave or personal days.  Employees receiving disability benefits who also participate in the University

Case ID: 221002134

The University of the Arts

retirement plan will continue to receive University contributions to the retirement plan while receiving disability benefits.

**CHAPTER 3-     EMPLOYEE BENEFITS**

**Section 9-     Retirement Programs**

**Retirement Plan with University Match:**

Regular full-time and regular part-time staff and full-time faculty are entitled to enroll in the University's Retirement Program.  Enrollment begins the first of the month after 30 days of continuous employment.  Under the University's program, eligible employees may contribute up to 4.5% of their base salary by tax-deferred salary reduction.  The University matches individual contributions with $1.50 for every $1.00 contributed by the employee, subject to federal limits.  Participation at the 4.5% level is mandatory for Senior Administrators, all full-time faculty and certain other positions.  Participation by all other eligible employees is voluntary.

**Group Supplemental Retirement Annuity:**

All employees may choose to participate in the Group Supplemental Retirement Annuity program.  Employees who participate in this program may contribute money on a tax-deferred basis subject to federal limits for 403(b) defined contribution retirement plans.  Maximum allowable contribution amounts are determined by current tax codes and can be computed and provided by the plan administration..  The University does not make any matching contributions to supplemental retirement annuity programs.

Information about both of these programs is available at: UArts Dedicated TIAA CREF Website and UArts TIAA-CREF Plan Descriptions

**CHAPTER 3-     EMPLOYEE BENEFITS**

**Section 10-     Tuition Remission and Reimbursement**

The University provides tuition assistance to regular full-time employees and their family members as defined below:

EMPLOYEES ENROLLING IN COURSES:

All combined tuition benefits for employees enrolling in courses may not exceed 12 credits per calendar year, and these benefits are subject to the University's applicable academic policies.

AT UARTS:  Regular full-time staff may take up to a maximum of 12 credits (January - December) in the Day or Evening programs of the University without tuition charge, on a space-available basis.  Employees qualifying for this benefit may take a combination of courses or workshops tuition-free provided they do not exceed twelve (12) credits (or non-credit equivalent) per calendar year.  Course and program-specific fees such as lab fees and thesis fees are not waived for employees.  (Exception: Private lessons through the School of Music are not covered by tuition assistance.)  Approval of the employee's supervisor is required if the course meets during the employee's regularly scheduled working hours.

OUTSIDE INSTITUTIONS:  After one full year of service, regular full-time employees are eligible for partial tuition reimbursement of credit-bearing courses taken at other accredited post-secondary institutions of higher education.  .  Tuition reimbursement, if approved, consists of seventy percent (70%) of the cost of tuition excluding fees and deposits.  Tuition is not reimbursable for non-credit courses, or credit bearing courses that the employee audits.  Prior approval of the department head or appropriate authority is required as well as certification by the Benefits Coordinator that funds will be available to reimburse the employee upon successful completion of the course.

Case ID: 221002134

The University of the Arts

Contingent upon the above-mentioned approval, reimbursement will be made upon the employee's presentation to the Human Resources Department of a copy of the paid invoice and submission of a grade report which certifies that the employee has successfully completed the course and received a grade of "C" (2.0 on a 4.0 scale) or better. General lab or activity fees and the cost of textbooks, writing supplies or other supplemental materials are not reimbursable.

Employees are entitled to only one type of tuition discount per course (i.e., alumni discount, tuition waiver, partial tuition reimbursement for outside courses, etc.) and tuition discounts may not be combined.

EMPLOYEES' FAMILY MEMBERS:

SPOUSES and DOMESTIC PARTNERS of regular full-time employees, after one full year of service, are eligible for fifty percent (50%) Tuition Remission for a maximum of three (3) credits per semester in the instructional programs of the University.

DEPENDENT CHILDREN (under 25 years of age) of regular full-time employees with two (2) years of full-time service receive full tuition remission in the undergraduate Day program of the University contingent upon admission. Specific charges such as lab fees, thesis fees, housing, meal plan and book costs are payable by the dependent child or faculty or staff member.  Dependents of employees with three (3) years of full-time service by the employee are eligible to apply for undergraduate tuition assistance in any member institution of the Tuition Exchange Program, subject to the normal tuition exchange quota and admission to the participating institution's program to which there is no guarantee.  In the event that an eligible child cannot be helped through the Tuition Exchange, a full-time employee, after two (2) full years of service to the University, may apply for a Tuition Grant.  The child must be attending an accredited post-secondary institution of higher education as a full-time undergraduate student.  Full-time employees are eligible to receive a grant for their children of $1,500 per academic year ($750 per semester), with total assistance not to exceed $6,000 per child.

Tuition awards may not be combined and are limited to one (1) type of award per academic year per recipient.

Non-matriculated dependent children (under 25 years of age) of regular full-time employees, after one full year of service, are eligible to receive fifty percent (50%) tuition remission in the programs offered in the day program and Continuing Education program of the University.

Dependent children under 25 years of age receive 100% tuition remission for enrollment in the Pre-College Programs (including the Saturday Arts Lab, the Saturday School and the Pre-College Summer Institute).

Note: the tuition remission does not cover fees, housing or meals.  Information, applications and forms for the various tuition assistance programs can be obtained at the Human Resources Department or online at: Benefits

The student receiving tuition remission must be the dependent child of the faculty/staff member. A child is considered a dependent when the faculty/staff member provides 50% or more of the child's support. The child must be the faculty/staff member's dependent at the time the benefit is awarded and for any previous three years during the child's lifetime. The faculty/staff member must continue to provide 50% or more of the child's support during the term(s) the benefit is received.

The dependent child must be one of the following:

- your biological child, for whom you are the legally designated parent;
- your stepchild, who is the biological or adopted child of your spouse;

Case ID: 221002134

The University of the Arts

- your legally adopted child, for whom you are the legally designated parent; or,
- the biological or adopted child of your same-sex domestic partner as registered with the University.

**CHAPTER 3-       EMPLOYEE BENEFITS**

**Section 11-       Travel Insurance**

The University maintains travel accident coverage for employees traveling on University business; details are available in Human Resources.

Employees who desire additional insurance coverage may do so on their own and at their own expense.

**CHAPTER 3-       EMPLOYEE BENEFITS**

**Section 12-       Direct Deposit of Employee Pay**

All employees are required to participate in Direct Deposit.  Forms for Direct Deposit are available in the Human Resources Department or online.

**CHAPTER 3-       EMPLOYEE BENEFITS**

**Section 13-       Library Privileges**

Employees may use all of the University Libraries' resources and services, in both the Music and Greenfield Libraries. They may borrow and renew most materials for six (6) week periods.  Staff who fail to return materials or to pay their fines may have their borrowing privileges suspended until the items are returned and/or the fines are paid.  Staff who terminate their employment with the University must return all library materials and pay any outstanding fines. See the Libraries' website for more information.

The Libraries have reciprocal arrangements with the Moore College of Art and Design, and Peirce College libraries. Employees wishing to take advantage of those arrangements must get a letter each semester from the Greenfield or Music Library indicating that they are a patron in good standing in order to borrow materials from Moore or Peirce.  It is recommended that you have your UArts Identification Card when visiting other libraries in case that card is required at building security desks.

**CHAPTER 3-       EMPLOYEE BENEFITS**

**Section 14-       Sick Leave Donation Program**

The University provides a means for eligible staff who experience medical emergencies and who do not have enough sick time to cover such an absence or do not have short-term disability to enable a paid leave.  Regular full-time  staff with more than one year of service are eligible to receive benefits from this program.

This program is funded by unused accrued vacation time forfeited by staff after August 30 of each fiscal year.   The value of this forfeited vacation time funds the sick leave bank ("Bank") for distribution to qualifying staff in the following period of September 1 through August 30.  The Bank is funded for 12 months, and the unused Bank balance does not roll over to the next 12 month period.

Staff who experience medical emergencies may qualify to receive up to 20 paid days of wage replacement from the Bank, which will run concurrently with the employee's approved leave of absence as outlined below.  A day of vacation time is considered one day for purposes of credit to the Bank, regardless of the number of hours or compensation that the donated day would have been worth to the staff member forfeiting the vacation day.

Case ID: 221002134

The University of the Arts

To receive a donation from the Bank, an eligible staff member must submit a written request, meet all of the following requirements: experience a medical emergency of 15 or more consecutive days; and have exhausted all his/her own earned and available sick, personal and vacation days, and have applied for and received authorization for a medical leave of absence or FMLA.  Application forms are available in Human Resources or online.

Human Resources evaluates the eligibility of the staff member and will make a determination of the number of paid days, if any, to be provided to the staff member from the Bank.  Factors considered in the evaluation include the number of requests for paid days, the total available days in the Bank and the staff member's leave history.  There is no guarantee of an applicant receiving any or all of the requested paid days.  Amounts paid to a staff member who receives days from the Bank are included in the gross income of the recipient and are subject to city, state and federal taxes.

**CHAPTER 3-        EMPLOYEE BENEFITS**

**Section 15-        Miscellaneous Benefits**

**Commuting Costs:**

Full-time faculty and staff may elect to use pre-tax salary, up to IRS approved amounts, to pay for costs associated with commuting to work by qualified mass transit, such as bus, train, subway, or qualified vanpool, and/or qualified parking.  Employees may also elect to use post-tax salary to pay for these costs, should the costs exceed the IRS monthly pre-tax allowances.  Details about payroll deductions for commuting costs are available in Human Resources or online.

**Flexible Spending Account:**

The Healthcare Flexible Spending Account allows full-time faculty and staff to pay for up to $2,500 un-reimbursed health care costs on a pre-tax basis.

The Dependent Care Flexible Spending Account allows married full-time faculty and staff, filing joint tax returns and faculty and staff filing as Head of Household, to pay for up to $5,000 per year ($2,500 if married, filing separately) of qualifying child care and elder care expense.  Details about flexible spending accounts are available in Human Resources or online.

**GlobalFit Corporate Fitness Program:**

The University encourages all of its faculty and staff members to be physically fit and active.  To support this goal, the University participates in the GlobalFit Corporate Fitness Program, which offers discounted membership rates at dozens of athletic clubs and fitness centers in the greater Philadelphia area.  Additional information is available in Human Resources or at GlobalFit.

Case ID: 221002134

The University of the Arts

**CHAPTER 4:       EMPLOYEE RELATIONS**

**Section 1-       Counseling and Progressive Discipline**

The University uses the process of progressive discipline to address problems of both staff misconduct and poor job performance.  (Note that progressive discipline applies only to those staff who have successfully completed their introductory period of employment.)

The steps of progressive discipline may include as follows:

1. Verbal warning
2. Written warning
3. 1, 3 or 5 days suspension without pay (as appropriate)
4. Termination

Progressive discipline is intended to be a counseling process, rather than a process that is strictly punitive.  Improved performance is the desired result of the process.  While most disciplinary and performance issues are appropriately handled by following the steps of progressive discipline in order, in cases of more serious conduct violations the University may respond with any action it deems appropriate up to and  including immediate termination without prior verbal or written warning.  Examples of the types of violations that may subject an employee to immediate termination include, but are not limited to, violation of University policies; insubordination; threatened or actual physical violence; possession, use or sale of controlled substances while on University business or on University property; poor performance; theft; harassment (including sexual harassment); and false, fraudulent or malicious statements about another employee or student of the University.  Please note that the above list is not all inclusive, as the nature and seriousness of other violations may warrant disciplinary action up to and including termination.

The supervisor shall consult (prior to imposing discipline) with the department head, who will then consult with the Associate Vice President for Human Resources regarding infractions for which suspension or termination is suggested, or for assistance in preparing written warnings.  Copies of all written warnings and notices of suspension must be submitted to the Associate Vice President for  Human Resources on the day they are issued, for inclusion in the employee's permanent personnel file.

Employees who have received written warnings and/or notices of suspension and do not agree with the content or wish to have their comments included may submit a written rebuttal/statement to the Associate Vice President for Human Resources for inclusion in their file.

All letters of termination will be prepared by the Human Resources Department.  Employees who are terminated for misconduct are not eligible for re-hire.

**CHAPTER 4-       EMPLOYEE RELATIONS**

**Section 2 -       Termination Due to Misconduct or Poor Performance**

The University expects all employees to follow the staff manual and the policies of the University, in order to ensure the best possible work environment and operations.  Although it is not possible to list all the forms of behavior that may result in disciplinary action, up to and including termination of employment, some examples of such misconduct follow:

- Theft or inappropriate removal or possession of property
- Falsification of timekeeping records, employment applications or any other University-related reports
- Working under the influence of alcohol or illegal drugs
- Possession, distribution, sale, transfer or use of illegal drugs

Case ID: 221002134

The University of the Arts

- Fighting or threatening violence in the workplace
- Excessive absenteeism or any absence without notice
- Negligence or improper conduct leading to personal injury or damage to property
- Insubordination or other disrespectful conduct
- Violation of safety or health rules
- Sexual harassment or other unlawful harassment or discrimination
- Possession of explosives, weapons or firearms at work or at a University-related function without the express authorization of the University
- Unauthorized absence from one's work station during the work day
- Unauthorized use of telephones, computers, mail system or other University-owned equipment or resources
- Violation of personnel policies
- Involvement in an unauthorized conflict of interest involving the University
- Sleeping on the job
- Unsatisfactory performance or conduct

This list is not exhaustive and provided for illustrative purposes only.  The University may terminate employees for misconduct and poor performance not specifically identified here.

Employees terminated due to misconduct or poor performance receive their regular salaries through the last actual day worked.   Employees terminated due to misconduct or poor performance are not entitled to receive advance notice, severance pay, or reimbursement of accrued vacation upon termination.

Employees terminated for misconduct are not eligible for re-hire.

**CHAPTER 4-    EMPLOYEE RELATIONS**

**Section 3 -  Resignation**

The University requests at least two (2) weeks written notice of resignation be given to the staff member's supervisor, with a copy to Human Resources.  No personal or vacation time may be taken during this notice period unless approved by the supervisor in writing prior to giving written notice.  If at least two weeks of notice is given, then unused, accrued vacation at the time of termination will be paid in the first appropriate payroll after termination (bi-weekly/ non-exempt staff; monthly/ exempt staff), as outlined in the vacation policy .  No payment is made for unused accrued sick or personal time.

**CHAPTER 4-    EMPLOYEE RELATIONS**

**Section 4 -    Exit Interview and Return of University Property**

Every employee must have an Exit Interview with Human Resources upon termination of their employment with the University.  Among other things, this interview provides an opportunity for the departing employee to discuss any compensation and benefits that he or she may be entitled to receive after termination.  All University property must be returned upon termination, including but not limited to University credit cards, cell phones, computers, laptops and related equipment/software, keys, business cards and Identification Card(s).  All outstanding personal accounts (including but not limited to library fines, computer loans, payroll advances, phone bills and corporate credit card balances) must be settled upon termination.

Case ID: 221002134

The University of the Arts

**CHAPTER 4-      EMPLOYEE RELATIONS**

**Section 5 -        Grievance Procedures**

This Grievance Procedure pertains to the disposition of active employee grievances and disputes, the appeal and resolution of which are not otherwise covered in this manual.  The Grievance Procedure does not apply to allegations of sexual harassment or other harassment, which are investigated and resolved through the University's procedures regarding **Sexual Harassment and Other Prohibited Harassment**, Chapter 4, section 8 of this manual.

The University encourages open dialogues between employees and their immediate supervisors to resolve disputes. After an employee has had the opportunity to discuss or review his/her problems with the immediate supervisor, and he/she continues to feel that the problem has not been resolved satisfactorily, the employee may discuss it with the Department Head or Division Head, as appropriate.  If the employee still does not feel the situation is resolved, he/she may invoke the formal Grievance Procedure described herein.

Grievances may be initiated by one employee or by a group of employees when the members of the group have an identical grievance.  Employees have the right to be heard without fear of jeopardizing either their employment or working status.

Official Grievance Forms are available only from Human Resources, which assigns a number to each grievance and maintain a log of all grievances filed and their dispositions.  Additionally, copies of responses at all steps of the grievance procedure must be forwarded to the Associate Vice President for Human Resources, who shall be responsible for monitoring the time limits as set forth in these procedures.

IMPORTANT NOTICE:  This Grievance Procedure is designed to provide prompt, fair review and relief for employees who feel they have been wronged, and as such depends greatly on the prompt reporting and review of such grievances.  A grievant who fails to file a grievance, or subsequent appeal, within the time frames set forth herein forfeits his or her grievance rights under this policy.

Step One -- Informal Discussion

Within twenty working days of the occurrence of the alleged incident, the grievant must present the grievance by informal discussion of the alleged incident to the grievant's supervisor.  If the matter cannot be resolved through informal discussion between the grievant and the immediate supervisor, or if the grievant is grieving an act of her/his supervisor, the grievant may proceed to Step Two.

Step Two -- Written Grievance to the Department Head

If the staff member's supervisor, after informal discussion, refuses or is unable to resolve the grievance in a manner acceptable to the grievant within ten working days of the employee presenting the grievance under Step One, then the grievant may present the grievance in writing to the grievant's Department Head.  The written grievance must be on the official grievance form provided by the Associate Vice President for  Human Resources and must include a statement of the incident, persons involved, places, pertinent dates, times, and must bear the signature of the employee or employees submitting the grievance.  The Department Head must provide a written response to the grievant and a copy to the Associate Vice President for  Human Resources within ten working days of the receipt of the written grievance.  If the grievant is not satisfied with the decision of the Department Head, the grievant may appeal the grievance to Step Three.

Step Three -- Written Grievance to the Division Head (Dean or Vice President)

Within ten working days of the receipt of the Department Head's written decision at Step Two, the grievant may present the written grievance and Department Head's written decision to the Division Head for his/her department.

Case ID: 221002134

The University of the Arts

The Division Head must provide a written response to the grievant, with a copy to the Department Head and Associate Vice President for  Human Resources, within ten working days of the receipt of the written grievance.  If the grievance is not satisfied with the decision of the Division Head, the grievant may appeal the grievance to Step Four.

Step Four --   Grievance Committee and Hearing

Within ten working days of the decision of the Division Head, the grievant may appeal the grievance to the Grievance Committee by submitting a written request for a hearing to the Associate Vice President for  Human Resources.  The Associate Vice President for  Human Resources will convene a Grievance Committee within ten working days of receipt of the appeal and must send written notice of the meeting to all parties involved in the grievance through Step Three.  The Grievance Committee is appointed by the Vice President for Finance and Administration and shall be composed of six staff members and the Associate Vice President for  Human Resources, who shall serve as chairperson and vote in the case of a tie.  The chairperson shall call a grievance hearing where the grievant and the respondents have the right to present such witnesses, as they deem necessary to develop the facts pertinent to the grievance.  The grievant and the respondents have the right to ask questions of any person participating in the hearing, except members of the Grievance Committee.  The grievant does not have the right to be represented by counsel or any other person.

During the grievance hearing, neither party shall be permitted to introduce information not presented at the previous steps of the grievance procedure, unless the party can show just cause as to why the information was not introduced at the beginning of the grievance procedure or the subsequent steps.

Within ten working days of the hearing, the Grievance Committee must submit its recommendation in writing to the President of the University.  A majority vote of the Committee determines the recommendation for the resolution of the grievance.  Detailed notes of the grievance hearing and copies of the recommendation of the Committee shall be prepared by a designated member of the Committee.

The President may, at his or her discretion, render a decision on the basis of the Grievance Committee recommendation and the records and detailed notes of the Grievance Committee hearing, or may collect further information as he or she deems appropriate.  The President will notify the employee and the Grievance Committee of the decision and the basis for it, in writing, within ten working days after he or she receives the recommendation of the Grievance Committee.  The decision of the President shall be final and binding as an internal administrative remedy.

**CHAPTER 4-      EMPLOYEE RELATIONS**

**Section 6-          Sexual Harassment and Other Prohibited Harassment (summary)**

**Section 6 contains a summary of the University's Sexual Harassment and Other Prohibited Harassment.  The complete, detailed policy is contained in Appendix A.**

The University of the Arts is committed to maintaining an environment in which students, faculty and staff can pursue academic, artistic and professional excellence.  Inappropriate workplace behavior and harassment create conditions that are wholly inconsistent with this commitment.  Such an environment can be secured only through mutual respect and unconstrained academic and professional interchange among faculty, staff and students.  Faculty, staff and students of the University are entitled to participate in and obtain the benefits of University programs, activities and employment without being discriminated against on the basis of: race, color, religion, sex, gender identity, national origin, age, mental or physical disability, veteran status, genetic information, the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, possession of a GED instead of a high school diploma and military status as defined by Pennsylvania law, sexual orientation, marital status, familial status and domestic/sexual violence victim status or any other prohibited factor.

Case ID: 221002134

The University of the Arts

The rights defined by this policy apply to all faculty, staff and students of the University, and the obligations are binding on all faculty and staff as part of their employment, regardless of tenure or years of service, and all students, regardless of academic status.

**CHAPTER 4-        EMPLOYEE RELATIONS**

**Section 7-        Retaliation Prohibited**

Retaliation or reprisal of any kind against anyone reporting allegations of harassment, discrimination or other prohibited activity, or cooperating in an investigation of such a report, is strictly prohibited.  Such retaliation shall be considered a serious violation of this policy and shall be punishable by discipline up to and including termination, regardless of whether the underlying charge of harassment is substantiated.  Examples of prohibited retaliation include threatening reprisals against the employee or student who complained or cooperated in the investigation; unfairly changing the evaluations, assignments or working conditions of such a student or employee; or otherwise continuing any harassment against such person.

If an employee or student is found to have intentionally lied about a claim of harassment, or brought the claim in bad faith, knowing that the allegation is false, then that employee or student may be subject to discipline.

**CHAPTER 4-    EMPLOYEE RELATIONS**

**Section 8-        Performance Evaluations**

Supervisors are required to conduct performance evaluations for each staff member annually, at the end of the University's fiscal year.  Performance evaluations are designed to document and improve employee performance, to assist supervisors in setting the goals and objectives for the staff member for the next fiscal year.

Each evaluation should include the completed performance evaluation and a work/professional development plan for the coming year.  The University requires use of standard forms for evaluations and work/professional development plans.  Exceptions to the use of these required forms must be approved in advance of their use by Human Resources or the Vice President for Finance and Administration.

Details about the performance evaluation process are available in Human Resources or at: Performance Evaluations.

Performance Evaluations are considered to contain CONFIDENTIAL personnel data.  Except as required by law, copies of the completed forms and any other supporting documents used in the evaluation may be released only to the Division or Department Head, the Associate Vice President for  Human Resources, the supervisor conducting the evaluation and the evaluated employee.  The Performance Evaluation becomes a permanent part of the personnel file.

While an employee is generally not terminated solely on the basis of a negative performance evaluation, a negative performance evaluation can begin or be part of the progressive discipline process, or be a factor in any step that is part of the process.

Case ID: 221002134

The University of the Arts

**CHAPTER 5-        POLICIES**

**Section 1-        Personnel Records**

As provided by Pennsylvania law, employees or their authorized agents may, upon written request, inspect their personnel files including any application for employment, wage or salary information, notices of commendations, warning or discipline, authorization for a deduction or withholding of pay, fringe benefit information, leave records, employment history with the employer, including salary information, job title, dates of changes, retirement record, attendance records and performance evaluations.  Employees may request to review their files by making a *written request* to Human Resources one week prior to examination.  Examination of one's personnel records must be accomplished in the presence of a Human Resources Officer, during the regular business hours of the office where these records are ordinarily maintained, during the employee's non-work time.  Employees are normally entitled to one review per year.  If an employee believes any information contained in the file is inaccurate or misleading, he/she may request, in writing, that the Associate Vice President for  Human Resources amend, delete, or otherwise modify the objectionable material.  In the event that no changes are able to be made, the employee may write a rebuttal and request that it be included in the file.  Request forms are available in the Human Resources Department.  The employee's written request should include the purpose of the inspection or the particular parts of the file the employee would like to examine.  If an employee designates an agent, they must designate a specific individual for a specific date or range of dates.

It is the responsibility of the employee to immediately notify Human Resources of any changes in name, address, phone, marital status and number of dependents or any other factor that affects eligibility for employee benefits or the University's ability to contact the employee so that personnel records can be kept current.

**CHAPTER 5-        POLICIES**

**Section 2-        Confidentiality**

During the course of their employment, and in the performance of their job duties, employees may have access to confidential and sensitive University information not available to the general public, as well as Confidential Information regarding other employees and students.  At all times during and after employment with the University, employees are to maintain Confidential Information, as described below, in the strictest confidence and may not disclose, use or publish any Confidential Information except as may be required in connection with their work for the University.  Employees must obtain the University's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that incorporates any Confidential Information.  Employees must take all necessary precautions to prevent the inadvertent or accidental disclosure of Confidential Information.  All Confidential Information shall be the sole and exclusive property of the University and its assigns.

The term "Confidential Information" shall mean any and all confidential knowledge, data or information that is generated by or utilized in the operations of the University, including without limitation personally-identifiable student and parent records, financial records (including social security and credit card numbers), health records; contracts, research data; alumni and donor records; personnel records other than an individual's own personnel record; University financial data; computer passwords, University proprietary information/data; and any other information for which access, use, or disclosure is not authorized by: 1) federal, state, or local law; or 2) University policy operations; the existence of any business discussions, negotiations, or agreements between the University and any third party and the identification of strategic partners and financing sources; information pertaining to University students, including but not limited to personal identifying information, academic performance information, or other student records maintained by the University; and information given to the University by a third party that is considered proprietary or confidential.

Employees remain free to use information which is generally known in the trade or industry or otherwise available publically.

Case ID: 221002134

The University of the Arts

**CHAPTER 5-        POLICIES**

**Section 3-        Conflict of Interest**

A potential or actual and authorized conflict of interest may occur whenever an employee is in a position to influence a decision that may result in a personal gain for the employee or an immediate family member (i.e., spouse, domestic partner, significant other, children, parents, siblings, in-laws) as a result of the University's business dealings.

The University as a general rule does not enter into purchasing or service contracts with students, faculty, staff, parents or members of their immediate families.  Acquisitions from or contracted services with a business in which a University employee has either a financial interest in, or a relative employed by, are prohibited unless full disclosure of the background facts are presented in writing for each transaction to the Financial Services Department prior to entering into an agreement.

**CHAPTER 5-        POLICIES**

**Section 4-        Policy on the Use of Social Media by Employees**

Social media is an everyday part of life for many University employees.  As such, employees should be mindful of the University's values and ethics when participating in social media.  While these media provide a number of benefits in which University employees may wish to participate in their personal lives, employees (faculty and staff) should never reveal confidential information about our students, faculty, staff, or the University.

These Social Media Guidelines ("Guidelines") are intended to help employees protect the University's interests and an employee's own interests when using social media.  Social media means any website, app, or other online destination that hosts user-submitted content, including:

- Social and professional networking sites, such as Facebook or LinkedIn;
- Blogs and micro-blogs, such as Twitter;
- Location services, such as Foursquare;
- Review-sharing sites, such as Yelp;
- Content-sharing sites, such as YouTube or Flickr;
- Discussion forums, such as Yahoo! Finance; or
- Wikis, such as Wikipedia.

Throughout these Guidelines, the University will refer to all user activity on such sites as "posting."

**Be careful about what you post.**  You are personally responsible for what you post.  Anything you post could remain public forever, even if you try to change or remove it later.  In accessing any social media site, you should review the site's Privacy Policy and familiarize yourself with how the site uses your information.   If you do not want your information to be publicly available, do not post it online.  This includes any and all personal information such as your birth date, contact information, and personal pictures.  The University is not responsible for any errors or damages you may cause or be subject to due to your postings.

**The use of social media may not interfere with an employee's work or the work of other employees and may not interfere with the University's operations.**

**Respect University policies.**  Your postings must not violate any of the University's policies.  Among other things, these policies provide that you must not disclose any confidential information of the University's employees, its students, or any other third party, through social media or otherwise.  Such confidential information is defined fully in this Handbook, and includes personally identifiable information regarding other University employees and students.  Confidential information excludes information concerning wages, hours and conditions of employment unless the

Case ID: 221002134

The University of the Arts

employee has responsibility of entering or access to personnel information as part of his or her duties for the University. These Guidelines are in no way intended to prohibit employees from professionally discussing the terms and conditions of their employment with others through social media or otherwise to prevent employees from engaging in protected activity. In conducting such discussions, however, employees should remain aware of the University's policies prohibiting unlawful harassment and discrimination and should comply with these policies. In addition, employees should remain aware that various laws may prohibit dissemination of false or mischaracterized factual information about other people and entities.

It is important to remember that you may inadvertently disclose confidential information using social media. For example, when attending the University's meetings or traveling for business, you must refrain from posting about your activities or location, including through GPS-based mobile applications, because this could alert others about non-public events or information. Moreover, private messaging features of social media are often not secure, and our policies prohibit using such messaging features to disclose confidential information.

**Do not make representations on behalf of the University absent express permission.** The University respects the rights of its employees to express themselves through social media on matters of interest to themselves and the general public. However, you may not post about the University's business, including its academics, services, student or community relations, or any other business activities, unless you have received express written consent from Human Resources. In order to maintain consistent and controlled University messages, you should respond to all media questions by replying that you are not authorized to comment for the University or that you do not have the information sought. Please take the name and number of the media organization and direct the inquiry to Personnel Services.

Although you are not precluded from listing the University as your employer (for example, on your LinkedIn page), there cannot be any implication that anything you post represents the views of the University or is attributed to the University. Please be mindful of the University's neutral reference policy and refrain from providing professional references to others through social media. In addition, you may not use your University e-mail address or the University logo in connection with your social media activities, except when engaged in protected concerted activity such as communicating with the public about a labor dispute or a protest about the University's terms and conditions of employment.

**Be respectful of others.** As a University employee, you should be professional and respectful of others, including to the University itself, its employees (faculty and staff), its students, and other academic entities. This means representing yourself on social media as you would in a business setting and using business-appropriate language. It also means not posting statements that are maliciously false, misleading, obscene, defamatory, threatening, offensive, discriminatory, or invasive of others' privacy. This type of conduct is expressly discouraged by the University in social media or any other forum. Sexual harassment and other forms of unlawful discriminatory harassment, such as hostility based on race, gender, sexual orientation or other classes protected by federal, state or local law are strictly forbidden.

**Respect laws.** The University does not condone the use of social media for any illegal purpose. You must respect copyright, trademark, privacy, financial disclosure, and all other laws. Posting other people's materials without their permission – such as photographs, articles, or music – may violate such laws. In addition, publicly disclosing confidential information may lead to liability (including personal liability) for insider trading or other violations of securities laws, and also may violate our policies.

**Passwords.** Maintaining the security of your social media passwords is your responsibility. Do not use any University passwords to access any external sites, including social media sites, and do not disclose your password(s) to others. The reason for this requirement is that, if you use your University password as your social media password and the security of an external site is breached and your password is stolen, others may be able to access the University's network if they are able to identify you as a University employee. This could create confidentiality and privacy issues for the University and place the University's business at risk.

Case ID: 221002134

The University of the Arts

**Access to social media through the University's equipment.**  The University reserves the right to restrict access to certain social media sites accessed through University equipment.  If you access social media sites that have not been restricted through University equipment, the University retains the right (but not the obligation) to monitor all files and messages stored on and transmitted through the University's computers, handheld devices or networks, as fully described in our policies, to the maximum extent permitted by law.  In addition, subject to applicable law, you have no reasonable expectation of privacy on social media accessed through the University's computers, handheld devices or networks, even when using a private account.

**Ask if you are uncertain.**  If you have any questions or comments about these Guidelines, or using social media responsibly, please direct them to Human Resources.  If you feel that anyone associated with the University has engaged in any inappropriate conduct using social media, please discuss your concerns with Human Resources.  Please do not publicize such concerns through a social media posting.

**Review these Guidelines periodically.**  These Guidelines will evolve as new technologies and social networking tools emerge.  Please check these Guidelines periodically to ensure that you are familiar with their content.

The University is committed to principles of academic and artistic freedom and seeks to support and promote this principle in and through its actions and policies.  No part of these Guidelines is intended to depart from that commitment, and principles of academic freedom will be observed in its implementation.

The intention of this Policy is not to stop UArts employees from conducting legitimate activities on the Internet, nor to stifle constructive criticism, but rather to highlight those areas in which problems can arise for both individual employees and the University.

Review of perceived violations of this policy by a member of staff will be conducted by the staff member's supervisor. Review of perceived violations by a faculty member will be conducted by the appropriate Dean. Actions that may be taken resulting from violations of this policy are outlined in the UArts Employee Relations policies.

**CHAPTER 5-        POLICIES**

**Section 5-            Nondiscrimination Policy**

The University is committed to maintaining an environment in which students; faculty and staff can pursue academic, artistic and professional excellence.  This environment can be secured only through mutual respect and unconstrained academic and professional interchange among faculty, staff and students.  Under applicable federal, state and local laws, and the University policy, the faculty, staff and students of the University are entitled to participate in and obtain the benefits of University programs, activities and employment without being discriminated against due to membership in the protected classes outlined in the University's EEO and Harassment policies.

**Discrimination against Volunteer Firefighters**

In accordance with Pennsylvania law, the University will not terminate or discipline an employee who is a volunteer firefighter, fire police officer, or volunteer member of an ambulance service or rescue squad who, in the line of duty, has responded to a call prior to reporting to work and, as a consequence, misses work time.  Any time lost from employment may be charged to the employee's regular pay.  Furthermore, the University will not discriminate against an employee who has been injured in the line of duty as a volunteer firefighter, fire police officer, or volunteer member of an ambulance service or rescue squad.  Employees who are called to volunteer service and lose work time must supply the employer with a statement from the chief executive officer of the volunteer fire company, ambulance service, or rescue squad, documenting the time of the call and the employee's presence at the scene.

Case ID: 221002134

The University of the Arts

**CHAPTER 5-        POLICIES**

**Section 6-        Authorization - Donations, Grant Proposals, Contracts, University Representation**

Donations, grant proposals, and statements made as a University spokesperson must be reviewed and approved by the President, Provost or the appropriate Vice President of the University.

Contracts for services, purchases, etc., must be reviewed and approved by the Vice President for Finance and Administration, Provost or President as appropriate prior to signing.

**CHAPTER 5-        POLICIES**

**Section 7-        Specialized Work Outside of Normal Job Responsibilities**

It is expected that most work performed for the University is the function of an existing job in a particular department, performed by an employee of that department.  Under very unusual circumstances it may be necessary to assign a University employee to provide specialized work that is typically provided by someone else, including outside contractors or consultants.  This work must be clearly outside of the department and the employee's regular job duties and responsibilities.  Discussion with the Human Resources Department is required prior to agreeing to pay additional compensation or assigning such work.  If the work involves an employee from another department, a conversation with the other department head or supervisor is also required before the specialized work is offered to the employee.

Non-exempt employees are entitled to overtime wages based on the aggregate of all hours worked in all capacities.  If additional compensation is required, it will be paid through the payroll system, with appropriate taxes withheld, according to the standardized payment schedule.  Once approved, the request for additional payment must be initiated by a personnel form indicating the department account to be charged, specific dates and hours worked along with a detailed description of the work performed.

**CHAPTER 5-        POLICIES**

**Section 8-        University Vehicle Use Policy**

The University expects that any employee or student driving a University-owned, rented or leased vehicle ("University Vehicle") will operate the vehicle in a safe and responsible manner with respect for other drivers and due consideration for acting as a representative of the University of the Arts.   The University also expects that any employee or student driving their personally-owned, rented or leased vehicle ("Personal Vehicle") in connection with University-related activities will operate their vehicle in a safe and responsible manner with respect for other drivers and due consideration for acting as a representative of the University of the Arts.   All University Vehicles are considered non-smoking thus smoking in University Vehicles is prohibited.   Drivers are prohibited from using mobile phones, smart phones, texting or otherwise driving while distracted while driving University Vehicles, as well as when driving Personal Vehicles in connection with University-related activities.  Please park the vehicle in a safe location before using any mobile device.

Verification of driver's license - Employees whose job descriptions require the employee hold a valid driver's license are required to undergo a motor vehicle background check upon hire and at any subsequent time deemed appropriate by the University.  The motor vehicle background check report must be approved by Human Resources as a condition of employment.  Employees whose job descriptions require the employee hold a valid driver's license are subject to disciplinary action if the employee fails to maintain a valid driver's license for any reason whatsoever. Authorization to drive University Vehicles may be revoked for reasons deemed appropriate by the University, and without recourse.

Case ID: 221002134

The University of the Arts

Regarding Automobile Insurance Coverage:

University Vehicles - The University's insurance policy covers the use of all University Vehicles as defined above, subject to deductibles that are charged to the employee's department in the event of a claim.

Personal Vehicles - The University's insurance policy provides excess liability coverage for employee use of Personal Vehicles, thus it is the employee's responsibility to maintain his/her own insurance on their Personal Vehicle.  In the event of a claim, it is the employee's responsibility to file that claim with their own insurance policy.  The University's insurance provides excess coverage after the employee's insurance is exhausted.

Employees are reimbursed at the standard IRS mileage rate for their documented use of personal vehicles while conducting University business.  Effective September 1, 2011 the reimbursement rate is 55.5 cents per mile, and requests for reimbursement should be made via expense reimbursement forms found at: Mileage Reimbursement Form.  The University does not reimburse employees for the cost of commuting to or from work.

**CHAPTER 5-        POLICIES**

**Section 9-        Use of University Property and Electronic Resources (summary)**

**Section 9 contains a summary of the University's Use of University Property and Electronic Resources Policy.  The complete, detailed policy is contained in Appendix A.**

**University Computers, E-Mail, Telephones, Equipment and Resources:**

The University of the Arts provides access to computing and information resources, telephones and other equipment and resources for students, faculty, staff and other authorized users in support of the University's mission of teaching, creative exploration, research and public service. Recognizing the value of such resources to our educational and artistic mission, the University has made a substantial investment in such resources and equipment and expects them to be used for University purposes only, in accordance with University rules, policies and objectives. No University resources or equipment may be used improperly by any faculty, student or staff member, or for personal gain or profit.

**CHAPTER 5-        POLICIES**

**Section 10-        Smoking Policy**

The University of the Arts is committed to providing a safe and healthy academic environment for its students, faculty, staff and guests.

It is the policy of the University of the Arts consistent with the City of Philadelphia's Clean Indoor Air Worker Protection Law, that smoking is prohibited inside all University academic, administrative and residential buildings, including the Merriam, Drake and Arts Bank theaters and their respective lobbies.  Smoking is not permitted in Furness Hall, including the adjacent outdoor foundry and shop areas, the Arronson Courtyard, or the balconies at the rear of Hamilton Hall.  Smoking is also prohibited in the DeVries Garden adjacent to Hamilton Hall.

In addition, smoking is prohibited within twenty (20) feet of any entrance to a University facility or building.

Case ID: 221002134

The University of the Arts

**CHAPTER 5-        POLICIES**

**Section 11-        Drug and Alcohol Abuse Policy (summary)**

**Section 11 contains a summary of the University's Drug and Alcohol Abuse Policy.  The complete, detailed policy is contained in Appendix A.**

Faculty and staff are the University of the Arts' most valuable resource, and their health and safety are of paramount concern.  The risks associated with the abuse of drugs or alcohol are numerous and include physical and mental impairment, and effects on an employee's professional and personal life. Abuse of drugs or alcohol can negatively impact job performance and attendance and can jeopardize continued employment. Drug or alcohol use can create a health risk for the user, and a safety risk for the user, co-workers and other members of the UArts community.

