IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN K.A. DOE, | : | |
| | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| THE UNIVERSITY OF THE ARTS, et al., | : | NO. 22-4561 |
| | : | |
| **Defendants.** | : | |

Perez, J.                                                                                                     June 30, 2025

## MEMORANDUM

This case arises from Defendant Daniel Dunn's alleged sexual assault of Plaintiff John K.A. Doe. Defendant Dunn was a professor in the Musical Theatre Department at Defendant The University of the Arts ("the University"). Am. Compl. ¶ 14. Plaintiff was a student. *Id.* ¶ 22. In the fall of 2019, Plaintiff enrolled in a course taught by Defendant Dunn titled "Jazz Dance Practice." *Id.* ¶ 23. By December 2019, Plaintiff and Defendant Dunn began interacting with each other on Instagram. *Id.* ¶ 24. In January or February 2020, Defendant Dunn invited Plaintiff to visit his theatre company in Philadelphia, Pennsylvania. *Id.* ¶ 25. They met at the theatre company in the evening hours, and Defendant Dunn served Plaintiff, who was under the legal drinking age, alcohol. *Id.* ¶ 28.

On a later date, Defendant Dunn invited Plaintiff to his home in Philadelphia. *Id.* ¶ 29. Plaintiff accepted the invitation and met Defendant Dunn at his residence in February or March of 2020. *Id.* ¶ 30. Again, Defendant Dunn served Plaintiff alcohol throughout the evening. *Id.* During a discussion about the film The Wizard of Oz, Defendant Dunn invited Plaintiff into his bedroom to watch the movie. *Id.* ¶ 31. While watching the movie, Plaintiff was in and out of consciousness

and unable to control his faculties. *Id.* He recalls Defendant Dunn taking his shirt off, seeing the movie on the television, and seeing Defendant Dunn perform oral sex on him. *Id.* Plaintiff woke up the next day in Defendant Dunn's bed. *Id.* ¶ 33. When he attempted to leave, he felt unwell and struggled to walk. *Id.* At approximately 4:36 p.m., Defendant Dunn privately messaged Plaintiff on Instagram: "How was your slumbbbber?" *Id.* ¶ 34. Plaintiff responded: "I think I just got sober. I did not mean to drink that much so I apologize greatly for that." *Id.* The two did not see each other again outside of class. *Id.* ¶ 36.

On April 30, 2020, Plaintiff was hospitalized and diagnosed with syphilis. *Id.* ¶ 38. Shortly thereafter, Plaintiff sent Defendant Dunn a private message on Instagram, informing him of his diagnosis and stating that Defendant Dunn was the last person with whom he was sexually active. *Id.* ¶ 39. Defendant Dunn responded: "To be completely transparent, to my knowledge nothing happened between us that would have caused any type of contraction in that way. Also, I am fully tested regularly and was tested prior to us hanging out and after and have received negative results both times. I will certainly get tested again, and I am sorry you had to go through that. Thank you for the heads up." *Id.* ¶ 40.

On May 13, 2020, Plaintiff emailed Defendant Kathryn Donovan, the Head of the Musical Theatre Department at the University and requested to speak with her. *Id.* ¶ 64. Later that evening, Plaintiff spoke with Defendant Donovan and informed her that Defendant Dunn invited him to his home, supplied him with alcohol, and then performed oral sex on him without his consent. *Id.* Plaintiff also reported that Defendant Dunn gave him syphilis. *Id.* Defendant Donovan told Plaintiff that she would "take care of things" by writing a statement based on their conversation, then she would send it to Plaintiff for his review. *Id.* ¶ 65.

After not receiving the written statement, Plaintiff followed up with Defendant Donovan on June 12. *Id.* ¶ 67. On June 15, 2020, Defendant Donovan wrote to Plaintiff: "I have moved ahead with my plan to change the hiring for fall to reflect our conversation and will be putting an anonymous note on the file . . . . Sending you warmth and love and in a few weeks look for a statement for you to approve from me that will go on the official file." *Id.* ¶ 68. Defendant Donovan did not provide Plaintiff a written statement for review. *Id.* ¶ 69. Feeling as though the University failed him, Plaintiff took a leave of absence during the fall 2020 semester. *Id.* ¶ 71.