The University will not tolerate drug and alcohol abuse as it imperils the health and well-being of its faculty, staff and students, and threatens the operation of its educational programs.

**Standards of Conduct:**

The unlawful manufacture, distribution, dispensation, possession or use of a drug or controlled substance by an employee on University property, in a University-owned vehicle or as any part of a University-sponsored program off campus is strictly prohibited.

In compliance with the laws of the Commonwealth of Pennsylvania, no person under twenty-one years of age shall attempt or carry out the purchase, possession, consumption or transport of alcoholic beverages on University property, University-owned vehicle or at any event sponsored by the University.

As a condition of employment, each faculty and staff member will abide by the terms of this policy and will notify the Provost (in the case of faculty) and the Associate Vice President for  Human Resources (in the case of staff) no later than five days after any conviction for a criminal drug statute offense or alcohol offense committed on University property, University-owned vehicles or as any part of a University-sponsored program off campus. Failure to comply with these conditions will be grounds for disciplinary action up to and including termination.

The Provost, Vice Presidents, Deans, and heads of administrative and residential units have the authority and responsibility to govern the use of alcohol in areas they control, both indoors and out, and to approve or disapprove of plans designed to ensure that (at events where alcohol will be served in such areas) only legal age individuals will have access to such alcohol. Further, those hosting such events must take reasonable steps to ensure that the acquisition, distribution and consumption of alcohol otherwise complies with applicable law and University policy.

**CHAPTER 5-        POLICIES**

**Section 12-        Workplace Violence**

The University is committed to maintaining a safe working, learning, and living environment for all members of the University community.  Threats, acts of aggression, and violence are unacceptable in the University community.  Any such threat or violent act, regardless of intent, will be considered serious misconduct and may be the basis for disciplinary action, up to and including dismissal.

The Federal Campus Sexual Violence Elimination Act (Campus (SaVe) included within the Violence Against Women Reauthorization Act specifically lists sexual assault, domestic violence, dating violence and stalking, and requires Universities to provide training programs for new employees and annual training updates for employees. Accordingly, all employees are required to undergo training upon hire, and annually thereafter.

In addition, the University prohibits the possession of firearms, explosives and other dangerous weapons on campus

Case ID: 221002134

The University of the Arts

and at University functions off campus.

If any member of the University community experiences or anticipates a threatening or violent situation, or knows of any instance involving threats of physical violence toward anyone, whether from inside or outside the University community, the community member is obligated to report such situation(s) or instance(s) immediately to an administrator or department head, or to the Director of Public Safety at  215-717-6830.  In an emergency, call 911.

All reports to the University will be taken seriously and investigated promptly.

**CHAPTER 5-        POLICIES**

**Section 13-        Solicitation**

To avoid disruption of business operations or disturbance of faculty and staff the following rules apply to solicitation and distribution of literature on UArts property.  This policy is not intended to restrict communications or actions protected or required by state or federal law, such as discussing wages, benefits or terms and conditions of employment.

Persons not employed by UArts may not solicit or distribute literature on UArts property at any time for any purpose.  (Employees of vendors and contractors who work regularly and exclusively on UArts property are subject to the same restrictions on solicitation and distribution as UArts employees.)

Both the solicitation of coworkers, guests, or visitors and the distribution of literature to coworkers, guests, or visitors by UArts employees are strictly prohibited on property during working time.

Working time does not include break periods and meal times, or other periods during the work day when employees are not engaged in performing their work tasks.  Working time includes the working time of both the employee doing the soliciting or distributing and the employee to whom the soliciting and distributing are directed.

Any literature that serves to announce a University sponsored activity/event, inform or provide general information to the University community must be displayed on appropriate bulletin boards or electronically sent via the University Communications Department only.  Departments may designate areas within their work areas to post work-related announcements.  Any other literature inappropriately displayed on walls, elevators, halls, or work areas is not permitted.

UArts may allow, as a limited exception to these rules, solicitations by employees regarding their own openings, professional shows/exhibits or on behalf of charitable causes not in conflict with the University or the University's interests.

All signs posted in and/or hung in or around residential facilities must have prior approval from the Office of Student Life.  Approved signs, posters and advertisements will be given to RAs to be hung throughout these buildings accordingly.

**CHAPTER 5-        POLICIES**

**Section 14-        Dress, Appearance, Uniforms, Safety Gear**

Appearance and grooming are assets to the employee and are also important to the University, our students and co-workers.  The University is both an educational and a business institution and employees should dress accordingly.

Good judgment and common sense must be exercised in regard to one's personal appearance.  It is important that employees maintain a neat, clean appearance and wear suitable clothes for the job in which they are engaged.

Case ID: 221002134

The University of the Arts

Positions in some departments may require uniforms.  Certain other positions in the University shops and studios may require the use of protective gear (protective eyewear, gloves, etc.)  Any employee occupying such a position must wear the required uniform and safety gear at all times while actively on the job.

**CHAPTER 5-       POLICIES**

**Section 15-       Whistleblower Policy**

We will not lie, steal or cheat, nor tolerate among us anyone who does. The University encourages all faculty, staff, students and volunteers, acting in good faith, to report suspected or actual wrongful, unethical or illegal conduct. Examples include, but are not limited to:
•        an instance of fraud of any kind or any other act of dishonesty;
•        unethical academic, business or recruiting conduct;
•        a violation of federal, state, local or any other law; or
•        substantial and specific danger to the employee's or public's health and safety.

The University is committed to protecting individuals from interference with making a protected disclosure and from retaliation for having made a protected disclosure or for having refused an illegal order as defined in this policy.

University faculty, staff, students, and volunteers may not retaliate against any individual who has made a protected disclosure or who has refused to obey an illegal order.  University faculty, staff, students, or volunteers may not directly or indirectly use or attempt to use the official authority or influence of their positions or offices for the purpose of interfering with the right of an individual to make a protected disclosure to the individual's immediate supervisor or other appropriate administrator or supervisor within the operating department, or other appropriate University official about matters within the scope of this policy.

It is the intention of the University to take whatever action may be needed to prevent and correct activities that violate this policy.

More information about the University's Whistleblower Procedures and University's Secure Reporting Line is available on the portal.

**CHAPTER 5-       POLICIES**

**Section 16-       Prolonged Incapacity or Illness**

Separation of employment for prolonged incapacity or absence will occur if a staff member is or proves to be unable to perform the terms, conditions, and normal duties of the appointment due to medical or other circumstances for a period of at least one year, with or without reasonable accommodation.  Such a termination may be made at the beginning of the incapacity, if the period of incapacity will exceed one year.

The University will make every effort to reintegrate full-time staff that have recovered sufficiently from a long illness and/or sustained a prolonged incapacity or absence and are able to function effectively as a colleague in their department.  The decision to terminate for incapacity will be made after examination of the facts surrounding each situation on a case-by-case basis and only after appropriate consultation and after the staff member or an appropriate representative has been informed in writing of the basis of the proposed action and the reasons for it.  The University will, in each case, work to ease the burden of any such termination.

Case ID: 221002134

The University of the Arts

**CHAPTER 5-     POLICIES**

**Section 17-     Worksite Lactation Policy**

The University provides a supportive environment to enable breastfeeding employees to express their milk during business hours.  In addition to using their normal break periods and meal times, employees shall be granted reasonable break time to express breast milk for their nursing child as frequently as needed, in an area that is shielded from view and free from intrusion by coworkers and the public.  For time that may be needed beyond the usual break periods, employees may make up work time as negotiated with their supervisors.  Employees who wish to express milk during the work period should keep supervisors informed of their needs so that appropriate accommodations can be made to satisfy the needs of both the employee and the department.  Nursing mothers who feel they have been denied appropriate accommodations are encouraged to contact Human Resources.

**CHAPTER 5-     POLICIES**

**Section 18-     University Service**

The University recognizes and values the many contributions made by staff.  Involvement with University endeavors and committees is encouraged.  Work performed by elected Staff Council officers and staff service on councils and committees described in the University's Governance Manual is considered University work and therefore, non-exempt staff must include time spent serving on these groups in their reported working hours for payroll purposes. Staff are not permitted to serve on these councils or committees, however, if such service impedes the staff member's ability to perform the responsibilities of his/her primary job.  Supervisors shall not unreasonably prohibit staff from serving on these councils and committees.

**CHAPTER 5-     POLICIES**

**Section 19-     Inclement Weather Closing Policy**

In the event of inclement weather or general emergency situations, the University may choose to close.  Only approved essential employees are permitted to work and be paid for time worked during the closure.

UArts emergency closings are communicated via:
- The University's recorded hotline – The recorded message can be accessed directly by calling 215-717-6996.
- www.uarts.edu – A bulletin will be displayed on the homepage.
- UArts Alert – A brief message announcing closing or delay information will be sent via text message to students, faculty, staff and others registered in the "UArts Alert" notification system.
- UArts Email – A message will be sent to your UArts email address.
- KYW-News Radio 1060 AM – Listening for our closing number – 116, which will be announced twice every hour. In addition to this, information is listed online at: www.kyw1060.com.

In the event that a storm develops during the day, the University may close early, employees will be dismissed and the remainder of the day's operations and classes will be canceled.

Occasionally, inclement winter weather can cause widespread delays in getting to work.  In such cases, a grace period will be allowed for employees experiencing difficulty making it into the city on time.  Travel time to and from the University will not be compensated.  In accordance with Pennsylvania law, the University will not terminate or discipline an employee for failing to report to work due to a closure of the roads in the county of the employee's residence or the county of the employer's place of business resulting from a state of emergency declared by the governor.  However, the University is not required to pay an employee for a work day on which the employee fails to report to work because of road closures.

Case ID: 221002134

The University of the Arts

When a storm is predicted, but not yet in evidence, the University will ordinarily be open with attendance required.  In such a case, if an employee decides not to come to work, he/she will not be compensated for the day unless the employee chooses to record time away as a vacation or personal day.

If a storm occurs but the University remains open, employees are expected to come to work, however, if an employee decides not to come to work, he/she will not be compensated for the day unless the employee chooses to record time away as a vacation or personal day.

**CHAPTER 5-      POLICIES**

**Section 20-      Hiring of UArts Students for Outside Projects**

The educational and professional development of UArts students may on occasion be advanced when faculty or staff hire students to work on external professional projects or activities. Such activities may range from "one-off" events (e.g., performing in a one-night "gig", or a half-day of exhibition installation work off campus) to an ongoing employment relationship of greater duration (e.g., multiple rehearsals and performances for a show or series of shows).

When faculty or staff hire current UArts students for "one-off" events or activities, the following norms must be observed:

1.  The student must be paid an agreed hourly rate or flat fee for their work, and all payments to the student must be made mindful of and consistent with city, state and local tax regulations.

2.  There must be a written and signed understanding recording the activity involved, the agreed-upon payment, and the student's acceptance of the terms.

3.  A student may not be hired by an instructor while registered for a class taught by that instructor. (Exceptions to this norm require approval by the Dean of the student's major academic unit.)

4.  The project must not require the student to miss scheduled classes or other activities required by registration in a course.

Additionally, when faculty or staff hire students over a period of multiple dates and times, or across multiple events, these norms must be observed:

5.  The student's participation must be approved in advance by the student's School Director (in CAMD and CPA) and by the Dean of the student's major academic unit (or his/her designate).

6.  Approval requires the hiring faculty or staff member to submit documentation of appropriate liability insurance as determined by the Finance Office. This documentation will be reviewed as part of the consideration of approval by the Dean of the student's major academic unit.

7.  The student must notify his/her faculty advisor of the project or activity, in order to provide ongoing mentorship of academic commitments and time management.

Case ID: 221002134

The University of the Arts

**CHAPTER 6-    LEAVES OF ABSENCE**

The University provides the following types of Leaves of Absence ("LOA") for full-time and regular part-time employees:

> **Family Medical Leave**
> **Military Leave**
> **Domestic or Sexual Violence Leave**
> **Crime Victim Leave**
> **Educational Leave**
> **Personal Leave**

Employees are required to submit requests for LOA in writing, and must secure written University approval prior to taking leaves of absence.

Each type of LOA has a distinct purpose and distinct requirements.  Family Medical Leave, Military Leave, Domestic or Sexual Violence Leave are each presented in great detail below due to federal, state and/or city legal compliance requirements.

**CHAPTER 6-**

**Section 1-    Family and Medical Leave (summary)**

**Section 1 contains a summary of the University's Family and Medical Leave Policy.  The complete, detailed policy is contained in Appendix A.**

In accordance with the Family and Medical Leave Act of 1993 and subsequent revisions and regulations (the "FMLA"), the University will grant up to twelve (12) weeks of unpaid leave in a 12-month period to eligible employees for any one or more of the following circumstances:  the employee's own illness ("medical");  to care for an ill spouse, child or parent ("family care");  to bond with a newly-born or adopted child or child newly-placed in the employee's home for foster care ("bonding");  or for exigent circumstances employed with the employee's spouse, son, daughter or parent call to active military duty ("exigent").

The University also will grant up to twenty-six (26) weeks of unpaid leave in a single 12-month period for an eligible employee to care and support for a spouse, son, daughter, parent, or next of kin who is a covered service member recovering from a serious illness or injury sustained in the line of active military duty ("covered service member care").

This policy summarizes leave opportunities available to eligible employees under one or both of these laws.  Human Resources has additional details and the medical and military certification forms referenced in this policy.  Forms are also on the UArts Portal  under Human Resources.  In addition, the University complies with all applicable state leave laws and to the extent state law provides additional rights, covered employees will be eligible for such additional leave.

**CHAPTER 6-**

**Section 2-    Military Leave**

The University recognizes that National Guard and Reserve Component Forces may be called or ordered to active duty.

Any employee who is called to or enlists for active duty in the Army, Navy, Marine Corps, Air Force, Coast Guard, Public Health Service commissioned corps, and the reserve components of these services and the National Guard, in

Case ID: 221002134

The University of the Arts

response to call-ups to aid with our nation's security and defense needs, automatically shall be granted a leave of absence in accordance with the provisions of the Uniformed Services Employment and Reemployment Rights Act of 1994, for up to five (5) years.  This leave can be extended if the national emergency continues beyond that period.  Except when required by military necessity or when it is otherwise impossible or unreasonable, an employee must give advance notice to his/her supervisor either orally or in writing of any need for a military leave of absence.  A copy of the "official orders" must be submitted to the employee's supervisor as soon as possible after receipt by the employee.

Any employee may use accumulated vacation or personal days prior to beginning the military leave of absence.  For employees whose active service is 31 days or more, the University will continue the employee's health benefits coverage for a period of 30 days from the date military leave begins, after which time the employee will have the option of continuing such coverage at his/her own expense while on active military leave.

Applicable tuition benefits for dependent children and a spouse will remain in effect for the duration of an employee's military leave.

To request a military leave, an employee must provide a written request and a copy of his/her orders to report for military duty to the Human Resources Department.  Upon return from military duty, the employee must promptly inform the University of his or her availability to return to work, in accordance with state and federal law.

**CHAPTER 6-**

**Section 3-**        **Domestic or Sexual Violence Leave**

The Philadelphia Domestic Abuse Leave Ordinance ("PDAL") allows eligible employees who are victims or whose qualifying family members are victims of domestic abuse, sexual assault, or stalking to take up to eight (8) weeks of unpaid leave during a single 12-month period to receive applicable victim support services.  These may be services provided for or by medical providers and/or victim services organizations.  They may include psychological or other counseling, participation in safety planning, assistance for temporary or permanent relocation, or legal assistance in connection with such domestic or sexual abuse.  This leave can be continuous (a block of 3 or more continuous days) or intermittent (less than 3 days and sporadic).  Leave under the Ordinance runs concurrently with FMLA leave.

The University requires employees to use all unused sick days, (if appropriate and in accordance with the University's Sick Leave Policy), vacation and personal holidays while on leave.  If an employee has exhausted all paid leave time and is not receiving disability benefits through the University, the balance of the leave is unpaid.

**CHAPTER 6-**

**Section 4-**        **Crime Victim Leave**

In accordance with Pennsylvania law, employees may take unpaid leave to appear as witnesses in court proceedings, and will not penalize employees for taking leave to attend court as a victim of, or a witness to, a crime or as a member of a victim's family.

**CHAPTER 6-**

**Section 5-**        **Educational Leave**

Following completion of one (1) year of continuous service with the University, regular full-time staff may request Educational Leave subject to the following criteria:

- The employee must present written proof that he/she is enrolled full time in a credit-bearing curriculum in an

Case ID: 221002134

The University of the Arts

accredited institution.
- The course(s) of study must relate to the employee's current position with the University or to other employment opportunities in the University.
- The requested leave period must conform to one (1) semester at the institution the employee is intending to attend.

Educational Leave is available for regular full-time staff who meet the above criteria; therefore no additional benefit of tuition reimbursement will be granted or denied to an employee while on educational leave.  Educational Leave is not an entitlement, and is granted or denied at the discretion of the University.

To request Educational Leave please use the Leave of Absence Request Form.

**CHAPTER 6-**

**Section 5-          Personal Leave**

Following completion of one (1) year of continuous service with the University, regular full-time staff may request Personal Leave for a compelling, non-recurring reason that is not included in the other leave of absence provisions as stated herein (including the provisions for Family/Medical Leave, and Military Leave).  Personal Leave is not an entitlement, and is granted or denied at the discretion of the University.

To request Personal Leave please use the Leave of Absence Request Form.

Case ID: 221002134

The University of the Arts

**CHAPTER 7:      HR FORMS**

Payroll and Human Resources Forms can be found on the UArts website by going to the Human Resources section of the UArts Portal at: Document Library

Case ID: 221002134

The University of the Arts

**APPENDIX A:     Detailed Policy Statements**

**Section 1- Drug and Alcohol Abuse Policy**

Faculty and staff are the University of the Arts' most valuable resource, and their health and safety are of paramount concern.  The risks associated with the abuse of drugs or alcohol are numerous and include physical and mental impairment, and effects on an employee's professional and personal life. Abuse of drugs or alcohol can negatively impact job performance and attendance and can jeopardize continued employment. Drug or alcohol use can create a health risk for the user, and a safety risk for the user, co-workers and other members of the UArts community.

The University will not tolerate drug and alcohol abuse as it imperils the health and well-being of its faculty, staff and students, and threatens the operation of its educational programs.

**Standards of Conduct:**

The unlawful manufacture, distribution, dispensation, possession or use of a drug or controlled substance by an employee on University property, in a University-owned vehicle or as any part of a University-sponsored program off campus is strictly prohibited.

In compliance with the laws of the Commonwealth of Pennsylvania, no person under twenty-one years of age shall attempt or carry out the purchase, possession, consumption or transport of alcoholic beverages on University property, University-owned vehicle or at any event sponsored by the University.

As a condition of employment, each faculty and staff member will abide by the terms of this policy and will notify the Provost (in the case of faculty) and the Associate Vice President for  Human Resources (in the case of staff) no later than five days after any conviction for a criminal drug statute offense or alcohol offense committed on University property, University-owned vehicles or as any part of a University-sponsored program off campus. Failure to comply with these conditions will be grounds for disciplinary action up to and including termination.

The Provost, Vice Presidents, Deans, and heads of administrative and residential units have the authority and responsibility to govern the use of alcohol in areas they control, both indoors and out, and to approve or disapprove of plans designed to ensure that (at events where alcohol will be served in such areas) only legal age individuals will have access to such alcohol. Further, those hosting such events must take reasonable steps to ensure that the acquisition, distribution and consumption of alcohol otherwise complies with applicable law and University policy.

**DRUGS**

**Federal Drug Penalties:**

An up to date list of federal drug trafficking penalties by schedule is available at Federal Penalties.

**Commonwealth of Pennsylvania Drug Penalties:**

The Controlled Substance, Drug, Device and Cosmetic Act, 35 Pa. C.S.A. 780-101 et seq., sets up five schedules of controlled substances based on dangerousness and medical uses. It prohibits the manufacture, distribution, sale or acquisition by misrepresentation or forgery of controlled substances except in accordance with the Act as well as the knowing possession of controlled substances unlawfully acquired. Penalties for first-time violators of the Act range from thirty days imprisonment, $500 fine, or both for possession or distribution of a small amount of marijuana or hashish, not for sale, to fifteen years or $250,000 or both for the manufacture or delivery of a Schedule I or II narcotic. A person over eighteen years of age who is convicted for violating The Controlled Substance, Drug, Device and Cosmetic Act, shall be sentenced to a minimum of at least one year total confinement if the delivery or possession with intent to deliver of the controlled substance was to a minor. If the offense is committed within 1,000 feet of the

Case ID: 221002134

The University of the Arts

real property on which a university is located, the person shall be sentenced to an additional minimum sentence of at least two years total confinement.

1.  The Pharmacy Act of 1961, 63 Pa. C.S.A. 390-8 makes it unlawful to procure or attempt to procure drugs by fraud, deceit, misrepresentation or subterfuge or by forgery or alteration of a prescription. The first offense is a misdemeanor, with a maximum penalty of one year's imprisonment, a $5,000 fine, or both.

2.  The Vehicle Code, 75 PA, C.S.A. 3101 et seq., which was amended effective July 1, 1977, prohibits driving under the influence of alcohol or a controlled substance, or both, if the driver thereby is rendered incapable of safe driving. A police officer is empowered to arrest without a warrant any person whom he or she has probable cause to believe has committed a violation, even though the officer may not have been present when the violation was committed. A person so arrested is deemed to have consented to a test of breath or blood for the purpose of determining alcoholic content, and if a violation is found it carries the penalties of a misdemeanor of the second degree, which includes imprisonment for a maximum of thirty days.

3.  The Federal drug laws, The Controlled Substances Act, 21 U.S.C. 801 et seq., are similar to the Pennsylvania Controlled Substance, Drug, Device, and Cosmetic Act, but contain, for the most part, more severe penalties. Schedules of controlled substance are established, and it is made unlawful knowingly or intentionally to manufacture, distribute, dispense, or possess with intent to distribute or dispense a controlled substance. If the quantity of controlled substance is large (e.g. 1,000 kg of a mixture or substance containing marijuana), the maximum penalties are life imprisonment, a $4,000,000 fine, or both. Lesser quantities of controlled substance (e.g. 100 kg of a mixture or substance containing marijuana) result in maximum penalties of life imprisonment, a $2,000,000 fine, or both. The distribution of small amounts of marijuana for no remuneration or simple possession of a controlled substance carries a maximum of one year's imprisonment, a $5,000 fine, or both, with the penalties for the second offense doubling. Probation without conviction is possible for first offenders. Distribution to persons under the age of twenty-one by persons eighteen or older carries double or triple penalties. Double penalties also apply to the distribution or manufacture of a controlled substance in or on or within 1,000 feet of the property of a school or college.

**Types of Drugs and their Health Risks:**

A complete listing of drugs by schedule is available at Federal Drug Schedules.  Drugs and other substances that are considered controlled substances under the Controlled Substances Act (CSA) are divided into five schedules.  An updated and complete list of the schedules is published annually in **Title 21 Code of Federal Regulations (C.F.R.) §§ 1308.11 through 1308.15**.  The chart below contains a reference to drugs by their street names.

   **Schedule I:** High abuse potential and no approved medical uses.

   Heroin (a narcotic), opiates and opium and its derivatives:
   Junk, Horse, Smack, Scag, Sugar

   GHB (Gamma hydroxybutyric acid): G, Liquid X, Liquid Ecstasy, Grievous Bodily Harm, Georgia Home Boy, Scoop, the date rape drug

   Marijuana and all derivatives: THC, Hashish, Hashish Oil, Hash, Pot, Acapulco Gold, Grass, Weed, Joint, Mary Jane, Reefer

   Hallucinogens: LSD (Acid, Microdot, Cubes), Peyote, Mescaline, Psilocybin (Mushrooms), Phencyclidine (PCP, Angel Dust, Hog, Purple Rain, Crazy Eddie, Hellraiser, Untouchable, Lethal Weapon), MDMA (Ecstasy)
   Methaqualone (Quaaludes)

Case ID: 221002134

The University of the Arts

**Schedule I Risks:** Use may lead to physical and/or psychological dependence.

Narcotics: Can cause dependence. Withdrawal from certain narcotics can be life-threatening. Single doses can produce impaired cognitive and motor functioning and fluctuations in mood and awareness. Higher doses can cause respiratory arrest.

A behavioral depressant and a hypnotic: Can cause aggression and violence, may render a victim unconscious within 20 minutes, and may cause death. The drug is colorless and odorless.

Marijuana: Single doses can impair cognitive functioning, learning motivation and motor abilities. Very large doses can cause confusion, restlessness, hallucinations and panic reactions. Possible depression of the immune system, chromosome damage, reduced sperm count in males.

Hallucinogens: Increased blood pressure, muscular weakness, trembling, nausea, chills, impaired mood and unpredictable changes in emotions and sensations.  Possible "flashbacks" some time after use.

Barbiturates: Can cause dependence with withdrawal symptoms. Larger doses cause slurred speech, slowed reactions and excessive sleep. Large doses or doses with alcohol or other sedative hypnotics can result in respiratory depression and death.

**Schedule II:** High potential for abuse. Written prescriptions required, and no refills allowed.

Narcotics, including morphine, methadone, meperidine (Demerol), codeine, oxycodone (Percodan, Percocet), fentanyl, hydromorphone (Dilaudid), opiates and opium and its derivatives

Barbiturates (Reds, Yellow Jackets, Barbs, Downers)

Secobarbital (Seconal), pentobarbital (Nembutal)

Stimulants - amphetamines (Speed, Bennies, Uppers, Black Beauties, Pep Pills)
cocaine and coca products (Crack, Coke, Flake, Snow, Freebase, Lady)
cocaine hydrochloride (Ice)

**Schedule II Risks:** Use may lead to severe physical and/or psychological dependence.

Narcotics: See above under Schedule I

Barbiturates: See above under Schedule I

Stimulants: Can cause irritability, impaired judgment, impulsivity and grandiosity. Increased blood pressure, heart rate, body temperature, respiration, sweating. Have been linked to cardiovascular problems and convulsions, which can be lethal. Repeated dosing can lead to dependence as well as a paranoid psychosis.

**Schedule III:** Some potential for abuse.  Prescriptions required, and up to five renewals within six months allowed.

Medications containing small amounts of narcotics, including Tylenol #3, Empirin with codeine, codeine-based cough suppressants such as Tusslonex and Hycomine

Medications containing small amounts of barbiturates, such as Florinal

Anabolic steroids

The University of the Arts

**Schedule III Risks:** Use may lead to low-to-moderate physical dependence or high psychological dependence.

Narcotics: See above under Schedule I

Barbiturates: See above under Schedule I

Steroids: The liver and the cardiovascular and reproductive systems are most severely affected. In males can cause sterility and impotence; in females irreversible masculine traits, menstrual irregularities, breast reduction and sterility. Psychological effects include aggression, combative behavior and depression. May also cause strokes, heart attacks, liver cancer, skin problems and arrested bone development during adolescence.

**Schedule IV:**  Low potential for abuse.  Prescriptions required, and up to five renewals within six months allowed.

Sedative-hypnotics (Tranks, Downers): diazepam (Valium), chlordiazepoxide (Librium), triazolam (Halcion), tempazepam (Restoril), meprobamate (Equanil), ethchlorvynol (Placidyl) and oxazepam (Serax).

Stimulants, including phentermine (Loamin), and diethylpropion (Tenuate)

Narcotics, including pentazocine (Talwin) and propoxyphene (Darvon, Darvocet)

**Schedule IV Risks:** Use may lead to physical and/or psychological addiction.

Sedative-hypnotics: Includes benzodiazepines and other similar substances. These can cause dependence with associated withdrawal symptoms; withdrawal can be life-threatening. Small doses tend to be relaxing; larger doses cause slurred speech, slowed reactions and sleep. Can produce dependence.  Large doses or doses in combination with alcohol and other sedative hypnotics can result in respiratory depression and death.

Stimulants: See above under Schedule II

Narcotics: See above under Schedule I

**Schedule V:**  Abuse potential low. Prescriptions may or may not be required.

Compounds that contain very limited amounts of codeine, dihydrocodeine, ethylmorphine, opium, and atropine, such as Terpine Hydrate with codeine, Robitussin AC

**Schedule V Risks:** Use may lead to physical and/or psychological addition.
Can cause nausea, gastrointestinal symptoms, drowsiness; withdrawal symptoms include runny nose, watery eyes, panic, chills, cramps, irritability.

**ALCOHOL**

**Commonwealth of Pennsylvania Penalties:**

The Pennsylvania Liquor Code, 47 Pa., C.S.A., 1-101 et seq., controls the possession and sale of alcoholic beverages within the Commonwealth. The Code as well as portions of the Pennsylvania Statutes pertaining to crimes and offenses involving minors, 18 Pa., C.S.A. 6307 et seq., provide the following:

Case ID: 221002134

The University of the Arts

1. It is a summary offense for a person under the age of twenty-one to attempt to purchase, consume, possess or knowingly and intentionally transport any liquor or malt or brewed beverages. Penalty for a first offense is suspension of driving privileges for 90 days, a fine up to $300 and imprisonment for up to 90 days; for a second offense, suspension of driving privileges for one year, a fine up to $500, and imprisonment for up to one year; for subsequent offense, suspension of driving privileges for two years, a fine up to $500 and imprisonment for up to one year. Multiple sentences involving suspension of driving privileges must be served consecutively.

2. It is a crime intentionally and knowingly to sell or intentionally and knowingly to furnish or to purchase with the intent to sell or furnish, any liquor or malt or brewed beverages to any minor (under the age of twenty-one). "Furnish" means to supply, give or provide to, or allow a minor to possess on premises or property owned or controlled by the person charged. Penalty for a first violation is $1,000; $2,500 for each subsequent violation; imprisonment for up to one year for any violation.

3. It is a crime for any person under twenty-one years of age to possess an identification card falsely identifying that person as being twenty-one years of age or older, or to obtain or attempt to obtain liquor or malt or brewed beverages by using a false identification card. Penalties are stated in (2) above.

4. It is a crime intentionally, knowingly or recklessly to manufacture, make, alter, sell or attempt to sell an identification card falsely representing the identity, birth date, or age of another. Minimum fine is $1,000 for first violation; $2,500 for subsequent violations; imprisonment for up to one year for any violation.

5. It is a crime to misrepresent one's age knowingly and falsely to obtain liquor or malt or brewed beverages. Penalties are as stated in (1) above.

6. It is a crime knowingly, willfully and falsely to represent that another is of legal age to obtain liquor or malt or brewed beverages. Penalty is a minimum fine of $300 and imprisonment for up to one year.

7. It is a crime to hire, request or induce any minor to purchase liquor or malt or beverages. Penalty is a minimum fine of $300 and imprisonment for up to one year.

8. Sales without a license or purchases from an unlicensed source of liquor or malt or brewed beverages are prohibited.

9. It is unlawful to possess or transport liquor or alcohol within the State of Pennsylvania unless it has been purchased from a State Store or in accordance with Liquor Control Board regulations. The University will cooperate with the appropriate law enforcement authorities for violations of any of the above-mentioned laws by an employee in the workplace or student.

10. The use in any advertisement of alcoholic beverages of any subject matter, language or slogan directed to minors to promote consumption of alcoholic beverages is prohibited.

11. No advertisement of alcoholic beverages shall be permitted, either directly or indirectly, in any booklet, program, book, yearbook, magazine, newspaper, periodical, brochure, circular, or other similar publication, published by, for, or on behalf of any educational institution.

**Health Risks of Alcohol:**

Alcohol: Single doses cause impaired coordination and motor control, impaired attention, cognitive function, and judgment. Higher doses results in extreme impairment of cognitive function, judgment and motor control, and possible alcohol poisoning. Long-term effects include depression, confusion, memory loss, blackouts, unhealthy loss of

Case ID: 221002134

The University of the Arts

appetite, vitamin deficiencies and gastrointestinal problems. Also respiratory depression; depression of the immune system; increased risk of heart disease including alcoholic cardiomyopathy; accidents; hypertension; brain damage; damage to the unborn fetus; impotence; liver disease including cirrhosis; and increased risk of hepatic cancer may occur.

**University Sanctions:**

Individuals whose work performance is impaired as a result of use or abuse of drugs or alcohol (either on or off campus); who illegally use or abuse drugs or alcohol on campus or on University business; who violate any provision of the University's employment rules or who have been convicted of violating any criminal drug statute while on University property, in a University-owned vehicle or while participating in a University-sponsored program off campus are subject to disciplinary action up to and including termination of employment. Disciplinary action or required participation in a rehabilitation program for employees will be determined and implemented by the Provost (in the case of faculty) and by the cognizant Vice President (in the case of staff) in consultation with the Associate Vice President for  Human Resources. Any such actions will be in compliance with the Faculty Handbook, the Staff Manual, union contracts and other specific University policies and regulations regarding termination and suspension of employees.

The University cooperates fully with law enforcement authorities. Violations of the UArts drug and alcohol policy which are also violations of federal or local law may be referred to the appropriate law enforcement agencies. In such situations, cases may proceed concurrently at the University and in the criminal justice system.
Local and federal laws prohibit the unlawful use, manufacture, possession, control, sale and dispensation of any illegal narcotic or dangerous drugs. These laws carry penalties for violations, including monetary fines and imprisonment.

**Treatment and Counseling:**

Early recognition and treatment of alcohol/drug abuse is important for successful rehabilitation and reduced personal, family and social disruption.  The University encourages the earliest possible diagnosis and treatment for drug abuse and supports sound treatment efforts.  If feasible, the University will assist and reasonably accommodate an employee in overcoming an alcohol/drug addiction.  However, all faculty and staff members are required to comply with University policies and rules of conduct and current abuse of alcohol or drugs will not excuse any misconduct. Moreover, the decision to seek diagnosis and accept treatment for such abuse is primarily the responsibility of the employee.

Faculty or staff members with personal alcohol/drug abuse problems may request assistance through the Associate Vice President for  Human Resources.  The AVP for HR will provide such assistance to eligible faculty or staff members on a confidential basis and refer the employee to alcohol/drug abuse treatment and counseling services, where appropriate.  The University will determine whether the employee or faculty member's employment responsibilities should be modified during the period of treatment or counseling.

Voluntary requests for assistance from the University will not prevent the University, in its sole discretion, from imposing disciplinary action for a violation of any provision of this Policy or other University policies.

**Prescribed Medication:**

If a faculty or staff member is undergoing a course of medical treatment involving any drug which may affect his/her ability to perform the essential functions of the job, he or she should report this treatment to the Associate Vice President for  Human Resources.  Information so provided shall be collected and maintained in a separate medical file in the Human Resources Department and be treated as a confidential medical record, except that the faculty or staff member's supervisor may be informed regarding necessary restrictions in the employee's work or duties, and first aid and safety personnel may be informed, when appropriate, if the condition might require emergency treatment.

Case ID: 221002134

The University of the Arts

**Employee Resources:**

Faculty and staff may obtain information and referrals from the Human Resources Department. Confidential counseling for substance abuse is also available through the Employee Assistance Program (EAP) and is available free of charge to employees and their families on a confidential basis, 24 hours a day 7 days a week. Employees who have a concern about drug or alcohol abuse are encouraged to contact the EAP for assistance in finding resources to help with the problem.

**APPENDIX A:      Detailed Policy Statements**

**Section 2-          Family and Medical Leave**

In accordance with the Family and Medical Leave Act of 1993 and subsequent revisions and regulations (the "FMLA"), the University will grant up to twelve (12) weeks of unpaid leave in a 12-month period to eligible employees for any one or more of the following circumstances:  the employee's own illness ("medical");  to care for an ill spouse, child or parent ("family care");  to bond with a newly-born or adopted child or child newly-placed in the employee's home for foster care ("bonding");  or for exigent circumstances employed with the employee's spouse, son daughter or parent call to active military duty ("exigent").

The University also will grant up to twenty-six (26) weeks of unpaid leave in a single 12-month period for an eligible employee to care and support for a spouse, son, daughter, parent, or next of kin who is a covered service member recovering from a serious illness or injury sustained in the line of active military duty ("covered service member care").

This policy summarizes leave opportunities available to eligible employees under one or both of these laws.  Human Resources has additional details and the medical and military certification forms referenced in this policy.  Forms are also on the UArts Portal  under Human Resources.  In addition, the University complies with all applicable state leave laws and to the extent state law provides additional rights, covered employees will be eligible for such additional leave.

**EMPLOYEE ELIGIBILITY**
To be eligible for a family and medical leave, an employee must have at least 12 months of employment with the University and at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave.

Employees also must work at a location in the United States or in any territory or possession of the United States where at least 50 employees are employed by the University within 75 miles.

**BASIC LEAVE ENTITLEMENT**
Eligible employees may take an unpaid leave of absence under the following circumstances (together, "basic leave"):

- For incapacity due to pregnancy, prenatal medical care or child birth (e.g., medical);
- To care for the employee's child after birth, or placement for adoption or foster care (e.g., bonding);
- For placement with the employee of a son or daughter for adoption or foster care (e.g., bonding);
- To care for the employee's spouse, son, daughter or parent with a serious health condition (e.g., family care). "Son or daughter" means a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person who stands in loco parentis by either providing day-to-day care for the child or financial support;
- For a serious health condition that makes the employee unable to perform the functions of the employee's job (e.g., medical); and
- For qualifying exigencies when the employee's spouse, son, daughter, or parent is on active duty in a foreign country or called to active duty in a foreign country from the National Guard, Reserve, or as a retired member of the regular armed services or reserves (e.g., exigency).  Qualifying exigencies may include rest and recuperation with a military member on short-term leave, attending certain military events, arranging for

Case ID: 221002134

The University of the Arts

alternative childcare, addressing certain financial and legal arrangements, attending counseling sessions, and attending post-deployment reintegration briefings.

The University will treat domestic partners as spouses under this policy.

"Domestic Partner" is defined as those individuals who, irrespective of gender, meet the six eligibility terms and conditions described by Independence Blue Cross, Keystone Health Plan, QCC Insurance University and Pennsylvania Blue Shield, which are that the employee:

1. is unmarried, at least eighteen (18) years of age, resides with the other partner and intends to reside with the other partner for an indefinite period of time;
2. is not related to the other partner by adoption or blood;
3. is the sole Domestic Partner of the other partner, with whom he/she has a close committed and personal relationship, and has been a member of this Domestic Partnership for at least six (6) months;
4. agrees to be jointly responsible for the basic living expenses and welfare of the other partner;
5. meets (or agrees to meet) the requirements of any applicable federal, state, or local laws or ordinances for Domestic Partnerships; and
6. demonstrates financial interdependence by submission of proof of three (3) or more of the following documents:

   a. a Domestic Partnership agreement;
   b. a joint mortgage or lease;
   c. a designation of one of the partners as beneficiary in the other partner's will;
   d. a durable property and health care powers of attorney;
   e. a joint title to an automobile, or joint bank account or credit account; or
   f. a valid marriage or civil union in another state
   g. such other proof as is sufficient to establish economic interdependency under the circumstances of the particular case.

**COVERED SERVICE MEMBER LEAVE ENTITLEMENT**
The University also provides a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered service-member during a single 12-month period. A covered service member for purposes of this leave entitlement is:
- A current member of the Armed Forces, including a member of the National Guard or Reserves, who has a serious injury or illness incurred in the line of duty on active duty that may render the service-member medically unfit to perform his or her duties for which the service-member is undergoing medical treatment, recuperation, or therapy; or is in outpatient status; or is on the temporary disability retired list.
- A veteran who is undergoing medical treatment, recuperation or therapy for a serious injury or illness that was incurred in or aggravated by service in the line of duty on active duty in the Armed Forces, whether or not the illness or injury manifested itself before or after the member became a veteran; and the veteran was a member of the Armed Forces, National Guard or Reserves at any time during the five year period before he or she began that treatment, recuperation, or therapy.