Plaintiff followed up with Defendant Donovan again on September 22, 2020. *Id.* ¶ 67. That same day, Defendant Donovan responded to Plaintiff: "many GENUINE apologies. there are so many things right now that put a big delay on that note, and it is very important to me. I will reach back this week with more information. thank you for reminding me." *Id.* ¶ 72. Having still not received the written statement, Plaintiff followed up with Defendant Donovan on October 4 and October 6. *Id.* ¶ 67. On October 6, 2020, Defendant Donovan replied:

> Please write a statement that you would like for me to have on file to cover the information that we discussed this summer. I have a large number of responses to your email and I would rather respond than react, so I will keep this short. As you know, I have long since terminated the employment of this individual, not to be employed again. With the departure of the Theatre Dean and the university's Title IX Coordinator, there is not in this interim semester a person to whom I would directly report the incident to carry out a trial or legally approach the matter. It was my understanding, though, from our conversation that you were interested in avoiding such an arrangement. Which means that I am left as the superior of this individual and this position, and I have terminated their employment.

*Id.* ¶ 73.

On October 7, 2020, Defendant Donovan informed Plaintiff that she would speak with the University's Title IX office. *Id.* ¶ 74. She further stated that she conducted her own research to determine the appropriate process for handling complaints under Title IX. *Id.* That same day, Defendant Donovan reported the incident to the University's Title IX coordinator. *Id.* ¶ 83. On

October 8, 2020, the University's Assistant Vice President for Student Services Student Affairs contacted Plaintiff and provided resources regarding the Title IX process. *Id.* ¶ 84. On October 12, the investigator handling the Title IX investigation contacted Plaintiff. *Id.* ¶ 85. On October 14, 2020, Plaintiff had his first interview with the Title IX investigator. *Id.* ¶ 86.

Throughout the investigation, the University refused to provide Plaintiff with information regarding Defendant Dunn's employment status. *Id.* ¶ 95. Neither Defendant Donovan nor the University (together, "the University Defendants") informed Plaintiff of his rights under Title IX, including, *inter alia*, his right to request reasonable accommodations so he could continue his education. *Id.* ¶ 96. Plaintiff withdrew from the University in January 2021. *Id.* ¶ 99. On July 29, 2021, the Title IX hearing was held, and it was determined that Defendant Dunn violated several university policies. *Id.* ¶ 106. Defendant Dunn was employed with the University throughout the 2020/2021 academic year. *Id.* ¶ 109.

As a result of the foregoing, Plaintiff filed a twelve-count amended complaint on December 19, 2022. Against the University, Plaintiff brings Title IX, breach of contract, negligence, and intentional tort claims. Against Defendant Donovan, Plaintiff brings breach of contract and negligence claims. Against Defendant Dunn, Plaintiff brings a negligence claim and an assault and battery claim. In response to the amended complaint, Defendant Dunn filed an answer. The University Defendants filed a motion to dismiss, which is presently before the Court.

I.   **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In deciding a Rule 12(b)(6) motion, courts must accept all well-pleaded allegations as true and draw reasonable inferences in favor of the nonmovant. *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). A claim is facially plausible when the plaintiff pleads

factual content that allows the court to reasonably infer the defendant's liability. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). However, courts need not accept "conclusory factual allegations or legal assertions." *In re Asbestos Prods. Liab. Litig.*, 822 F.3d 125, 133 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 678–79).

## II. DISCUSSION

The Court begins its analysis by addressing two threshold issues—res judicata and the statute of limitations. It then proceeds to the merits, addressing the Title IX, breach of contract, negligence, and intentional tort claims. Finally, the Court considers whether Plaintiff's demands for punitive damages should be stricken.

### A. Threshold Issues

The res judicata doctrine "precludes the parties or their privies from relitigating issues that were or could have been raised in" a previous action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). As such, the doctrine applies when there is "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008). The University Defendants argue that res judicata bars Plaintiff's claims because the Philadelphia Court of Common Pleas already dismissed a previous action Plaintiff brought involving the same parties and the same underlying subject matter. The issue, however, is that the previous action was dismissed *without prejudice*. "Pennsylvania courts have 'interpreted the phrase "without prejudice" as importing the contemplation of further proceedings.'" *Draper v. Darby Twp. Police Dep't*, 777 F. Supp. 2d 850, 855 (E.D. Pa. 2011). When an action is dismissed without prejudice, "the judicial act done is not intended to be res judicata of the merits of the controversy." *Id.* Therefore, there is no final judgment on the merits. The res judicata doctrine does not apply.