The 12-month period for purposes of this leave entitlement begins when an employee starts using his or her leave. Leave taken under the employee's basic leave entitlement also will count towards the 26 week entitlement during this 12-month period.

**DEFINITION OF SERIOUS HEALTH CONDITION**
A "serious health condition" is generally defined as an illness, injury, impairment, physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities.

Case ID: 221002134

The University of the Arts

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or a chronic condition.  Other conditions may meet the definition of continuing treatment.

**AMOUNT OF LEAVE**
Generally, an eligible employee is entitled to a total of up to 12 weeks for his/her basic leave entitlement in a 12-month period, measured backwards from the date the leave in question begins.  The 12-month period for purposes of the covered service member leave entitlement begins when an employee starts using his or her leave.  Leave taken under the employee's basic leave entitlement also will count towards the 26 week covered service member leave entitlement during the 12-month period used for covered service member leave.  For example, if an employee takes 12 weeks of leave in January upon the birth or adoption of a child, that employee would be allowed to take up to an additional 14 weeks of leave in the following 12-month period pursuant to this provision

Leave for birth and care or placement of a son or daughter for adoption or foster care, must conclude within 12 months of the birth or placement.

**USE OF INTERMITTENT OR REDUCED SCHEDULE LEAVE**
An employee does not need to use the employee's medical, family care, exigency or covered service member leave entitlement in one block of time.  Under some circumstances, employees may take these leaves intermittently or on a reduced schedule basis when medically necessary or in connection with a qualifying exigency.  Intermittent leave is leave taken in separate blocks of time due to a single qualifying reason.  A reduced schedule leave is a leave that reduces an employee's usual number of working hours per work day or work week.

An employee must make a reasonable effort to schedule intermittent or reduced scheduled leave to minimize disruption to work, consistent with the health care provider's treatment plan.  When an employee utilizes intermittent or reduced schedule leave for planned medical treatment, the University may temporarily transfer the employee to an alternative position with equivalent pay and benefits, if doing so will be less disruptive to the University during the period of intermittent or reduced schedule leave.

Only the amount of leave actually taken will count against the employee's basic or covered service member leave entitlements.

**EMPLOYEE NOTICE & CERTIFICATION REQUIREMENTS**

*Notice of Leave*
Employees must give written notice to Human Resources at least thirty (30) days in advance of the need for leave if the need for leave is foreseeable based on an expected birth, placement for adoption or foster care, or planned medical treatment for a serious health condition of the employee or immediate family member.  If an employee fails to give 30 days' advance written notice for foreseeable leave, the University may delay the taking of the leave until at least 30 days after the date notice was provided.

When 30 days notice is not possible because the need for leave was not foreseeable 30 days in advance, the employee must provide notice as soon as the need for leave becomes foreseeable.  At minimum, the employee practicable and generally must notify his/her supervisor as far in advance as possible.  Such a report should be made no later than one hour before the staff member's scheduled reporting time that the employee will be absent]  Absent unusual circumstances, when an employee fails to comply with the University's  procedures for reporting absences and requesting leave, the University may delay or deny the leave request.

Case ID: 221002134

The University of the Arts

Sufficient information to put the University on notice of the employee's need for a FMLA leave should be provided by the employee and may include that the employee is unable to perform job functions due to medical circumstances, the employee must be absent to care for a family member unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or facts supporting the need for covered service member leave.  Employees must also inform the University if the requested leave is for a same reason for which leave was previously taken or certified.

*Certification of the Need for Leave*
For leave taken because of one's own serious health condition; to care for a parent, spouse, son or daughter with a serious health condition; or, for a covered service member with a serious injury or illness, the University will require that the employee provide a completed medical certification by an authorized health care provider.

Medical certification forms are available from Human Resources.  If an employee requests intermittent or reduced schedule leave, information the University will require will include certification that this type of leave is medically necessary and verification of the schedule for treatment, if applicable, as well as the expected duration and frequency of the need for such leave.

For exigency leave, the University will require that employees provide documentation to support the request for leave, including documentation from the military confirming a covered military member's active duty or call to active duty status in support of a contingency operation.

The employee must provide the University with the certification within 15 calendar days of the University's request.  Failure to provide sufficient certification in a timely manner may result in delay or denial of the FMLA leave request.  An employee's absence will not be counted as FMLA leave, and be entitled to the protections and benefits of the FMLA, unless timely and sufficient certification is provided by the employee.

The University may request that an employee submit to a second and third medical opinion if it has reason to doubt the validity of the initial certification provided except in the case of exigency or covered service member leave.  The University also may request that the employee recertify the need for continued FMLA protected leave in certain circumstances.

**EMPLOYER OBLIGATIONS**
The University will inform employees requesting leave (i) whether they are eligible under the FMLA; (ii) whether any additional information is required from the employee; and (iii) the employees' rights and responsibilities related to the leave.  If the employee is found not to be eligible for leave, the University will provide to the employee the reason for ineligibility.

The University also will inform employees if leave will be designated as FMLA leave and the amount of leave counted against the employee's leave entitlement under each law.  If the University determines that the leave is not covered by the FMLA, the University will notify the employee.

**INTEGRATION OF LEAVE WITH PAID TIME OFF & DISABILITY BENEFITS**
The University may requires the employee to use any accrued, unused paid leave while taking leave under the FMLA In such circumstances, the FMLA leave and paid leave will run concurrently.  Similarly, if an employee is receiving workers' compensation benefits, leave taken in connection with the workers' compensation illness or injury may be designated as FMLA-protected leave if the employee is eligible and the illness or injury qualifies as a serious health condition.

In cases where an employee is receiving disability or workers' compensation benefits while taking FMLA leave and the employee wishes to supplement such benefits so that the employee receives 100 percent of his/her income while taking leave, the employee should contact Human Resources with such a request to determine if paid leave can be used to supplement such benefits in such circumstances.  In no circumstance will an employee be able to receive a

Case ID: 221002134

The University of the Arts

combination of paid leave and benefits that exceeds 100 percent of the employee's regular income while taking FMLA leave, unless otherwise provided by state law.

**MAINTENANCE OF BENEFITS DURING LEAVE**
The University will maintain group health insurance coverage for an employee on a FMLA leave on the same terms and conditions as if the employee continued to work. This means that if the employee is responsible for a portion of the premiums for such coverage while working, the employee will continue to be responsible for the same portion of those premiums and for other University benefit plan coverage during the FMLA leave.  During times of the leave that the employee is not using accrued paid time off benefits from which these premiums and other benefit plan costs typically can be deducted, the employee must arrange to personally pay the amount due in accordance with the provisions of the applicable plans.  If a required premium is not received within [30 days] of the due date, the coverage may be dropped for the remainder of the leave.

If an employee does not return to work following a FMLA leave for reasons beyond the employee's control, such individual may be required to reimburse the University for the employer portion of the group health insurance premiums it paid during the leave, unless the employee cannot return to work because of the employee's own serious health condition, the serious health condition of the employee's spouse, child or parent or because of other circumstances beyond the employee's control.

Use of FMLA leave will not result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

**RETURN TO WORK**
During a FMLA leave, employees must report to Human Resources every 30 days on their status and their intent to return to work.

When an employee returns from a FMLA leave, the University will return the employee to the same position the employee held when the leave commenced, or to an equivalent position that has equivalent benefits, pay and other terms and conditions of employment to the extent the employee would have been entitled to return to such position and retain such terms and conditions of employment had they not taken leave.

Female employees returning from leave after the birth or adoption of a child should give notice if they will require lactation breaks to express breast milk once they return to work, and will be afforded reasonable, unpaid break time in a private location.

The University is not required to restore "key" employees to their positions or to equivalent positions upon their return to work following family and medical leave when restoration to employment will cause the University substantial and grievous economic injury.  The University will notify "key" employees–certain highly compensated, salaried individuals–in writing of the decision denying job restoration. Such employees will be given a reasonable opportunity to return to work after such notification.

**FITNESS FOR DUTY**
The University will require employees on leave for their own serious health condition to submit, prior to their return, a medical certification from their health care provider of their ability to return to work.  Such certification should include any medical restrictions or limitations of the employee, how long they will remain in effect and if any reasonable accommodation is needed by the employee to satisfactorily and safely return to working.  The University may delay restoration to an employee who fails to provide such certification. The University may also require fitness-for-duty certifications for employees on intermittent leave when the University has a reasonable safety concerns relating to the employee's return to work.

Case ID: 221002134

The University of the Arts

**PROHIBITED PRACTICES**

Under the FMLA, the University cannot interfere with, restrain, or deny the exercise of any right provided by the FMLA or terminate the employment of or discriminate against any individual for opposing any practice because of involvement in any proceeding relating to the FMLA.  In addition, the University cannot use the taking of a FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.

An employee may file a complaint with the U.S. Department of Labor, an applicable state agency, or may bring a private lawsuit against an employer.  However, the University encourages all employees to first bring any concerns they have regarding this policy to the attention of Human Resources or by calling [1-888-203-3506] or click on the EthicsPoint link under "Campus Resources" located on the University's portal site (http://myuarts.uarts.edu). You will automatically be taken to EthicsPoint's home page where you can click on "*File a report*" The University prohibits retaliation against any employee for bringing any complaint forward in good faith under this policy.

The FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater leave rights

**APPENDIX A:     Detailed Policy Statements**

**Section 3-          Sexual Harassment and Other Prohibited Harassment**

The University of the Arts is committed to maintaining an environment in which students, faculty and staff can pursue academic, artistic and professional excellence.  Inappropriate workplace behavior and harassment create conditions that are wholly inconsistent with this commitment.  Such an environment can be secured only through mutual respect and unconstrained academic and professional interchange among faculty, staff and students.  Faculty, staff and students of the University are entitled to participate in and obtain the benefits of University programs, activities and employment without being discriminated against on the basis of: race, color, religion, sex, gender identity, national origin, age, mental or physical disability, veteran status, genetic information, the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, possession of a GED instead of a high school diploma and military status as defined by Pennsylvania law, sexual orientation, marital status, familial status and domestic/sexual violence victim status or any other prohibited factor.

The rights defined by this policy apply to all faculty, staff and students of the University, and the obligations are binding on all faculty and staff as part of their employment, regardless of tenure or years of service, and all students, regardless of academic status.

Academic Freedom and Freedom of Artistic Expression

This policy shall not impair the lawful exercise of free speech (including written, graphic, verbal or artistic expression) that serves legitimate educational or artistic purposes; shall not infringe upon legitimate teaching methods; and shall not restrict the academic or artistic freedom of the members of University of the Arts community.

Sexual Misconduct and Sexual Harassment Defined

The University regards any act of sexual misconduct, sexual harassment or other forms of harassment to be a violation of the standards of conduct required of all persons associated with the institution, including applicants for employment and third parties over whom the University has control.  The prohibition against sexual harassment, sexual misconduct and other forms of harassment applies to all interactions occurring on campus, in University facilities, or within the context of University-related activities and applies regardless of the gender, gender identity or sexual orientation of the individuals involved.

Case ID: 221002134

The University of the Arts

**Sexual Misconduct**

For the purposes of this policy, sexual misconduct refers to a range of behaviors that include sexual harassment and all forms of non-consensual sexual activity.  For purposes of this policy, the University prohibits the following specific forms of sexual misconduct: sexual harassment, sexual assault, sexual exploitation, intimate partner violence, stalking, and retaliation.  These various forms of sexual misconduct are defined below.

**Sexual Assault**

For purposes of this policy, sexual assault is defined as having or attempting to have sexual intercourse or sexual contact with another individual without consent.

**Sexual Harassment**

For purposes of this policy, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal or physical conduct of a sexual nature when:

- submission to such conduct is either explicitly or implicitly made a term or condition of an individual's employment, education, academic success, living environment, or participation in a University-related activity; or

- submission to or rejection of such conduct by an individual is used as the basis for or a factor in decisions affecting that individual's employment, education, academic success, living environment, or participation in a University-related activity; or

- such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or educational performance or creating an intimidating, hostile or offensive environment for that individual's employment, education, academic success, living environment or participation in a University-related activity.

Some examples of what may constitute sexual harassment are:  threatening to take or taking actions, such as discharge, demotion or reassignment, if sexual favors are not granted; demands for sexual favors in exchange for favorable or preferential treatment; unwelcome and repeated flirtations, propositions or advances; unwelcome physical contact; whistling; leering; improper gestures; tricks; horseplay; use of stereotypes; offensive, insulting, derogatory or degrading remarks; unwelcome comments about appearance; sexual jokes or use of sexually explicit or offensive language; gender  or sex based pranks; and the display of sexually suggestive objects or pictures.  The above list of examples is not intended to be all inclusive.  Care should be taken in informal situations, including University functions, performances, exhibitions, and business trips.

**Sexual Exploitation**

For purposes of this policy, sexual exploitation is defined as an act or acts committed through non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage or any other non-legitimate purpose.

Examples include, but are not limited to:  observing another individual's nudity or sexual activity or allowing another to observe consensual sexual activity without the knowledge and consent of all parties involved; non-consensual streaming of images, photography, video, or audio recording of sexual activity or nudity, or distribution of such without the knowledge and consent of all parties involved; and inducing incapacitation for the purpose of making another person vulnerable to non-consensual sexual activity.

Case ID: 221002134

The University of the Arts

Domestic Violence/Dating Violence

For the purposes of this policy, Domestic violence can be physical, sexual, emotional, economic, or psychological actions or threats of actions that influence another person. This includes any behaviors that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound someone.  Dating Violence is defined as a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner.  Dating violence is committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim and the relationship shall be determined based on the reporting party's statement with consideration of 1) length of the relationship, 2) type of relationship, 3) frequency of interaction between the persons involved in the relationship.


Stalking

For purposes of this policy, stalking is defined as a course of conduct involving more than one instance of unwanted attention, harassment, physical or verbal contact, or any other course of conduct directed at an individual that could be reasonably regarded as likely to place that individual in fear of harm or injury, including physical, emotional, or physical harm.  This includes cyber-stalking, a particular form of stalking in which electronic media such as the Internet, social networks, blogs, cellular phones, texts, or other similar devices or forms of contact are used to pursue, harass, or make unwelcome contact with another person.


Retaliation

Retaliation or reprisals of any kind against anyone reporting allegations of sexual misconduct, sexual harassment or other forms of harassment, or against anyone cooperating in an investigation of such a report, are strictly prohibited. Such retaliation shall be considered a serious violation of this policy and shall be punishable by discipline up to and including dismissal, regardless of whether the charge of sexual misconduct, sexual harassment or other form of harassment is substantiated. Examples of prohibited retaliation include: threatening reprisals against an individual who complained or cooperated in the investigation; unfairly changing the evaluations, assignments or working, studying or living conditions of such an individual; or otherwise continuing any sexual harassment, sexual misconduct or other form of harassment against such person.


If a faculty member, employee or student is found to have intentionally lied about a claim of sexual harassment, sexual misconduct or other form of harassment, or brought the claim in bad faith, knowing that the allegation is false, then that faculty member, employee or student may be subject to discipline up to and including termination or dismissal from the University.


Definitions:

For purposes of this policy, the following terms have the definitions provided below.  Please note that some of these terms may be used in other contexts, as such in connection with concurrent legal proceedings, and that they may have different meanings in those contexts:


Complainant

 An individual who reportedly experienced sexual misconduct, regardless of whether that individual participates in the disclosure or review of that report by the University at any point.

Case ID: 221002134

The University of the Arts

Consent

For the purpose of this policy, consent is clear, voluntary and unambiguous communication indicating a willingness to engage in a particular activity.  Consent may not be inferred from silence, passivity, lack of resistance or lack of active response.  In the absence of an outward demonstration, consent does not exist.  Consent can be withdrawn by either party at any point.  Consent is not effective if it results from the use of physical force, threat of physical force, intimidation, coercion, incapacitation or any other factor that would eliminate an individual's ability to exercise his or her own free will to choose whether or not to engage in a particular activity. Individuals are considered impaired and unable to give consent when intoxicated, of limited mental capability or other similar condition that interferes with reasonable judgment.

Reporter

An individual who reports to the University a concern regarding possible sexual misconduct. A reporter need not be a complainant.

Respondent

A University member or participant in a University program who is reported to have engaged in alleged sexual misconduct. This term also includes individuals whose identities are unknown if (a) there is reason to believe that they may be a University member or participant in a University program or (b) the complainant or reporter is a student.

Support Person

An individual or individuals chosen by a complainant, respondent, reporter, or witness to provide support during the review of a report of possible sexual misconduct under this policy. The person(s) chosen may not already be directly involved in the investigative process (for example, as a complainant, respondent, witness, or reporter) and may not speak on behalf of the person they are supporting, but instead may be present only to provide assistance or advice to the individual they are supporting. An approved support person must be a member of the University of the Arts community and is not permitted to speak at the proceedings.

Title IX

Title IX of the Education Amendments of 1972 (Title IX) (20 U.S.C. § 1681 et seq.; 34 C.F.R. Part 106) (as amended) is a federal law that prohibits sex-based discrimination, including sexual harassment and sexual assault, in education programs that receive federal financial assistance.

The Violence Against Women Reauthorization Act of 2013

The Violence Against Women Reauthorization Act requires colleges and universities "to strengthen institutional policies related to these crimes, provide greater support and accommodations for victims, and protect the rights of both parties (complainant and respondent) during institutional disciplinary proceedings ("Violence Against Women Act; Notice of Proposed Rulemaking," 79 Federal Register 119 (20 June 2014), pp. 35422.

Other Forms of Harassment Defined

For purposes of this policy, other forms of harassment are defined as verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color, gender, age, religion, national origin, sexual orientation, disability, veteran status or any other characteristic protected by law, and that:

Case ID: 221002134

The University of the Arts

- creates an intimidating, hostile or offensive work or academic environment; or

- unreasonably interferes with an individual's work or academic performance.

Some examples of such harassment are:  using epithets or slurs; mocking, ridiculing or mimicking another's culture, accent, appearance or customs; threatening, intimidating or engaging in hostile or offensive acts that focus on any characteristic protected by law, including jokes or pranks; displaying on walls, bulletin boards or elsewhere on University premises, or circulating in the University community, of written or graphic material that denigrates or shows hostility or aversion toward a person or group because of any characteristic protected by law.  The above list of examples is not intended to be all inclusive.


Employee/Student Interaction

In addition to the general prohibitions against sexual misconduct, sexual harassment and other forms of harassment of any type, the University imposes an obligation on its staff and faculty members with regard to their interactions with students.  No employee may ask for a date, make a sexual advance to a student, or in any other way become romantically or sexually involved with a student.  This rule is for the protection of students, employees and the University.


If a staff or faculty member has any doubt or question about whether his or her relationship with a student violates this policy, the employee should refrain from further interaction with the student and contact the appropriate Title IX Deputy Coordinator for advice.


A staff or faculty member may not in any way use his or her status as an employee to intimidate a student or advance a personal or sexual relationship.


Employee/Employee Interaction

Consensual romantic and/or sexual relationships between an employee with supervisory authority and any subordinate, including one not directly reporting to the supervisor, may compromise the University's ability to enforce its policy against sexual harassment.  Consequently, if such relationships arise, they will be considered carefully by the University, and appropriate action will be taken as needed.  Such action may include a change in the responsibilities of the individuals involved in such relationships or transfer of location within the University to diminish or eliminate the supervisory relationship and workplace contact that may exist.  Any supervisory employee involved in such a relationship is required to report the relationship to his or her supervisor, and to Human Resources.


Student/Student Interaction

Sexual activity and relationships between students of any gender, gender identity, or sexual orientation, must be based in mutual, voluntary, and unambiguous consent.  The University's Code of Student Conduct prohibits "conduct which threatens the physical or psychological health and/or safety of any person (including the person committing the act) or the sanctity of the campus, including, but not limited to physical or sexual assault" and includes rape, sexual assault, sexual harassment, dating violence, domestic violence, stalking, and hazing.


Communication, Privacy, and Confidentiality

This policy is part of the University's overall commitment to open communication.  The University encourages any employee or student with concerns about sexual harassment, sexual misconduct or other form of harassment, as well

Case ID: 221002134

The University of the Arts

as campus community concerns of any nature (including, but not limited to, any alleged discrimination) to bring those concerns to the attention of a campus official.

Reports of sexual harassment, sexual misconduct or other forms of harassment will be kept as confidential as possible.  Information about complaints and investigations will be shared only on a need-to-know basis. Campus representatives must balance requests for confidentiality by complainants who do not wish their names to be shared with respondents, or who do not wish to pursue formal investigation, with the responsibility to provide a non-discriminatory environment for all members of the campus community.  At times, information identifying the individuals involved in an incident must be shared with responsible parties on campus.  All employees of the University are considered responsible parties with the exception of individuals who have been identified as a confidential resource.  All responsible parties are required to share reports of sexual harassment, sexual misconduct or other forms of harassment with the appropriate identified Title IX Deputy Coordinator or Title IX Coordinator.

Certain campus professionals are confidential resources who are not required to share reports of sexual harassment, sexual misconduct or other forms of harassment, unless the circumstances involve an imminent risk to individuals. These confidential resources include the counselors of the Counseling Center, staff of the Health Center, and pastoral and religious advisers of student organizations.


Reporting Sexual Misconduct

The University encourages all individuals to seek medical assistance immediately after an incident of sexual misconduct to address concerns about physical and emotional well-being.

The decision to report or not report an incident of sexual misconduct or assault is a personal one, and individuals are not expected or required to pursue a specific course of action or a specific timeline.  An individual may choose to speak to a confidential resource, as outlined in the above section, make a report to the University, or report to the Philadelphia Police.

To report sexual assault to the police, contact the Philadelphia Police Department at 215-685-3251 or 3252.  The investigating officer will explain the investigatory and legal processes that follow a report.  The University encourages complainants to pursue criminal action for incidents of sexual harassment or misconduct that may also be crimes under Pennsylvania Law.  The University will assist a complainant in making a criminal report and will cooperate with law enforcement agencies if a complainant decides to pursue the criminal process to the extent permitted by law.

If the respondent is a member of the University community or participant in a University program, complainants may report the incident to the University through the procedures detailed below.


Procedures for Reporting a Complaint of Sexual Misconduct, Sexual Harassment, or Other Forms of Harassment to the University:


1.        Title IX Coordinator and Deputy Coordinators

The University's Title IX Coordinator monitors compliance with regulations concerning charges of sexual harassment, sexual misconduct or other forms of harassment; Deputy Coordinators investigate and address such allegations. Any student, staff or faculty member who has been the victim of sexual harassment, sexual misconduct or other form of harassment should promptly report, orally or in writing, the sexual harassment, sexual misconduct or other form of harassment to the appropriate Title IX Deputy Coordinator.  The appropriate Title IX Deputy Coordinators are as follows:

- For charges of sexual harassment, sexual misconduct or other forms of harassment in which the complainant is a student, the Associate Dean of Students is the investigating Deputy Coordinator.  Reports should be submitted to the Associate Dean of Students by calling (215) 717-6606.

Case ID: 221002134

The University of the Arts

- For charges in which the complainant is a faculty member, the Associate Provost is the investigating Deputy Coordinator.  Reports should be submitted to the Associate Provost by calling (215) 717-6393.

- For charges in which the complainant is a staff member, the Associate Vice President for Human Resources is the investigating Deputy Coordinator. Reports should be submitted to the Associate Vice President for Human Resources by calling (215) 717-6366.


The Deputy Coordinators report complaints in aggregate to the University's Title IX Coordinator, Connie Michael (215-717-6260)  and consult with the Title IX Coordinator for guidance as needed when investigating complaints.

As soon as a report is received, it will receive prompt and appropriate attention.  If, for any reason, the individual is uncomfortable discussing such matters with the designated Deputy Coordinator, he or she should promptly report the matter to the Title IX Coordinator, or to another Deputy Coordinator. Failure to report the incident to a Title IX Deputy Coordinator restricts the University's ability to investigate or resolve the issue.


2.  Duty of Administrators, Faculty Members and Supervisors with Knowledge of Harassment

In the event that a complaint of sexual harassment, sexual misconduct or other form of harassment -- formal or informal, written or oral, from an alleged victim or otherwise -- is made to an administrator, faculty member or staff member other than those specifically identified above, that administrator, faculty member or staff member must: (a) inform the person making the complaint that the matter will be referred to the appropriate Title IX Deputy Coordinator; and (b) promptly report, either orally or in writing, such complaint to the designated Title IX Deputy Coordinator. Every University administrator, faculty member and staff supervisor has a duty to maintain a workplace/educational environment free of any form of sexual harassment, sexual misconduct or other form of harassment.


3.      Investigation Process

In the event of any report, orally or in writing, of sexual harassment, sexual misconduct or other form of harassment, a prompt inquiry will be made to determine whether any sexual harassment, sexual misconduct or other form of harassment has occurred.  If a preliminary inquiry into the matter by the Deputy Coordinator indicates there may be validity to the charges, then the University will promptly proceed with a formal, thorough and impartial investigation.  If such a formal investigation proceeds, interviews and/or statements will be obtained by the Deputy Coordinator from all available involved parties, including the complainant, the respondent and witnesses, if any.   At any time during the course of an investigation, the complainant, respondent, or any witnesses may provide a written statement, other supporting materials, or identify other potential witnesses, regarding the charge under review.


Throughout the process, any person participating in the process may have a support person present at any meeting related to the review of the reported sexual misconduct.


During the investigation, intermediate measures may be taken to ensure that further sexual harassment, sexual misconduct or other form of harassment does not occur.  Such measures may include schedule changes, removal from specific courses or activities, removal from University housing, or suspension from the University. The investigator, upon completion of the factual investigation, will reach a conclusion as to whether sexual harassment, sexual misconduct or other form of harassment occurred.  The investigator's findings will be made using the preponderance of the evidence standard. This standard requires that the information supporting a finding of responsibility be more convincing than the information in opposition to it. Under this standard, individuals are presumed not to have engaged in sexual misconduct unless a preponderance of the evidence supports a finding that sexual misconduct occurred.

Case ID: 221002134

The University of the Arts

For matters where a student is the responding or complaining party, the process will follow the Conduct Review Process, as outlined in the Student Handbook.  Based upon the factual investigation and conclusions, and any other information that becomes available, the Associate Dean of Students will reach a conclusion as to whether sexual harassment, sexual misconduct or other form of harassment occurred.

4.      Remedial and Disciplinary Measures

If the investigating Title IX Deputy Coordinator finds, following an investigation or conduct review process, that sexual harassment, sexual misconduct or other form of harassment did occur, the University will take immediate steps to stop the sexual harassment, sexual misconduct or other form of harassment, implement appropriate corrective and disciplinary action, and initiate any necessary preventive measures to ensure the sexual harassment, sexual misconduct or other form of harassment does not occur again. Even if the University concludes that sexual harassment, sexual misconduct or other form of harassment did not occur, or that it is unable to determine one way or the other what occurred due to the lack of verifiable or credible evidence, the University may take disciplinary or preventive measures, such as training and monitoring, to ensure sexual harassment, sexual misconduct or other form of harassment does not occur in the future.

A written record of the complaint, any investigation and the resolution of the complaint will be kept in a confidential file by the Associate Vice President of Human Resources, who is the custodian of these records for all matters involving employees, or by the Dean of Students, who is the custodian of such records for all matters involving students.  In matters involving both student(s) and employee(s), copies of such records will be maintained by both custodians. Any conclusion from the inquiry or investigation will be communicated to both the complainant and the respondent, stressing the confidentiality and anti-retaliation provisions outlined in this policy.

5.      Further Review

If the complaining party or the responding party is not satisfied with the resolution of the matter, he or she may appeal to the Dean of Students for matters originating with a student; to the Vice President for Finance and Administration for matters originating with a staff member; or to the Provost for matters originating with a faculty member, within fourteen days of being informed of the proposed resolution.  The complaining party and the named responding party have the right to appear before the designated University official.  At the conclusion of any further review, the designated official shall either affirm the prior conclusion or take alternative action.  A written determination will be issued, and both the complaining party and the responding party will be informed of this decision.

If the complaining party or the responding party believes that the response by the University is insufficient or inappropriate, he or she may file a complaint with the Title IX Coordinator, who will review whether these procedures have been properly followed and the University's policies have been properly enforced. At the conclusion of this review by the Title IX Coordinator, he or she will make recommendations to the President, who shall either affirm the prior conclusion or determine alternative actions or accommodations.  The decision of the President will be final. No further University review is available.

The sole exception to the foregoing procedure occurs in a case in which a tenured faculty member is recommended for dismissal due to sexual harassment, sexual misconduct or other form of harassment, and the President is in agreement with the recommendation. In such event, the President will instruct the Provost to initiate the procedures set forth in Section 1.11.2 of the Faculty Handbook relating to the dismissal of tenured faculty.

If a recommendation for dismissal is not upheld after exhaustion of the tenured faculty appeal process, the President shall nonetheless take remedial action, including discipline short of dismissal, which is reasonably calculated to prevent any future harassment. Such actions are not subject to further review.

Case ID: 221002134

The University of the Arts

**APPENDIX A:      Detailed Policy Statements**

**Section 4-          Use of University Property and Electronic Resources**

**University Computers, E-Mail, Telephones, Equipment and Resources:**

The University of the Arts provides access to computing and information resources, telephones and other equipment and resources for students, faculty, staff and other authorized users in support of the University's mission of teaching, creative exploration, research and public service. Recognizing the value of such resources to our educational and artistic mission, the University has made a substantial investment in such resources and equipment and expects them to be used for University purposes only, in accordance with University rules, policies and objectives. No University resources or equipment may be used improperly by any faculty, student or staff member, or for personal gain or profit.

**Computers and Internet Access:**

Computing resources include host computer systems, University-sponsored computers and workstations, and peripherals, software, internet access and electronic files.  Proper use demonstrates respect for intellectual property, ownership of data, systems security mechanisms and each individual's rights to privacy and to freedom from intimidation, harassment and annoyance.

Under the auspices of the Vice President for Technology and Information Services, all University computer systems, including user files, may be monitored in order to respond to threats involving attempts to disrupt the University's network or systems. Should the University find itself in a compromised position with regard to computer fraud, denial of service attempts, illegal hacking attacks, or phishing exercises in attempt to illegally obtain protected information, the Vice President will work with the Provost and President to determine an appropriate course of action to protect the integrity of our systems and the privacy of faculty. Faculty should understand that all computer files and communications using equipment owned or otherwise provided by the University are subject to review and should not expect such files and communications to be private. The University must comply with state and federal guidelines for the protection of information, the privacy of individuals and, if called upon to do so, must provide discoverable information to federal and state authorities when officially requested to do so.

All users of the University's information and technology resources are expected:

- to respect the rights of others and not use such resources to threaten, harass, intimidate or insult others, or to engage in unlawful, defamatory or obscene activity;

- to abide by all applicable licenses, copyrights, patents, intellectual property rights, contracts, security agreements, and other restrictions; and

- to use such resources solely for University-related activities and purposes.

The same policies and laws that govern faculty, staff and student publications in traditional media are applicable to publications in computer media.  With few exceptions, web pages and electronic files may not contain copyrighted material without the approval of the owner of the copyright.  Likewise, theft or misuse of private property -- whether it be tangible or intellectual property -- is prohibited.

The University reserves the right to restrict or rescind computing privileges, or the use of any other University facilities or resources, in accordance with this and other applicable University policies when the user has exhibited inappropriate behavior in the use of such resources.  Other discipline and remedial measures may be appropriate, including referral to local, state and/or federal authorities, as set forth in other applicable University policies.

Case ID: 221002134

The University of the Arts

The following types of activities are selected examples of behaviors that are unethical, unlawful, and/or inappropriate:

a.  attempting to alter system, hardware, software, or account configuration;
b.  accessing or monitoring another individual's accounts, files, software, electronic mail, or computer resources without the permission of the owner;
c.  misrepresenting one's own identity, role, or the identity of any other person in any type of electronic communication;
d.  misrepresenting or implying that the content of a personal home page constitutes the views or policies of the University, or altering the University's official Web site or related pages without prior authorization in writing;
e.  misusing the University's computing resources so as to reduce their efficiency or to affect access to the detriment of other users;
f.  producing chain letters or broadcasting messages to individuals or lists of users, or producing any communication that interferes with the work of others;
g.  breaching or attempting to breach computer security systems, with or without malicious intent;
h.  engaging in any activity that might be harmful to systems or to any stored information such as creating or propagating viruses, worms, Trojan horses, or other rogue programs, disrupting services, or damaging files;
i.  violating copyright and/or software licenses agreements;
j.  using computing resources for commercial or profit-making purposes without the written authorization from the University;
k.  downloading or posting to University computers, or transporting across University networks, material that is illegal, proprietary, in violation of University contractual agreements, or in violation of University policy; or
l.  violating local, state or federal laws.

The University considers any violation of these regulations to be a serious offense. Violations may result in one or more of the following: revocation or restriction of computer privileges; disciplinary action as outlined in the Code of Student Conduct, the Faculty and Staff Handbooks, and other University policies and procedures; or a referral to local, state, and/or federal authorities.

The above policies supplement the University's Code of Conduct and all existing policies.

**E-Mail:**

This policy applies to all members of the University of the Arts community and refers to all electronic mail resources at the University.  Any person who uses the University's electronic mail facilities consents to all of the provisions of this policy and agrees to comply with all of its terms and conditions and with all applicable state and federal laws and regulations.  Violations may result in revocation or restriction of computer privileges; disciplinary action as outlined in the Code of Student Conduct, the Faculty Handbook and Staff Manual, and other University policies and procedures; referral to local, State, and/or Federal authorities.

The primary purpose of accounts is to facilitate communication among users, including outside vendors, colleagues, etc.  E-mail must be used in accordance with the responsible use provision contained in this policy.  Users shall not, under any circumstances, give their passwords for any e-mail system to an unauthorized person nor shall they obtain any other individual's' password by any unauthorized means whatsoever.  No user shall use the University's e-mail systems or services for the purpose of transmitting fraudulent, defamatory, harassing, obscene, or threatening messages, or solicitation or distribution of any information concerning these activities or for the promotion of non-university-authorized goods, services or personnel, or for any other communications that are prohibited by law.

**Privacy and E-mail:**

Both the nature of e-mail and the character of the University of the Arts environment make e-mail less private than users may anticipate.  The privacy of e-mail messages may be compromised by the fact they must routinely pass

Case ID: 221002134

The University of the Arts

through numerous computers and are sometimes seen by system administrators in the course of maintaining these systems, redirecting lost mail, or by assistants routinely screening colleagues' mail.

The University of the Arts does not routinely monitor or inspect e-mail. Nonetheless, e-mail is subject to a number of laws, policies, and practices that apply to the disclosure and protection of the University of the Arts' records. Examples include, but are not limited to the Federal Family Educational Rights and Privacy Act; University personnel policies; disclosure pursuant to litigation; and other provisions of The University Guidelines for Responsible Computing.

The users of University electronic mail resources have no expectation of privacy in their email accounts.  The University of the Arts may access e-mail accounts to satisfy a legal obligation or to insure proper operation of the electronic mail facilities, and it reserves the right to take appropriate investigatory and/or disciplinary action.

Case ID: 221002134

# EXHIBIT B

Case ID: 221002134

**SEXUAL AND GENDER-BASED
VIOLENCE, DISCRIMINATION, EXPLOITATION,
STALKING AND HARASSMENT POLICY**

## I.   STATEMENT OF NON-DISCRIMINATION

The University of the Arts does not discriminate on the basis of race, color, ethnicity, national origin, age, gender, sex, sexual orientation, gender identity or expression, physical or mental disability, religion, status as a veteran or special disabled veteran, or any other protected class.

## II.   PURPOSE OF POLICY

The University of the Arts is committed to creating and maintaining a safe, healthy, and respectful environment for its students, faculty, staff and guests.  It is the responsibility of each member of the university community to respect the privacy and dignity of one another.  The University recognizes that discrimination based on sex or gender, including sexual harassment, sexual violence, and other forms of sexual misconduct, is harmful to the well-being of our community and serves as a barrier to academic and professional success. To foster and maintain a safe learning, living and working environment, the University sets forth the below policy prohibiting any form of sexual or gender-based violence, exploitation, stalking and harassment. This policy outlines the University's coordinated response to reports of sexual and gender-based violence, exploitation, stalking and harassment in compliance with Title IX of the Education Amendments of 1972 ("Title IX"), the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Act (the "Clery Act"), and the Violence Against Women Reauthorization Act of 2013 ("VAWA"), and other applicable federal and Pennsylvania state laws.

## III.   APPLICATION OF POLICY

This policy applies to all members of the University community, including students, faculty, visiting faculty, affiliates, staff, contractors, vendors, visitors and guests without restriction.  The University will consider the application of this policy on a case-by-case basis.

This policy applies to conduct that occurs:

> (1) On University premises or property; and/or

> (2) In the context of University employment, education, research, recreational, social or artistic activity, irrespective of the location of the occurrence, if the conduct has or can be reasonably predicted to have a continuing negative effect on the University and its students, faculty, visiting faculty, affiliates, staff, contractors, vendors, visitors or guests.

## IV.   TITLE IX COORDINATOR

The University's Title IX Coordinator is responsible for monitoring compliance with Title IX; tracking and reporting annually on all incidents in violation of this policy; and coordinating the

Case ID: 221002134

University's investigation, response and resolution of reports made under this policy. To contact the University's Title IX Coordinator, please e-mail titleix@uarts.edu or visit www.uarts.edu/titleix.

## V.    REPORTING RESPONSIBILITIES OF UNIVERSITY EMPLOYEES

With the exception of the confidential resources listed in this policy, all University employees, full and part-time, regardless of tenure or contractual status, are considered "Responsible Employees" and are mandated to report any incidents of misconduct under this Policy to the University's Title IX Coordinator. Responsible Employees are required to share with the Title IX Coordinator all known information, including the identities of any alleged Respondent (if known), the identities of any Complainants, the names of other witnesses involved in the alleged misconduct, as well as all other relevant facts of which the Responsible Employee is aware, including the date, time, and location of the incident and any statements made by parties or witnesses.

## VI.    STATEMENT ON PRIVACY AND CONFIDENTIALITY

The University is committed to protecting the privacy interests of all individuals involved in a report of sexual or gender-based harassment or misconduct. In any report, investigation or resolution of an allegation of sexual and gender-based harassment or misconduct, every effort will be made to protect the privacy interests of the individuals involved in a manner consistent with the need for a thorough review of the allegation and the protection of any individual or the broader campus community. Information related to a report of harassment or misconduct will be shared only with those University employees who "need to know" in order to assist in the investigation and/or resolution of the complaint. At all times, the privacy of the parties will be respected and safeguarded. All University employees who are involved in the review, investigation or resolution of a report, including conduct board members, have received specific training regarding the safeguarding of private information.

Students or employees wishing to obtain confidential assistance on or access to campus resources without making a report to the University may do so by speaking with professionals who are obligated by law to maintain confidentiality. These professionals, who are identified in the Resources and Reporting section of this policy, include individuals in the Student Health Services and the Student Counseling Center, and the Employee Assistance Program.