Next, the University Defendants argue that the statute of limitations bars Plaintiff's Title IX claims. Plaintiff filed his initial complaint on October 25, 2022. According to the University Defendants, any claims must have occurred after October 25, 2020, but Plaintiff's alleged sexual assault occurred between February and March of 2020. When there is no federal statute of limitations, federal courts look to state law in deciding the timeliness of a plaintiff's cause of action. *Hardin v. Straub*, 490 U.S. 536, 538 (1989). Because Title IX does not contain a statute of limitations, the Parties agree that Pennsylvania's personal injury two-year statute of limitations applies to the Title IX claims. Mot. at 8; Opp. at 9.

When federal courts borrow a forum state's statute of limitations, they must also incorporate the forum state's tolling rules. *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 422 (3d Cir. 2005). Pennsylvania has a minority tolling statute that gives victims of sexual abuse between the ages of 18 and 24 until they reach 30 years of age to commence an action for damages stemming from the sexual abuse. 42 Pa. Cons. Stat. § 5533(b)(2)(i.1). This Court joins the others in this circuit that have applied the minority tolling statute to Title IX claims.[1] *See, e.g.*, *Doe v. E. Stroudsburg Univ. of Pa.*, 2023 WL 7548028, at *4 (M.D. Pa. Nov. 13, 2023); *J.C. v. Greensburg-Salem Sch. Dist.*, No. 19-1683, 2019 WL 3845749, at *11 (W.D. Pa. Aug. 15, 2019); *K.E. Dover Area Sch. Dist.*, No. 1:15-CV-1634, 2017 WL 4347393, at *4–5 (M.D. Pa. Sept. 29, 2017). The parties do not dispute that Plaintiff was between the ages of 18 and 24 at the time of the alleged sexual abuse. As such, his Title IX claims are timely under Pennsylvania law.

**B. Title IX Claims**

---

[1] The Court understands that whether 42 Pa. Cons. Stat. § 5533, as amended in 2019, constitutes a "specialized statute of limitation" that does not apply to federal claims is a question before the Third Circuit. However, as the law stands as of the date of this opinion, the Court concludes that Section 5533 is a tolling statute that applies to Title IX claims.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A university may be held liable under Title IX for teacher-on-student sexual abuse if the university had actual notice of the abuse and exhibited deliberate indifference. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Actual notice must be given to "an appropriate person"—that is, an official "with authority to take corrective action to end the discrimination." *Id.* Deliberate indifference is established where "an official who is advised of a Title IX violation refuses to take action to bring the [university] into compliance." *Id.*

Plaintiff brings pre-assault and post-assault Title IX claims against the University. Pre-assault claims "involve[] a school's failure to anticipate and prevent a sexual assault." *Doe v. N. Penn Sch. Dist.*, 636 F. Supp. 3d 519, 527 (E.D. Pa. 2022). Post-assault claims "involve[] the school's failure to respond properly to a sexual assault after it occurred and had been reported." *Id.*

### 1. Pre-Assault Claim

The University argues that the pre-assault claim fails because Plaintiff has not plausibly alleged that the University had actual knowledge of Defendant Dunn committing sexual assaults prior to the incident with Plaintiff. "An educational institution has 'actual knowledge' if it is aware of known acts of discrimination." *C.K. v. Wrye*, 751 F. App'x 179, 184 (3d Cir. 2018); *see also Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005). The "mere 'possibility' that a teacher is behaving inappropriately with a student" is not enough. *Id.* Instead, the known acts of discrimination must alert the school "that a specific teacher poses a substantial danger to a student." *Id.* Plaintiff's allegations, even when viewed in a light most favorable to him, do not demonstrate

actual knowledge. Plaintiff pleads "[u]pon information and belief" that "an appropriate person" had "notice of sexual assault, battery, molestation, and harassment committed by Defendant Dunn prior to Plaintiff's sexual assault." FAC ¶ 193 (emphasis added). Plaintiff also pleads that the University and Defendant Donovan "knew that there were complaints about Defendant Dunn's inappropriate interactions with students, but nonetheless allowed Defendant Dunn to continue to be employed for" the University. *Id.* ¶ 55.