If a Complainant requests that their name or other identifiable information remain confidential, the University will at all times seek to respect the request of the Complainant, and where it cannot do so, the University will communicate with the Complainant about the reasons why the request for confidentiality cannot be honored. In all cases where confidentiality is requested, the University will balance this request with its obligation to provide a safe and nondiscriminatory environment for all University community members. The University will weigh the request for confidentiality against the following factors: the seriousness of the alleged conduct, any potential threats to community safety, the respective ages and positions of the Complainant and the Respondent, whether there have been other harassment complaints against the Respondent, and the Respondent's right to receive information under applicable law. In all cases the University

Case ID: 221002134

will take reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation, but its ability to investigate may be limited by the request for confidentiality.

When the University honors a Complainant's request for confidentiality after weighing all relevant factors, it will never-the-less continue to take appropriate steps to limit the effects of the alleged misconduct and to aid in the prevention of its recurrence.

If a report of misconduct discloses an immediate threat to the health or safety of the University campus community, the University will issue a timely notice of the conduct to the community to protect the health or safety of the broader campus community, pursuant to the Clery Act.

Immediately threatening circumstances include, but are not limited to, recently reported incidents of sexual misconduct that include the use of force, a weapon, or other circumstances that represent a serious and ongoing threat to the University students, faculty, administrators, professional staff, or visitors.

All resolution proceedings are conducted in compliance with the requirements of FERPA, the Clery Act, Title IX, and University policy. No information shall be released from such proceedings except as required or permitted by law or University policy.

## VII.    CONDUCT PROHIBITED BY POLICY

The following conduct is strictly prohibited under the terms of this policy.  The below-defined conduct is not to be construed as an exhaustive or all-inclusive list of prohibited conduct. Conduct not specifically described below but which nonetheless implicates the purposes and application of this policy described above should be considered prohibited conduct for reporting purposes.

The University will evaluate reports of conduct prohibited by this policy on a case-by-case basis.

***Sexual Misconduct:***

Sexual misconduct refers to a range of behaviors that includes, but is not limited to, sexual or gender-based harassment, sexual violence, sexual exploitation, relationship and interpersonal violence, stalking, and retaliation. These various forms of sexual misconduct are defined in more detail below. Some of these prohibited forms of conduct may also be crimes under Pennsylvania and/or federal law.

The University considers a variety of factors in determining whether particular reported behaviors meet the criteria of prohibited conduct, including: the type, frequency, and duration of the conduct; the identity and relationship of the persons involved; the number of individuals involved; the location of the conduct and the context within which it occurred; and the degree to which the conduct affected the Complainant(s).

Case ID: 221002134

The University evaluates whether particular reported behavior(s) may meet the definition of Sexual Misconduct from both a subjective and objective perspective. Additional factors to consider include whether the conduct was unwelcome and whether a reasonable person in that individual's position would have perceived the conduct as intimidating, hostile, offensive, or otherwise prohibited by this policy.

### *Sexual Harassment:*

Sexual harassment is defined as any unwelcome verbal or non-verbal contact, sexual advance, request for sexual contact or sexual favors, or other unwanted conduct of a sexual nature where:

> 1. Submission to or rejection of such behavior is made implicitly or explicitly a term or condition of instruction, employment, advancement, evaluation or participation in any University activity, program or benefit (commonly referred to as *quid pro quo harassment*); or
>
> 3. Such behaviors are sufficiently severe, persistent, or pervasive to have the purpose or effect of unreasonably interfering with an individual's academic or educational experience, working environment, or living conditions by creating an intimidating, hostile, or offensive environment (commonly referred to as *hostile environment harassment*). The purpose or effect will be evaluated based on the perspective of a reasonable person under similar circumstances.

Examples of conduct that could constitute sexual harassment include but are not limited to the following: unwelcome jokes or comments; the use of sexually explicit or offensive language; unwelcome and repeated flirtations, propositions, or advances; displaying sexually suggestive or offensive objects, posters or other depictions about sex, gender, or gender expression; unwelcome comments about appearance; offensive, insulting, derogatory or degrading remarks; threatening to take or taking actions if sexual favors are not granted or complied with, or said advances are otherwise rebuffed; demands for sexual favors in exchange for favorable or preferential treatment.

### *Gender-Based Harassment:*

Gender-based harassment is defined as any unwelcome verbal or non-verbal contact or conduct based upon sex or gender, sexual orientation, gender identity or gender expression. Gender-based harassment need not be specifically sexual in nature to be prohibited by this policy.

Gender-based harassment includes, but is not limited to, the following:  physical assault or physical interference intended to harass on the basis of gender; inappropriate graphics or other displays of gender-degrading materials; sexist jokes, anecdotes, or slurs; and insulting, demeaning or derogatory conduct direct toward a person on the basis of their gender.

Case ID: 221002134

### _Discrimination:_

Gender or sex-based discrimination is defined as the prejudicial treatment of another person because of that person's sex, gender, sexual orientation, gender-identity, or gender expression. Discrimination may include, but is not limited to, unfavorable treatment, hiring, firing, and distribution of assignments, grades, accolades, benefits or other terms associated with an individual's status, employment, relationship or placement within the University on the basis of their sex, gender, sexual orientation, gender identity, or gender expression.

### _Sexual Exploitation:_

Sexual exploitation is defined as an act or acts committed through non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage or other non-legitimate purpose.

Examples of conduct that could constitute sexual exploitation include, but are not limited to, the following: use of another person's nudity or sexuality for personal gain; receipt of financial or other personal benefit from the sexuality or sexual acts of another;  recording images, video, audio or any other depiction of another person's sexual activity, intimate body parts, or nakedness without that person's consent; distributing images, video, audio or any other depiction of another person's sexual activity, intimate body parts, or nakedness, if the individual distributing the images or audio knows or should have known that the person depicted in the material did not consent to such disclosure and the objects of such disclosure; voyeurism, including but not limited to viewing another person's sexual activity, intimate body parts, nakedness or otherwise viewing an individual in a place where that person would have a reasonable expectation of privacy without that person's consent.

### _Sexual Violence:_

Sexual violence is defined as having or attempting to have sexual contact with another person without that person's consent. This may include sexual intercourse or sexual contact achieved by the use or threat of force or coercion, where an individual does not consent to the sexual act, or where an individual is incapacitated.

> _Relating to **non-consensual sexual intercourse**_: having or attempting to have sexual intercourse with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral penetration involving genital-to-mouth contact.

> _Relating to **non-consensual sexual contact**_: having or attempting to have sexual contact with another individual without consent. Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, or disrobing or exposure of another for the purposes of sexual gratification, and without permission. Intimate parts may include the breasts, buttocks, genitals, mouth or any other part of the body that is touched in a sexual manner for the purpose of sexual gratification.

Case ID: 221002134

***Relationship and Interpersonal Violence:***

Relationship and interpersonal violence is defined as any act of violence or threatened act of violence against a person who is, or has been involved in, a sexual, dating, domestic, or other intimate relationship with that person. It may involve one act or an ongoing pattern of behavior. The existence of such a relationship may be determined based on the reporting party's statement, the length and type of relationship at issue, and the frequency of interaction between the persons involved in the relationship.

Relationship and interpersonal violence can encompass a broad range of behavior, including, but not limited to, physical violence and sexual violence or the threat of such violence, emotional violence, and economic violence. Relationship and interpersonal violence may take the form of threats, assault, property damage, or violence, or threat of violence to oneself, one's sexual or romantic partner, or to the family members or friends of the sexual or romantic partner.

***Stalking:***

Stalking is defined as a course of conduct involving more than one instance of unwelcome conduct that causes a person to fear for their personal safety or to experience substantial emotional distress. Acts that together constitute stalking may include direct actions or actions communicated to or by a third party, or other means of communication. Substantial emotional distress is defined as significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

Stalking includes the concept of cyberstalking, a particular form of stalking in which electronic media such as the Internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used to pursue, harass, or make unwelcome contact with another person in an unsolicited fashion.

Examples of stalking may include, but are not limited to:

- unwelcome and repeated visual or physical proximity to a person;
- repeated oral or written threats;
- extortion of money or valuables;
- unwelcome/unsolicited written communication, including letters, cards, emails, instant messages, and messages on online bulletin boards;
- unwelcome/unsolicited communications to or about a person, their family, friends, or co-workers; or
- sending/posting unwelcome/unsolicited messages with an assumed identity; or
- explicitly or implicitly threatening physical contact; or
- any combination of these behaviors directed toward an individual person.

***Retaliation:***

Retaliation is defined as any adverse action taken or threat made against an individual or group of individuals for filing a complaint or report under this policy; filing an external complaint or report, including but not limited to reports to law enforcement; or participating in the

Case ID: 221002134

University's investigative or disciplinary process related to a complaint or report under this policy.

Examples of retaliation include, but are not limited to: threatening reprisals or retribution against an individual who complained or cooperated with an investigation arising under the terms of this policy; unfairly changing the evaluations, assignments or working, studying, or living conditions of such an individual; acts of abuse or violence; and any other conduct that has or is intended to have a materially adverse effect on the working, academic, social or living environment of an individual.

## VIII.    RELATED DEFINITIONS

### *Complainant*:

A Complainant is an individual who may have experienced conduct that violates this Policy. A Complainant may file a formal complaint under this Policy.

### *Respondent*:

A Respondent is an individual who is alleged to have violated this Policy. A Respondent may be the subject of a formal complaint under this Policy.

### *Consent*:

Consent is an affirmative, voluntary, and unambiguous communication indicating a willingness to engage in a mutually agreed upon sexual activity. Consent may not be inferred from silence, passivity, lack of resistance or lack of active response. Consent cannot be obtained through the use of coercion or force or by taking advantage of the incapacitation of another person.

Consent to engage in sexual activity may be withdrawn by any party at any time. Withdrawal of consent must also be outwardly demonstrated by words and/or actions that indicate a desire to end sexual activity. Withdrawal of consent may in some cases be demonstrated through nonverbal conduct alone. Once withdrawal of consent has been clearly expressed, sexual activity must cease. A previous sexual relationship and/or current relationship with a partner, do not, by themselves, imply consent.

### *Incapacitation*:

Incapacitation is a state in which an individual is unable to make an informed and rational decision to engage in sexual activity because the person lacks conscious awareness of the nature of the act or is physically helpless. Engaging in sexual activity with an individual who one knows, or based on the circumstances should reasonably know, to be mentally or physically incapacitated constitutes a violation of this Policy.

*A note on the use of alcohol and drugs*:

Incapacitation may result from the use of alcohol or drugs, whether voluntary or involuntary, if an individual's level of impairment is such that they are unable to make conscious decisions or are physically helpless. Alcohol and drugs impair a person's decision-making capacity, awareness of consequences, and ability to make informed judgments. It is especially important that anyone engaging in sexual activity be aware of the other person's level of intoxication. Consumption of drugs or alcohol may diminish one's ability to give consent to engage in sexual activity, but being intoxicated or impaired due to consumption of drugs or alcohol is never an excuse for sexual misconduct, and does not diminish one's responsibility to obtain consent.

### *Coercion:*

Coercion is verbal and/or physical conduct used to compel another individual to engage in sexual activity against their will. Coercion may include a wide range of behaviors, including manipulation, abuse of trust or power, intimidation, or express or implied threats of physical or emotional harm.

### *Force:*

Force is the use or threat of physical violence or intimidation to overcome an individual's free will to choose whether or not to consent to engage in sexual activity.

## IX.   RESOURCES AND REPORTING

### **Immediate/Emergency Assistance Resources:**

The University encourages those who have experienced sexual or physical violence to utilize emergency assistance.

#### *Law Enforcement:*

In the event of an emergency, please call 911, then notify Public Safety on the emergency line: 215-717-6666.

You may also make a report directly to a University Public Safety Officer (PSO). Public Safety officers are stationed in University buildings. When a PSO receives a report of sexual misconduct, they will notify the Professional On-Duty (POD) staff member, who is trained to inform reporting parties of the options and resources available.

#### *Medical:*

Those who have experienced conduct prohibited by this Policy are strongly encouraged to seek medical treatment. A medical provider can provide emergency and/or follow-up medical services, and the opportunity to discuss any health care concerns in a confidential medical setting. A medical exam following a sexual assault has two goals: first, to diagnose and treat the full extent of any injury or physical effect (sexually transmitted

Case ID: 221002134

infection or pregnancy) and second, to properly collect and preserve evidence. There is a limited window of time (typically 72 to 96 hours) following an incident of sexual assault to preserve physical and other forms of evidence.

**On-Campus:**

**Student Health Services** can provide confidential medical services to University students, such as evaluation and treatment of minor injuries, pregnancy tests, and HIV and STI testing.

*Location:* Gershman Hall, Room 306
*Hours:* M-F, 9am-5pm
*Phone:* 215-717-6230
*Website:* www.uarts.edu/students/health-services

**Off-Campus**:

**The Philadelphia Sexual Assault Response Center (PSARC)** is designated to provide forensic rape examinations to victims of sexual assault. It is recommended that individuals who wish to pursue legal action receive this examination, which includes a collection of evidence. You do not need to file a police report to receive services at PSARC. PSARC is located within the same building as the Philadelphia Police Department Sexual Victims Unit. During this examination, you can receive treatment for injuries and sexually transmitted infections (STIs) as well as emergency contraception. You are not responsible for payment of the medications or medical forensic examination.

*Location:* 300 E. Hunting Park Avenue, Philadelphia, PA 19124
*Phone:* 215-800-1589
*Transportation to PSARC can be provided by the Philadelphia Police Department.*

**Support Resources:**

The following resources are available to assist members of the University's community to provide counseling and support, as well as with making a report, filing a complaint pursuant to this Policy, and/or participating in the University's investigative process as a reporting party, Complainant, Respondent, or witness.

***Confidential Resources*:**

The following resources maintain confidentiality. Generally, any information disclosed to the resources listed below will be held in confidence unless the individual sharing the information gives their consent to the disclosure of that information.

Confidential resources are not obligated to share information with the University's Title IX Coordinator and disclosure to a confidential resource does not constitute a report to the University. However, this commitment to confidentiality does not preclude the

Case ID: 221002134

sharing of information among University administrators, as appropriate, to ensure the safety of the members of the University community.

**On-Campus:**

**Student Counseling Center -** Services at the University Counseling Center are available to all University students, free of cost. Counseling provides a safe, confidential place to talk and discuss varying issues in a private and confidential setting. Therapists in the Counseling Center are trained to assist students impacted by sexual, physical, and emotional abuse, including those students who may have witnessed or have been accused of sexual misconduct.

*Location:* Gershman Hall, 307
*Walk in Hour*s: M-F 11am-1pm
*Phone*: 215-717-6630
*Website*: www.uarts.edu/counseling

**Student Health Services**
*Location:* Gershman Hall, Room 306
*Hours:* M-F, 9am-5pm
*Phone:* 215-717-6230
*Website:* www.uarts.edu/students/health-services

**Employee Assistance Program (for employees only) -** All University employees are entitled to use the confidential Employee Assistance Program (EAP). Through EAP, employees can access counseling services via telephone and in-person. University employees can obtain more information about EAP through the Human Resources page on the University Portal.

**Off-Campus:**

**Philadelphia Center Against Sexual Violence (formerly known as WOAR) –** The Philadelphia Center Against Sexual Violence provides free and confidential individual and group counseling to children and adults who have experienced sexual violence: this includes sexual abuse, sexual assault, rape/date rape, and incest.
*Website*: www.woar.org
*24-Hour Hotline*: 215-985-3333

**Women Against Abuse -** Women Against Abuse provides a number of services to victims of abuse, including 24-hour emergency safe havens, legal advocacy and representation, long-term housing and supportive services, and more.
*Location*: 100 South Broad Street, Suite 1341, Philadelphia, PA 19110
*Phone*: 215-386-1280
*Website*: www.womenagainstabuse.org

**The Philadelphia Domestic Violence Hotline**

Case ID: 221002134

*24-Hour Hotline*: 1-866-723-3014

**National Sexual Assault Hotline**
*24-Hour Hotline*: 1-800-656-4673

**National Domestic Violence Hotline**
*24-Hour Hotline*: 1-800-799-7233

<u>Law Enforcement</u>:

Members of the University's community are encouraged, but not required, to report incidents of prohibited conduct under this policy to local law enforcement. At the Complainant's request, the University will assist the Complainant in contacting local law enforcement and will cooperate with law enforcement agencies if a Complainant decides to pursue the criminal process.

**To file a criminal complaint directly with the Philadelphia Police Department: call 911 for an emergency, and 311 for a non-emergency.**

Note: The filing of a criminal complaint does not reduce or eliminate the University's responsibility to address a report of misconduct under this Policy. Though the University may need to delay temporarily the fact-finding portion of an investigation while the police are gathering evidence, the University will not delay its investigation until the ultimate outcome of the criminal investigation or the filing of any charges, and may need to take interim measures to protect the Complainant and campus community.

<u>Reporting Sexual Misconduct to the University</u>

Individuals may report prohibited conduct to a Responsible Employee (as defined above), directly to the University and/or to outside law enforcement agencies. Disclosures to a confidential resource, such as individuals in the Student Counseling Center, will not be considered a report to the University.  Please note that making a report of prohibited conduct is not the same as filing a formal Complaint.

> **To make a report to the University, contact:**
> **The University of the Arts Title IX Coordinator**
> titleix@uarts.edu
> 215-717-6362
> Using the link on www.uarts.edu/titleix

## X.    AMNESTY

The University encourages reporting and seeks to remove any barriers to reporting by making the procedures for reporting transparent and straightforward.  The University recognizes that an individual who has been drinking or using drugs at the time of the incident may be hesitant to make a report or provide information in connection with an investigation under this Policy because of the perceived potential for disciplinary consequences for their own conduct.  When

Case ID: 221002134

information is uncovered through the Title IX investigative process that involves alcohol or drug usage in violation of the Student Handbook, this information **will not be used** to pursue any disciplinary action for alcohol or drug use, provided that any such violations did not and/or do not place the health or safety of any other person at risk. The University may, however, initiate an educational discussion or pursue other educational remedies regarding alcohol or other drugs.

Student health and safety are of primary concern of the University. As such, in cases of significant intoxication as a result of alcohol or other substance abuse, we encourage individuals to seek medical assistance for themselves or others. Please see the Medical Amnesty Policy in the Student Handbook for more information.

## XI.    REPORTS INVOLVING MINORS

For purposes of this Policy and relevant law, a child is defined as an individual under the age of 18. Any University employee who has reasonable cause to suspect abuse of a child that the employee has come into contact with during the course of employment must make a report to the Title IX Coordinator, who will facilitate a report to local law enforcement and the Pennsylvania Department of Public Welfare division of Child Welfare Services. This requirement applies to an employee's suspicion of past or present abuse of a person who is a child at the time of the report. All other members of the University community (students, visitors, guests, etc.) are strongly encouraged to report whenever child abuse is suspected.

In the interest of protecting the safety and welfare of a child, any uncertainty about whether reporting is required or whether abuse has actually occurred should always be resolved in favor of making a report. Do not investigate, attempt to obtain proof, or try to solicit information from the child. This responsibility lies with the Pennsylvania Department of Human Services. If the child is in immediate danger, please call 911 immediately.

Employees may submit a report of suspected child abuse directly to the Pennsylvania Department of Human Services by submitting an online report (preferred method) to the Pennsylvania Department of Human Services at www.compass.state.pa.us/cwis or calling Pennsylvania's Child Line at 800-932-0313 (alternative method). Please Note: If you call Childline, you must also submit a written report within 48 hours. Once an employee submits a report to the Pennsylvania Department of Human Services, they must then notify the University's Title IX Coordinator by calling (215) 717-6362 or emailing titleix@uarts.edu.

## XII.   INITIAL REVIEW OF A REPORT

Upon receipt of a report of prohibited conduct under this Policy, the Title IX Coordinator and/or other appropriate University administrators will make an initial review of the known information and respond to any immediate health or safety concerns raised by the report, including but not limited to the possible use of interim measures described below. An initial review may lead the Title IX Coordinator to determine that it is necessary for the University to proceed with a formal investigation regardless of whether there is a formal complaint, also described in further detail below.

An individual making a report of sexual misconduct under this Policy can expect information regarding:

- The right to seek medical treatment, and explain the importance of obtaining and preserving forensic and other evidence;
- The right to contact law enforcement or to decline to contact law enforcement;
- The right to seek a protective order;
- The available University and community resources;
- The right to request reasonable academic, housing, employment, and other accommodations;
- The right to seek informal resolution or formal resolution under this Policy;
- The University's prohibition against retaliation; and
- Any other relevant information that may address the particular individual's safety or procedural questions and concerns.

## XIII.    INTERIM MEASURES

The University may provide reasonable interim support and protective measures to prevent further acts of misconduct under this Policy and to provide a safe educational and work environment. Although individuals may find interim measures most useful during the time period in which the University investigates a complaint arising under this Policy, interim measures may be implemented at any time and may include:

- Academic accommodations;
- University employment accommodations;
- Medical and mental health services, including counseling;
- Change in campus housing;
- Assistance in finding alternative housing;
- Assistance in arranging for alternative University employment arrangements and/or changing work schedules;
- A No Contact Directive that serves as a notice to both parties that they must not have verbal, electronic, written, or third party communication with one another;
- Providing a Public Safety escort to ensure that the individual can move safely between school programs and activities;
- Transportation accommodations;
- Interim separation from University employment or University-related activities, including housing; or
- Assistance in identifying additional resources including off-campus and community advocacy, support, and services.

The University may provide interim measures regardless of whether a Complainant seeks to pursue the University's formal resolution process. Interim measures may be requested by both Complainants and Respondents. The University determines which measures are appropriate on a case-by-case basis.

Case ID: 221002134

- Student Respondents wishing to contest an interim separation action may do so by notifying the AVP for Student Affairs. Employee Respondents wishing to contest an interim separation action may do so by notifying Human Resources. The Respondent's appeal must be in writing and include the following information:
  - o Name
  - o Rationale for the request
  - o Any documentation that supports that the Respondent would not pose an immediate threat to others or would not pose an imminent threat of disruption to normal campus operations
- The Respondent will be notified of the decision within five (5) business days of receipt of the request.  The interim separation will remain in effect while any review is pending.  There will be no further appeals to this decision.  If the interim separation is lifted, other interim restrictions (e.g., removal from university housing, limited access to campus, cessation of any organizational activities, or changes to work duties) may be assigned until the outcome of any related case.
- The interim separation does not replace the regular conduct or discipline processes, which shall proceed as normal.

## XIV.    RIGHT TO AN ADVISOR

All parties to a report under this Policy have the option to choose an advisor to participate in any meeting regarding alleged incidents of sexual misconduct. An approved advisor is required to meet with the Title IX Coordinator or their designee prior to participating to receive information about University Policy and procedures.

The advisor is present to provide support; they do not actively participate in the process, nor may they ask questions or speak on behalf of a party. An advisor may be cautioned or asked to leave if their conduct serves to delay, disrupt or otherwise interfere with the integrity of a meeting or adjudication. The University has the right at all times to determine what constitutes appropriate behavior on the part of the advisor and whether an advisor may remain at a meeting or adjudication proceeding.

## XV.    NOTE ON PRE-COLLEGE SUMMER INSTITUTE STUDENTS

Complaints of misconduct filed under this Policy against students taking part in the Pre-College Summer Institute will be addressed administratively by the Title IX Coordinator and AVP for Student Services, in partnership with the College of Critical and Professional Studies. The adjudication process outlined in this Policy may not apply to allegations made against students taking part in the Pre-College Summer Institute.

## XVI.    INFORMAL RESOLUTION PROCESS

Informal resolutions are alternative means of resolving reports under this Policy that do not involve the formal resolution/complaint and adjudication process. Informal resolutions generally are pursued when the Complainant, having been fully informed of all available options, has

explicitly made that choice. An informal resolution process must be voluntary for both parties, and either party can ask to end the informal resolution process at any time before its completion.

A Complainant who pursues a formal resolution under this Policy may request an informal resolution at any point up to and including the charging meeting with the Associate Vice President for Student Services.

Once a complaint has been resolved through an informal resolution process, the matter will be considered closed, and a future complaint cannot be filed based on the same allegations.

For some limited types of alleged violations of this Policy, an informal resolution may include mediation. Mediation may not be appropriate for complaints of sexual violence, intimate partner or dating violence, and/or other types of misconduct depending on the particular circumstances surrounding each complaint. Even if both parties otherwise agree to engage in an informal resolution process, the University retains ultimate discretion as to whether such a process would be appropriate in any individual case.

## XVII.   FORMAL RESOLUTION PROCESS FOR FACULTY AND STAFF RESPONDENTS

### In the Absence of a Formal Complaint:

In order to protect the safety of the campus community, the Title IX Coordinator may determine that it is necessary to investigate allegations of violations of this Policy even absent the filing of a formal complaint or report or if a formal complaint has been withdrawn.

In some cases, the Title IX Coordinator may need to proceed with an investigation even if a Complainant specifically requests that the matter not be pursued. In those circumstances, the Title IX Coordinator will take into account the Complainant's articulated concerns, the best interests of the University community, fair treatment of all individuals involved, and the University's obligations under Title IX/VAWA. A formal resolution that occurs as a result of this analysis will follow the procedures described below.

### Formal Complaints:

When a Complainant, having been made fully aware of all informal and formal resolution options under this Policy, chooses to pursue a formal complaint against the Respondent(s), the below procedures will follow.

### Investigation:

If the University receives a formal complaint under this Policy, or the University deems it necessary to proceed with a formal investigation absent a formal complaint, a formal investigation will commence promptly. The investigation will be conducted by a qualified individual who receives annual training on issues related to sexual and gender-based harassment,

Case ID: 221002134

sexual assault, dating violence, domestic violence, and stalking, as well as training on how to conduct an investigation that is fair, impartial, and thorough.

The Respondent will receive written notice of any allegations against them prior to their interview. The investigator will interview the parties separately and will make reasonable attempts to gather any available relevant physical or medical evidence, including documents, communications between parties, and other electronic records as appropriate. Parties are permitted to submit written statements in addition to, or in lieu of, participating in an interview. The investigator will determine the relevancy of any proffered information. The investigator may not consider statements of personal opinion and statements as to any party's general reputation for any character trait.

At the conclusion of the fact-gathering stage of the investigation, the investigator will prepare an investigative report which will be made available to both parties for review.  Each party will have an opportunity to provide additional written information to the investigator, to request the collection of additional information, and to identify individuals who may possess relevant information and request that such individuals be interviewed.  If any additional information is gathered, a summary of that information will be shared with both parties and each will have the opportunity for further response.  The investigator will designate reasonably prompt deadlines to ensure a timely completion of the process while also providing an adequate opportunity for both parties to provide thorough information in the investigation.

Investigations and resolutions of formal complaints under this Policy will be reasonably prompt. Factors that may contribute to the timeframe of an investigation and resolution include, but are not limited to: a need comply with a request by external law enforcement for temporary delay to gather evidence for a criminal investigation, a request to accommodate the availability of witnesses, a need to account for University breaks or vacations, or a need to account for the complexities of a particular case, including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons. The University will communicate with the parties any expected delays in the investigation or resolution of a complaint and the reasons for any delay.

**<u>Adjudication</u>**:

At the discretion of the Title IX Coordinator, in consultation with other relevant University constituents such as the Provost or Human Resources, the University may utilize either an external adjudicator or a single investigator model to adjudicate formal complaints filed under this policy against faculty or staff Respondents. In making the determination to select an appropriate adjudicative process, the Title IX Coordinator may consider, among other factors: the nature of the report; the complexity of the facts involved; whether the report implicates any issues of actual or apparent conflicts of interest; the availability of trained University adjudicators; the University's academic or administrative calendars (including whether the University is in session or on break); or any other relevant factors.

Regardless of the use of a single investigator or external adjudicator, determinations regarding responsibility will be made by considering whether, based on the information set forth in the

Case ID: 221002134

investigative report, there is sufficient information to determine that the Respondent violated University Policy by a preponderance of evidence.

**Sanction:**

In determining an appropriate sanction for a violation of this Policy, the University may consider a range of factors, including but not limited to: the nature of the conduct; the degree of violence, if any, involved; the impact of the conduct on the Complainant or other parties; the impact or implications of the conduct on the community or the University; prior misconduct by the Respondent; maintenance of a safe and respectful educational and employment environment; and any other mitigating, aggravating, or compelling circumstances in order to reach a just and appropriate resolution in each case.

> ***For faculty Respondents***: If a determination has been made that the actions of a faculty Respondent violated this Policy, the dean of the college or division and/or other appropriate administrators, in consultation with Human Resources and the Title IX Coordinator, will determine the appropriate disciplinary action to be taken against the faculty member to address the violation, to prevent its reoccurrence, and to address its effects.

> ***For staff Respondents***: If a determination has been made that the actions of a staff Respondent violated this Policy, the Respondent's immediate supervisor and/or other appropriate administrators, in consultation with Human Resources and the Title IX Coordinator, will determine the appropriate disciplinary action to be taken against the staff member to address the violation, to prevent its reoccurrence, and to address its effects.

The University will provide written notice of the outcome of any formal resolution proceedings, including the determination of a Policy violation and the imposition of any sanction(s) to both parties.

Sanctions that may be imposed under this Policy include, but are not limited to:

- **Verbal Warning**: An in-person meeting with the Title IX Coordinator, the Respondent's supervisor or other appropriate administrator, to discuss behavioral expectations and standards for University community members.
- **Written Warning**: Notice, in writing, that continuation or repetition of prohibited conduct may be cause for additional disciplinary action.
- **Educational Requirements**: Completion of training, projects, programs, or requirements designed to help the employee manage behavior and understand why it was inappropriate.  Includes appropriate and relevant community service opportunities.
- **Suspension**: Exclusion from University premises, attending classes, and other privileges or activities for a specified period of time, as set forth in the suspension notice. Notice of this action will remain in the employee's file. Conditions for return to work may be specified in the suspension notice.

Case ID: 221002134

- **Termination**: Permanent termination of employment status and exclusion from University premises, privileges, and activities. This action will be permanently recorded in the employee's file.
- **Other discipline** may be imposed instead of, or in addition to, those specified above. More than one of the disciplinary outcomes listed above may be imposed for any single violation.

**Appeal:**

Either party may appeal the outcome or the sanction of a matter resolved under this Policy (including a finding that there was insufficient evidence to determine a policy violation occurred) within ten (10) calendar days of receiving written notice of the outcome and sanction. The appeal shall consist of a concise and complete written statement outlining the grounds for appeal and all relevant information to substantiate the basis for the appeal.

Appeals are limited to the grounds of:

- new evidence that could affect the finding of the responsibility/non-responsibility and that was not reasonably available at the time of the investigation;
- procedural error(s) that had a material impact on the fairness of the adjudication; and
- the imposed sanctions were grossly disproportionate to the violation committed.

Faculty appeals should be submitted to the Provost; Staff appeals should be submitted to the Vice President of Finance and Administration. Appeals are not intended to be a full rehearing of the allegations. This is not an opportunity for the Appellate Authority to substitute their judgment for that of the original adjudicator, but rather to make a determination regarding the specific grounds on which the appeal was made. The Appellate Authority shall make a determination of the appeal within ten (10) calendar days of receipt of the appeal. The decision of the Appellate Authority is final.

## XVIII.   FORMAL RESOLUTION PROCESS FOR STUDENT RESPONDENTS

**In the Absence of a Formal Complaint:**

In order to protect the safety of the campus community, the Title IX Coordinator may determine that it is necessary to investigate allegations of violations of this Policy even absent the filing of a formal complaint or report or if a formal complaint has been withdrawn.

In some cases, the Title IX Coordinator may need to proceed with an investigation even if a Complainant specifically requests that the matter not be pursued.  In those circumstances, the Title IX Coordinator will take into account the Complainant's articulated concerns, the best interests of the University community, fair treatment of all individuals involved, and the University's obligations under Title IX.  A formal resolution that occurs as a result of this analysis will follow the procedures described below.

**Formal Complaints:**

Case ID: 221002134

When a Complainant, having been made fully aware of all informal and formal resolution options under this Policy, chooses to pursue a formal complaint against the Respondent(s), the below procedures will follow.

**Investigation:**

If the University receives a formal complaint under this Policy, or the University deems it necessary to proceed with a formal investigation absent a formal complaint, a formal investigation will commence promptly. The investigation will be conducted by a qualified individual who receives annual training on issues related to sexual and gender-based harassment, sexual assault, dating violence, domestic violence, and stalking, as well as training on how to conduct an investigation that is fair, impartial, and thorough.

The Respondent will receive written notice of any allegations against them prior to their interview. The investigator will interview the parties separately and will make reasonable attempts to gather any available relevant physical or medical evidence, including documents, communications between parties, and other electronic records as appropriate. Parties are permitted to submit written statements in addition to, or in lieu of, participating in an interview. The investigator will determine the relevancy of any proffered information. The investigator may not consider statements of personal opinion and statements as to any party's general reputation for any character trait.

At the conclusion of the fact-gathering stage of the investigation, the investigator will prepare an investigative report which will be made available to both parties for review.  Each party will have an opportunity to provide additional written information to the investigator, to request the collection of additional information, and to identify individuals who may possess relevant information and request that such individuals be interviewed.  If any additional information is gathered, a summary of that information will be shared with both parties and each will have the opportunity for further response.  The investigator will designate reasonably prompt deadlines to ensure a timely completion of the process while also providing an adequate opportunity for both parties to provide thorough information in the investigation.

Investigations and resolutions of formal complaints under this Policy will be reasonably prompt. Factors that may contribute to the timeframe of an investigation and resolution include, but are not limited to: a need comply with a request by external law enforcement for temporary delay to gather evidence for a criminal investigation, a request to accommodate the availability of witnesses, a need to account for University breaks or vacations, or a need to account for the complexities of a particular case, including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons. The University will communicate with the parties any expected delays in the investigation or resolution of a complaint and the reasons for any delay.

**Threshold Determination**:

Case ID: 221002134

Upon completion of the investigative report, the investigator will make a threshold determination regarding the allegation(s). The determination will consider whether the investigative report contains sufficient information for an adjudicator to make a determination as to whether or not there was a violation of this Policy based on the preponderance of the evidence. If a determination is made that this threshold has not been reached, the investigator will notify the parties in writing of this determination. If a determination is made that the threshold has been reached, the investigator will notify the parties of this determination and submit the investigative report to the AVP for Student Services.

**Adjudication:**

### *Role of AVP for Student Services in Adjudication*:

The AVP for Student Services is responsible for ensuring that the adjudication procedures are followed as outlined in this Policy. The AVP for Student Services will be reasonably available to the parties and advisors to answer questions throughout the hearing process, and may interject as needed during the hearing.

### *Selection of an Adjudicative Body*:

The Title IX Coordinator and AVP for Student Services, in consultation with other relevant University constituents, will select an adjudicative body to conduct a hearing.

The University may, at its sole discretion, select from the following options:
- A single external adjudicator;
- A Campus Standards Board panel comprised of four (4) University faculty and staff members (three voting panel members and one individual serving as a non-voting Chair);
- A hybrid Campus Standards Board panel comprised of three (3) faculty and staff members (serving in a voting capacity) and one (1) external participant to serve as a non-voting Chair; or
- A Student Conduct Administrator (see Section 5 of the Student Handbook).

In making the determination to select an appropriate adjudicative body, the University may consider, among other factors: the nature of the report; the complexity of the facts involved; whether the report implicates any issues of actual or apparent conflicts of interest; the availability of trained panel members for a hearing; the University's academic or administrative calendars (including whether the University is in session or on break); or any other relevant factors.

Either the Complainant or Respondent may submit a written request to the AVP for Student Services to contest the individual(s) participating in adjudication if there are reasonable articulated grounds to suspect bias, conflict of interest, or an inability to be fair and impartial. This challenge must be raised within four (4) business days of receipt of notification of the selected adjudicative body.

Case ID: 221002134

Anyone who participates in adjudication under this Policy receives specific training regarding sex discrimination, sexual misconduct, intimate partner and dating violence, stalking, and retaliation. Students are not permitted to serve on an adjudicative body.

### *Notice of Charges and Meeting with the AVP for Student Services*:

The AVP for Student Services will notify the parties, in writing, of the formal charges under this Policy. The parties will have the opportunity to meet with the AVP for Student Services to review the charges, options under the Policy, and hearing process.

As noted above, the Complainant has the opportunity to request an Informal Resolution at any point up to and during this meeting with the AVP for Student Services.

### *Acceptance of Responsibility by the Respondent*:

After receiving the formal charge(s) from the AVP for Student Services, the Respondent may choose not to contest the charge(s) and give up the right to a hearing by accepting responsibility for all charges. If a Respondent accepts responsibility, the Complainant will be notified in writing and both parties will have the opportunity to submit written information for consideration in sanctioning; a Complainant may submit an impact statement, and a Respondent may submit a mitigation statement.

The AVP for Student Services will impose the appropriate sanction(s) (see below for guidelines and range of permissible sanctions). The Complainant and Respondent will be simultaneously notified of the sanction(s) and rationale for the sanction in writing, and this sanction decision may only be appealed by both parties based on the grounds of "the imposed sanction(s) were grossly disproportionate to the violation committed." If there is no appeal by either party, the sanction imposed will be final.

### *Scheduling the Hearing*:

The hearing will be scheduled with reasonable consideration of the schedules of the parties, advisors, and the University's calendar. The parties will be given notice of the date of the hearing at least ten (10) business days prior to the hearing.

Either party may request to have an adjudication rescheduled. Absent extenuating circumstances, requests to reschedule must be submitted to the AVP for Student Services at least three (3) business days prior to the adjudication. A request to reschedule an adjudication must be supported by a compelling reason for the delay. A determination as to whether compelling reason(s) exist to justify reschedule a hearing will be made by the AVP for Student Services and will not be subject to appeal.  The University may also reschedule the adjudication, without a request by the parties, when there is reasonable cause to do so. The parties will be notified promptly of any changes to the scheduled adjudication.

Case ID: 221002134

Failure to attend one's own hearing does not preclude the case from being heard and a decision from being rendered.

### *Parties' Access to Information Prior to the Hearing*:

The parties will be given access to the investigative report and any supporting evidence ten (10) business days leading up to the hearing.

### *Requesting the Presence of Witnesses at the Hearing*:

Witnesses may be present only at the request of the parties. Requests for witnesses must be made, in writing, to the AVP for Student Services at least five (5) calendar days prior to the date of the hearing. Witnesses are limited to those individuals who were formally interviewed by the investigator. Similarly, parties may not refer to evidence during the hearing that was not considered by the investigator during the investigation.

### *Options for Alternative Presence*:

For reasons of privacy or safety, either party may request the presence of a partition or to attend the hearing via videoconference (or other means that do not entail physical presence). All such requests will be considered and decided at the discretion of the AVP for Student Services.

### *Restriction on Direct Communication Between the Parties*:

Parties are entitled to ask questions of one another, of witnesses, and of the panel during the hearing, however they may not address each other directly. Parties may submit any questions to be asked at the hearing in advance of or during the hearing to the AVP for Student Services, who will then ask the questions. The AVP for Student Services will use reasonable discretion to determine appropriateness and relevance of each question posed and may rephrase or decline to ask any particular question.

### *Recording of the Hearing*:

There shall be a single recording of all hearings under this Policy (not including deliberations). The recordings shall be property of the University and will be maintained in accordance with FERPA. In case of an appeal, an audio file of the transcript is available to either the Complainant or Respondent for review in a space approved by the AVP for Student Services and in the presence of a University administrator. The recordings will typically be destroyed at the conclusion of the adjudicative process, including any internal appeals.