These conclusory allegations do not include *facts* that allow this Court to infer that the University had actual notice or knowledge of Defendant Dunn engaging in prior assaults. There are no supporting facts suggesting anything more than "a mere possibility" of inappropriate behavior. Plaintiff does not allege when these prior assaults took place, when the University became aware of the prior assaults, or even how the University became aware of the prior assaults. Indeed, in his response to the motion to dismiss, Plaintiff falls just short of conceding that his pre-assault claim is insufficient at this time. *See generally* ECF No. 15 at 17 (acknowledging that "this claim may not have accrued as of yet."). Naked allegations, without supporting facts, are insufficient to state a claim. *Hassen v. Gov't of Virgin Islands*, 861 F.3d 108, 116 (3d Cir. 2017). For this reason, Plaintiff's pre-assault Title IX claim is dismissed without prejudice.

### 2. Post-Assault Claim

With respect to the post-assault claim, the Parties disagree on which standard should apply. Plaintiff argues that the standard set forth in *Wamer v. Univ. of Toledo*, 27 F.4th 461 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 444 (2022), should apply because this case involves a teacher-on-student sexual assault claim. Defendants urge this Court to apply the standard articulated in *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), which traditionally governs student-on-student claims. Under *Davis*, the University's deliberate indifference must "at a minimum, cause students

to undergo harassment or make them liable or vulnerable to it." *Id.* at 644. Under *Wamer*, the University's deliberate indifference must only cause the plaintiff to "suffer discrimination." *Wamer*, 27 F.4th at 471. *Wamer* eliminated the requirement for a post-notice incident of harassment because in teacher-on-student harassment cases, "a school quite obviously 'subjects' its students to harassment and discrimination when it fails to respond to harassment by its agent." *Id.* at 470.

    *Wamer* is not the only court that declined to apply the *Davis* standard to teacher-on-student claims. *See, e.g.*, *Sauls v. Pierce Cnty. Sch. Dist.*, 399 F.3d 1279, 1284 (11th Cir. 2005) (rejecting *Davis* for a teacher-on-student claim); *N.N. v. N. Burlington Cnty. Reg'l Sch. Dist.*, No. 23-1280, 2023 WL 9017175, at *5 n.5 (D.N.J. Dec. 29, 2023) ("Because Plaintiff's claims are based on teacher-student discrimination—not discrimination by a third party, such as peers—*Davis* is inapplicable."); *Moeck v. Pleasant Valley Sch. Dist.*, 983 F. Supp. 2d 516, 530 (M.D. Pa. 2013) ("*Davis* is not on point, however, because that case dealt with student on student harassment, not teacher on student sexual harassment."). This Court will follow suit.

    The *Davis* court acknowledged that "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a system effect on a program or activity." *Davis*, 526 U.S. at 653. "When a teacher sexually harasses a student, it can more easily be presumed that the harassment would undermine and detract from the student's educational experience because teachers are at the core of a student's access to and experience of education." *Wamer*, 27 F.4th at 471 (cleaned up). Accordingly, it is appropriate that a less stringent standard apply in teacher-on-student harassment cases.

Under *Wamer*, to state a post-assault Title IX claim, a plaintiff must plausibly plead that "(1) [he] was sexually harassed by a teacher or professor, (2) an official with authority to take corrective action had actual notice of the harassment, (3) the school's response was clearly unreasonable, and (4) the school's deliberate indifference caused her to suffer discrimination." *Id*. The University argues that Plaintiff has not sufficiently pled deliberate indifference. To satisfy the deliberate indifference element, Plaintiff must show that following the school's unreasonable response, he either (1) experienced an additional instance of harassment, or (2) had an objectively reasonable fear of further harassment that caused him to take specific reasonable actions to avoid harassment. *Id*.