### *Hearing Procedures*:

- A hearing will be called to order by the Chair. The AVP for Student Services will then explain the adjudication process and make introductions of those present at the hearing.
- The Chair will read the charges and the responding party will provide a preliminary indication of whether they are responsible or not responsible for those charges.
- If appropriate, the investigator will provide a summary of the investigation. The adjudicative body members, the Complainant, and the Respondent, may ask questions of the investigator.
- The Complainant may present an opening statement. The adjudicative body members and the Respondent may pose questions to the Complainant.
- The Respondent may present an opening statement. The adjudicative body members and the Complainant may pose questions to the Respondent.
- The AVP for Student Services will identify and call relevant witnesses. The adjudicative body members and the parties may pose questions to the witnesses.
- The AVP for Student Services may call back any participant for additional questions or clarifications.
- The Complainant may present a closing statement.
- The Respondent may present a closing statement.
- At the conclusion of the hearing, all parties except the adjudicative body members and the AVP for Student Services shall be excused from the hearing room.

*__Deliberation__*:

The adjudicative body will determine a Respondent's responsibility by a preponderance of the evidence. This means that the adjudicative body will decide whether it is "more likely than not," based upon the information provided at the adjudication, that the Respondent is responsible for the alleged violation(s) of this Policy. A majority vote is required to establish a finding.

The AVP for Student Services will remain for deliberation but does not vote. The adjudicative body members will first try to reach a determination by consensus; but a simple majority vote as to responsibility will suffice.

The findings of the adjudicative body will be reduced to writing by the Chair of the adjudicative body. The findings will detail the findings of fact and determination of responsibility, making reference to the evidence that led to the finding and will serve as the record of the proceeding. The vote of individual adjudicative body members shall not be shared with any parties.

*__Sanctions__*:

The AVP for Student Services is responsible for determining appropriate sanctions for findings of responsibility under this Policy. In doing so, they may consult with the Title IX Coordinator. Factors considered in determining appropriate sanctions may include:

- The Respondent's prior discipline history, if any;
- How the University has sanctioned similar incidents in the past;

- The nature and severity of the conduct at issue;
- The impact of the conduct on the Complainant, and their desired sanctions, if known;
- The impact of the conduct on the University community, its members, or its property;
- Whether the Respondent appears to understand the severity of their actions; and
- Any other mitigating or aggravating circumstances, including the University's values.

Any Respondent who is determined to have engaged in any form of prohibited conduct may receive a sanction ranging from a warning to expulsion and appropriate educational requirement. The University may broaden or lessen any sanctions based on significant mitigating circumstances or egregiously offensive behavior. The University may issue a single sanction or a combination of sanctions. Sanctions may include, but are not limited to, the following:

- **Warning**: A written notification that a violation of the Student Code of Conduct occurred and that any further responsible finding of misconduct may result in more severe disciplinary action. Warnings are typically recorded for internal purposes only and are not considered part of a student's permanent student conduct record. Though disclosed with a student's signed consent, a student who receives a warning is still considered in good standing*.
- **Probation**: A written notification that indicates a serious and active response to a violation of the Student Code of Conduct. Probation is for a designated period of time and includes the probability of more severe sanctions, if found responsible for additional violations of the Student Code of Conduct, including suspension or expulsion from the University. Notification of probation is considered a change in good standing*[1] status.
- **Loss of privileges**: Denial of the use of certain University facilities or the right to participate in certain activities, events, programs, or to exercise certain privileges for a designated period of time.
- **Restitution**: A student may be required to make payment to an individual or to the University related to the misconduct for damage, destruction, defacement, theft, or unauthorized use of property.
- **Fines**: The University of the Arts reserves the right to impose fines, as appropriate, in addition to requiring payment for costs resulting from or associated with the offenses.
- **Relocation or removal from (University-operated) housing**: Relocation is the reassignment of a student from one living space to another. Removal from housing is the removal of a student from all University-operated housing. Relocation and removal from housing are typically accompanied by the loss of privileges regarding the visitation to specific residential areas for a specified period of time. The University may take such action for remedial, rather than disciplinary purposes.
- **Revocation of Affiliation**: Revocation of affiliation is the permanent removal of a student as a member of a specific organization and/or the permanent removal of an organization's recognized affiliation with the University.

---

* Good Standing - A student is not in good standing when the student has been found responsible for a student conduct policy violation and as a result is serving a sanction of probation, suspension, or expulsion. Students employed as a Resident Assistant or First Year Guide must be in and remain in good standing throughout their employment.

Case ID: 221002134

- **No Contact Directives**: No Contact Directives are directives to students that restrict the contact and/or communication between or among designated parties. No Contact Directives may be the result of a student conduct process or put in place temporarily. No Contact Directives are not legal protective orders as those are issued by a court of law.
- **Persona Non Grata**: Persona Non Grata prohibits an individual from a specific or all campus property. Violation of a persona non grata may subject the violator to arrest for trespass.
- **Educational/Assessment/Referrals**: The University reserves the right to impose counseling or substance assessments or other required educational sanctions.
- **Suspension**: The separation of a student from the University for a specified period of time, after which the student is eligible to return. Conditions for re-enrollment may be required and will be included in the notification of suspension. During the period of suspension, the student may not participate in University academic or extracurricular activities and may be barred from all property owned or operated by the University. Suspension from the University will result in automatic "W" grades in all classes for the semester in which suspension was sanctioned. Students who are suspended may not be on campus without specific, written permission of the Assistant Vice President for Student Services or designee. Suspension is for a designated period of time and includes the probability of more severe sanctions, including expulsion, if found responsible for violations of the Student Code of Conduct. Notification of suspension will normally be sent to parents, as it results in a change in good standing status.
- **Expulsion**: Expulsion is the permanent separation of the student from the University. Expulsion from the University will result in automatic "W" grades in all classes for the semester in which expulsion was sanctioned. Students who are expelled may not be on campus without specific, written permission of the Assistant Vice President for Student Services or designee. Notification of expulsion will normally be sent to parents, as it results in a change in good standing status.

The following sanctions, among others, may be imposed upon student groups or organizations:

- **Deactivation:** Loss of privileges, including University recognition, for a specified period of time.

More than one of the above sanctions listed may be imposed for any single violation. Other than University expulsion, disciplinary sanctions shall not be made part of the student's academic transcript but shall become part of the student's permanent record. A student's permanent record is, subject to review only by those authorized to request it, such as transfer higher-education institutions and future employers and in other cases when the student initiates the disclosure.

**Notice of Outcome and Sanction, if any:**

The AVP for Student Services will notify both the Respondent and the Complainant, in writing, of the outcome, rationale, and any sanctions, if applicable, within five (5) business days. The notice will include notification of appeal options. Typically, the imposition of sanctions will take effect immediately and will not be stayed pending the resolution of the appeal.

Case ID: 221002134

**Appeal:**

Either party may appeal the determination of responsibility or sanction(s). The Vice President for Enrollment Management and Student Affairs hears appeals of non-academic decisions, except in cases where the Vice President is the reporting party or a witness in the matter. (In such instances, appeals will go to the Vice President for Academic Affairs).

Appeals must be filed within ten (10) business days of receiving the written notice of outcome.

Dissatisfaction with the outcome of the hearing is not grounds for appeal.

The limited grounds for appeal of an outcome are as follows:

- New evidence that could affect the finding of responsibility and that was unavailable at the time of the investigation; and/or
- Procedural error(s) that had a material impact on the fairness of the adjudication.

The limited grounds for appeal of a sanction(s) are as follows:
- The imposed sanction(s) were inappropriate under University sanctioning guidelines.

If the respondent accepts responsibility, and no hearing is convened, the limited grounds for appeal are as follows:
- The imposed sanctions were inappropriate under University sanctioning guidelines.

The appeal shall consist of a concise and complete written statement outlining the grounds for the appeal. Upon receipt of an appeal, the Assistant Vice President for Student Services (or their designee) will notify both parties. Each party has an opportunity to respond in writing to the appeal. Any response to the appeal must be submitted to the appropriate appeal review party (see above) within two (2) business days of notice of the appeal.

The appeal consideration will be conducted in an impartial manner by the appeal review party. In any request for an appeal, the burden of proof lies with the party requesting the appeal, as the original determination and sanction are presumed to have been decided reasonably and appropriately. The appeal is not a new review of the underlying matter.

The appeal review party shall consider the merits of an appeal only on the basis of the three (3) grounds for appeal and supporting information provided in the written request for appeal and the record of the original hearing. The appeal review party can affirm the original findings, alter the findings, and/or alter the sanctions, depending on the basis of the requested appeal.

If the appeal is granted based on procedural error(s) that materially affected the outcome of the matter, the appeal review party will order that a new hearing be conducted by a new adjudicative body.

Case ID: 221002134

In the case of new and relevant information, the appeal review party can recommend that the case be returned to the original adjudicative body to assess the weight and effect of the new information and render a determination after considering the new facts.

Typically, the appeal review party will communicate the result of the appeal to the parties within ten (10) business days from the date of the submission of all appeal documents by both parties, but the time may be longer or shorter depending on the nature of the case. Appeal decisions are final.

## XIX.    OBLIGATION TO PROVIDE TRUTHFUL INFORMATION

All University community members are expected to provide truthful information in any report or proceeding under this Policy. Knowingly submitting or providing false or misleading information in bad faith or with a view to personal gain, to cause intentional harm to another, or to obstruct or delay the University's process in connection with an alleged Policy violation is prohibited and subject to disciplinary sanctions. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not ultimately substantiated.

## XX.    STATEMENT OF ACADEMIC FREEDOM

The free expression and study of ideas are essential to the pursuit of a higher education. At times, it will be necessary to consider ideas that some community members may find unpleasant or offensive, for the simple reason that offensive ideas are part of our history and culture. All University community members must be empowered to discuss any topic or idea that is germane to the subject at hand, while at the same time acting as good citizens and participants in a shared endeavor with people of all political and social worldviews and with varied backgrounds. This calls for honest discussion, the asking of questions to clear up misconceptions, and a search for the universal growing from careful examination of the specific contexts of studied works. It calls for treating other community members as human beings with individual sets of experiences and opinions, treating them with dignity, but also extending to them the respect not only of their experiences and opinions, but also of their intellectual curiosity and resilience.

Additionally, this Policy adopts the Statement of Academic Freedom found in the University's Faculty Handbook.

Case ID: 221002134

# EXHIBIT C

Case ID: 221002134



**From:** Schaefer, Christine [mailto:cschaefer@uarts.edu]
**Sent:** Thursday, October 8, 2020 9:53 AM
**To:** Donovan, Katie <kadonovan@uarts.edu>
**Cc:** Pyle, Sara <spyle@uarts.edu>
**Subject:** RE: Reporting a Title IX Incident from a Student
**Importance:** High

Katie

I am acknowledging your email reporting this incident.  I or our investigator will be contacting you.  Our investigator is
Ashley Lynam, Esq. from FHMS Law.  Alison Fleming from FHMS might also contact you.  Please respond immediately to
any of their communications.

Thank you for acknowledging that you was a great misstep on your part for not reporting this when you were first
informed back in May. You apologized several times in your email. You did complete your Harassment training in
November, 2019. I want to acknowledge that too.

However, there is no excuse for you not knowing the that you are considered a responsible employee who when
knowing there is an alleged assault that you must report it immediately and for not knowing protocol to follow.  Our
Title IX policy is well communicated and posted. It is on the
1) Title IX webpage on uarts.edu
2) Faculty Handbook

Case ID: 221002134

3) Staff Manual
4) Student Handbook
5) Policies, Workers Comp, EthicsPoints HR Portal page

I would highly suggest you read the attached policy that was in force back in May so you know what to expect.  (our current policy was updated on August 14, 2020).

Again when Ms. Lynam or Ms. Fleming contact you please respond immediately.  Please let me know if you have any questions.

Christine

Christine M. Schaefer, SPHR, SHRM-SCP
Associate Vice President for Human Resources
The University of the Arts
320 S Broad St, Rm 260
Philadelphia, Pa 19102
215-717-6366
Fax 215-717-6530
cschaefer@uarts.edu
uarts.edu



**From:** Donovan, Katie [mailto:kadonovan@uarts.edu]
**Sent:** Wednesday, October 7, 2020 4:18 PM
**To:** Schaefer, Christine <cschaefer@uarts.edu>
**Subject:** Reporting a Title IX Incident from a Student

Hi Christine-

I am writing to you as our Title IX Coordinator about an incident that was reported to me by a student this summer regarding one of our faculty members. On May 13th, 2020 ▇▇▇▇▇▇ (a junior DPP student) emailed me to ask if I could speak to him about "a situation." We arranged to speak, and I received the call from him that evening. When we spoke he outlined for me the details of an alleged assault that took place outside of school between faculty member Dann Dunn and himself. Throughout the call he repeatedly spoke about how he would not take this to trial and that he did not want anyone to speak about this because he was very concerned that his parents would find out. I told him at that time that I would take all the steps that I needed to to try to properly resolve the situation without taking any steps that were outside of his consent as the human who was reporting. Here is my great misstep, and about this I am incredibly sorry and hoping that my delayed actions and incorrect process has not compromised anything about the situation. I recognize and fully bring forth that my significant overwhelm is no excuse for the delays and missteps in the process. In that moment when I spoke with ▇▇▇, I told him that I had planned to write out a statement of what he had reported to me to try to be able to share it in some official way, but not knowing what the right step was to take, as he was so adamant that it not be shared. I should have had ▇▇▇ write a statement, and I should have shared that along to our Title IX Office. This fall he reached out to me again to check on the status of the statement that I was writing. He wrote on June 12th, September 22nd, and October 4th. I reiterate that there is no excuse in my experience of overwhelm that delayed response. He would ask "checking in" and I would write back to say that I was still

Case ID: 221002134

planning to write the response (not knowing the proper protocol). When he wrote to me this last time his email was very angry with my delay, and rightly so. I wrote back to ask him to write a statement for me to keep on file, still not knowing the protol I should follow (which again is my fault as I should have simply asked). After that communication I reached out to Lauren Fanslau and Dean Dicciani about the situation to ask what I was to do. I am contacting you with the students statement to officially report it now, as I know I should've done right away. I communicated this to the student, and told him that I would keep in communication with him once it had moved ahead to Title IX.

I am incredibly sorry for the delay and misstep in my approach to this matter. I can say that while my actions were not the correct ones to take, I was trying to do the right thing. I am now sharing ██'s statement with you and am available for all future communication on the matter as I am needed.

Thank you,
Katie
--
**Katie Donovan**
She / Her
Head of Musical Theatre; Assistant Professor
Ira Brind School of Theater Arts

The University of the Arts
320 South Broad Street
Philadelphia, PA  19102
215-717-6455

Case ID: 221002134

# EXHIBIT D

Case ID: 221002134



**THE UNIVERSITY**
**OF THE ARTS**

## NOTICE OF ALLEGATIONS

| TO: | Katherine Donovan |
|---|---|
| **FROM:** | **Christine M. Schaefer, SPHR, SHRM-SCP** |
| **DATE:** | **November 16, 2020** |
| **RE:** | **Employee Misconduct - Notice of Allegations** |

This letter is being sent to inform you that the University received information that you may have engaged in acts of misconduct which may violate several University policies and processes, including but not limited to: (a) the May 2020 Sex- and Gender-Based Misconduct Policy ("the May 2020 Sexual Misconduct Policy"); (b) the August 2019 Sexual and Gender-Based Violence, Discrimination, Exploitation, Stalking, and Harassment Policy ("the August 2019 Sexual Misconduct Policy"); (c) the Faculty Handbook; and (e) the Staff Manual.

Specifically, the University has been informed that on or about May 13, 2020, former University of the Arts student ▮▮▮▮▮▮▮▮▮▮ informed you that he was assaulted by then-faculty member Dann Dunn ("Dunn"). Further, it has been alleged that you failed to report this to the Title IX Office until October 7, 2020, about five months after the initial report by ▮▮▮▮

The allegations set forth above may implicate the following University policies and sections:

    a)    The May 2020 Sexual Misconduct Policy, Section V
    b)    The August 2019 Sexual Misconduct Policy, Section V
    c)    The Faculty Handbook, Section 3.14
    d)    The Staff Manual, Chapter 4, Section 6

The above-referenced policies and sections are identified for your assistance and not intended to be an exhaustive list of implicated terms.

The University will be investigating the allegations to determine whether any policy violations occurred. The investigation will be conducted by Ashley R. Lynam, Esquire. Ms. Lynam will be contacting you directly related to this investigation. Please also contact Ms. Lynam upon

Case ID: 221002134

receipt of this Notice at alynam@mmwr.com, or by telephone at 215-932-0400.  We will be in touch with you to inform you of the results of the investigation.

Finally, please consider this notice of a No Contact Directive.  Neither you nor the Complainant may engage in verbal, electronic, written, or third-party communication with one another pending the outcome of this investigation.

-2-

Case ID: 221002134

# EXHIBIT E

Case ID: 221002134





# Student
# Handbook

2020–2021

Case ID: 221002134

# TABLE OF CONTENTS

Academic Year Calendar *(catalogue.uarts.edu/)*

**TABLE OF CONTENTS**       **1**

**SECTION 1: THE UNIVERSITY OF THE ARTS MISSION AND CORE VALUES**       **4**

OUR MISSION       4

CORE VALUES       4

NOTICE OF NON-DISCRIMINATION AND EQUAL OPPORTUNITY       4

**SECTION 2: ACADEMIC POLICIES**       **6**

ACADEMIC INTEGRITY POLICY       6

    Violations of Academic Integrity       6

**SECTION 3: CAMPUS POLICIES**       **7**

ALCOHOL AND OTHER DRUGS       7

    Local, State and Federal Laws       7

ALCOHOL AND OTHER DRUGS AMNESTY       8

AUTOMOBILES       9

COMPUTERS AND TECHNOLOGY       9

DAMAGE TO PROPERTY       9

DISCRIMINATION AND DISCRIMINATORY HARASSMENT       10

DISRUPTIVE BEHAVIOR       10

DISSENT AND DEMONSTRATIONS       10

FIRE SAFETY       10

GAMBLING       10

HAZING       10

NON-ACADEMIC DISHONESTY       11

SEX- AND GENDER-BASED MISCONDUCT POLICY       11

SMOKING       11

SOLICITATION       11

VIOLENCE       11

WEAPONS       11

**SECTION 4: RESIDENTIAL LIVING POLICIES**       **12**

ART PROJECTS AND SUPPLIES       12

BAG CHECKS       12

BED BUG & OTHER PESTS       12

BEHAVIORAL AGREEMENTS       12

BICYCLES       13

Case ID: 221002134

CLOSING/BREAK                                               13
CONFISCATION                                                13
DAMAGE TO PROPERTY/DAMAGE BILLING                           13
DEFENESTRATION                                              13
EARLY ARRIVALS                                              13
EMPTY BEDS/BEDROOMS                                         14
FIRE SAFETY                                                 14
FURNITURE                                                   14
GUEST/VISITATION                                            14
HEALTH AND SAFETY INSPECTIONS                               15
HOUSING AGREEMENT                                           16
ID CARDS                                                    17
KEYS/LOCKOUTS                                               17
LOUNGES                                                     17
MAINTENANCE/REPAIRS                                         17
NOISE                                                       17
OCCUPANCY                                                   17
PERSONAL PROPERTY (LOSS)                                    17
PETS                                                        18
PHYSICAL ACTIVITIES                                         18
POSTING                                                     18
PROHIBITED AREAS                                            18
PROHIBITED ITEMS                                            18
ROOMMATE CONFLICTS                                          19
ROOM ENTRY AND SEARCH                                       19
SMOKING                                                     19
SOLICITATION                                                20
ACCOMMODATION REQUESTS                                      20
WEAPONS                                                     20

**SECTION 5: STUDENT CODE OF CONDUCT, ADJUDICATION, AND SANCTIONS   21**
COMMUNITY STANDARDS AND THE STUDENT CONDUCT SYSTEM          21
    Definitions                                            21
    Jurisdiction of the University Conduct System          22
STUDENT CODE OF CONDUCT                                     22
CONDUCT REVIEW PROCESS                                      22
ROLE OF THE ADVISOR                                         23
GENERAL CONDUCT                                             23

Case ID: 221002134

ADVANCED CONDUCT                                                    24

    STUDENT CONDUCT ADMINISTRATOR ADJUDICATION          25

    CAMPUS STANDARDS BOARD ADJUDICATION                 25

        During Adjudication                             26

        Witnesses                                       26

        Deliberation                                    26

    EXTERNAL ADJUDICATION                               27

SANCTIONS                                                          27

INTERIM SANCTIONS                                                  28

GENERAL CONDUCT APPEALS                                            28

ADVANCED CONDUCT APPEALS                                           29

**APPENDIX A: SEXUAL AND GENDER-BASED MISCONDUCT  POLICY          32**

Case ID: 221002134

# SECTION 1: THE UNIVERSITY OF THE ARTS MISSION AND CORE VALUES

## OUR MISSION

To advance human creativity

The University of the Arts is dedicated to advancing human creativity in an increasingly complex and technology-driven world.

We believe creativity is the true catalyst for social and economic change and the most essential skill for success in today's society.

We deliver a diverse curriculum, grounded in critical inquiry and creative practice, which enables students to both explore and transcend different artistic disciplines.

We are committed to being the place of choice for thinkers, doers and dreamers—a constantly evolving university devoted to the art and science of creativity for a better world.

## CORE VALUES

**Integrity and Diversity**
We are a supportive community committed to individual and artistic integrity and inclusion. We promote and respect self-expression, a wide range of ideas, and diversity in all its forms.

**Excellence, Creativity and Passion**
With a focus on excellence, we inspire, challenge and support the unconventional thinkers, dreamers and doers who are passionate about using their creative works to impact society.

**Connections and Collaboration**
We connect design and the performing, visual, communication and liberal arts in the classroom and the community, expanding artistic possibilities, outcomes and lives through creative collaboration

## NOTICE OF NON-DISCRIMINATION AND EQUAL OPPORTUNITY

The University of the Arts is a supportive community committed to individual and artistic integrity and inclusion. We promote and respect self-expression, a wide range of ideas, and diversity in all of its forms. We are committed to creating an inclusive environment in which University community members are able to access academic, social, recreational programs and services, as well as opportunities for admissions and employment on an equitable and nondiscriminatory basis.

The University of the Arts does not discriminate on the basis of age, color, disability, gender identity, marital status, national or ethnic origin, political affiliation, race, religion, sex (including pregnancy), sexual orientation, veteran status, and family medical or genetic information, in its programs and activities as required by Title IX of the Education Amendments of 1972, the Americans with Disabilities Act of 1990, as amended, Section 504 of the Rehabilitation Act of 1973, Titles VI and VII of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, and other applicable statutes and University policies. The University also prohibits acts of retaliation against those who report acts of harassment discrimination or who cooperate with the investigative process.

Acts of sexual violence, domestic violence, dating violence, and stalking are considered forms of sex-based discrimination. For more information about the University's response to incidents of sexual misconduct, including confidential reporting options, a reporting guide for faculty and staff, and resources and accommodations for those who have been affected by sexual misconduct, please visit www.uarts.edu/titleix. To make a report of sexual misconduct, contact the University's Title IX Coordinator, Lexi Morrison, at titleix@uarts.edu or (215) 717-6362.

**Note: All faculty and professional staff at the University are required to report any incidents of sexual misconduct to the University's Title IX Coordinator**.

The University will promptly and equitably respond to all reports of discrimination, harassment, and retaliation as it relates to protected classifications. Complaints of discrimination, harassment, and retaliation may be directed to the University's Title IX

Case ID: 221002134

Coordinator and Diversity Administrator, Lexi Morrison, at lmorrison@uarts.edu or (215) 717-6362. Complaint procedures can be found in Appendix A of the faculty, staff, and student handbooks.

Inquiries regarding the Americans with Disabilities Act, the Rehabilitation Act, and related statutes and regulations may be directed to the Educational Accessibility Office, access@uarts.edu. To learn more about accessibility at UArts, visit www.uarts.edu/faculty-and-staff/educational-accessibility.

Case ID: 221002134

# SECTION 2: ACADEMIC POLICIES

**ACADEMIC INTEGRITY POLICY**

Academic Integrity is a commitment to the core values of honesty, trust, fairness, respect and responsibility and their role in ensuring the health and vigor of the academic and creative community.

## Violations of Academic Integrity

Violations of academic integrity are considered to be acts of academic dishonesty and include but are not limited to cheating, plagiarizing, fabricating, denying others access to information or material, and facilitating academic dishonesty. The lack of knowledge of citation procedures is an unacceptable explanation for plagiarism, as is having studied together to produce remarkably similar papers or creative works submitted separately by two students.

Since academic dishonesty takes place whenever anyone undermines the academic integrity of the institution or attempts to gain an unfair advantage over others, this list is not and cannot be exhaustive.

1. Attempting to commit academic dishonesty: Attempting or preparing to cheat, fabricate, or plagiarize, even if the attempt is discovered before it is completed.
2. Cheating: using unauthorized materials, information, or study aids in any educational exercise.
3. Denying others access to information or material.
4. Fabrication: falsifying or inventing any information or citation in an educational exercise.
5. Facilitating academic dishonesty: assisting others to cheat, plagiarize, and/or fabricate information.
6. Plagiarism: representing the ideas or language of another as one's own in any educational exercise.
7. Submission of the same, or essentially the same, assignment for two or more classes without the direct prior permission of all instructor(s) involved.

For information on University Academic Policies and Intellectual Property please refer to The University Catalogue: catalogue.uarts.edu

Case ID: 221002134

# SECTION 3: CAMPUS POLICIES

The policies described below, mandated for all students whether on or off campus, are not meant to serve as a comprehensive list and are subject to review and modification by the Assistant Vice President for Student Services (or their designee) if deemed necessary for the safety and security of the UArts community.

## ACCESS TO FACILITIES

By way of being registered for classes and having an account in good standing, students are granted access to all of the academic facilities on-campus, provided that they show a valid ID upon entering. Every semester, identification cards issued for all students, faculty, and employees are validated by Student Financial Services or Human Resources. Public Safety Officers may deny access to University facilities for anyone not carrying a validated identification card.

During 24 hour building access, students are permitted to enter academic buildings. Students are not permitted to occupy academic spaces in a way that would disrupt the academic community, such as performing basic life functions in classrooms or other common spaces.

Each residence hall on campus is equipped with an electronic, computerized card reader. Only residents of the building can gain access by swiping their card through the card reader on each floor. The system is operational 24 hours a day, 7 days a week while classes are in session. Additionally, each resident is responsible for swiping themselves into the residence hall. No other residents or non-UArts affiliates should be tailgating behind a current resident. The resident is responsible for anyone who tailgates in behind them. If you are having issues with the card reader, please notify the Public Safety officer at the front desk of the building.

If, during the course of the year, you should lose your ID card, contact Student Financial Services immediately.  Replacement ID cards cost $35, which can be charged to the student's account if the student does not have the necessary funds available at the time of replacement.

Unauthorized entry, whether peacefully or by force, into a prohibited area or residence hall in which there is no documented reason for being present is prohibited.

## ALCOHOL AND OTHER DRUGS

All members of the University of the Arts community are hereby notified of the primary components of the Substance Abuse Prevention Policy in compliance with the Drug-Free Schools and Community Act of 1989 and subsequent amendments.

### Local, State and Federal Laws

A person in the Commonwealth of Pennsylvania who is under 21 years of age commits a summary offense if they attempt to purchase, consume, possess or transport alcohol.

Federal and state laws prohibit the possession, use and distribution of illegal drugs.

The following are considered violations of the UArts alcohol policy:
1. Consumption by underage persons on or off campus.
2. Consumption on campus or possession of alcoholic beverages or containers intended to contain alcoholic beverages, whether empty of alcohol, used for purposes other than holding alcohol or not regardless of age.
3. Being intoxicated as indicated by appearance or behavior, such as: slurred speech, unstable walk, unconsciousness, destruction of property, use of abusive language, alcohol on breath, vomiting or disturbance to others.
4. Sale or trade of alcohol on the campus property or to members of The University of the Arts community.

All student conduct policies, including those related to drugs and alcohol, are applicable while a student is studying abroad. Students are expected to abide by the legal drinking age in the country or countries in which they are studying. If students choose to consume alcoholic beverages while participating in a study abroad program, the University expects responsible behavior and moderation. Students are responsible for their behavior and any misconduct related to the consumption of alcohol.

Resident(s) in whose UArts housing alcohol is being consumed are responsible for the behavior of non-UArts guests.

Students found to be in the presence of alcohol but not drinking will be considered responsible for condoning the violation.

Alcohol is prohibited at any University sponsored events for students with exceptions to this policy granted only by the Assistant Vice President of Student Services (or their designee).  Exceptions will ONLY be considered with a faculty/staff sponsor and arrangements for food and beverage made through University partner, Parkhurst Catering. The sponsoring faculty/staff member

Case ID: 221002134

must complete the *Alcohol Permission Request for Reception* form on the UArts portal **no less than two (2) weeks before** the event. Approved events may be required to have UArts Public Safety present. The sponsor and/or the students are responsible for all costs for the event, with the exception of Public Safety staff members which will be provided by the University at no additional cost.

The following are considered violations of the University drug policy:
1. Consumption or possession of illegal drugs on or off campus.
2. Being under the influence of illegal drugs as indicated by appearance or behavior, such as: slurred speech, unstable walk, unconsciousness, destruction of property, use of abusive language, vomiting or disturbance to others.
3. Sale, distribution or trade of illegal drugs on the campus property or to members of The University of the Arts community.
4. Possession of drug paraphernalia.
5. Being in the presence of drugs.

Resident(s) in whose UArts housing drugs are being consumed are responsible for the behavior of non-UArts guests.

Students found to be in the presence of drugs but not using will be considered responsible for condoning the violation.

Any University official (including members of Public Safety, Residence Life + Community Standards and the Student Affairs staffs) who has a reasonable suspicion that the alcohol or drug policy is being violated may access any University facility to determine an appropriate course of action. University officials are authorized to intervene in any situation that warrants action including, but not limited to: removal of attendees; closing of the event; and/or confiscation of illegal drugs and paraphernalia; and notification of University personnel. All confiscated alcohol and drugs are turned over to the Office of Public Safety for disposal, in conjunction with the Philadelphia Police Department.

When University officials confiscate illegal drugs, such items will be turned over to the Philadelphia Police Department as required by law. Prosecution for violation of the law will be made at the discretion of the Philadelphia Police Department.

The University reserves the right to test a student for the presence of drugs in their system if necessary and may prevent a student's return to University housing (or withhold other privileges) until compliance and/or such tests show an absence of illegal drugs.

## ALCOHOL AND OTHER DRUGS AMNESTY

Student health and safety are of primary concern of the University. As such, in cases of significant intoxication as a result of alcohol or other substance use, we encourage individuals to seek assistance for themselves or others.

**Amnesty for Victims/Reporting Party:** The University encourages the reporting of Code violations and crimes by victims. Sometimes, victims are hesitant to report to University Officials because they fear that they may personally face sanctions due to policy violations involving underage drinking or drug use at the time of the incident. It is in the best interests of this community that as many victims as possible choose to report to University Officials. To encourage reporting, the University has a policy of giving such victims amnesty from policy violations involving underage drinking or drug use at the time of the incident.

**Amnesty for Help Seeking:** The University encourages students to seek medical assistance for those in need, including oneself. Sometimes, students are hesitant to seek medical assistance for fear that they may get themselves in trouble. The University has a policy of giving amnesty from policy violations involving underage drinking or drug use at the time of help seeking for students who actively seek medical help for themselves or others, or for students who provide help seeking assistance to victims.

**The following are not covered by the Medical Amnesty Policy:**
- Students waiting until the police or other authority arrive before seeking assistance
- Action by University faculty, staff, or student
- Action by police or other law enforcement personnel
- Violations of the Code of Conduct other than the alcohol/drugs policy

**Actions by the Office of Student Affairs:**
- Involved student(s) will be required to meet with a member of the Office of Student Affairs, or their designee, who may issue educational requirements that may include, but are not limited to, alcohol and/or drug education, counseling, and/or a substance abuse assessment.
- Serious or repeated incidents will prompt a higher degree of concern/response.
- Failure to complete the educational assignments or treatment recommendations will result in disciplinary action.
- The student will be responsible for any costs associated with drug or alcohol education interventions.

**Application to Student Organizations:**

Case ID: 221002134

In circumstances where an organization is found to be hosting an event where medical assistance is sought for an intoxicated guest, the organization (depending upon the circumstances) may be held responsible for violations of the Alcohol Policy or Drug Policy. However, the organization's willingness to seek medical assistance for a member or guest will be viewed as a mitigating factor in determining a sanction for any violations of the Alcohol Policy or Drug Policy.

## AUTOMOBILES

Students living in the University's residence halls are not permitted to maintain vehicles (except bicycles) on campus. Students may request an exemption to this policy from the Office of Educational Accessibility.

## COMPUTERS AND TECHNOLOGY

Improper use of University computing and information resources, telephones and other equipment, whether for personal gain or profit, is prohibited. Under the auspices of the Vice President, Technology and Information Services, all University computer systems, including user files, may be monitored and/or confiscated at any time should any portion of the system be threatened, or its integrity, security, or proper use be in question. Members of the University community should understand that all computer files and communications are subject to review, and should not expect such files and communications to be private.

No user shall use the University's email systems or services for the purpose of transmitting fraudulent, defamatory, harassing, obscene, or threatening messages, or for the promotion of non-university-authorized goods, services or personnel, or for any other communications that are prohibited by law.

The University reserves the right to restrict or rescind computing privileges, or the use of any other University facilities or resources, in accordance with this and other applicable University policies when the user has exhibited inappropriate behavior in the use of such resources.

This policy covers all types of inappropriate behavior. The following types of activities are selected examples of behaviors that are unethical, unlawful, and/or inappropriate.
- Attempting to alter system, hardware, software, or account configuration.
- Accessing or monitoring another individual's accounts, files, software, electronic mail, or computer resources without the permission of the owner.
- Misrepresenting one's own identity, role, or the identity of any other person in any type of electronic communication.
- Intentionally or negligently revealing passwords or permitting another to use one's personal account.
- Altering, or destroying communications, or intentionally compromising the security of electronic information passing through the UArts network.
- Misrepresenting or implying that the content of a personal home page constitutes the views or policies of the University, or altering the University's official Web site or related pages without prior authorization in writing.
- Misusing the University's computing resources so as to reduce their efficiency or to affect access to the detriment of other users.
- Producing chain letters or broadcasting messages to individuals or lists of users, or producing any communication that interferes with the work of others.
- Breaching or attempting to breach computer security systems, with or without malicious intent.
- Engaging in any activity that might be harmful to systems, the network or to any stored information such as creating or propagating viruses, worms, Trojan horses, or other rogue programs, disrupting services, or damaging files.
- Wasting system resources or overloading the UArts network with extra data.
- Violating copyright and/or software license agreements.
- Using computing resources for commercial or profit-making purposes without the written authorization of the University.
- Downloading or posting to University computers, or transporting across University networks, material that is illegal, proprietary, in violation of University contractual agreements, or in violation of University policy.
- Violating local, state or federal laws.

**On-Line Behavior**
Students should be aware that their on-line activities are part of the public domain and, accordingly, should be handled with good judgment. The University does not actively monitor on-line activity outside of the University domain and does not progressively monitor the web for violations of campus policies. However, if made aware, via an electronic medium, of activity that violates University policy, the University may take appropriate action, as it would if made aware through a conventional communications medium.

## DAMAGE TO PROPERTY

Students are responsible for any damage that results from excess negligence or intentional act. Students may not make material alterations or additions to campus spaces or University-owned furniture. Littering, applying graffiti, public urination, and/or other behavior which threatens the cleanliness and appearance of the University is prohibited.

Case ID: 221002134

## DISCRIMINATION AND DISCRIMINATORY HARASSMENT

**Discrimination** is conduct that is based upon a protected category such as race, color, ethnicity, national origin, religion, gender, gender identity or expression, sex, sexual orientation, disability, age, status as a veteran, or any other characteristics prohibited by law (*i.e.*, creed, marital status, citizenship status, etc.) and that 1) adversely affects a term or condition of an individual's employment, education, living environment or participation in a University activity; or 2) is used as the basis for or a factor in decisions affecting that individual's employment, education, living environment or participation in a University activity.

**Discriminatory Harassment** is unwelcome conduct based on a person's actual or perceived membership in a protected category, as defined above, and such conduct unreasonably interferes with, limits, or effectively denies an individual's educational or employment access, benefits, or opportunities by creating a hostile environment. A hostile environment is one that is severe **or** pervasive, **and** objectively offensive. The University does not tolerate discriminatory harassment of any employee, student, visitor, or guest, and the University will act to remedy all forms of harassment when reported, whether or not the harassment rises to the level of creating a "hostile environment" under this section.

## DISRUPTIVE BEHAVIOR

Intentional obstruction or disruption of teaching, research, administration, disciplinary procedures, other University activities or activities authorized to take place on University property; Disorderly conduct including acts which breach the peace are strictly prohibited.

## DISSENT AND DEMONSTRATIONS

There may be times that students will choose to dissent with University or public policy and openly demonstrate on campus. Demonstrations may be held on campus as long as they do not disrupt the operation of the University. Specifically, disruptions will include activities which:

1. Interfere with the rights of students, faculty, staff or guests of the University;
2. Disrupt or obstruct educational and other activities of the University;
3. Obstruct or restrict free movement of persons on any part of the University campus;
4. Interfere with the proper use of offices or other facilities to the students, faculty, trustees, staff or guests of the University;
5. Endanger the safety of any person at the University; and/or,
6. Threaten or result in the destruction of property.

The student group must register its intent to demonstrate by submitting a letter to the Assistant Vice President of Student Services at least 48 hours prior to the demonstration. To access a University space for the purpose of demonstrations, students must file a room-reservation request. The Assistant Vice President for Student Services can assist with room reservation requests.

## FIRE SAFETY

Candles, hoverboards, incense, lanterns, potpourri and other flammable items including, but not limited to, electric frying pans, halogen lamps, immersion coils, fireworks, flammable liquids, space heaters, and flammable decorations are not permitted on campus unless officially sanctioned and supervised by University officials. Tampering with alarm-pull stations, use of fire equipment, including sprinklers, extinguishers, and/or hoses, in any manner for which it was not intended and/or without just cause and failing to evacuate from a building during a fire alarm are strictly prohibited.

## GAMBLING

Any form of gambling on the University of the Arts property or involving University functions including but not limited to extra-curricular activities is prohibited. Gambling is defined as playing a game for money or property or otherwise placing a bet on an uncertain outcome.

## HAZING

The purpose of the Hazing Policy is to protect the safety and rights of all students of the University of the Arts who choose to join a club or other organization that is associated with the University. It applies to all such organizations whether its facilities are located on or off the University campus. Hazing of a student by any organization or group of its members is prohibited.

For the purposes of this policy, hazing is defined as: Any action or situation which recklessly or intentionally endangers the mental or physical health or safety of a student for the purpose of initiation or admission into or affiliation with any organization operating under the sanction of an institution of higher education.  The term shall include, but not be limited to, any brutality of a physical nature, such as whipping, beating, branding, forced calisthenics, exposure to the elements, forced consumption of any food, liquor, drug or other substance, or any other forced physical activity which could adversely affect the physical health and safety of the individual, and shall include any activity which would subject the individual to extreme mental stress, such as sleep deprivation,

Case ID: 221002134

forced exclusion from social contact, forced conduct which could result in extreme embarrassment, or any other forced activity which could adversely affect the mental health or dignity of the individual. For purposes of this definition, any activity as described in this definition upon which the initiation or admission into or affiliation with an organization is directly or indirectly conditioned shall be presumed to be "forced" activity, the willingness of an individual to participate in such activity notwithstanding. The foregoing definition is based on the definition cited by the Commonwealth of Pennsylvania.