Plaintiff's allegations satisfy these requirements. On May 13, 2020, Plaintiff reported the sexual assault to Defendant Donovan who, in turn, failed to immediately inform the University's Title IX coordinator and failed to properly advise Plaintiff of his rights under Title IX. FAC ¶¶ 64-76. Defendant Donovan assured Plaintiff she would "take care of things," but failed to report the incident to the Title IX office until October 7, 2020. *Id*. ¶¶ 65, 80. Plaintiff followed up with Defendant Donovan several times between May 13, 2020 and October 6, 2020; however, "no interim support and/or protective measured were discussed with or provided to Plaintiff prior to the start of the fall 2020 semester." *Id*. ¶¶ 67, 70. Plaintiff alleges that this failure to provide the required support and protective measures caused him to take a leave of absence during the fall 2020 semester. *Id*. ¶ 71.

The University commenced its investigation shortly after Defendant Donovan reported the assault to the Title IX coordinator. *Id*. ¶ 83. However, despite repeated requests, the University did not provide Plaintiff with any information regarding the status of Defendant Dunn's employment. *Id*. ¶ 95. On July 29, 2021, fourteen months after Plaintiff initially reported the sexual assault, a

Title IX hearing was held and it was determined that Defendant Dunn violated university policy. *Id.* ¶ 106. Plaintiff alleges that Defendant Dunn was employed with the University throughout the 2020-2021 academic year. *Id.* ¶ 109. These allegations demonstrate that Plaintiff had an objectively reasonable fear of future harassment, and this fear caused him to take a leave of absence. This Court has no question that Plaintiff's post-assault allegations "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### C. Breach of Contract Claim

Plaintiff brings a breach of contract claim against the University Defendants. Specifically, Plaintiff claims that the University's Student Handbook ("the Handbook") and the Sexual and Gender-Based Violence, Discrimination, Exploitation, Stalking and Harassment Policy ("Harassment Policy") establish the contract between him and the University Defendants, and the University Defendants breached that contract. To prevail on a breach of contract claim under Pennsylvania law, Plaintiff must plead "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

In Pennsylvania, "the relationship between a private educational institution and an enrolled student is contractual in nature." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999). The contract's terms include "the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Id.* To be enforceable, the contract's terms must be sufficiently definite. *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011). A plaintiff's breach of contract claim fails if the

"allegations [do not] relate to a specific and identifiable promise that the school failed to honor." *Id.* For example, courts have held that general policy statements that are aspirational in nature are not enforceable. *Id.* In *Vurimindi*, the plaintiff based his breach of contract claim on the university's mission statement, diversity statement, and anti-harassment policy. *Id.* These policy statements declared the university's desire to provide "the highest quality education," explained that it "appreciates and values differences," and expressed that "harassment is unacceptable." *Id.* The court concluded that these statements were not sufficiently definite to create an enforceable contract. *Id.* at 134.

In contrast, policy provisions that "guarantee[] a right to specific types of investigation, support, or sanctions in the event that a student experiences offensive and unwelcome conduct" are sufficiently definite to be enforceable. *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 560 (E.D. Pa. 2016). In *Doe v. Abington Friends School*, the plaintiff brought a breach of contract action against their school based on its failure to comply with its bullying and harassment policy contained within the student handbook. No. 22-0014, 2022 WL 16722322, at *4 (E.D. Pa. Nov. 4, 2022). In holding that the policy was enforceable, the court noted that "the reporting and investigation procedures [were] couched in mandatory language." *Id.* The policy instructed students who believe they were bullied to promptly notify an adult at the school. *Id.* The policy then explained that after receiving the complaint, "the adult will refer the complaint" and "the school will initiate a prompt investigation." *Id.* Because this policy contained a "contractual promise to promptly investigate bullying and harassment complaints," it was sufficiently definite to constitute an enforceable contract. *Id.* at *5.