## NON-ACADEMIC DISHONESTY

The following are prohibited:

- Aiding and abetting: knowingly encouraging, assisting and or being an accessory to any act prohibited by the Student Code of Conduct
- Eluding or evading: any statement, action, or behavior with the intent of hiding the truth, including running or hiding from University personnel.
- Forgery: the act to imitate or counterfeit documents, signatures, and the like.
- Lying: any statement, action, or behavior with the intent to deceive.
- Possession of stolen property: any items of material value possessed or controlled by an individual without the explicit permission or authorization of the owner or the owner's designated representative.
- Possession or use of a fake ID.
- Theft: knowingly taking, or attempting to take, an item or items without the owner's expressed permission.

## SEX- AND GENDER-BASED MISCONDUCT POLICY

The University's policy on Sex- and Gender-Based Misconduct Policy  is contained in Appendix A. Questions about the policy, procedures, and resources can be directed to the University's Title IX Coordinator at titleix@uarts.edu or 215-717-6362.

## SMOKING

The University of the Arts maintains a smoke-free environment. Smoking is prohibited on all University property, including outdoor building courtyards, balconies, stairwells, and steps. Smoking is, in part, defined as carrying or holding of any lit or ignited pipe, cigar, cigarette, electronic cigarette, or any other lit or battery operated smoking equipment or device.  Smoking is permitted only out of doors and 20 feet from building entrances and exits. Students seeking support in smoking cessation should contact Student Health Services at healthservices@uarts.edu for assistance.

## SOLICITATION

In an effort to assure a productive and harmonious work environment, persons not employed by The University of the Arts may not make solicitations or distribute literature at the University at any time for any purpose. The University recognizes that students and alumni may have interests in events and organizations outside the University. However, students and alumni may not make solicitations or distribute literature concerning these activities on the University campus or by electronic mail.

## VIOLENCE

The University is committed to maintaining a safe working, learning, and living environment for all members of the University community. Threats, acts of aggression, physical attack, and violence are unacceptable in the University community.

## WEAPONS

Students are not permitted to use or possess weapons that could be considered lethal, including those weapons in which the person has a permit, while on campus. Weapons on campus including, but not limited to, firearms of any kind, kung fu sticks, shuriken, knives (other than eating utensils), cap guns, ammunition, fireworks, and explosives (or explosive chemicals), among other dangerous weapons or substances. Weapons used as props, whether real or otherwise, are not permitted in the residence halls. Weapons used as props for performances/exhibits need permission from faculty and are not permitted outside of performance or exhibit space.

Case ID: 221002134

# SECTION 4: RESIDENTIAL LIVING POLICIES

All of the policies outline the standards and behaviors expected of all University of the Arts students.  There are additional standards and policies that apply to students living in University housing.  The policies described below are not meant to serve as a comprehensive list and are subject to review and modification by the Director of Residence Life + Community Standards as deemed necessary for the safety and security of the community.  For more information regarding residential living, please refer to the Residence Life + Community Standards website at https://www.uarts.edu/students/housing.

## ART PROJECTS AND SUPPLIES

All residents are expected to exercise caution when completing art projects or collecting materials to complete projects while in the residence halls.  Paint should be used in an appropriate manner and in well-ventilated areas, including but not limited to; studios and designated classroom spaces.  Students are not permitted to use paint, including spray paint on any balconies or in stairwells.  Students may not use spray paint in their rooms or in lounge space.  Students may not store hazardous or unsafe materials in their residence hall room at the discretion of the Director of Residence Life + Community Standards. Drugs or alcohol and/or drug and alcohol paraphernalia used as a prop or as part of an art project is prohibited.

## BAG CHECKS

All residents and guests may be asked to open their bags by Public Safety Officers and Residence Life + Community Standards Staff if circumstances warrant.  Residents or guests who are non-compliant with bag check requests may not be permitted to enter the building.

## BED BUG & OTHER PESTS

The Office of Residence Life + Community Standards and the Facilities Department are committed to a timely and effective response to any residents who suspect they may have bed bugs/pests. If pests are found, students should place a maintenance request and contact the resident assistant on duty. Resident assistants can provide traps, the exterminator visits campus once a week to address any reported pest issues.

For the safety and health of our campus community, please note the following guidelines in suspected bed bug findings:

1.  Contact Residence Life + Community Standards staff or go to the front desk of your residence hall and ask Public Safety to contact Maintenance. If bites have been experienced, please visit Health Services as soon as possible for medical attention.

2.  Facilities will contact the exterminator to inspect the apartment in question. Students may not, at any time, deny the facilities department access to any part of their living space.

3.  If the exterminator finds evidence of bedbugs in the apartment, the Office of Residence Life + Community Standards in conjunction with Facilities will provide the resident(s) in the affected apartment with a list of instructions that must be completed, in addition to the treatment that will be provided by the exterminator.

4.  The University will not cover the cost of anything a student wishes to dry clean or have laundered by an outside vendor. UArts is not responsible for personal property that may be damaged due to bed bugs. Only the University's exterminator can confirm or deny the presence of bed bugs.

5.  Bed bugs have the potential to cause serious community disruption to health and safety, and all students are expected to comply with all instructions given to them within 24 hours of bed bug confirmation. Failure to do so could result in documentation as per the UArts Code of Conduct.

## BEHAVIORAL AGREEMENTS

Residents may be required to adhere to behavioral agreements should circumstances warrant such an agreement.  Behavioral agreements are developed by the Area Coordinator (AC), the Director of Residence Life + Community Standards and/or Assistant Vice President for Student Services, based on the nature of the concern.  These agreements may require students to meet regularly with staff members in the Division of Student Affairs and/or follow behavioral expectations while living in residence.  Failure to adhere to the terms of the agreement may result in the termination of the housing contract without refund.

Case ID: 221002134

## BICYCLES

Outdoor bike racks are located at Furness Hall, students must provide their own locks. Bicycles should not be locked to railings, lampposts, or parked on safety ramps. Students cannot leave bicycles in hallways, stairwells or community rooms within residence halls. Students may store their bicycles in their room/apartment with their roommate(s) approval. Bicycles stored in residence hall rooms cannot block the entrance/exit from the space.

## CLOSING/BREAK

Residence halls close at various times throughout the academic year in accordance with the University calendar; including winter break, and end of year closing following Spring term. Residents will be sent closing information prior to each closing. Residents should review and adhere to the provided closing checklist to avoid charges.

The Office of Residence Life & Community Standards understands that unique circumstances may result in students who need housing during scheduled breaks. Students requesting break occupancy should contact Residence Life at least three weeks prior to closing. Additional documentation may be requested.

All break occupancy requests are subject to approval by Residence Life. Residents who are not approved for a break occupancy will be required to vacate campus housing for the duration of the break.

## CONFISCATION

The Office of Residence Life + Community Standards reserves the right to remove any item(s) that are either prohibited by university policy or compromises student health or safety from the residential facilities, including students' apartments. In the event that a confiscation occurs while the resident is absent, a notice will be issued.

## DAMAGE TO PROPERTY/DAMAGE BILLING

The resident is individually responsible for any damage beyond reasonable wear and tear to their residence hall room/apartment or University-owned furniture. Damage that results from excess negligence or intentional act will be documented as per the UArts Code of Conduct.  The resident may not make material alterations or additions to the apartment, residence hall or University-owned furniture. This prohibition includes, but is not limited to, the use of nails, screws, bolts, or permanent adhesives.

All residents are equally responsible for damage to common areas within the residence halls, including but not limited to; lobbies, lounges, hallway space, laundry facilities, or equipment provided for common use. In the event that the person(s) directly responsible are not identified, the Office of Residence Life + Community Standards will notify residents when and if there will be common space charges placed on their account. Advance notification of common space charges will be provided, when possible. When a bill is assessed to the community, the Area Coordinator will notify all impacted residents of the damage, provide the cost to fix the problem (and brief explanation of how the price is determined, when available), and encourage those responsible to take ownership and/or those students with information to report to Residence Life + Community Standards. Community billing is only reversed if the responsible individual is identified, either through proof (photographic, written, audio, or video evidence) or a statement of admission from the responsible person is provided.

## DEFENESTRATION

Residents may not defenestrate, which is the act of causing an object to fall out of a window.  This includes, but is not limited to trash, ashes, cigarette butts, other items or fluids.  Students will be responsible for any injury or damage caused to University or private property damaged in the act of defenestrating.

## EARLY ARRIVALS

If students are returning to campus prior to the start of the Housing Contract, due to involvement in an official University function (ie. on-campus jobs, student organization leadership, requirements for academic purposes), early arrival requests must be submitted by the sponsoring faculty or staff member via email to reslife@uarts.edu.  Requests and sponsorship must be received by August 1 for the fall semester and January 1 for the spring semester.

Requests for students not sponsored by faculty or staff will generally not be approved.

**Unauthorized Early Arrival Fee**
Students who arrive on campus prior to their scheduled move-in date, without prior approval are subject to a $100/daily fee. Students who arrive on campus prior to their scheduled move-in date to drop off personal items will be considered early arrivals and may be charged the daily fee. Fees associated with early arrivals will be billed directly to the student's account.

Case ID: 221002134

## EMPTY BEDS/BEDROOMS

Residents assigned to a space that has unoccupied beds or bedrooms should expect another student to be assigned to these spaces at any time. Advance notification of a new roommate will be sent to students, when possible.

The university reserves the right to make room assignment and residence hall changes, which includes consolidating residents who have no roommates. All unoccupied spaces should be kept accessible and clean. Residents should not disassemble university issued furniture or utilize unoccupied beds, furniture or space. If a vacancy is not accessible and clean for an incoming resident, the resident(s) of the assignment may be assessed the cost of housekeeping and maintenance work required to prepare the space for new residents(s). The cost will be split among the occupants of the designated assignment.

## FIRE SAFETY

Residents are required to exit residence halls immediately in the event of a fire alarm and may not return to the residence hall until instructed to do so by the University.  The resident may not:
1. Intentionally cause a false fire alarm;
2. Interfere with the proper functioning of the fire safety system;
3. Tamper with the sprinkler, smoke detector or fire hose system;
4. Misuse the chemical fire extinguishers;
5. Place items on an active heating device.

The following items and/or acts are prohibited:
1. Items that involve or could involve an open flame. These items include, but are not limited to candles, incense, sterno lamps and kerosene lamps.
2. Any electrical device that the University deems a fire hazard. These include but are not limited to; electrical outlet powered string/rope lights, halogen lamps, hoverboards, extension cords and live Christmas trees. Students may use surge protector power strips in lieu of extension cords.
3. Wall tapestries, flags or other wall hangings unless made from fabrics that are compliant with NFPA 701 flammability standards.
   a. Compliance may be established by a label on the fabric item, or by treating the fabric with an approved product. Following treatment of fabrics, students must send notification to reslife@uarts.edu attesting to this treatment along with the receipt for purchase of the product and the product label.
   b. The Fire Marshal or University may cut and test a piece of these fabrics and students must accept this as a condition of having fabric hangings in University housing.
   c. Tapestries may not be hung from the ceiling.
4. Smoking, polluting or lingering on the fire escapes or stairwells as they provide an egress to the ground level in case of fire.
5. Obstructed path from the bed to the front door.

## FURNITURE

All of the furniture and appliances provided by the University remain the property of the University throughout the resident's occupancy.  The resident may not remove or disassemble any University-owned furniture or appliances from the apartment. Furniture cannot be taken outside the residence or used as lawn furniture. The resident may not remove any University-owned items from the common spaces within the residence hall.  Any furniture brought into the halls that is deemed a health hazard, as defined by the Director of Residence Life + Community Standards, is subject to removal. Construction such as, but not limited to, panels, dividers, lofts, shelves and bunks are not permitted. Beds may not be placed on top of other furniture. Dressers may not be stacked. Residents are not permitted to adjust university furniture into an unsafe position.

Students will be charged for damaged and missing furniture. Requests for repairs or replacement can be done by submitting a work request.

## GUEST/VISITATION

A guest is defined as any person not assigned to the resident host's room.  Resident hosts must sign in their guest(s) following proper procedure at the front desk of their residence hall.  Resident hosts may not have more than three (3) guests signed in at any given time. Each guest is required to leave a photo identification card at the front desk while in the building.  The guest(s) ID card(s) must remain at the desk until the guest(s) vacate the building.  Acceptable forms of photo ID include:  driver's license, non-driver's ID, school ID, or passport. No other forms of ID will be accepted. Guests without ID will not be permitted access into the residence hall, except in emergencies. Resident hosts must escort their guest(s) at all times within the building, including when they exit the building.

14

Case ID: 221002134

Resident hosts are responsible for their guest's actions. A guest may not occupy a resident host's room when the host is not present. A resident may not pressure a roommate to tolerate the presence of a guest. All guests to a room are subject to the agreement of all room residents.  The presence of guests must not restrict free access for assigned residents to all common spaces and any private space they may have or create any situation that infringes on the need of roommates to remain undisturbed. Any student wishing to visit a hall other than the hall to which they are assigned must be signed in as a guest by a resident of that hall. Students may not sign in or sign out guest(s) for other residential students. UArts students, in the role of guest or host, are responsible for following the guest policy.

Residents are permitted to have overnight guests in accordance with the above-mentioned policy. Cohabitation is not permitted and is defined at the discretion of the Director of Residence Life + Community Standards.  Residents, who have guests that are deemed to be cohabitating, or are causing a disruption to the community, will be asked to have their guest leave.

To host a guest overnight without a valid photo ID or a guest between the ages of 11 and 16, the host must email Residence Life + Community Standards the following information no later than 48 hours (Monday-Friday) prior to the date of the visit and wait for approval:

        Guest Name:
        Guest Age and Date of Birth:
        Guest Emergency Contact Name and Relationship:
        Guest Emergency Contact Cell:
        Guest Arrival Date and Time:
        Guest Departure Date and Time:

        Host Name:
        Host Building:
        Host Room:
        Host Cell:

The student host assumes responsibility for the welfare of guests between the ages of 11 and 16 and those without photo identification.

Verified immediate family members who come to visit a residential student and do not have proper ID may be issued an emergency ID by the Professional On-Duty (POD) staff member. Students should contact the Public Safety Officer at the front desk of the residence hall for assistance contacting the POD. Requests from non-family members without ID who request building access will be handled on a case-by-case basis by the Public Safety Officer at the desk and the POD. Emergency IDs will only be issued when non-admittance to the residence halls could impact a person's safety. Emergency IDs will not be issued to guests simply because they do not have proper identification.

No guest, regardless of age, may bring alcoholic beverages or any other prohibited item into the residence halls.

## HEALTH AND SAFETY INSPECTIONS

Residents are responsible for keeping their apartments in a safe and healthy condition.  The Office of Residence Life + Community Standards performs regular inspections of the resident's apartment to ensure compliance with University standards of health and safe living practices.  The dates and approximate times of these inspections will be scheduled with residents at least 48 hours in advance and will be conducted by two (2) residential staff members from Residence Life + Community Standards. Residents who do not pass inspection will be subject to additional inspection appointments.

Health and Safety inspections consist of:
- Checking-in with residents and following-up on reported maintenance issues.
- Assessment of food storage and waste cleanliness.
- Visual checks for prohibited items or behaviors that pose a risk to residents and the larger community (e.g., candles, cooking appliances in non-kitchen areas, non-surge extension cords).

If an apartment or room condition are deemed unacceptable, the Residence Life staff will notify the resident(s) by issuing a warning. The resident(s) will have two days, or deadline otherwise specified by staff, to correct/clean the areas of concern. If the apartment, or room remains unacceptable, the residents will be reported to the Director of Residence Life + Community Standards.

In addition, Residence Life staff will inspect apartments, suites, and bedrooms at the beginning of Winter Break. Residence Life staff provides information to residents to prepare their room for Winter Break. Students who do not follow closing procedures may

Case ID: 221002134

be subject to fines held from their Dorm Damage Deposit at the end of the academic year. Students will be notified of charges via email prior to their return to campus for the spring semester.

Residence Life + Community Standards staff will not conduct a room search that infringes on residents' privacy, but they may open cabinets or closets to find fire equipment and/or locate safety hazards.  If, in the course of doing so, item(s) or items that are prohibited are located, Public Safety will confiscate the item(s). See the Confiscation policy for more information.

## HOUSING AGREEMENT

Students sign an electronic *Housing Agreement* for the current academic year and are provided with an assignment for a space on campus, not a particular apartment or room. Students who leave the University due to withdrawal, leave of absence (medical or general), dismissal, or termination of the housing agreement must contact the Office of Residence Life + Community Standards and are responsible for officially checking out of their housing assignment.

Students who are notified during Winter Break that they are being academically dismissed or who choose not to return to the University, must contact the Office of Residence Life + Community Standards and check out of their assignment.  The check-out process occurs no later than 72 hours prior to the Spring Semester opening of the Residence Halls.

If a student is mandated by the Office of Residence Life + Community Standards and/or Student Affairs to relocate to a new apartment or out of the residence halls, they must do so according to the timeline outlined by University administration. Upon departure, items that remain in an apartment more than 48 hours after the student has been re-assigned or removed from residence will be disposed of.

**Cancellation**. University approved cancellation of the Housing Agreement will result in refunds in accordance with the tuition refund policy as listed on the UArts website:

| Cancellation Occurring | | |
|---|---|---|
|  | Housing Cost Charged | Housing Cost Refunded |
| Prior to First Day of Classes | 0% | 100% |
| Before the End of the Second Week of Classes | 20% | 80% |
| Before the End of the Third Week of Classes | 60% | 40% |
| After the End of the Third Week of Classes | 100% | 0% |

Residents who wish to apply for cancellation of their Housing Agreement, must complete a Contract Cancellation form, available in the Office of Residence Life + Community Standards. This form also allows students to apply to cancel their meal plan, or move to another plan.

Refunds of meal plans are issued in accordance with the tuition refund policy as listed above and on the UArts website.

Residents wishing to cancel their meal plan for medical exemption should contact the Office of Educational Accessibility by emailing access@uarts.edu.

If a resident's cancellation is not approved, they are financially obligated for the entire academic year housing and meal plan costs.

This Housing Agreement may be terminated by the University under the following conditions:

- The resident fails to maintain a healthy and safe living environment, as determined by the Director of Residence Life + Community Standards (or designee).
- The resident receives a sanction that includes suspension/expulsion from University housing.
- The resident ceases to be eligible for University housing under the terms of the agreement.

16

Case ID: 221002134

- The resident experiences a medical emergency or unforeseen financial hardship (Contract Cancellation form required for review).

## ID CARDS

All residents must display a valid, University-issued ID card with the appropriate residential building sticker and Student Financial Services semester verification to gain access to the residence halls. Residents must enter and exit residence halls through the main entrance at which the Public Safety front desk is located. Residents may not intentionally provide another person their ID card for the purpose of that other individual gaining access to the residence hall. If a student loses their ID card, they should report it to Public Safety immediately so access is shut off and visit Student Financial Services in Hamilton Hall room 270 to obtain a new ID card.

## KEYS/LOCKOUTS

In the case that the resident is no longer in possession of the apartment key, the lock mechanism for the apartment door will be replaced for security reasons. The resident will be charged $65.00 for this replacement. A $10.00 charge will be assessed for replacing the mail key.

Failure to return the apartment key upon checkout will require the lock mechanism for the apartment door to be replaced for security reasons. When a resident vacates an apartment they must return their old key within 72 hours. A $65.00 charge will be assessed for replacement keys or lock replacement.

In the event of a lockout, a $10.00 fee will be charged to the account of any resident student who requires a member of the University staff to open the door to that resident's apartment.

## LOUNGES

Juniper and Pine Hall Lounges are open to commuter and residential students. All other residence hall lounges are for residential students and their guests only. Students are not permitted to sleep or conduct inappropriate behavior in the lounges.

## MAINTENANCE/REPAIRS

Residents are responsible for submitting online maintenance requests for repairs needed to their apartment through the UArts portal. In emergency situations, residents should notify the RA on Duty or ask the Public Safety Officer at their residence hall front desk to contact Maintenance on their behalf. Residents are also responsible for reporting pest concerns/sightings. Pest Control services are on site once a week to address reported concerns. Most routine requests will be addressed in 24-72 hours. See Bed Bug/Pest policy for more information.

## NOISE

All noise must be kept at a moderate level. Use of musical instruments, especially amplified musical instruments or particularly loud instruments (e.g., brass instruments or drums), are not permitted in the residence halls. Courtesy Hours are in effect at all times, when a resident must lower the level of noise being created upon another resident's request. Quiet Hours are in effect 24 hours a day during Final Examination, Critiques and Juries Weeks. Outside of those weeks, quiet hours are in effect Sunday-Thursday from 11pm-7am and Friday-Saturday 12am-7am. All residents are expected to act in a conscientious fashion regarding noise levels.

## OCCUPANCY

If a resident's eligibility status changes during the length of the Housing Agreement, the resident is expected to move out of the residence halls within forty-eight (48) hours. If an extension is required, the resident must submit the request in writing to the Office of Residence Life + Community Standards. Students participating in the University's Commencement are permitted to remain in their assigned residence hall space until 12pm the day following Commencement.

## PERSONAL PROPERTY (LOSS)

The University is not responsible for loss or damage of personal property in the residence halls. The University does not insure the student's personal property against loss or damage resulting from any cause including, though not limited to, fire, water, vandalism and/or theft. Students are encouraged to purchase private insurance and/or to obtain personal lockboxes. In addition, students should refrain from keeping cash and/or expensive items in their residence hall apartment. Students should keep their apartment doors locked whenever they are not present. It is each individual's responsibility to obtain renter's insurance for their personal property. Students may have coverage under a family homeowner policy so it is advisable to check with them to determine if coverage is available. Students may also look into obtaining coverage through National Student Services, Inc. College Student Property Insurance.

Case ID: 221002134

## PETS

Pets of any kind are not permitted in the residence halls, except for fish. The maximum size for an aquarium is 2 gallons, and fish must be non-carnivorous.  Failure to abide by the above restriction will result in a $25.00 fine for each day the pet remains in the residence hall.

Animals, live or dead, may not be used in pranks or otherwise for amusement or ceremony. Use of animal materials, bi-products or bodily fluids is prohibited in the residence halls

Students requesting exceptions to this policy under the auspices of the Americans with Disabilities Act (ADA), must do so through the Office of Educational Accessibility. The University is committed to providing reasonable and appropriate accommodations for qualified students with disabilities.  The University complies with Section 504 of the Rehabilitation Act, the Americans with Disabilities Act Amendments Act (ADAAA) and the Fair Housing Act (FHA).  UArts permits Support Animals (often referred to as Emotional Support Animals) in campus residential housing as a reasonable accommodation once the student has met the guidelines under which approval of a Support Animal is determined, and the procedure for requesting housing accommodations has been completed and approved. Please note that if you are found responsible for having a support animal without approval, you are no longer eligible. Anticipated or current roommates of a student applying for an emotional support animal (ESA), must sign off on the animal as part of the intake process. Residents are responsible for their emotional support animal's actions. If a roommate is experiencing an issue with a Support Animal, they should contact Residence Life & Community Standards to file a grievance.

## PHYSICAL ACTIVITIES

Students may not participate in any physical activity or recreation inside the residence halls that poses a threat to the safety of other students or to the facility itself.  These activities include, but are not limited to: riding hoverboards, skateboarding, rollerblading, roller-skating, bike riding, and throwing objects.

## POSTING

Bulletin boards are designated for posting residence hall information, community activities board notices and other similar items. All postings on bulletin boards or common areas of residence halls must receive approval from Residence Life. Approved signs, posters and advertisements will be given to Residence Life + Community Standards staff to be hung accordingly. All signs, except those regarding residence hall business or publicity for hall events, must display appropriate approval stamps from Residence Life. Unauthorized removal of postings or vandalism of bulletin boards is prohibited.

## PROHIBITED AREAS

For safety and security reasons, residents may not access the following areas of any residence hall:
1. Roof and/or terraces;
2. Balconies;
3. Storage Basements;
4. Fire-escapes except for exit due to fire or other emergency.

## PROHIBITED ITEMS

The following are prohibited for use and/or possession in the residence halls. Any other item that is deemed unsafe or inappropriate for residential living may be considered prohibited, at the discretion of the Director of Residence Life + Community Standards.

1. Air Conditioners not provided by the University
2. Alcohol containers (empty or not), alcohol paraphernalia
3. Candles/incense/wax burners (open flame, hot plate heating element, or lit ember)
4. Drugs and drug paraphernalia
5. Electric Blankets
6. Extension cords
7. Fireworks
8. Halogen lamps
9. Hot tubs/pools/slip 'n slides
10. Hookahs
11. Hoverboards
12. Microwave ovens not provided by the University
13. Refrigerators not provided by the University
14. Space Heaters
15. String lights, rope lights, holiday lights (limited to 3 strands per apartment, must be solar or battery powered)
16. Body Modification Equipment (including branding, tattooing, piercing guns or other body modification equipment)
17. Weapons

Case ID: 221002134

18. Wall tapestries, flags or other wall hangings
    a. Permitted when made from fabrics that are compliant with NFPA 701 flammability standard.
    b. Compliance may be established by a label on the fabric item, or by treating the fabric with an approved product. Following treatment of fabrics, students must send notification to reslife@uarts.edu attesting to this treatment along with the receipt for purchase of the product and the product label.
    c. The Fire Marshal or University may cut and test a piece of these fabrics and students must accept this as a condition of having fabric hangings in University housing.
    d. Tapestries may not be hung from the ceiling or used as room dividers.

The following items are permitted, but must display a manufacturer's label that shows the electrical ratings and listing by a nationally recognized testing laboratory (e.g., ETL, UL, etc.):
    a. Electric skillets
    b. Hot plates
    c. Induction cooktop
    d. Panini makers/George Foreman grills

## ROOMMATE CONFLICTS

To support students experiencing roommate conflict, Residence Life + Community Standards staff host mediations. Mediation is a guided conversation which allows the parties to respectfully voice their concerns and reach a mutually beneficial solution. Residence Life staff are trained to facilitate mediation and students are encouraged to take advantage of their skillset. While there are some situations where mediation is not appropriate, most problems can be effectively mediated and is often the first required course of action. Please refer to the following steps to resolve a conflict with a roommate.
1. Students should attempt to solve problems on their own first. Conflict resolution skills are vital for harmonious living and being a successful professional in your career field.
2. Address the problem, how you perceive it, and why it is of concern to you. Avoid profanity or disrespectful language. Do not assume that others know how you felt about an issue. Be willing to work toward a compromise. It may be helpful to talk it through with your resident assistant first to prepare for the conversation.
3. If the situation is not resolved, the student should notify their resident assistant. The resident assistant will then facilitate a conversation between the students and draft an updated roommate agreement to be signed.
4. If the problem persists, the resident assistant will notify the Area Coordinator. All residents involved will discuss the problem with the Area Coordinator.

## ROOM ENTRY AND SEARCH

The University respects each student's right to privacy and is committed to protecting this right. However, University officials (such as Residence Life + Community Standards, Public Safety, and Facilities staff) may enter a student room when there is reason to believe that the health or safety of residents and/or residential space is in jeopardy or a University policy is being violated. Maintenance may also enter rooms to perform necessary repairs, as needed.

A room search will only be conducted when authorized by one of the following people:
1. Vice President for Enrollment Management and Student Affairs
2. Assistant Vice President for Student Services
3. Director of Residence Life + Community Standards
4. Director of Campus Life

Students do not have to be present for the search, however University personnel will make a good faith effort to contact the student and provide them with written documentation of search authorization either at the time of the search or the next business day. During a search, the student may be required to open any locked trunks, suitcases, etc. If the student is not present, any item in the room, including purses, trunks, etc., may be searched. The University will take due care to ensure proper handling of student's belongings, but it is not liable for damage or clean up as a result of a room search.

## SMOKING

The University of the Arts maintains a smoke-free environment. Smoking is prohibited on all University property, including outdoor building courtyards, balconies, stairwells, and steps. Smoking is, in part, defined as carrying or holding of any lit or ignited pipe, cigar, cigarette, electronic cigarette, or any other lit or battery operated smoking equipment or device. Smoking is permitted only out of doors and 20 feet from building entrances and exits. Smoking is therefore prohibited in all areas of the residence halls. Students found smoking in their apartments, hallways, roofs, stairwells, catwalks, and/or balconies will be in violation of the smoking policy. Any used cigarettes, ashtrays, smoking paraphernalia, and/or ashes will be considered a violation of the smoking policy. Students seeking support in smoking cessation should contact Student Health Services at healthservices@uarts.edu for assistance.

Case ID: 221002134

## SOLICITATION

Residents are not permitted to use their room, suite, or apartment for any commercial purpose. Solicitation by residents or guests is prohibited in the residence halls. Door to door advertising by outside vendors is not allowed.

## ACCOMMODATION REQUESTS

Students who wish to request housing accommodations or adjustments due to a disability must contact the Office of Educational Accessibility at 215-717-6616 or access@uarts.edu . For more information, please refer to the following website: uarts.edu/ accessibility

## WEAPONS

Students are not permitted to have weapons on campus including, but not limited to, firearms of any kind, nunchucks, shuriken, knives (other than eating utensils), cap guns, ammunition and explosives (or explosive chemicals), among other dangerous weapons or substances. Weapons used as props, whether real or otherwise, are not permitted in the residence halls.

Case ID: 221002134

# SECTION 5: STUDENT CODE OF CONDUCT, ADJUDICATION, AND SANCTIONS

## COMMUNITY STANDARDS AND THE STUDENT CONDUCT SYSTEM

The overriding principle of the UArts Student Code of Conduct is the promotion of a civil educational environment for all community members. The UArts Student Code of Conduct acknowledges that every student has both the freedoms and the responsibilities of being an adult student-artist.

As appropriate to an institution of higher education, standards of performance and social conduct are generally more demanding than those required of the general public. The University places great value on freedom of expression, but also recognizes the responsibility to protect the values and structures of an academic community. It is important, therefore, that students assume responsibility for helping to sustain an educational and social community where the rights of all are respected.

By registering at the University of the Arts, each student agrees to accept responsibility for compliance with academic regulations, course syllabi and conduct regulations as listed in the University Catalog and Student Handbook and regulations pertaining to any specific operation within the University.

The Student Conduct process is an administrative educational process informed by legal and compliance requirements.

Students share responsibility for upholding community standards and are expected to participate in good faith with investigation and adjudication processes meant to resolve a code allegation. Decisions about whether a student or group is responsible for a conduct violation are based on a preponderance of the evidence standard meaning, the allegation is supported by evidence that sufficiently demonstrates that it is more likely than not that a violation occurred. Without sufficient evidence, a student or group will be found not responsible. No sanction shall be brought against a student accused of a violation of the Student Code of Conduct, except in instances of academic dishonesty handled by faculty members in accordance with policies set forth in their syllabi and the academic integrity policy in the University Catalog. Students wishing to appeal academic sanction decisions made by faculty members should consult the Academic Grievance Procedure section of the University Catalog for guidelines.

Should a student's presence on campus create a threat to the safety or well-being of other members of the University of the Arts community, the University reserves the right to issue interim sanctions as outlined in this Handbook until the time of a hearing. Additionally, the University reserves the right to resolve a case and sanction a student, including suspension, without a hearing where such action is deemed necessary or appropriate by the President of the University.

### Definitions

The following definitions refer to the University of the Arts conduct review procedures and processes only:

1. The term "University" means the University of the Arts;
2. The term "student" includes both full and part-time students, pursuing undergraduate or graduate studies. Persons who are not officially enrolled for a particular term but who have a continuing relationship with the University are considered "students";
3. The term "University official" includes any person employed by the University or an out-sourced auxiliary service who performs assigned administrative or professional responsibilities, including conducting classroom activities;
4. The term "Student Life staff" includes Resident Assistants, Coordinators, on-call staff, the Director of Residence Life + Community Standards, and the Director of Campus Life;
5. The term "member of the University community" includes any person who is a student, faculty member, University official or any other person employed by the University, including any University auxiliary service employee and vendors;
6. The term "University premises" includes all land, buildings, facilities, and other property in the possession of, owned, used, or controlled by the University;
7. The term "University organization" means any number of persons who have complied with the formal requirements for University recognition/registration;
8. The terms "student conduct administrator" and "hearing body" means any person or persons authorized to determine whether a student has violated the Student Code of Conduct and to recommend imposition of sanctions; exercise disciplinary action following a proper hearing;
9. The term "appellate body" means any person or persons authorized to consider the appeal of a hearing body's determination that a student has violated the Student Code of Conduct or sanctions imposed;
10. The term "University policy" is defined as the written regulations of the University as found in, but not limited to, the University Catalog and Student Handbook;

Case ID: 221002134

**Jurisdiction of the University Conduct System**

The University Conduct System will hear complaints concerning violations of University policy or regulations whenever the conduct in question occurs in any of the following circumstances:

1. If it occurs on the campus or in any University facility;
2. If it occurs while the student who is charged was attending or participating in any University-related activity, i.e., study abroad, field trip, social event, activity sponsored by a recognized student organization;
3. If the conduct occurs through an online social media account;
4. Off-campus conduct the effects of which extend to the University's educational environment; and/or
5. The fact that a student's conduct may also constitute a crime in violation of local, state, or federal law does not limit the ability of the University to discipline the student for that conduct. The University, therefore, reserves the right to submit a complaint to the conduct review system even if the same conduct is or may become the subject of a criminal case.

## STUDENT CODE OF CONDUCT

In addition to the policies listed in various sections of this handbook, the University of the Arts Student Code of Conduct outlines behaviors that are prohibited at the University.  The specific items are not meant to serve as an exhaustive list, but as a general guideline for addressing student behavior.  The University reserves the right to address other behaviors that occur that are considered detrimental to the learning environment and/or health and safety of the University community.

To that end, prohibited behavior at the University of the Arts includes the following:

1. **Academic dishonesty or misconduct as described in the University Catalog, the Student Handbook, and all other rules governing University facilities, programs and services**
   a. Conduct prohibited by the Academic Integrity Policy as outlined in Section 2.

2. **Violation of policies as described in the University Catalog, the Student Handbook, and all other rules governing University facilities, programs and services**
   a. Conduct prohibited by Campus Policies as outlined in Section 3.
   b. Conduct prohibited by Residential Living Policies as outlined in Section 4.
   c. Conduct prohibited by the Sex- and Gender-Based Misconduct Policy, as outlined in Appendix A.

3. **Non-compliance with the directions of University or civil authorities performing official duties;**

4. **Violation of statutes, laws, ordinances and/or regulations of the City of Philadelphia, Commonwealth of Pennsylvania (or other states, when applicable) and the United States of America.**

## CONDUCT REVIEW PROCESS

The Assistant Vice President for Student Services oversees the University student conduct system. Consultation with the Assistant Vice President or any other conduct officer in no way obligates an individual to file a formal complaint or report.

An allegation against a student may be reported to the Assistant Vice President for Student Services or Director of Residence Life + Community Standards by any member of the UArts community including another student, a Public Safety officer, or member of the faculty or staff.

Allegations involving sex- and gender-based misconduct will be forwarded to the Title IX Coordinator or may be made directly to the Title IX Coordinator at titleix@uarts.edu or by visiting www.uarts.edu/titleix. **Resolution of allegations under the Sex- and Gender-Based Misconduct Policy are outlined in Appendix A.**

The Assistant Vice President for Student Services, or their designee, will oversee the review of information received in order to determine further appropriate action, including:
- informal follow up.
- formal follow up under the general conduct process for allegations that, if proven, would not result in suspension or expulsion from the University.
- formal follow up under the advanced conduct process for allegations that, if proven, could result in sanctions that include suspension or expulsion from the University.

The University is responsible for investigating complaints of misconduct and determining if the information provided has reached the level of initiating student conduct proceedings. The student conduct administrator makes the threshold determination to resolve the allegation through General Conduct or the Advanced Conduct process. If a threshold to hold advanced adjudication is reached,

Case ID: 221002134

the respondent who is alleged to have violated policy will be provided an opportunity to respond in the course of the investigation, the pre-adjudication procedures, and the adjudication.

If the alleged incident represents a violation of federal, state, or local law, the reporting complainant is encouraged to initiate proceedings in the criminal or civil court system regardless of whether a complaint is filed within the University.

When a student organization engages in some act of misconduct, the University may take action not only against the student(s) involved, but also against the organization itself.

With respect to academic dishonesty, faculty may choose to follow policies and procedures described in their course syllabi in consultation with their program director or school dean.

Parties and other individuals who offer information at an adjudication are expected to respond honestly and to the best of their knowledge. A complainant, respondent, or witness who intentionally provides false or misleading information may be subject to discipline under the Student Code of Conduct.

Anyone with questions about the conduct process should contact the Office of Student Affairs at 215-717-6617 or the Office of Residence Life + Community Standards at 215-717-6970 during business hours.

## ROLE OF THE ADVISOR

For general conduct adjudication, a list of trained student advisors is available on the UArts website at uarts.edu/students/conduct.

For advanced conduct adjudication both respondents and complainants can work with a trained faculty or staff member that can assist the student in navigating the process. At the discretion of the student, the advisor may accompany the student to any meeting and/or adjudication process related to these procedures. Students have the right to request any current member of UArts faculty or staff to serve as their advisor. If not previously trained, this individual will be required to meet with the student conduct administrator (or their designee) in advance of any participation.

The advisor is present to provide support; they do not actively participate in the process, nor may they ask questions or speak for the student.  An advisor may be cautioned or asked to leave if their participation acts to delay, disrupt or otherwise interfere with the integrity of a meeting or adjudication.  The student conduct administrator has the right at all times to determine what constitutes appropriate behavior on the part of the advisor and whether the person may remain at the adjudication proceedings.

## GENERAL CONDUCT

Allegations in which possible sanctions do not include suspension or expulsion from the University if the student were found responsible are addressed through the general conduct process.

University hearings are open only to members of the University community and individuals who have specific involvement in the case, and only at the discretion of the student conduct administrator.  The University conduct review process shall be conducted according to the following guidelines:

> The general conduct process is typically conducted by a professional staff member in the Office of Residence Life + Community Standards (hereinafter, referred to as the "student conduct administrator") and includes investigation and formal resolution. Prior to a meeting with a student conduct administrator, the respondent is encouraged to meet with a Conduct Advisor made available by and through the University to review the student conduct system, student rights, and potential sanctions.

> The student conduct administrator will send the respondent written notification, via UArts email, of the allegations of misconduct and the aspects of the Student Code of Conduct that are alleged to have been violated and the name, telephone number, and office location of the student conduct administrator. In addition, the respondent will receive the date and time of the scheduled administrative review with the student conduct administrator to adjudicate the matter.

> During resolution, the respondent  will be given the opportunity to review all available information regarding the allegation(s) in question and an opportunity to respond to those allegations.
> - If, during the course of the administrative review with the respondent, the student conduct administrator determines the incident being discussed is more serious than was originally believed, the administrative review will be stopped immediately, and the incident will be referred to either the Director of Residence Life and Community Standards, or their designee, to determine the next course of action.

Case ID: 221002134

After the administrative review and a review of the information available, including an opportunity for the respondent to respond, the student conduct administrator will make a determination if the respondent violated the Student Code of Conduct and issue sanctions, as appropriate. Pertinent records, exhibits, and written statements may be accepted as evidence for consideration at the discretion of the student conduct administrator. Assumptions, speculations, or references to prior, unreported incidents will not be permitted. Should the respondent fail to attend the administrative review with the student conduct administrator, the student conduct administrator will consider the information available and render a decision regarding the respondent's responsibility and sanctions, if any.