Here, the Handbook and Harassment Policy contain sufficiently definite terms to be enforceable. The Handbook explicitly states that "All faculty . . . at The University are required to

report incidents of sexual misconduct to The University's Title IX Coordinator." Am. Compl. ¶ 207. The Harassment Policy also explicitly states that "All University employees . . . are mandated to report any incidents of misconduct under this Policy to the University's Title IX Coordinator." *Id.* ¶ 208. In addition to this mandatory language, the policies set forth the process employees and the University are required to follow when handling reports of sexual misconduct and harassment. *Id.* at 207-08. Plaintiff alleges that the University Defendants breached the promises made in these policies by, *inter alia*, failing to take immediate action when Plaintiff reported his sexual assault to Defendant Donovan and by failing to properly handle his Title IX complaint or inform him of his rights. Because Plaintiff's allegations directly relate to the specific promises set forth in the Handbook and Harassment Policy, and Plaintiff alleges that the University Defendants did not adhere to those promises, Plaintiff has plausibly alleged that an enforceable contract was breached.

With respect to damages, University Defendants argue that Plaintiff's request for emotional damages should be stricken. Damages for emotional distress are not recoverable in breach of contract claims unless the emotional distress is accompanied by physical injury or "the breach is of such a type that serious emotional disturbance is a particularly likely result." *Rittenhouse Regency Affiliates v. Passen*, 482 A.2d 1042, 1043 (Pa. Super. Ct. 1984). Plaintiff alleges that the University Defendants' breach caused "the exacerbation and/or aggravation of a pre-existing eating disorder resulting in malnutrition and malnourishment." Am. Compl. ¶ 214. Neither party presents case law discussing whether such injuries are sufficient to recover emotional damages based on the circumstances of this case.[2] Without more, the Court declines to preclude the recovery

---

[2] The University Defendants cite case law in the intentional infliction of emotional distress context. This claim, however, is for breach of contract.

of damages for emotional distress at this stage of the litigation. As such, the breach of contract claim survives dismissal in its entirety.

        **D.**        **Negligence Claims**

The University Defendants move to dismiss the negligence claims on the grounds that they are barred by the gist of the action doctrine and otherwise fail to state a claim.

The gist of the action doctrine "bars claims for allegedly tortious conduct where the gist of the conduct sounds in contract rather than tort." *Nat'l Fire Ins. Co. of Hartford v. Johnson Controls Fire Prot. LP,* No. 18-5379, 2019 WL 4014405, at *3 (E.D. Pa. Aug. 23, 2019) (internal quotations omitted). "The purpose of the doctrine is to preclude plaintiffs from re-casting ordinary breach of contract claims into tort claims." *Id.* (cleaned up). "Although a breach of contract can give rise to an actionable tort, 'to be construed as in tort . . . the wrong ascribed to defendant must be the gist of the action, the contract being collateral.'" *Quandry Sols., Inc. v. Verifone Inc.*, No. 07-097, 2007 WL 655606, at *2 (E.D. Pa. Mar. 1, 2007) (quoting *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992)).

"When distinguishing between tort and breach of contract claims at the motion to dismiss stage, the determinative factor is 'the nature of the duty alleged to have been breached' as plead by the plaintiff." *Wartluft v. Milton Hershey Sch.*, 354 F. Supp. 3d 584, 591 (M.D. Pa. 2018) (quoting *Bruno v. Erie Ins. Co.*, 106 A.2d 48, 68 (2014)). If the duty is derived from the terms of the parties' contract, then the claim is contractual in nature. *Id.* On the other hand, if the duty derives from the defendant's "broader social duty owed to all individuals," then the claim shall be considered a tort. *Id.* Plaintiff alleges that the University Defendants had a duty to "exercise ordinary care to ensure an educational environment free of sexual assault," to "exercise ordinary care in the handling of Plaintiff's complaint of sexual assault," and that the University had a duty

to train all employees on university policy and the "appropriate steps to take when a title IX report of sexual assault is reported by a student." Am. Compl. ¶¶ 222-23, 235. These duties, however, are rooted in the Handbook and Harassment policy, rather than some external duty of care.

"The relationship between a privately funded college and a student has traditionally been defined in this Commonwealth as strictly contractual in nature." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007). As such, it is no surprise that "plaintiff fails to point to any caselaw indicating that a private university owes these specific duties to its students under Pennsylvania negligence law." *Harris v. Saint Joseph's Univ.*, No. 13-3937, 2014 WL 1910242, at *6 (E.D. Pa. May 13, 2014) (quoting *Reardon*, 926 A.2d at 487). For these reasons, the Court concludes that Plaintiff's negligence claims sound in contract, not tort. The negligence claims are therefore barred by the gist of the action doctrine.