Following a general conduct hearing, the student conduct administrator shall advise the respondent in writing, via UArts email, of the decision and of the sanction(s) imposed, if any, within three business days whenever possible.

The general conduct process is subject to appeal pursuant to the appeal procedures outlined by this policy. There shall be a written record of all general conduct hearings for use by the appellate body; a copy of this record will not be provided to the accused or the reporting party. The record shall cite the violation(s), the decision (responsible or not responsible), a brief statement of the facts upon which the finding is based, and the sanction(s).

## ADVANCED CONDUCT

Allegation(s) subject to this policy in which possible sanctions could result in suspension or expulsion from the University if the student(s) were found responsible, including academic misconduct cases, are addressed through the advanced conduct process.

The Hearing Body for advanced conduct may be a Campus Standards Board, a student conduct administrator, or a University appointed external adjudicator. In making the determination to select an appropriate Hearing Body, the University may consider, among other factors, the nature of the report, the complexity of the facts, whether there is any issue of actual or perceived conflict of interest, the availability of trained panel members for a hearing, whether the University is in session or on break, or any other factors deemed relevant. Regardless of the Hearing Body chosen, a hearing will be conducted following the procedures outlined in this handbook.

A complaint under the advanced conduct process will generally involve adjudication before the Campus Standards Board (CSB) or external adjudicator. A complainant or respondent, however, may request resolution through administrative adjudication, to be conducted by the Assistant Vice President for Student Services (hereinafter referred to as the "student conduct administrator"). Both parties must agree to resolution by administrative adjudication. The option of administrative adjudication is also applicable for cases involving academic misconduct, but must be requested by both the respondent and reporting faculty members (see the academic misconduct policy in the University Catalogue). Administrative adjudication is particularly appropriate when the respondent has admitted to the misconduct and there is no discernible dispute in the relevant facts of the investigation report; however, at the discretion of the student conduct administrator, it may also be used when the facts are in dispute.

In cases of advanced conduct, an investigative report will be compiled of any information report(s), interview summaries, written statements, and any other documentary information that will be considered by the student conduct administrator, CSB or external adjudicator. Both parties must have notice, the opportunity to review the investigative report in advance, and the opportunity to present relevant information. The investigative report will serve as the primary evidence in making a determination of responsibility.

The student conduct administrator will review any investigative report, any witness statements, and any other documentary evidence to determine whether the included information contained is relevant and material to a determination of responsibility, given the nature of the allegation. In general, the student conduct administrator may redact information that is irrelevant, more prejudicial than probative, or immaterial. The student conduct administrator may also redact statements of personal opinion, rather than direct observations or reasonable inferences from the facts, and statements as to general reputation for any character trait, including honesty.

Following a review of the investigation report and a finding that sufficient evidence exists to charge a student, a Notice of Charges is prepared by the student conduct administrator. The Notice provides the respondent with a statement of the policy violation(s) that are alleged to have taken place and a summary of the facts underlying the allegation(s). Where appropriate, a notice will also be sent to a complainant. In addition, the notice provides the parties with a date and time to meet with the student conduct administrator to discuss adjudication procedures and answer any questions they have regarding the adjudication process. During that meeting, the respondent will have the opportunity to indicate whether or not they are responsible or not responsible for the charge(s).

If the respondent indicates they are responsible for the charges, and all parties involved agree to administrative adjudication, the student conduct administrator will determine sanctions.

24

Case ID: 221002134

If the respondent indicates they are not responsible for the charges, the student conduct administrator will convene a Campus Standards Board or designate an external adjudicator for adjudication.

## STUDENT CONDUCT ADMINISTRATOR ADJUDICATION

In reaching a determination as to whether university policy has been violated, the student conduct administrator will reach a determination by a preponderance of the evidence—that is, whether the conduct was more likely than not to have occurred as alleged.

If the respondent has indicated they are responsible for the charges, the student conduct administrator will determine sanctions.

The student conduct administrator will notify both the respondent and the complainant, in writing, of any sanctions within five (5) business days. The notice will include notification of appeal options. Typically, the imposition of sanctions will take effect immediately and will not be stayed pending the resolution of the appeal.

Depending upon the nature and severity of the allegations, the student conduct administrator may decline to handle the matter administratively and refer the case to the Campus Standards Board or external adjudicator at any time.

## CAMPUS STANDARDS BOARD ADJUDICATION

Campus Standards Board hearings are open only to those people who have specific involvement in the case or who will serve as an advisor to the accused.

The CSB is a review board composed of University faculty and administrators. All CSB members must participate in appropriate annual training including training about non-discrimination, the factors relevant to a determination of credibility, the appropriate manner in which to receive and evaluate sensitive information, the manner of deliberation, the application of the preponderance of the evidence standard, sanctioning, and the University's policies and procedures.

Each CSB panel to adjudicate a case consists of three (3) voting panelists and one (1), non-voting chair. The CSB is supported by the student conduct administrator (the Assistant Vice President for Student Services or designee) who will be present to facilitate the process. They are not a voting member of the CSB.

The complainant or respondent may submit a written request to the student conduct administrator to contest a member of the CSB if there are reasonable articulated grounds to suspect bias, conflict of interest, or an inability to be fair and impartial. This challenge must be raised within four (4) business days of receipt of notification of the CSB panel members. All objections must be raised prior to the commencement of the adjudication or are deemed waived. The student conduct administrator will make the determination as to whether sufficient bias, conflict of interest, or inability to be fair and impartial exists sufficient to warrant designating an alternative CSB panel member.

The student conduct administrator will be available to meet with all involved parties prior to the adjudication; be present during the adjudication to serve as a resource for the CSB on issues of policy and procedure; and see that policy and procedure are appropriately followed throughout the adjudication meeting.

A complainant or respondent can request to have an adjudication rescheduled. Absent extenuating circumstances, requests to reschedule must be submitted to the student conduct administrator at least three (3) business days prior to the adjudication. A request to reschedule an adjudication must be supported by a compelling reason for the delay. The student conduct administrator may also reschedule the adjudication, without a request by either the respondent and/or complainant, when there is reasonable cause to do so. The student conduct administrator will make the determination as to whether a compelling reason exists sufficient to delay an adjudication. The student conduct administrator will notify the parties of any changes to the scheduled adjudication.

Both parties will have the opportunity to review all investigative documents, subject to the privacy limitations imposed by state and federal law, at least five (5) business days prior to the adjudication, unless the student has requested an expedited adjudication, in which case they will be deemed to have waived this right. The investigative report will include any information report(s), interview summaries, written statements, and any other documentary information that will be presented during adjudication. Where appropriate, a complainant will also be provided these same rights. All information and/or materials the parties wish to include in the investigative report or have considered at the adjudication must be provided to the student conduct administrator prior to the adjudication.

The CSB panel is expected to review all information pertinent to the incident in question. Generally, the investigative report will be made available for CSB panel members to review five (5) business days prior to the adjudication.

Case ID: 221002134

*During Adjudication*
    **i.** An adjudication will be called to order by the Chair. The student conduct administrator will then explain the adjudication process and make introductions of adjudication attendees.
    **ii.** The chair will read the charges and the responding party will provide a preliminary indication of whether they are responsible or not responsible for those charges.
    **iii.** If appropriate, the investigator will provide a summary of the investigation. The CSB, the complainant, and/or respondent, may pose questions to the investigator at the conclusion of the summary.
    **iv.** When applicable, the complainant may present a brief opening statement. The CSB and the respondent may pose questions to the complainant.
    **v.** The respondent may present a brief opening statement. The CSB and the complainant may pose questions to the respondent.
    **vi.** The student conduct administrator will identify and call relevant witnesses. The CSB, the complainant, and or/respondent will have an opportunity to pose questions to each witness.
    **vii.** The student conduct administrator may call back any participant for additional questions or clarifications.
    **viii.** The complainant may present a brief closing statement.
    **ix.** The respondent may present a brief closing statement.
    **x.** All parties except CSB members shall be excused from the hearing room while the Board discusses the case to determine their decision.
        **a.** Their decision will be made at the time of the hearing unless circumstances make deferment necessary; and
        **b.** A majority vote of CSB members is sufficient to make a determination.

There shall be a single recording of all University Campus Standard Board hearings (not including deliberations). The recordings shall be property of the University and will be maintained in accordance with FERPA. In case of an appeal, an audio file of the transcript is available to either the complainant or respondent for review in a space approved by the student conduct administrator and in the presence of the students hearing advisor.

*Witnesses*
Witnesses will only be called to participate in the adjudication at the request of the CSB and/or student conduct adjudicator. During the investigation, the complainant and respondent will have been asked to identify witnesses. The University may also identify witnesses during the course of the investigation. Witnesses must have observed the act in question or have information relevant to the incident and cannot participate solely to speak about an individual's character.

If either party wishes to identify witnesses, the following must be submitted no later than ten (10) business days before the adjudication to the student conduct administrator by email or in hardcopy format:
- the names of any witnesses that either party wishes to identify;
- a written statement and/or description of what each witness observed, if not already provided during investigation;
- a summary of why the witness' presence is relevant to making a decision about responsibility at the hearing; and
- the reason why the witness was not interviewed, if applicable.

The student conduct administrator will determine if the witness(es) have relevant information.

If witnesses are approved to be present, the respondent and complainant are provided with a list of witnesses and any relevant documents related to their appearance at the adjudication no later than three (3) business days before the adjudication. All parties have the opportunity to pose questions of witnesses, regardless of who identified them to participate.

*Deliberation*
The CSB will determine a respondent's responsibility by a preponderance of the evidence. This means that the CSB will decide whether it is "more likely than not," based upon the information provided at the adjudication, that the respondent is responsible for the alleged violation(s).

After all of the information has been presented, the parties will be dismissed from the adjudication room so that the CSB may deliberate. The student conduct administrator will remain for deliberations but does not vote. The CSB will first try to reach a determination by consensus; but a simple majority vote as to responsibility will suffice.

The findings of the CSB will be reduced to writing by the student conduct administrator. The findings will detail the findings of fact and determination of responsibility, making reference to the evidence that led to the finding and will serve as the record of the proceeding. The vote itself shall not be shared with any parties.

The student conduct administrator will notify both the respondent and the complainant, in writing, of the outcome and any sanctions, if applicable, within five (5) business days. The notice will include notification of appeal options. Typically, the imposition of sanctions will take effect immediately and will not be stayed pending the resolution of the appeal.

Case ID: 221002134

**EXTERNAL ADJUDICATION**

External adjudication hearings are open only to those people who have specific involvement in the case or who will serve as an advisor to the parties.

External adjudication follows the process outlined above in the Campus Standards Board Adjudication, but with a single external party serving as the hearing body.

# SANCTIONS

If a student, group, or organization is found responsible for a violation of the Student Code of Conduct the student conduct administrator will determine the appropriate sanctions. The sanctions may include, but are not limited to, those set forth in the Student Handbook.

In considering the appropriate sanction, the student conduct administrator will consider the following factors:

      (1) the respondent's prior discipline history;
      (2) how the University has sanctioned similar incidents in the past;
      (3) the nature and violence of the conduct at issue;
      (4) the impact of the conduct on the complainant, and their desired sanctions, if known;
      (5) the impact of the conduct on the University community, its members, or its property;
      (6) whether the respondent has accepted responsibility;
      (7) whether the respondent is reasonably likely to engage in the conduct in the future;
      (8) the need to deter similar conduct by others; and
      (9) any other mitigating or aggravating circumstances, including the University's values.

Any respondent who is determined to have engaged in any prohibited form of conduct may receive a sanction ranging from a warning to expulsion and appropriate educational requirement. The student conduct administrator may broaden or lessen any sanctions based on significant mitigating circumstances or egregiously offensive behavior. The student conduct administrator may issue a single sanction or a combination of sanctions.

**Warning** - A written notification that a violation of the Student Code of Conduct occurred and that any further responsible finding of misconduct may result in more severe disciplinary action. Warnings are typically recorded for internal purposes only and are not considered part of a student's permanent student conduct record. Though disclosed with a student's signed consent, a student who receives a warning is still considered in *good standing*.
**Probation** - A written notification that indicates a serious and active response to a violation of the Student Code of Conduct. Probation is for a designated period of time and includes the probability of more severe sanctions, if found responsible for additional violations of the Student Code of Conduct, including suspension or expulsion from the University. Notification of probation is considered a change in *good standing* status.
**Loss of privileges** - Denial of the use of certain University facilities or the right to participate in certain activities, events, programs, or to exercise certain privileges for a designated period of time.
**Restitution** - A student may be required to make payment to an individual or to the University related to the misconduct for damage, destruction, defacement, theft, or unauthorized use of property.
**Fines** – The University of the Arts reserves the right to impose fines, as appropriate, in addition to requiring payment for costs resulting from or associated with the offenses.
**Relocation or removal from (University-operated) housing** - Relocation is the reassignment of a student from one living space to another. Removal from housing is the removal of a student from all University-operated housing. Relocation and removal from housing are typically accompanied by the loss of privileges regarding the visitation to specific residential areas for a specified period of time. The University may take such action for remedial, rather than disciplinary purposes.
**Revocation of Affiliation** - Revocation of affiliation is the permanent removal of a student as a member of a specific organization and/or the permanent removal of an organization's recognized affiliation with the University.
**No Contact Directives** - No Contact Directives are directives to students that restrict the contact and/or communication between or among designated parties. No Contact Directives may be the result of a student conduct process or put in place temporarily. No Contact Directives are not legal protective orders as those are issued by a court of law.
**Persona Non Grata** – Persona Non Grata prohibits a student from a specific or all campus property. Violation of a persona non grata may subject the violator to arrest for trespass.
**Educational/Assessment/Referrals** - The University reserves the right to impose counseling or substance assessments or other required educational sanctions.
**Suspension** - The separation of a student from the University for a specified period of time, after which the student is eligible to return. Conditions for re-enrollment may be required and will be included in the notification of suspension. During the period of suspension, the student may not participate in University academic or extracurricular activities and may be barred from all property owned or operated by the University. Suspension from the University will result in automatic "W" grades in all classes for the semester in which suspension was sanctioned. Students who are suspended may not be on campus without specific, written

Case ID: 221002134

permission of the Assistant Vice President for Student Services or designee. Suspension is for a designated period of time and includes the probability of more severe sanctions, including expulsion, if found responsible for violations of the Student Code of Conduct. Notification of suspension will normally be sent to parents, as it results in a change in *good standing* status.

**Expulsion -** Expulsion is the permanent separation of the student from the University. Expulsion from the University will result in automatic "W" grades in all classes for the semester in which expulsion was sanctioned. Students who are expelled may not be on campus without specific, written permission of the Assistant Vice President for Student Services or designee. Notification of expulsion will normally be sent to parents, as it results in a change in *good standing* status.

The following sanctions, among others, may be imposed upon student groups or organizations:
- Deactivation – Loss of privileges, including University recognition, for a specified period of time.

**\*Good Standing -** A student is not in *good standing* when the student has been found responsible for a student conduct policy violation and as a result is serving a sanction of probation, suspension, or expulsion. Students employed as a Resident Assistant or First Year Guide must be in and remain in *good standing* throughout their employment.

More than one of the above sanctions listed may be imposed for any single violation. Additionally, educational sanctions may be imposed at the discretion of the student conduct administrator. Other than University expulsion, disciplinary sanctions shall not be made part of the student's academic transcript but shall become part of the student's conduct record. Student conduct records, with the exception of suspension or expulsion sanctions, are cleared after seven (7) years. A student's conduct record is subject to review only by those authorized to request it, such as transfer higher-education institutions and future employers and in other cases when the student initiates the disclosure.

## INTERIM SANCTIONS

In certain circumstances, the student conduct administrator (or their designee) may impose sanction(s) pending an assessment and/or the adjudication to prevent further acts of misconduct and to provide a safe educational and work environment. Interim sanctions may be imposed to:

1. help ensure the safety and well-being of members of the University community or preservation of University property;
2. help ensure the student's own physical or emotional safety and/or well-being;
3. help prevent disruption or interference with the normal operations of the University.

Student Respondents wishing to contest an interim separation action may do so by contacting the Assistant Vice President for Student Services.  The Respondent's appeal must be in writing and include the following information:

    Name (Individual or Student Organization)
    Student ID (not applicable in Student Organization related cases)
    Rationale for the request
    Any documentation that supports that the Respondent would not pose an immediate threat to the campus community or would not pose an imminent threat of disruption to normal campus operations

The Respondent will be notified of the decision within five (5) business days of receipt of the request.  The interim separation will remain in effect while any review is pending.  There will be no further appeals to this decision.  If the interim separation is lifted, other interim restrictions (e.g., removal from university housing, limited access to campus, cessation of any organizational activities, or changes to work duties) may be assigned until the outcome of any related case.

The interim separation does not replace the regular conduct or discipline processes, which shall proceed as normal.

Whenever interim sanctions are imposed, the adjudication is scheduled at the earliest possible time. The interim sanction(s) may remain in effect until a final decision has been reached, including any appropriate appeals process.

## GENERAL CONDUCT APPEALS

Respondents may appeal the determination of responsibility or sanction(s) in writing to the Director of Residence Life + Community Standards (or their designee). The appeal must be filed within five (5) business days of receiving the written notice of outcome.

Dissatisfaction with the outcome of the hearing is not grounds for appeal.

The limited grounds for appeal of an outcome are as follows:
- new evidence that could affect the finding of the hearing and that was unavailable at the time of the hearing; and/or

Case ID: 221002134

- procedural error(s) that had a material impact on the fairness of the hearing; and

The limited grounds for appeal of a sanction(s) are as follows:
- The imposed sanctions were inappropriate under University sanctioning guidelines.

The appeal shall consist of a concise and complete written statement outlining the grounds for the appeal. The appeal consideration will be conducted in an impartial manner by the Director of Residence Life + Community Standards. In any request for an appeal, the burden of proof lies with the party requesting the appeal, as the original determination and sanction are presumed to have been decided reasonably and appropriately. The appeal is not a new review of the underlying matter.

The Director of Residence Life + Community Standards shall consider the merits of an appeal only on the basis of the three (3) grounds for appeal and supporting information provided in the written request for appeal and the record of the original hearing. The Director of Residence Life + Community Standards can affirm the original findings, alter the findings, and/or alter the sanctions.

If the appeal is granted based on procedural error(s) that materially affected the outcome of the hearing, the Director of Residence Life + Community Standards will return the case to the student conduct administrator for additional review or forward the case to a new student conduct administrator.

In the case of new and relevant information, the Director of Residence Life + Community Standards can recommend that the case be returned to the original student conduct administrator to assess the weight and effect of the new information and render a determination after considering the new facts.

Typically, the Director of Residence Life + Community Standards will communicate the result of the appeal to the student requesting the appeal within three (3) business days from the date of the submission of the appeal, but the time may be longer or shorter depending on the nature of the case. Appeal decisions are final.

## ADVANCED CONDUCT APPEALS

Respondents and complainants may appeal the determination of responsibility or sanction(s). Appeals of advanced conduct adjudication are handled as follows:
1. The Vice President for Enrollment Management and Student Affairs hears appeals of non-academic decisions, except in cases where the Vice President is the reporting party or a witness in the matter. (In such instances, appeals will go to the Vice President for Academic Affairs);
2. The Vice President for Academic Affairs hears appeals of academic decisions, except in cases where the Vice President is the reporting party or a witness in the matter. (In such instances, appeals will go to the Vice President for Enrollment Management and Student Affairs);

Appeals must be filed within ten (10) business days of receiving the written notice of outcome.

Dissatisfaction with the outcome of the hearing is not grounds for appeal.

The limited grounds for appeal of an outcome are as follows:
- new evidence that could affect the finding of the hearing and that was unavailable at the time of the hearing; and/or
- procedural error(s) that had a material impact on the fairness of the hearing; and

The limited grounds for appeal of a sanction(s) are as follows:
- The imposed sanctions were inappropriate under University sanctioning guidelines.

If the respondent accepts responsibility, and no hearing is convened, the limited grounds for appeal are as follows:
- The imposed sanctions were inappropriate under University sanctioning guidelines.

The appeal shall consist of a concise and complete written statement outlining the grounds for the appeal. Upon receipt of an appeal, the Assistant Vice President for Student Services (or their designee) will notify both parties. Each party has an opportunity to respond in writing to the appeal. Any response to the appeal must be submitted to the appropriate appeal review party (see above) within two (2) business days of notice of the appeal.

The appeal consideration will be conducted in an impartial manner by the appeal review party. In any request for an appeal, the burden of proof lies with the party requesting the appeal, as the original determination and sanction are presumed to have been decided reasonably and appropriately. The appeal is not a new review of the underlying matter.

Case ID: 221002134

The appeal review party shall consider the merits of an appeal only on the basis of the three (3) grounds for appeal and supporting information provided in the written request for appeal and the record of the original hearing. The appeal review party can affirm the original findings, alter the findings, and/or alter the sanctions, depending on the basis of the requested appeal.

If the appeal is granted based on procedural error(s) that materially affected the outcome of the hearing, the appeal review party will return the case to the student conduct administrator, CSB, or external adjudicator for additional review or forward the case for a new hearing, which may (at the appeal review party discretion) be heard by an alternate student conduct administrator, CSB, or external adjudicator.

In the case of new and relevant information, the appeal review party can recommend that the case be returned to the original student conduct administrator, CSB, or external adjudicator to assess the weight and effect of the new information and render a determination after considering the new facts.

Typically, the appeal review party will communicate the result of the appeal to the student requesting the appeal within ten (10) business days from the date of the submission of all appeal documents by both parties, but the time may be longer or shorter depending on the nature of the case. Appeal decisions are final.

Case ID: 221002134

The University of the Arts reserves the right to change and/or add to the policies, procedures and programs described in the University Catalog and Student Handbook and will make reasonable efforts to inform students of such changes and/or additions via UArts email notification.

Case ID: 221002134

# APPENDIX A: SEXUAL AND GENDER-BASED MISCONDUCT  POLICY

## I. PURPOSE OF POLICY

The University of the Arts ("the University") is committed to creating and maintaining a workplace and educational environment, as well as other benefits, programs, and activities, free from acts of Sex- and Gender-Based Misconduct, including acts of sexual harassment, sexual assault, dating violence, domestic violence, stalking, and other forms of sex- and gender-based misconduct. To ensure compliance with federal and state civil rights laws and regulations, and to affirm its commitment to promoting the goals of safety and respect in all aspects of the educational program or activity, the University has developed internal policies and procedures that provide a prompt, thorough, and impartial process for those involved in allegations of sexual harassment and other forms of sex- and gender-based misconduct. The University values and upholds the equal dignity of all members of its community and strives to balance the rights of the parties in the grievance process.

## II. TITLE IX COORDINATOR

The University's Title IX Coordinator oversees implementation of the University policies relating to equal opportunity, harassment, and nondiscrimination, including Sex- and Gender-Based Misconduct, as addressed by this Policy. The Title IX Coordinator is responsible for coordinating the University's efforts related to the intake, investigation, resolution, and implementation of supportive measures to stop, remediate, and prevent Sex- and Gender-Based Misconduct prohibited under this Policy. To contact the University's Title IX Coordinator, please e-mail titleix@uarts.edu (full contact information just below) or visit www.uarts.edu/titleix.

The Title IX Coordinator acts with independence and authority free from bias and conflicts of interest. The Title IX Coordinator oversees all resolutions under this Policy and these procedures. University employees involved in the University grievance process under this Policy are vetted and trained to ensure they are not biased for or against any party in a specific case, or for or against Complainants[1] and/or Respondents[2], generally.

To raise any concern involving bias or conflict of interest by the Title IX Coordinator, contact the University of the Arts President at president@uarts.edu. Concerns of bias or a potential conflict of interest by any other University of the Arts employee involved in the Title IX process should be raised with the Title IX Coordinator.

Reports of misconduct or discrimination committed by the Title IX Coordinator should be reported to the University President at president@uarts.edu. Reports of misconduct or discrimination

---

[1] A Complainant is an individual who is alleged to be the victim of conduct that could constitute a violation of this Policy.

[2] A Respondent is an individual who has been reported to be the perpetrator of conduct that could constitute a violation of this Policy.

Case ID: 221002134

committed by any other employee involved in the Title IX process should be reported to the Title IX Coordinator.

## III.    ADMINISTRATIVE CONTACT INFORMATION

The University has determined that the following administrators are Officials with Authority to address and correct Sex- and Gender-Based Misconduct. Formal Complaints or notice of alleged Policy violations, or inquiries about or concerns regarding this Policy and procedures, may be made internally to:

**Title IX Coordinator**
Vacant
320 South Broad Street, Philadelphia, PA 19102
Hamilton Hall 302
215-717-6362
titleix@uarts.edu

**Associate Vice President for Human Resources**
Christine M. Schaefer, SPHR, SHRM-SCP
320 South Broad Street, Philadelphia, PA 19102
Hamilton Hall 260
215-717-6366
cschaefer@uarts.edu

**Assistant Vice President for Student Services**
Sara Pyle
401 South Broad Street, Philadelphia, PA 19102
Gershman Hall 309
215-717-6627
spyle@uarts.edu

**President**
David Yager
320 South Broad Street, Philadelphia, PA 19102
Hamilton Hall 110
215-717-6380
president@uarts.edu

## IV.    COMPLAINTS TO EXTERNAL AGENCIES

Inquiries may be made externally to:

**U.S. Department of Education's Office for Civil Rights**
**Philadelphia Office**

Case ID: 221002134

100 Penn Square East, Suite 515, Philadelphia, PA 19107-3323
215-656-8541
OCR.Philadelphia@ed.gov
https://www2.ed.gov/about/offices/list/ocr/complaintprocess.html

**Pennsylvania Human Relations Commission**
**Philadelphia Regional Office**

110 North 8th Street, Suite 501, Philadelphia, PA 19107
215-560-2496
https://www.phrc.pa.gov/Pages/default.aspx

**Equal Employment Opportunity Commission**
**Philadelphia District Office**

801 Market Street, Suite 1000, Philadelphia PA 19107-3126
1-800-669-4000
PDOContact@eeoc.gov
https://www.eeoc.gov/employees/howtofile.cfm

## V.    MANDATED REPORTING

All University employees (faculty, staff, administrators) are expected to report actual or suspected discrimination or harassment to appropriate officials immediately, though there are some limited exceptions.

In order to make informed choices, it is important to be aware of confidentiality and mandatory reporting requirements when consulting campus resources. On campus, some resources may maintain confidentiality and are not required to report actual or suspected discrimination or harassment. They may offer options and resources without any obligation to inform an outside agency or campus official unless a Complainant has requested the information be shared.
If a Complainant expects formal action in response to their allegations, reporting to any Mandated Reporter can connect them with resources to report crimes and/or policy violations, and these employees will immediately pass reports to the Title IX Coordinator who will take action when an incident is reported to them.

## VI.    PRIVACY VS. CONFIDENTIALITY

References made to *confidentiality* refer to the ability of identified confidential resources to not report crimes and violations to law enforcement or college officials without permission, except for extreme circumstances, such as a health and/or safety emergency or child abuse. References made to *privacy* mean University offices and employees who cannot guarantee confidentiality but will maintain privacy to the greatest extent possible, and information disclosed will be relayed only as necessary to investigate and/or seek a resolution and to notify the Title IX Coordinator or designee, who is responsible for tracking patterns and spotting systemic issues.

Case ID: 221002134

## VII.    CAMPUS AND COMMUNITY RESOURCES

The University is committed to treating all individuals with dignity, care and respect. A Complainant, Respondent, or any other individual impacted by a report of behavior under this policy will have equal access to support, resources and counseling services through the University. We encourage community members to seek the support of campus and community resources. The University's Title IX Coordinator can provide information about this Policy and University procedure, connect individuals with resources and supportive measures, and assist any party in the event that an official report and/or resolution is pursued. Individuals are encouraged to use all available resources, regardless of whether the incident occurred recently or in the past.

### a.   LAW ENFORCEMENT:

**In the event of an emergency, please call 911, then notify Public Safety on the emergency line: 215-717-6666.**

You may also make a report directly to a University Public Safety Officer (PSO). Public Safety officers are stationed in University buildings. When a PSO receives a report of sexual misconduct, they will notify the Professional On-Duty (POD) staff member, who is trained to inform reporting parties of the options and resources available.

### b.   MEDICAL SERVICES:

Those who have experienced conduct prohibited by this Policy are strongly encouraged to seek medical treatment. A medical provider can provide emergency and/or follow-up medical services, and the opportunity to discuss any health care concerns in a confidential medical setting. A medical exam following a sexual assault has two goals: first, to diagnose and treat the full extent of any injury or physical effect (sexually transmitted infection or pregnancy) and second, to properly collect and preserve evidence. There is a limited window of time (typically 72 to 96 hours) following an incident of sexual assault to preserve physical and other forms of evidence.

**On-Campus:**

**Student Health Services**: Student Health Services can provide confidential medical services to University students, such as evaluation and treatment of minor injuries, pregnancy tests, and HIV and STI testing.

Gershman Hall 306
M-F 9am-5pm
215-717-6230
www.uarts.edu/students/health-services

**Off-Campus**:

Case ID: 221002134

**The Philadelphia Sexual Assault Response Center (PSARC)** is designated to provide forensic rape examinations to victims of sexual assault. It is recommended that individuals who wish to pursue legal action receive this examination, which includes a collection of evidence. You do not need to file a police report to receive services at PSARC. PSARC is located within the same building as the Philadelphia Police Department Sexual Victims Unit. During this examination, you can receive treatment for injuries and sexually transmitted infections (STIs) as well as emergency contraception. You are not responsible for payment of the medications or medical forensic examination. Transportation to PSARC can be provided by the Philadelphia Police Department.

300 E. Hunting Park Avenue, Philadelphia, PA 19124
215-800-1589

### c.  CONFIDENTIAL RESOURCES:

The following resources maintain confidentiality for notice received within their confidential roles. Generally, any information disclosed to the resources listed below will be held in confidence unless the individual sharing the information gives their consent to the disclosure of that information.

Confidential resources are not obligated to share information with the University's Title IX Coordinator and disclosure to a confidential resource does not constitute a report to the University.

**On Campus**:

**Student Counseling Center**: Services at the University Counseling Center are available to all University students, free of cost. Counseling provides a safe, confidential place to talk and discuss varying issues in a private and confidential setting. Therapists in the Counseling Center are trained to assist students impacted by sexual, physical, and emotional abuse, including those students who may have witnessed or have been accused of sexual misconduct.

Gershman Hall 205/206
M-F 11am-1pm (walk in hours)
215-717-6630
counseling@uarts.edu
www.uarts.edu/counseling

**Student Health Services**:

Gershman Hall 306
M-F 9am-5pm
215-717-6230
healthservices@uarts.edu
www.uarts.edu/students/health-services

Case ID: 221002134

**Employee Assistance Program (for employees only)**: All University employees are entitled to use the confidential Employee Assistance Program (EAP). Through EAP, employees can access counseling services via telephone and in-person. University employees can obtain more information about EAP here.

**Off-Campus:**

**Philadelphia Center Against Sexual Violence (formerly known as WOAR):** The Philadelphia Center Against Sexual Violence provides free and confidential individual and group counseling to children and adults who have experienced sexual violence: this includes sexual abuse, sexual assault, rape/date rape, and incest.

1617 John F. Kennedy Blvd., Suite 800
215-985-3333
www.woar.org

**Women Against Abuse:** Women Against Abuse provides a number of services to victims of abuse, including 24-hour emergency safe havens, legal advocacy and representation, long-term housing and supportive services, and more.

100 South Broad Street, Suite 1341, Philadelphia, PA 19110
215-386-1280
www.womenagainstabuse.org

**For more local and national resources, please visit the Title IX Resource Page at** www.uarts.edu/titleix.

## VIII.     SUPPORTIVE MEASURES

Supportive measures are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the Complainant or Respondent before or after the filing of a Formal Complaint or where no Formal Complaint has been filed. Such measures are designed to restore or preserve equal access to the University's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the University community, or deter further acts of harmful behavior.

The University will maintain the privacy of the supportive measures, provided that privacy does not impair the University's ability to provide the supportive measures. The University will act to ensure as minimal an academic impact on the parties as possible, and will implement measures in a way that does not unreasonably burden the other party. Supportive measures may include, but are not limited to:

- Referral to medical and mental health services, including counseling;

37

Case ID: 221002134

- Referral to the Employee Assistance Program;
- Academic accommodations;
- Public Safety escort services;
- No Contact Directives (mutual restrictions on contact between the parties);
- Leaves of absence;
- Changes in campus housing or assistance in finding alternative housing;
- Assistance in arranging for alternative University employment arrangements and/or changing work schedules;
- Student financial aid counseling;
- Safety planning;
- Persona Non Grata orders;
- Transportation accommodations;
- Visa/immigration services (phila.gov/departments/office-of-immigrant-affairs/); or
- Assistance in identifying additional resources including off-campus and community advocacy, support, and services.

The University may provide supportive measures regardless of whether a Complainant seeks to pursue the University's Formal Grievance process. Supportive measures may be requested by both Complainants and Respondents. The University determines which measures are most appropriate on a case-by-case basis.

## IX.    EMERGENCY REMOVAL

The University may determine that it is necessary to remove a Respondent from the University on an emergency basis, if the Respondent poses an immediate threat to the physical health or safety of any student or other individual in the University community, based on the specific allegations raised under this Policy. This risk analysis is performed by the Title IX Coordinator in conjunction with the appropriate University administrators, including but not limited to the Associate Vice President for Human Resources, the Assistant Vice President for Student Services, and/or the Director of Public Safety.

In all cases in which an emergency removal is imposed, the student or employee will be notified of the action and provided with an opportunity to challenge the decision following the removal, and be given the option to meet with the Title IX Coordinator and other appropriate University administrators prior to such action/removal being imposed, or as soon thereafter as reasonably possible, to show cause why the action/removal should not be implemented or should be modified. This meeting is not a hearing on the merits of the allegation(s), but rather is an administrative process intended to determine solely whether the emergency removal is appropriate. When this meeting is not requested in a timely manner, objections to the emergency removal will be deemed waived. A Complainant and their Advisor may be permitted to participate in this meeting if the Title IX Coordinator determines it equitable to do so.

A Respondent may be accompanied by an Advisor of their choice when meeting with the Title IX Coordinator and other appropriate University administrator for the meeting regarding any emergency removal. The Respondent will be given access to a written summary of the basis for

Case ID: 221002134

the emergency removal prior to the meeting to allow for adequate preparation.

The Title IX Coordinator has sole discretion under this policy to implement or stay an emergency removal and to determine the conditions and duration. Violation of an emergency removal under this Policy will be grounds for discipline, which may include expulsion or termination.

The University will implement the least restrictive emergency actions possible in light of the circumstances and safety concerns. At the discretion of the Title IX Coordinator, alternative coursework options may be pursued to ensure as minimal an academic impact as possible on the parties.

The University reserves the right to place a non-student employee respondent on administrative leave even if the emergency removal provision does not apply.

## X.    CONDUCT PROHIBITED BY POLICY

### a.  SEXUAL HARASSMENT

Acts of sexual harassment may be committed by any person upon any other person, regardless of the sex, sexual orientation, and/or gender identity of those involved.  Sexual Harassment, as an umbrella category, includes the actual or attempted offenses of quid pro quo sexual harassment, hostile environment sexual harassment, sexual assault, domestic violence, dating violence, and stalking.

Sexual Harassment is conduct on the basis of sex that satisfies one of the following:

    i.    **Quid Pro Quo Sexual Harassment**:  An employee of the University conditions (implicitly or explicitly) the provision of an aid, benefit, or service of the University on an individual's participation in unwelcome sexual conduct.

    ii.    **Hostile Environment Sexual Harassment**:  Unwelcome conduct, determined by a reasonable person to be so severe, and pervasive, and objectively offensive that it effectively denies a person equal access to the University's educational program or activity.

    iii.    **Sexual Assault:**

        1.    **Sex Offenses, Forcible**: Any sexual act directed against another person, without the consent of the complainant, including instances in which the complainant is incapable of giving consent.

        2.    **Forcible Rape**: Penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the complainant

Case ID: 221002134

3. **Forcible Sodomy**: Oral or anal sexual intercourse with another person, forcibly, and/or against that person's will (non-consensually), or not forcibly or against the person's will in instances in which the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

4. **Sexual Assault with an Object**: The use of an object or instrument to penetrate, however slightly, the genital or anal opening of the body of another person, forcibly, and/or against that person's will (non-consensually), or not forcibly or against the person's will in instances in which the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

5. **Forcible Fondling**: The touching of the private body parts of another person (buttocks, groin, breasts), for the purpose of sexual gratification, forcibly, and/or against that person's will (non-consensually), or not forcibly against the person's will in instances in which the complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

6. **Incest**: Non-forcible sexual intercourse, between persons who are related to each other, within the degrees wherein marriage is prohibited by Pennsylvania law.

7. **Statutory Rape**: Non-forcible sexual intercourse, with a person who is under the statutory age of consent in Pennsylvania.

iv. **Dating Violence**: Violence on the basis of sex committed by a person who is or has been in a social relationship of a romantic or intimate nature with the complainant. The existence of such a relationship shall be determined based on the complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of the definition, dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence.

v. **Domestic Violence**: Violence on the basis of sex committed by a current or former spouse or intimate partner of the complainant, by a person with whom the complainant shares a child in common, or by a person who is cohabitating with, or has cohabitated with, the Complainant as a spouse or intimate partner, or by a person similarly situated to a spouse of the Complainant under domestic or family violence laws of Pennsylvania, or by any other person against an adult or youth Complainant who is protected from that person's acts under the domestic or family violence laws of Pennsylvania.

vi. **Stalking**: Engaging in a course of conduct directed at a specific person that would cause a reasonable person to (a) fear for their safety or the safety of others; or (b) suffer substantial emotional distress.

Case ID: 221002134

**b. OTHER FORMS OF SEX- AND GENDER-BASED MISCONDUCT**:

    **i. Discriminatory Harassment**: Unwelcome conduct based on a person's actual or perceived sex, gender, gender-identity, or sexual orientation, and such conduct unreasonably interferes with, limits, or effectively denies an individual's educational or employment access, benefits, or opportunities by creating a hostile environment. A hostile environment is one that is severe **or** pervasive, **and** objectively offensive. The University does not tolerate discriminatory harassment of any employee, student, visitor, or guest, and the University will act to remedy all forms of harassment when reported, whether or not the harassment rises to the level of creating a "hostile environment" under this section.

    **ii. Sexual Exploitation**: An act or acts of conduct in which a person exploits or takes advantage of another person in a sexual manner without consent. Examples of Sexual Exploitation include, but are not limited to, the following:

        1. Recording (audio or video) or photographing sexual activity without the knowledge and consent of all parties involved
        2. Electronic or printed transmission (posting online, texting, emails, etc.) of sounds or images of sexual activity without the knowledge or consent of all parties involved
        3. Voyeurism (spying on others who are engaged in an intimate or sexual act)
        4. Going beyond consent (having consensual sex but allowing other people to watch without the knowledge of the consenting party)
        5. Prostituting another person
        6. Public indecency (exposing yourself without consent)
        7. Knowingly exposing an individual to a sexually transmittable infection or virus without his or her knowledge.

## XI. SEXUAL HARASSMENT: RELATED DEFINITIONS

As used in the Sexual Harassment offenses listed above, the following definitions and understandings apply:

    **a. Coercion**: Coercion is verbal and/or physical conduct used to compel another individual to engage in sexual activity against their will. Coercion may include a wide range of behaviors, including manipulation, abuse of trust or power, intimidation, or express or implied threats of physical or emotional harm.