### E.      Intentional Tort Claims

Plaintiff also brings claims for intentional infliction of emotional distress ("IIED") and assault and battery against the University. Specifically, Plaintiff alleges that the University is vicariously liable for the intentional torts of Defendant Dunn.[3]

An employer may be held liable for the intentional torts, or even criminal acts, of its employees if the "acts were committed during and within the scope of the employment." *Nelson v. Loftus*, No. 17-3247, 2019 WL 175127, at *2 (E.D. Pa. Jan. 11, 2019). Conduct falls within the

---

[3] In his opposition to the motion to dismiss, Plaintiff argues that these claims are also based on Defendant Donovan's behavior. Plaintiff, however, pleads no facts suggesting Defendant Donovan committed assault and battery or intentional infliction of emotion distress. Under each of these counts, the amended complaint makes a single passing reference to Defendant Donovan, stating that "[t]he aforementioned negligent, grossly negligent, careless, intentional, reckless, and/or other liability producing acts and/or omissions Defendants Donovan and Dunn occurred while acting within the course and scope of their employment with the University, . . . ." Am. Compl. ¶ 280. In contrast, the *factual* allegations set forth under each count relate solely to Defendant Dunn's behavior.

scope of employment if it (1) is of a kind and nature that he is employed to perform; (2) occurs substantially within the authorized time and space limits designated by his employer; (3) is driven by a desire to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer." *Id.* (quoting *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998)). "[A]n assault committed by an employee upon another individual for personal reasons or in an outrageous manner is not 'actuated by an intent to perform the business of the employer' and falls outside the scope of employment" as a matter of law. *Id.* (quoting *Costa*, 708 A.2d at 493). Therefore, Defendant Dunn's assault and battery of Plaintiff falls outside the scope of his employment as a matter of law, mandating dismissal of the assault and battery claim against the University.

Similarly, "where an employee commits an act 'encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law." *Costa*, 708 A.2d at 493. In support of the IIED claim, Plaintiff pleads that the University "authorized and encouraged" its employees to spend time with students outside of the university setting, and that Defendant Dunn spent time at his residence with Plaintiff. Am. Compl. ¶ 276-77. While at Defendant Dunn's home, Defendant Dunn served Plaintiff alcohol "and after Plaintiff passed out and while Plaintiff was in and out of consciousness unable to control his faculties, Dunn sexually assaulted Plaintiff." *Id.* ¶ 278. Sexually assaulting Plaintiff is not the type of work Defendant Dunn, a professor, was employed to perform. *See id.* ¶ 14. Furthermore, the sexual assault occurred at Defendant Dunn's residence—not substantially within employment-related time and space limits. Sexually assaulting Plaintiff could not plausibly be actuated by a purpose to serve the University, and a professor sexually assaulting a student is not expectable by the University. As Plaintiff pleads, Defendant Dunn's alleged behavior "constitutes extreme and/or

outrageous behavior." *Id.* ¶ 278. As a result, his conduct falls outside the scope of his employment, and the IIED claim must be dismissed as well.

### F. Punitive Damages

Finally, the University Defendants argue that Plaintiff's demands for punitive damages should be stricken. Only the post-assault Title IX claim and breach of contract claim remain. The Supreme Court has stated that "punitive damages, unlike compensatory damages and injunction, are generally not available for breach of contract." *Barnes v. Gorman*, 536 U.S. 181, 187 (2002). Because "Title IX's contractual nature has implications for our construction of the scope of available remedies," the court also held that punitive damages are not available in Title IX actions. *Id.* As such, Plaintiff's demands for punitive damages are stricken.

### III. CONCLUSION

For the aforementioned reasons, the University Defendants' motion to dismiss is granted in part and denied in part. It is granted to the extent it seeks to dismiss the pre-assault Title IX claim, negligence claims, and intentional tort claims. It is denied to the extent it seeks to dismiss the post-assault Title IX claim and breach of contract claim. An appropriate order follows.