    **b. Consent**: Consent is an affirmative, voluntary, and clear communication indicating a willingness to engage in a mutually agreed upon sexual activity. Consent may not be inferred from silence, passivity, lack of resistance or lack of active response. Consent cannot be obtained through the use of coercion or force or by taking advantage of the incapacitation of another person. Consent to engage in sexual activity may be withdrawn by any party at any time. Withdrawal of consent must also be outwardly demonstrated by

Case ID: 221002134

words and/or actions that indicate a desire to end sexual activity. Withdrawal of consent may in some cases be demonstrated through nonverbal conduct alone. Once withdrawal of consent has been clearly expressed, sexual activity must reasonably cease. A previous sexual relationship and/or current relationship with a partner, do not, by themselves, imply consent.

c. **Force**: Force is the use or threat of physical violence or intimidation to overcome an individual's free will to choose whether or not to consent to engage in sexual activity.

d. **Incapacitation:** Incapacitation is a state in which an individual is unable to make an informed and rational decision to engage in sexual activity because the person lacks conscious awareness of the nature of the act or is physically helpless. Engaging in sexual activity with an individual who one knows, or based on the circumstances should reasonably know, to be mentally or physically incapacitated constitutes a violation of this policy. Incapacitation may result from the use of alcohol or drugs, whether voluntary or involuntary, if an individual's level of impairment is such that they are unable to make conscious decisions or are physically helpless. Alcohol and drugs impair a person's decision-making capacity, awareness of consequences, and ability to make informed judgments. It is especially important that anyone engaging in sexual activity be aware of the other person's level of intoxication. Consumption of drugs or alcohol may diminish one's ability to give consent to engage in sexual activity, but being intoxicated or impaired due to consumption of drugs or alcohol is never an excuse for sexual misconduct, and does not diminish one's responsibility to obtain consent.

e. **Substantial Emotional Distress**: Substantial emotional distress is defined as significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

## XII.   RETALIATION

Protected activity under this Policy includes reporting an incident that may implicate this Policy, participating in the Informal Resolution Process or Formal Grievance Process, supporting a Complainant or Respondent, assisting in providing information relevant to an investigation, and/or acting in good faith to oppose conduct that constitutes a violation of this Policy. Acts of alleged retaliation should be reported immediately to the Title IX Coordinator and will be promptly investigated. The University is prepared to take appropriate steps to protect individuals who fear that they may be subjected to retaliation. It is prohibited for the University or any member of the University community to take materially adverse action by intimidating, threatening, coercing, harassing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by law or policy, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this Policy and procedure. Charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX, constitutes retaliation. The exercise of rights protected under the First Amendment does not

Case ID: 221002134

constitute retaliation. Charging an individual with a code of conduct violation for making a materially false statement in bad faith in the course of a grievance proceeding under this Policy and procedure does not constitute retaliation, provided that a determination regarding responsibility, alone, is not sufficient to conclude that any party has made a materially false statement in bad faith.

## XIII.    AMNESTY

The University encourages reporting and seeks to remove any barriers to reporting by making the procedures for reporting transparent and straightforward.  The University recognizes that an individual who has been drinking or using drugs at the time of the incident may be hesitant to make a report or provide information in connection with an investigation under this Policy because of the perceived potential for disciplinary consequences for their own conduct.  When information is uncovered through the Title IX investigative process that involves alcohol or drug usage in violation of the Student Code of Conduct, this information **will not be used** to pursue any disciplinary action for alcohol or drug use, provided that any such violations did not and/or do not place the health or safety of any other person at risk. The University may, however, initiate an educational discussion or pursue other educational remedies regarding alcohol or other drugs.

Student health and safety are of primary concern of the University. As such, in cases of significant intoxication as a result of alcohol or other substance abuse, we encourage individuals to seek medical assistance for themselves or others. Please see the Medical Amnesty Policy in the Student Handbook for more information.

## XIV.    REPORTS INVOLVING MINORS

For purposes of this Policy and relevant law, a child is defined as an individual under the age of 18. Any University employee who has reasonable cause to suspect abuse of a child that the employee has come into contact with during the course of employment must make a report to the Title IX Coordinator, who will facilitate a report to local law enforcement and the Pennsylvania Department of Public Welfare division of Child Welfare Services. This requirement applies to an employee's suspicion of past or present abuse of a person who is a child at the time of the report. All other members of the University community (students, visitors, guests, etc.) are strongly encouraged to report whenever child abuse is suspected.

In the interest of protecting the safety and welfare of a child, any uncertainty about whether reporting is required or whether abuse has actually occurred should always be resolved in favor of making a report. Do not investigate, attempt to obtain proof, or try to solicit information from the child. This responsibility lies with the Pennsylvania Department of Human Services. If the child is in immediate danger, please call 911 immediately.

Employees may submit a report of suspected child abuse directly to the Pennsylvania Department of Human Services by submitting an online report (preferred method) to the Pennsylvania Department of Human Services at www.compass.state.pa.us/cwis or calling Pennsylvania's Child Line at 800-932-0313 (alternative method). Please Note: If you call Childline, you must also

Case ID: 221002134

submit a written report within 48 hours. Once an employee submits a report to the Pennsylvania Department of Human Services, they must then notify the University's Title IX Coordinator by calling (215) 717-6362 or emailing titleix@uarts.edu.

## XV.   FILING A FORMAL COMPLAINT WITH THE UNIVERSITY

Notice or complaints of Sex- and Gender-Based Misconduct may be made using any of the following options:

- File a complaint with, or give verbal notice to, the Title IX Coordinator, Associate Vice President for Human Resources, Assistant Vice President for Student Services, or University President. Such a report may be made at any time by using the telephone number or email address, or by mail to the office address, listed for the Title IX Coordinator or any other official listed.
- Report online, using third party provider EthicsPoint, at www.uarts.ethicspoint.com. A report may be made anonymously through EthicsPoint, however please know that the University may be limited in its ability to respond to a report of prohibited discrimination, harassment, or retaliation without identifying information of all parties involved, and will be excluded from providing the Complainant with supportive measures and options without that individual's name and contact information.

A Formal Complaint means a document filed/signed by the Complainant or signed by the Title IX Coordinator alleging a policy violation by a Respondent and requesting that the University of the Arts investigate the allegation(s). A Complaint may be filed with the Title IX Coordinator in person, by mail, or by electronic mail, by using the contact information in the section immediately above, or as described in this section. As used in this paragraph, the phrase "document filed by a Complainant" means a document or electronic submission (such as by electronic mail or through an online portal provided for this purpose by the University) that contains the Complainant's physical or digital signature, or otherwise indicates that the Complainant is the person filing the Formal Complaint. At the time of filing a Formal Complaint, the Complainant must be participating in or attempting to participate in the education program or activity of the University.

If a Complainant does not wish to make a Formal Complaint, the Title IX Coordinator may determine a Formal Complaint is necessary. The University of the Arts will inform the Complainant of this decision in writing, and the Complainant need not participate in the process further but will receive all notices issued under this Policy.

Nothing in this Policy prevents a Complainant from seeking the assistance of state or local law enforcement alongside the appropriate on-campus process, and the University will assist the Complainant in contacting law enforcement, if requested.

Upon receipt of a Formal Complaint, the University of the Arts will provide the Complainant with information about the option to use the Informal Resolution Process or the Formal Grievance Process, as outlined below.

Case ID: 221002134

The timeframe for the completion of the Formal Grievance Process begins with the filing of a Formal Complaint. The Formal Grievance Process will be concluded within a reasonably prompt manner, and no longer than ninety (90) business days after the filing of the Formal Complaint, provided that the Formal Grievance Process may be extended for a legitimate reason, including but not limited to the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities.

## XVI.    INFORMAL RESOLUTION PROCESS

Informal Resolution can include three different approaches:

- When the parties agree to resolve the matter through an alternative resolution mechanism including but not limited to mediation or restorative practices;
- When the Respondent accepts responsibility for violating this Policy, and desires to accept a sanction and end the resolution process; or
- When the Title IX Coordinator can resolve the matter informally by providing supportive measures to remedy the situation.

To initiate Informal Resolution, a Complainant needs to submit a Formal Complaint, as defined above. If a Respondent wishes to initiate Informal Resolution, they should contact the Title IX Coordinator to so indicate.

It is not necessary to pursue Informal Resolution first in order to pursue the Formal Grievance Process, and any party participating in Informal Resolution can stop the process at any time and begin or resume the Formal Grievance Process.

Prior to implementing Informal Resolution, the University will provide the parties with written notice of the reported misconduct and any sanctions or measures that may result from participating in such a process, including information regarding any records that will be maintained or shared by the University.

The University will obtain voluntary, written confirmation that all parties wish to resolve the matter through Informal Resolution before proceeding and will not pressure the parties to participate in Informal Resolution.

The Respondent may accept responsibility for all or part of the alleged Policy violations at any point during the resolution process. If the Respondent indicates an intent to accept responsibility for all of the alleged misconduct, the formal process will be paused, and the Title IX Coordinator will determine whether Informal Resolution can be used according to the criteria in that section above.

If Informal Resolution is applicable, the Title IX Coordinator will determine whether all parties and the University are able to agree on responsibility, sanctions, and/or remedies. If so, the Title IX Coordinator implements the accepted finding that the Respondent is in violation of University Policy and implements agreed-upon sanctions and/or remedies, in coordination with other

Case ID: 221002134

appropriate administrator(s), as necessary.

This result is not subject to appeal once all parties indicate their written assent to all agreed upon terms of resolution. When the parties cannot agree on all terms of resolution, the Formal Grievance Process will resume at the same point where it was paused.

When a resolution is accomplished, the appropriate sanction or responsive actions are promptly implemented in order to effectively stop the harassment or discrimination, prevent its recurrence, and remedy the effects of the discriminatory conduct, both on the Complainant and the community.

## XVII.   FORMAL GRIEVANCE PROCESS

### a.  JURISDICTION

#### i.   Jurisdiction Under the May 2020 Title IX Final Rule

On May 19, 2020, the U.S. Department of Education issued a Final Rule under Title IX of the Education Amendments of 1972 that mandates a grievance process that this University must follow to comply with the law in these specific covered cases before issuing a disciplinary sanction against a person accused of sexual harassment. *See*, 85 Fed. Reg. 30026 (May 19, 2020). The full text of the Final Rule and its extensive Preamble are available here: http://bit.ly/TitleIXReg.

The Formal Grievance Process will apply for purposes of Title IX when all of the following elements are met, in accordance with the May 2020 Final Rule, and in the reasonable determination of the Title IX Coordinator:

(1) The conduct is alleged to have occurred in the United States; and
(2) The conduct is alleged to have occurred in the education program or activity of the University of the Arts, where the University has control over both the program and the alleged harasser; and
(3) The alleged conduct, if true, would constitute covered Sexual Harassment as defined in section IXa or Other Forms of Sex- and Gender-Based Misconduct as defined in section IXb of this policy; and
(4) The Complainant was participating in or attempting to participate in the University's educational program at the time of the complaint.

If any one of these elements is not met, the Title IX Coordinator will notify the parties that the Formal Complaint is "dismissed for the purposes of Title IX." Each party may appeal this dismissal using the procedure outlined in "Appeals," below.

Upon dismissal for the purposes of Title IX, the Formal Complaint may be reinstated under the Formal Grievance Process pursuant to the section below.

#### ii.   Reinstatement of the Formal Grievance Process

Case ID: 221002134

At the discretion of the Title IX Coordinator, as determined on a case by case basis, the Formal Grievance Process may be reinstated when the following elements are met, irrespective of the location of the alleged conduct:

(1) The conduct is alleged to have occurred between individuals who are current members of the University community;
(2) The alleged conduct has had or can be reasonably predicted to have a continuing negative effect on the University and its students, faculty, visiting faculty, affiliates, staff, contractors, vendors, visitors or guests; and
(3) The alleged conduct, if true, would constitute covered Sexual Harassment as defined in section IXa or Other Forms of Sex- and Gender-Based Misconduct as defined in section IXb of this policy.

If any one of these elements is not met, the Title IX Coordinator will notify the parties that the Formal Complaint is dismissed under the Formal Grievance Process. Each party may appeal this dismissal using the procedure outlined in "Appeals," below.

Additionally, the University of the Arts retains discretion to utilize the Student Code of Conduct, Staff Manual, and/or Faculty Handbook to determine if a violation of such policies have occurred. If so, the University of the Arts will refer the allegations to the appropriate resolution process.

## b. DISCRETIONARY DISMISSAL GROUNDS

The Title IX Coordinator, in consultation with appropriate University administrators, may dismiss the Formal Complaint under the Formal Grievance Process, at any time during the investigation or hearing, if:

(1) A Complainant notifies the Title IX Coordinator in writing that they would like to withdraw the Formal Complaint or any allegations raised in the Formal Complaint; or
(2) The Respondent is no longer enrolled or employed by the University of the Arts; or,
(3) If specific circumstances prevent the University from gathering evidence sufficient to reach a determination regarding the Formal Complaint or allegations within the Formal Complaint.

The Title IX Coordinator will notify the parties that the Formal Complaint is dismissed under the Formal Grievance Process if determined appropriate under the discretionary dismissal grounds. Each party may appeal this dismissal using the procedure outlined in "Appeals," below.

Additionally, the University of the Arts retains discretion to utilize the Student Code of Conduct, Staff Manual, and/or Faculty Handbook to determine if a violation of such policies have occurred. If so, the University of the Arts will refer the allegations to the appropriate resolution process.

## c. NOTICE

### i. Notice of Allegations

Case ID: 221002134

The Title IX Coordinator will draft and provide the Notice of Allegations, containing a notice of the date, time, and location of initial interview, to any party to the allegations under this Policy after the institution receives a Formal Complaint of the allegations. The University will provide sufficient time for the parties to review the Notice of Allegations and prepare a response before any initial interview.

The Title IX Coordinator, in consultation with appropriate University officials, may determine that the Formal Complaint must be dismissed on the grounds identified above, and will issue a Notice of Dismissal. If such a determination is made, any party to the allegations of sexual harassment identified in the Formal Complaint will receive the Notice of Dismissal in conjunction with, or in separate correspondence after, the Notice of Allegations.

### ii.   Ongoing Notice

If, in the course of an investigation, the institution decides to investigate allegations about the Complainant or Respondent that are not included in the Notice of Allegations and are otherwise prohibited under this Policy, the University will notify the parties whose identities are known of the additional allegations by their institutional email accounts or other reasonable means.

The parties will be provided sufficient time to review the additional allegations to prepare a response before any initial interview regarding those additional charges.

### d.  RIGHT TO AN ADVISOR

### i.   Who May Serve as an Advisor

The parties may each have an Advisor of their choice present with them for all meetings and interviews within the resolution process, if they so choose. The parties may select whoever they wish to serve as their Advisor as long as the Advisor is eligible and available.

The Advisor may be a friend, mentor, family member, attorney, or any other individual a party chooses to advise, support, and/or consult with them throughout the resolution process. The parties may choose Advisors from inside or outside of the University community. An Advisor who is chosen from outside of the University community is requested to meet with the Title IX Coordinator to review the Advisor role.

The Title IX Coordinator will also offer to assign a trained Advisor for any party if the party so chooses. Any Advisor provided for a party by the University will be trained by the University and be familiar with the University policy and procedures.

The University may permit parties to have more than one Advisor upon special request to the Title IX Coordinator. The decision to grant this request is at the sole discretion of the Title IX Coordinator and will be granted equitably to all parties.

### ii.   Role of the Advisor

Case ID: 221002134

All Advisors are subject to the same University policies and procedures, whether they are attorneys or not. Advisors are expected to advise their advisees without disrupting proceedings. The Advisor may not make a presentation or represent their advisee during any meeting or proceeding and may not speak on behalf of the advisee to the Investigator(s) or the Hearing Body except during a hearing proceeding, during cross-examination.

The parties are expected to ask and respond to questions on their own behalf throughout the investigation phase of the resolution process. Although the Advisor generally may not speak on behalf of their advisee, the Advisor may consult with their advisee, either privately as needed, or by conferring or passing notes during any resolution process meeting or interview. For longer or more involved discussions, the parties and their Advisors should ask for breaks to allow for private consultation.

Advisors are expected to maintain the privacy of the records shared with them. These records may not be shared with third parties, disclosed publicly, or used for purposes not explicitly authorized by University. The University may seek to restrict the role of any Advisor who does not respect the sensitive nature of the process or who fails to abide by the University's privacy expectations.

Any Advisor who oversteps their role as defined by this Policy will be warned only once. If the Advisor continues to disrupt or otherwise fails to respect the limits of the Advisor role, the meeting will be ended, or other appropriate measures implemented. Subsequently, the Title IX Coordinator will determine how to address the Advisor's non-compliance and future role.

### e. INVESTIGATION

#### i. General Rules of Investigations

The Title IX Coordinator will designate a qualified investigator to perform an investigation of the allegations under a reasonably prompt timeframe after issuing the Notice of Allegations.

The University, and not the parties, has the burden of proof and the burden of gathering evidence, i.e. the responsibility of showing a violation of this Policy has occurred. This burden does not rest with either party, and either party may decide not to share their account of what occurred or may decide not to participate in an investigation or hearing. This does not shift the burden of proof away from the University and does not indicate responsibility.

The University cannot access, consider, or disclose medical records without a waiver from the party (or parent, if applicable) to whom the records belong or about whom the records include information. The University will provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence, (i.e. evidence that tends to prove and disprove the allegations) as described below.

#### ii. Inspection and Review of Evidence

Case ID: 221002134

Prior to the completion of the investigation, the parties will have an equal opportunity to inspect and review the evidence obtained through the investigation. The purpose of the inspection and review process is to allow each party the equal opportunity to meaningfully respond to the evidence prior to conclusion of the investigation.

Evidence that will be available for inspection and review by the parties will be any evidence that is directly related to the allegations raised in the Formal Complaint. It will include any:

(1) Evidence that is relevant, even if that evidence does not end up being relied upon by the institution in making a determination regarding responsibility; and
(2) Inculpatory or exculpatory evidence (i.e. evidence that tends to prove or disprove the allegations) that is directly related to the allegations, whether obtained from a party or other source.

All parties must submit any evidence they would like the investigator to consider prior to when the parties' time to inspect and review evidence begins.

The University will send the evidence made available for each party and each party's Advisor, if any, to inspect and review.

The parties will have ten (10) calendar days to inspect and review the evidence and submit a written response by email to the investigator. The investigator will consider the parties' written responses before revising the Investigative Report.

The University will provide the parties five (5) calendar days after the initial inspection and review of evidence, and before the investigator completes their Investigative Report, to provide additional evidence in response to their inspection and review of the evidence, and then provide the parties five (5) calendar days to inspect, review, and respond to the party's additional evidence through a written response to the investigator. Those written responses will be disclosed to the parties.

Any evidence subject to inspection and review will be available at any hearing, including for purposes of questioning.

The Advisors must agree not to disseminate any of the evidence subject to inspection and review or use such evidence for any purpose unrelated to the Title IX grievance process.

The Advisors must agree not to photograph or otherwise copy the evidence.

### iii.   Investigative Report

The investigator will prepare an Investigative Report that fairly summarizes relevant evidence.

Only relevant evidence (including both inculpatory and exculpatory – i.e. tending to prove and disprove the allegations) will be included in the Investigative Report.

Case ID: 221002134

The investigator may redact irrelevant information from the Investigative Report when that information is contained in documents or evidence that is/are otherwise relevant.

## f.  HEARING

### i.  General Rules of Hearings

The University will not issue a disciplinary sanction arising from the Formal Grievance Process under this Policy without holding a live hearing, unless otherwise resolved through an Informal Resolution process.

The live hearing may be conducted with all parties physically present in the same geographic location, or, at the University's discretion, any or all parties, witnesses, and other participants may appear at the live hearing virtually. The University will use technology that will enable participants simultaneously to see and hear each other. At its discretion, the University may delay or adjourn a hearing based on technological errors not within a party's control.

All proceedings will be recorded through audio recording. That recording will be made available to the parties for inspection and review.

### ii.  Continuances or Granting Extensions

The University may determine that multiple sessions or a continuance (i.e. a pause on the continuation of the hearing until a later date or time) may be needed to complete a hearing. If so, the University will notify all participants and endeavor to accommodate all participants' schedules and complete the hearing as promptly as practicable.

### iii.  Participants in the Live Hearing

All participants in the live hearing are subject to the Rules of Decorum. Live hearings are not public, and the only individuals permitted to participate in the hearing are as follows:

#### 1.  Complainant and Respondent (The Parties)

The parties cannot waive the live hearing, though they are not required to attend. The University may still proceed with the live hearing in the absence of a party and may reach a determination of responsibility in their absence, through admissible and available evidence. Evidence of statements by parties or witnesses cannot be considered if those parties or witnesses do not testify at the hearing. However, a verbal or written statement constituting part or all of the allegation itself is not a statement that must be excluded if the maker of the statement does not submit to questioning about that statement. A statement would not include a document, audio recording, audiovisual reading, and/or digital media, including but not limited to text messages, emails, and social media postings, that constitute the conduct alleged to have been the act of sexual harassment under the formal complaint.

Case ID: 221002134

The University will not threaten, coerce, intimidate, or discriminate against the party in an attempt to secure the party's participation.

If a party or witness does not submit to questioning at the hearing, the Hearing Body cannot rely on any prior statements made by that party or witness in reaching a determination regarding responsibility, but may reach a determination regarding responsibility based on evidence that does not constitute a "statement" by that party or witness.

The Hearing Body cannot draw an inference about the determination regarding responsibility based solely on a party's absence from the live hearing or refusal to answer questions.

### 2. The Hearing Body

The Hearing Body will consist of either a single decision-maker (external to the University); or a hearing panel of three (3) voting panel members, including a Chair.

No member of the Hearing Body will also have served as the Title IX Coordinator, Title IX Investigator, or Advisor to any party in the case, nor may any member of the Hearing Body serve on the Appeals Body in the case.

The Hearing Body will be trained on topics including how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias, issues of relevance and questions, including how to apply the prior sexual history/predisposition protections provided for complainants, any technology to be used at the hearing, the definition of sexual harassment, the scope of the institution's education program or activity, and how to conduct a grievance process.

No member of the Hearing Body will have a conflict of interest or bias in favor of or against complainants or respondents generally, or in favor or against the parties to the particular case. The parties will have an opportunity to raise any objections regarding the Hearing Body's actual or perceived conflicts of interest or bias at the commencement of the live hearing.

### 3. Advisor

Questioning is required during the hearing, but must be conducted by the parties' Advisors. The parties are not permitted to directly question each other or any witnesses. If a party does not have an Advisor for a hearing, the University will appoint a trained Advisor for the limited purpose of conducting any questioning.

A party may reject this appointment and choose their own Advisor, but they may not proceed without an Advisor. If the party's Advisor will not conduct questioning, the University will appoint an Advisor who will do so thoroughly, regardless of the participation or non-participation of the advised party in the hearing itself. Extensive questioning of the parties and witnesses will also be conducted by the Hearing Body during the hearing.

### 4. Witnesses

Case ID: 221002134

Witnesses cannot be compelled to participate in the live hearing, and have the right not to participate in the hearing free from retaliation.

If a witness does not submit to questioning, as described below, the Hearing Body cannot rely on any statements made by that witness in reaching a determination regarding responsibility, including any statement relayed by the absent witness to a witness or party who testifies at the live hearing.

### iv.   Hearing Procedures

For purposes of this section, the "Hearing Chair" refers to either a single decision maker or a member of a panel chosen for that role.

For all live hearings conducted under the Formal Grievance Process, the procedure will be as follows:

- The Hearing Chair (either a single external decision maker or the Chair, as described above) will open and establish rules and expectations for the hearing;
- The parties will each be given the opportunity to provide opening statements;
- The Hearing Body will ask questions of the parties and witnesses;
- Parties will be given the opportunity for questioning after the Hearing Body conducts its initial round of questioning. During the Parties' questioning, the Hearing Chair will have the authority to pause questioning at any time for the purposes of asking the Hearing Body's own follow up questions; and any time necessary in order to enforce the established rules of decorum.

### v.   Questioning Procedure

Each party's Advisor will conduct questioning of the other party or parties and witnesses. During questioning the Advisor will ask the other party or parties and witnesses relevant questions and follow-up questions, including those challenging credibility directly, orally, and in real time.

Before any question is answered, the Hearing Chair will determine if the question is relevant. Questions that are duplicative of those already asked, including by the Hearing Chair, may be deemed irrelevant if they have been asked and answered. Abusive questions may be deemed irrelevant as well.

### vi.   Review of Recording

The recording of the hearing will be available for review by the parties during the timeframe of the appeal, unless there are any extenuating circumstances. The recording of the hearing will not be provided to parties or advisors.

### g.   DETERMINATION OF RESPONSIBILITY

Case ID: 221002134

### i.   Standard of Proof

The University uses the preponderance of the evidence standard for investigations and determinations regarding responsibility of Formal Complaints covered under this Policy. This means that the investigation and hearing determines whether it is more likely than not that a violation of the Policy occurred.

### ii.   General Considerations for Evaluating Testimony and Evidence

While the opportunity for questioning is required in all hearings under the Formal Grievance Process, determinations regarding responsibility may be based in part, or entirely, on documentary, audiovisual, and digital evidence, as warranted in the reasoned judgment of the Hearing Body.

The Hearing Body shall not draw inferences regarding a party or witness' credibility based on the party or witness' status as a Complainant, Respondent, or witness, nor will it base its judgments in stereotypes about how a party or witness would or should act under the circumstances.

Generally, credibility judgments should rest on the truthfulness of the party or witness, the plausibility of their testimony, the consistency of their testimony, and its reliability in light of corroborating or conflicting testimony or evidence.

Credibility judgments should not rest on whether a party or witness' testimony is non-linear or incomplete, or if the party or witness is displaying stress or anxiety.

Both inculpatory and exculpatory (i.e. tending to prove and disprove the allegations) evidence will be weighed in equal fashion.

Parties may call "expert witnesses." The University does not provide for expert witnesses in other proceedings. The expert witness will be allowed to testify and be questioned, and their testimony evaluated accordingly.

Parties may call character witnesses to testify, though their testimony must be relevant to the complaint.

The University will admit and allow relevant testimony regarding polygraph tests ("lie detector tests") and other procedures that are outside of standard use in academic and non-academic conduct processes.

Where a party or witness' conduct or statements demonstrate that the party or witness is engaging in retaliatory conduct, including but not limited to witness tampering and intimidation, the Hearing Body may draw an adverse inference as to that party or witness' credibility.

### iii.   Components of Determination Regarding Responsibility

Case ID: 221002134

The written Determination Regarding Responsibility will be issued simultaneously to all parties through their institution email account, or other reasonable means as necessary. The Determination will include:

- Identification of the allegations potentially constituting prohibited conduct under this Policy;
- A description of the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;
- Findings of fact supporting the determination;
- Conclusions regarding which section of the Policy if any, the Respondent has or has not violated.
- For each allegation:
  - A statement of, and rationale for, a determination regarding responsibility;
  - A statement of, and rationale for, any disciplinary sanctions the University of the Arts imposes on the respondent; and
  - A statement of, and rationale for, whether remedies designed to restore or preserve equal access to the University of the Arts's education program or activity will be provided by the University of the Arts to the Complainant; and
- When the determination is considered by the institution to be final, and any changes to the determination that could occur prior to finalization.
- The University's procedures and the permitted reasons for the Complainant and Respondent to appeal (described below in "Appeal").

### iv.   Timeline of Determination Regarding Responsibility

If there are no extenuating circumstances, the determination regarding responsibility will be issued by the University within ten (10) calendar days of the completion of the hearing.

### h.  SANCTIONS

Factors considered when determining a sanction may include, but are not limited to:

- The nature, severity of, and circumstances surrounding the violation(s)
- The Respondent's disciplinary history
- The need for sanctions/responsive actions to bring an end to the discrimination, harassment, and/or retaliation
- The need for sanctions/responsive actions to prevent the future recurrence of discrimination, harassment, and/or retaliation
- The need to remedy the effects of the discrimination, harassment, and/or retaliation on the Complainant and the community
- The impact on the parties
- Any other information deemed relevant by the Hearing Body

The sanctions will be implemented as soon as is feasible, either upon the outcome of any appeal or

Case ID: 221002134

the expiration of the window to appeal without an appeal being requested.

The sanctions described in this policy are not exclusive of, and may be in addition to, other actions taken or sanctions imposed by external authorities.

**i.   Student Sanctions:**

Sanctions may include, but are not limited to, the following:

- **Warning**: A written notification that a violation of the Student Code of Conduct occurred and that any further responsible finding of misconduct may result in more severe disciplinary action. Warnings are typically recorded for internal purposes only and are not considered part of a student's permanent student conduct record. Though disclosed with a student's signed consent, a student who receives a warning is still considered in good standing*.
- **Probation**: A written notification that indicates a serious and active response to a violation of the Student Code of Conduct. Probation is for a designated period of time and includes the probability of more severe sanctions, if found responsible for additional violations of the Student Code of Conduct, including suspension or expulsion from the University. Notification of probation is considered a change in good standing[3] status.
- **Loss of privileges**: Denial of the use of certain University facilities or the right to participate in certain activities, events, programs, or to exercise certain privileges for a designated period of time.
- **Restitution**: A student may be required to make payment to an individual or to the University related to the misconduct for damage, destruction, defacement, theft, or unauthorized use of property.
- **Fines**: The University of the Arts reserves the right to impose fines, as appropriate, in addition to requiring payment for costs resulting from or associated with the offenses.
- **Relocation or removal from (University-operated) housing**: Relocation is the reassignment of a student from one living space to another. Removal from housing is the removal of a student from all University-operated housing. Relocation and removal from housing are typically accompanied by the loss of privileges regarding the visitation to specific residential areas for a specified period of time. The University may take such action for remedial, rather than disciplinary purposes.
- **Revocation of Affiliation**: Revocation of affiliation is the permanent removal of a student as a member of a specific organization and/or the permanent removal of an organization's recognized affiliation with the University.
- **No Contact Directives**: No Contact Directives are directives to students that restrict the contact and/or communication between or among designated parties. No Contact Directives

---

[3] A student is not in good standing when the student has been found responsible for a student conduct policy violation and as a result is serving a sanction of probation, suspension, or expulsion. Students employed as a Resident Assistant or First Year Guide must be in and remain in good standing throughout their employment.

Case ID: 221002134

may be the result of a student conduct process or put in place temporarily. No Contact Directives are not legal protective orders as those are issued by a court of law.

- **Persona Non Grata**: Persona Non Grata prohibits an individual from a specific or all campus property. Violation of a persona non grata may subject the violator to arrest for trespass.
- **Educational/Assessment/Referrals**: The University reserves the right to impose counseling or substance assessments or other required educational sanctions.
- **Suspension**: The separation of a student from the University for a specified period of time, after which the student is eligible to return. Conditions for re-enrollment may be required and will be included in the notification of suspension. During the period of suspension, the student may not participate in University academic or extracurricular activities and may be barred from all property owned or operated by the University. Suspension from the University will result in automatic "W" grades in all classes for the semester in which suspension was sanctioned. Students who are suspended may not be on campus without specific, written permission of the Assistant Vice President for Student Services or designee. Suspension is for a designated period of time and includes the probability of more severe sanctions, including expulsion, if found responsible for violations of the Student Code of Conduct. Notification of suspension will normally be sent to parents, as it results in a change in good standing status.
- **Expulsion**: Expulsion is the permanent separation of the student from the University. Expulsion from the University will result in automatic "W" grades in all classes for the semester in which expulsion was sanctioned. Students who are expelled may not be on campus without specific, written permission of the Assistant Vice President for Student Services or designee. Notification of expulsion will normally be sent to parents/guardians, as it results in a change in good standing status.

The following sanctions, among others, may be imposed upon student groups or organizations:

- **Deactivation:** Loss of privileges, including University recognition, for a specified period of time.

More than one of the above sanctions listed may be imposed for any single violation.
Other than University expulsion, disciplinary sanctions shall not be made part of the student's academic transcript but will become part of the student's permanent record. A student's permanent record is subject to review only by those authorized to request it, such as transfer higher-education institutions and future employers and in other cases when the student initiates the disclosure.

ii.  **Employee Sanctions**

Sanctions may include, but are not limited to, the following:

- **Verbal Warning**: An in-person meeting with the Title IX Coordinator, the Respondent's supervisor or other appropriate administrator, to discuss behavioral expectations and standards for University community members.

Case ID: 221002134

- **Written Warning**: Notice, in writing, that continuation or repetition of prohibited conduct may be cause for additional disciplinary action.
- **Educational Requirements**: Completion of training, projects, programs, or requirements designed to help the employee manage behavior and understand why it was inappropriate. Includes appropriate and relevant community service opportunities.
- **Suspension**: Exclusion from University premises, attending classes, and other privileges or activities for a specified period of time, as set forth in the suspension notice. Notice of this action will remain in the employee's file. Conditions for return to work may be specified in the suspension notice.
- **Termination**: Permanent termination of employment status and exclusion from University premises, privileges, and activities. This action will be permanently recorded in the employee's file.
- **Other discipline** may be imposed instead of, or in addition to, those specified above. More than one of the disciplinary outcomes listed above may be imposed for any single violation.

i. **APPEALS**

Each party may appeal the dismissal of a Formal Complaint or any included allegations and/or a determination regarding responsibility. To appeal, a party must submit their written appeal within five (5) calendar days of being notified of the decision, indicating the grounds for the appeal.

The limited grounds for appeal available are as follows:

- Procedural irregularity that affected the outcome of the matter (i.e. a failure to follow the institution's own procedures);
- New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter;
- The Title IX Coordinator, investigator(s), or decision-maker(s) had a conflict of interest or bias for or against an individual party, or for or against complainants or respondents in general, that affected the outcome of the matter.

The submission of appeal stays any sanctions for the pendency of an appeal. Supportive measures and remote learning opportunities remain available during the pendency of the appeal.

If a party appeals, the University will as soon as practicable notify the other party in writing of the appeal, however the time for appeal will be offered equitably to all parties and will not be extended for any party solely because the other party filed an appeal.

Appeals for matters involving student Respondents will be decided by the Vice President for Enrollment Management and Student Affairs; appeals for matters involving staff Respondents will be decided by the Vice President for Finance and Administration, and appeals for matters involving faculty Respondents will be decided by the Vice President for Academic Affairs. Appeal Officers are free of conflict of interest and bias, and will not serve as investigator, Title IX Coordinator, or on the Hearing Body in the same matter.

Case ID: 221002134

Outcome of appeal will be provided in writing simultaneously to both parties, and include rationale for the decision. The Notice of Appeal Outcome will specify the finding on each ground for appeal, any specific instructions for remand or reconsideration, any sanctions that may result which the University is permitted to share according to state or federal law, and the rationale supporting the essential findings to the extent the University is permitted to share under state or federal law.

## XVIII.   OBLIGATION TO PROVIDE TRUTHFUL INFORMATION

All University community members are expected to provide truthful information in any report or proceeding under this Policy. Knowingly submitting or providing false or misleading information in connection with an alleged Policy violation is prohibited and subject to disciplinary sanctions. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not ultimately substantiated. Nor should a finding of policy violation, alone, be used to support a complaint that that Respondent lied in the resolution process.

## XIX.   STATEMENT OF ACADEMIC FREEDOM

The free expression and study of ideas are essential to the pursuit of a higher education. At times, it will be necessary to consider ideas that some community members may find unpleasant or offensive, for the simple reason that offensive ideas are part of our history and culture. All University community members must be empowered to discuss any topic or idea that is germane to the subject at hand, while at the same time acting as good citizens and participants in a shared endeavor with people of all political and social worldviews and with varied backgrounds. This calls for honest discussion, the asking of questions to clear up misconceptions, and a search for the universal growing from careful examination of the specific contexts of studied works. It calls for treating other community members as human beings with individual sets of experiences and opinions, treating them with dignity, but also extending to them the respect not only of their experiences and opinions, but also of their intellectual curiosity and resilience.

Additionally, this Policy adopts the Statement of Academic Freedom found in the University's Faculty Handbook. Speech that meets the policy definition of sexual harassment, above, is not protected by academic freedom or free speech rights.

## XX. Recordkeeping

University of the Arts will maintain for a period of [at least] seven years records of:

1. Each sexual harassment investigation including any determination regarding responsibility and any audio or audiovisual recording or transcript required under federal regulation;
2. Any disciplinary sanctions imposed on the Respondent;
3. Any remedies provided to the Complainant designed to restore or preserve equal access to the University of the Arts's education program or activity;
4. Any appeal and the result therefrom;
5. Any Informal Resolution and the result therefrom;

Case ID: 221002134

6. All materials used to train Title IX Coordinators, Investigators, Decision-makers, and any person who facilitates an Informal Resolution process. University of the Arts will make these training materials publicly available on University of the Arts' website. (Note: If the University of the Arts does not maintain a website, the University of the Arts must make these materials available upon request for inspection by members of the public.); and

7. Any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment, including:

8. The basis for all conclusions that the response was not deliberately indifferent;

9. Any measures designed to restore or preserve equal access to the University of the Arts's education program or activity; and

10. If no supportive measures were provided to the Complainant, document the reasons why such a response was not clearly unreasonable in light of the known circumstances.

University of the Arts will also maintain any and all records in accordance with state and federal laws.

## XXI. Disabilities Accommodations in the Resolution Process

University of the Arts is committed to providing reasonable accommodations and support to qualified students, employees, or others with disabilities to ensure equal access to the University of the Arts' resolution process.

Anyone needing such accommodations or support should contact the Director of Educational Accessibility or AVP for Human Resources, who will review the request and, in consultation with the person requesting the accommodation and the Title IX Coordinator, determine which accommodations are appropriate and necessary for full participation in the process.

## XXII. Revision of this Policy and Procedures

This Policy and procedures supersede any previous policy(ies) addressing harassment, sexual misconduct, discrimination, and/or retaliation under Title IX and will be reviewed and updated annually by the Title IX Coordinator. The University of the Arts reserves the right to make changes to this document as necessary, and once those changes are posted online, they are in effect.

During the resolution process, the Title IX Coordinator may make minor modifications to procedures that do not materially jeopardize the fairness owed to any party, such as to accommodate summer schedules. The Title IX Coordinator may also vary procedures materially with notice (on the institutional website, with the appropriate effective date identified) upon determining that changes to law or regulation require policy or procedural alterations not reflected in this Policy and procedures.

If government laws or regulations change – or court decisions alter – the requirements in a way that impacts this document, this document will be construed to comply with the most recent government laws or regulations or court holdings.

Case ID: 221002134

This document does not create legally enforceable protections beyond the protection of the background state and federal laws which frame such policies and codes, generally.
This Policy and procedures are effective August 14, 2020.

Case ID: 221002134

# ADVANCING
# **HUMAN**
# **CREATIVITY**



Case ID: 221002134

**<u>VERIFICATION</u>**



*Filed and Attested by the Office of Judicial Records 25 OCT 2022 11:15 am I. LOWELL*

I,  [John K.A. Doe]  , hereby state:

1.    I am the plaintiff in this action.

2.    I verify that the statements made in the foregoing Complaint are true and correct to the best of

       my knowledge, information and belief; and

3.    I understand that the statements in said Complaint are made subject to the penalties of 18 Pa.

       C.S. § 4904 relating to unsworn falsifications to authorities.


Dated: ___10/25/2022_____          [John K.A. Doe]_____
                                                                    Plaintiff